Robert F. McCauley (SBN 162056)
robert.mccauley@finnegan.com
Arpita Bhattacharyya (SBN 316454)
arpita.bhattacharyya@finnegan.com
Jeffrey D. Smyth (SBN 280665)
jeffrey.smyth@finnegan.com
**FINNEGAN, HENDERSON, FARABOW,**
**GARRETT & DUNNER, LLP**
3300 Hillview Avenue
Palo Alto, California 94304
Telephone:    (650) 849-6600
Facsimile:    (650) 849-6666

*Attorneys for Plaintiff and Counterdefendant*
*ASETEK DANMARK A/S*

Heidi L. Keefe (SBN 178960)
hkeefe@cooley.com
Reuben H. Chen (SNB 228725)
rchen@cooley.com
Daniel J. Knauss (SBN 267414
dknauss@cooley.com
Lam K. Nguyen (SNB 265285)
lnguyen@cooley.com
Deepa Kannappan (SBN 313573)
dkannappan@cooley.com
Alexandra Leeper (SBN 307310)
  aleeper@cooley.com
**COOLEY LLP**
3175 Hanover Street
Palo Alto, CA 94304-1130
Telephone:    (650) 843-5000
Facsimile:    (650) 849-7400

*additional attorneys listed in signature block*

*Attorneys for Defendant and Counterclaimant*
*COOLIT SYSTEMS, INC., and Defendants*
*COOLIT SYSTEMS USA INC., COOLIT*
*SYSTEMS ASIA PACIFIC LIMITED, COOLIT*
*SYSTEMS (SHENZHEN) CO., LTD., CORSAIR*
*GAMING, INC. and CORSAIR MEMORY, INC.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| ASETEK DANMARK A/S, | CASE NO. 3:19-cv-00410-EMC |
| Plaintiff and Counterdefendant, | **JOINT STATEMENT REGARDING COLLATERAL ESTOPPEL AND JUDICIAL ESTOPPEL DEFENSES** |
| v. | |
| COOLIT SYSTEMS, INC., | |
| Defendant and Counterclaimant, | |
| COOLIT SYSTEMS USA INC., COOLIT SYSTEMS ASIA PACIFIC LIMITED, COOLIT SYSTEMS (SHENZHEN) CO. LTD. | |
| Defendants, | |
| CORSAIR GAMING, INC. and CORSAIR MEMORY, INC., | |
| Defendants. | |

1    Pursuant to the Court's orders at the October 7 and 21, 2021 hearings, the parties have met and

2    conferred and hereby submit this joint statement.  The parties have agreed that Asetek shall be bound

3    to the prior litigation positions as stated in Section I below.

4    **I.    Stipulation**

5        The parties hereby stipulate as follows:

6        1.    The claimed "reservoir" in Asetek's invention is a single receptacle that is divided

7              into an upper chamber and a lower chamber, with the upper chamber providing the

8              pumping function and the lower chamber providing the thermal exchange function.

9        2.    Prior art devices included a pump, a single-chamber reservoir (as that term was

10             used in the prior art), and a cold plate as separate components that were connected

11             using tubing or attached together with clips or screws or permanently coupled.

12       3.    Asetek's patent claims are directed to a liquid cooling device comprising a dual-

13             chambered reservoir bounded by a heat -exchanging interface.

14   **II.    Dispute on Prior Litigation Positions**

15       Other than the above, no agreement has been reached, and the parties have set forth their

16   respective positions here in Section II.  Asetek also believes that Defendants should be bound to

17   prior positions taken in IPRs against Asetek's patents, and that Defendants' arguments about

18   estoppel against Asetek are inconsistent with their prior positions in the IPRs.  Defendants disagree

19   with Asetek's belief as set forth in their statement below.

20   **CoolIT's Statement**

21       Under the doctrine of collateral estoppel and/or the broader doctrine of judicial estoppel,

22   Asetek should be bound to its prior prevailing litigation positions.  This is because Asetek previously

23   succeeded in convincing the jury that the "upper/pump chamber" and "lower/thermal exchange

24   chamber" in the "reservoir" cannot be separable components, unlike those in prior art such as Ryu.

25   Rather, a *single* receptacle of the claimed "reservoir" is divided into two chambers; that is, the

26   "upper/pump chamber" and the "lower/thermal exchange chamber" must be contained *within* the same

27   single receptacle.

28

2

1  Asetek now attempts to walk back on its prior prevailing positions, even one Asetek expressly

2  told this Court.  The chart below identifies Asetek's prior positions and corresponding support,

3  including excerpts of the 2014 Trial Transcript (Exhibit A), 2014 Jury Verdict (Exhibit B), and 2014

4  Findings of Fact and Conclusion of Law (Exhibit C) from the prior trial record in *Asetek Danmark A/S*

5  *v. CMI USA, Inc.*, Case No. 4:13-cv-00457.  CoolIT respectfully requests that the Court order Asetek

6  be bound to these prior prevailing positions or, in the alternative, to grant Defendants' motion for leave

7  to amend the answers to include collateral estoppel and judicial estoppel defenses.

**A.**  **Two separate receptacles screwed together cannot form a single receptacle.  In Asetek's claimed invention, the upper/pump chamber and the lower/thermal exchange chamber are not separable.**

| Asetek's prior position | Corresponding support |
|---|---|
| Two separate receptacles screwed together cannot form a single receptacle. | This position was what Asetek expressly told this Court on Oct. 7th:<br><br>"Your Honor, Asetek would – will be fine signing a stipulation that **Asetek is not going to take the position that two separate receptacles screwed together can form a single receptacle**."  (October 7, 2021, Hearing Tr. at 29-30, Ms. Bhattacharyya (emphasis added).)<br><br>Additionally, Asetek's expert successfully convinced the jury that the "reservoir" is a single "receptacle with two chambers in it; not two components that are separable being screwed together":<br><br>13  Q.   And all of the claims of the '764 patent recite a<br>14  reservoir, which was construed by the Court to be a single<br>15  receptacle that has dual chambers in it.  Correct?<br>16  A.   That's correct.   It's a receptacle with two chambers in<br>17  it; not two components that are separable being screwed<br>18  together or clipped together.<br><br>(Trial Transcript at 1444:13-18 (testimony by Asetek's expert).)<br><br>Further, the Jury Verdict and the Court's Findings of Fact and Conclusions of the Law further support holding Asetek to this position, as shown below: |

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Asetek's prior position | Corresponding support |
|---|---|
|  | c. What difference, if any, existed between the claimed invention and the prior art at the time of the claimed invention?<br><br>_____ Asetek's patented invention is directed to a closed loop liquid cooling system in which cooling liquid is pumped continuously between a pump head and a heat radiator (positioned remote from the pump head). Rather than connecting together multiple separate components (as in the prior art), Asetek's patented pump head design combines, into a single unit, a pump and the claimed "reservoir" that has, among other things, dual chambers and is bounded by a removable cold plate. Also, the claimed "reservoir" in Asetek's invention is a single receptacle that is divided into an upper chamber and a lower chamber, with the upper chamber providing the pumping function and the lower chamber providing the thermal exchange function. ~~Asetek's dual-chamber design allows the pumping and the heat-exchange functionalities to be independently optimized in the separate chambers.~~ In addition to providing efficient heat removal, Asetek's patented invention includes ~~the benefits of~~ a compact (narrow) profile, cost-effective manufacturing, ~~and~~ reduced risk of fluid leakage. (Asetek's position) *at least one of the following benefits over each example of prior art :*<br><br>_____ There were no meaningful differences between the scope of the claimed invention and what was known in the prior art. (CMI USA's position)<br><br>__X__ other, specify *ASETEKS POSITION ABOVE WITH NOTED CHANGES*<br><br>(Jury Verdict (ECF No. 219) at 4.)<br><br>22 | 1147:3-10, 12-25; 1148:1-8; 1148:14-1149:21; 1150:17-20, Dr. Tilton disagreed, explaining<br>23 | that Ryu does not teach a dual-chambered reservoir, but rather describes two receptacles that are<br>24 | separate structural and functional components, Tilton 1441:24-1443:7; 1444:13-25. The experts<br>25 | agreed, however, that Ryu's two chambers components are connected to allow fluid to pass<br>between them. Id. at 1442:22-1443:7; Carman 1142:13-1143:7.<br><br>(2014 Findings of Fact and Conclusions of Law at 8.)<br><br>10 | practice" as the devices disclosed in Asetek's patents. Id. at 1441:24-1442:6. Specifically,<br>11 | nowhere does Ryu teach or suggest a dual-chambered reservoir comprising an upper/pump<br>12 | chamber and a lower/thermal exchange chamber; instead, Ryu describes two separate receptacles<br>13 | that are connected with screws or clips, or are laminated together. Id. at 1442:7-1443:7; 1443:12-<br>14 | 1444:12<br><br>(2014 Findings of Fact and Conclusions of Law at 10.)<br><br>19 | CMI also has not shown that Ryu discloses a reservoir—a receptacle or chamber for<br>20 | holding a liquid or fluid that includes a pump chamber and a thermal exchange chamber—as is<br>21 | required by all asserted claims of the '764 patent. Dr. Tilton testified that Ryu is a device<br>22 | composed of two separate components that probably would not be manufactured as a single piece,<br>23 | not a single receptacle with two chambers. Tilton 1442:7-1444:25; 1506:20-1507:9. In particular,<br><br>(2014 Findings of Fact and Conclusions of Law at 19.) |

STIPULATION
CASE NO. 3:19-cv-00410-EMC

| Asetek's prior position | Corresponding support |
|---|---|
| Asetek's patented invention is directed to a closed loop liquid cooling system in which cooling liquid is pumped continuously between a pump head and a heat radiator (positioned remote from the pump head). Rather than connecting together multiple separate components (as in the prior art), Asetek's patented pump head design combines, into a single unit, a pump and the claimed 'reservoir' that has, among other things, dual chambers and is bounded by a removable cold plate. | This position is from the Jury Verdict verbatim, which now Asetek is attempting to qualify by ignoring Ryu and other prior art presented at trial: <br><br>  <br><br> (Jury Verdict (ECF No. 219) at 4.) <br><br> During meet-and-confer, Asetek also acknowledged and agreed to this position in the Jury Verdict: <br><br> "In advance of our meet and confer tomorrow and in response to your various proposals, Asetek agrees that as stated in the jury verdict: <br><br> 'Asetek's patented invention is directed to a closed loop liquid cooling system in which cooling liquid is pumped continuously between a pump head and a heat radiator (positioned remote from the pump head).  Rather than connecting together multiple separate components (as in the prior art), Asetek's patented pump head design combines, into a single unit, a pump and the claimed 'reservoir' that has, among other things, dual chambers and is bounded by a removable cold plate.'" <br><br> (Exhibit D, October 19, 2021 email from Mr. McCauley.) |
| In the claimed invention, the upper/pump chamber and lower/thermal exchange chamber are | Asetek's expert successfully convinced the jury that the two chambers in the reservoir's single receptacle are not separable and thus cannot be physically separated as follows: |

| Asetek's prior position | Corresponding support |
|---|---|
| not separable (and thus cannot be physically separated). | 13 Q.   And all of the claims of the '764 patent recite a<br>14 reservoir, which was construed by the Court to be a single<br>15 receptacle that has dual chambers in it.   Correct?<br>16 A.   That's correct.   It's a receptacle with two chambers in<br>17 it; not two components that are separable being screwed<br>18 together or clipped together.<br><br>(Trial Transcript at 1444:13-18 (testimony by Asetek's expert).)<br><br>10 Q.   But the same is not true of the Asetek's invention.<br>11 Correct?<br>12 A.   That's correct.   There's no way to make those components<br>13 separable.   If I took the -- what the Eriksen invention's<br>14 define as the upper chamber off of the thermal exchange<br>15 chamber, I'd have part of each -- I'd either have a fully<br>16 enclosed thermal-exchange chamber and a nonfunctional pump, or<br>17 vice versa.<br>18     And I think this, again, speaks to -- the specific<br>19 structure is what they're capturing; is that the functional<br>20 elements are integrated into a device with fewer parts.   And so<br>21 that's, again, one of the primary benefits of the invention.<br><br>(2014 Trial Transcript at 1447:10-21 (testimony by Asetek's expert).)<br><br>10 Q.   The -- in Asetek's patented design, the two chambers --<br>11 the pump chamber and the thermal-exchange chamber -- cannot be<br>12 physically separated.   Right?<br>13 A.   That's correct.   If you tried to take the upper chamber<br>14 away from the lower chamber, you'd have two nonfunctional<br>15 devices, or one functional and one nonfunctional device.<br>16 Q.   And the only part of the reservoir in Asetek's patented<br>17 design that can be separated is just the heat-exchange<br>18 interface?<br>19 A.   The heat-exchanging interface.   That's correct.<br><br>(2014 Trial Transcript at 1508:10-19 (testimony by Asetek's expert); *see also* 2014 Findings of Fact and Conclusions of Law at pp. 19-20 (including any testimony cited by the Court).) |

| Asetek's prior position | Corresponding support |
|---|---|
| | 6  **Q.**  When you provided your report, you looked at that first 7  sentence, and then you said this is proof that these two 8  components are separate components, because if they were part 9  of a single reservoir, they could not be made of different 10  materials or clipped together.  Right? 11  **A.**  That's one aspect, yes. 12  **Q.**  Well, that's what you wrote in your report.  Correct? 13  **A.**  I also wrote that there are separate, inseparable 14  components -- separate, inseparable functional components. 15  That's the primary basis for my opinion.<br><br>(2014 Trial Transcript at 1570:6-15 (testimony by Asetek's expert).)<br><br>4  You've also heard testimony both from Dr. Tilton and from 5  Mr. Eriksen, himself, about the benefits of Mr. Eriksen's 6  design.  And, by the way, this relates to another factor that 7  His Honor is going to ask you to find on the Verdict Form.  I'm 8  just going to walk through them quickly.  Dr. Tilton went 9  through these in some detail, as did Mr. Eriksen. 10  Dual chambers allow for independent optimization of two 11  things:  The thermal-exchange function in the lower or the 12  thermal-exchange chamber, and also the pumping function in the 13  upper or the pump chamber. 14  This design minimizes leakage, because you've got fewer 15  joints, et cetera. 16  The number of components is reduced.  So the fewer 17  components you have -- excuse me -- the more leakage is 18  reduced.<br><br>(2014 Trial Transcript at 1697:4-18 (testimony by Asetek's expert).)<br><br>Further, the Jury Verdict and the Court's Findings of Fact and Conclusions of the Law further support holding Asetek to this position, as shown below: |

| Asetek's prior position | Corresponding support |
|---|---|
| | c. What difference, if any, existed between the claimed invention and the prior art at the time of the claimed invention?<br><br>_____ Asetek's patented invention is directed to a closed loop liquid cooling system in which cooling liquid is pumped continuously between a pump head and a heat radiator (positioned remote from the pump head). Rather than connecting together multiple separate components (as in the prior art), Asetek's patented pump head design combines, into a single unit, a pump and the claimed "reservoir" that has, among other things, dual chambers and is bounded by a removable cold plate. Also, the claimed "reservoir" in Asetek's invention is a single receptacle that is divided into an upper chamber and a lower chamber, with the upper chamber providing the pumping function and the lower chamber providing the thermal exchange function. Asetek's dual-chamber design allows the pumping and the heat exchange functionalities to be independently optimized in the separate chambers. In addition to providing efficient heat removal, Asetek's patented invention includes the benefits of a compact (narrow) profile, cost-effective manufacturing, and reduced risk of fluid leakage. (Asetek's position)  *at least one of the following benefits over each example of prior art:*<br><br>_____ There were no meaningful differences between the scope of the claimed invention and what was known in the prior art. (CMI USA's position)<br><br>_X_ other, specify *ASETEKS POSITION ABOVE WITH NOTED CHANGES*<br><br>(2014 Jury Verdict at 4.)<br><br>19 CMI also has not shown that Ryu discloses a reservoir—a receptacle or chamber for<br>20 holding a liquid or fluid that includes a pump chamber and a thermal exchange chamber—as is<br>21 required by all asserted claims of the '764 patent. Dr. Tilton testified that Ryu is a device<br>22 composed of two separate components that probably would not be manufactured as a single piece,<br>23 not a single receptacle with two chambers. Tilton 1442:7-1444:25; 1506:20-1507:9. In particular,<br><br>(2014 Findings of Fact and Conclusions of Law at 19.)<br><br>1 Further, Dr. Tilton pointed out in his testimony that Ryu's pump chamber and water jacket<br>2 are not just separate components, but can be spatially separated and connected by tubing, yet still<br>3 meet the functional requirements of the device, unlike the device disclosed in the '764 patent.<br>4 Tilton 1445:1-1447:21; see also Tr. Ex. 529 (Ryu). This testimony all suggests that Ryu does not<br>5 disclose a reservoir containing two separate chambers, but rather is a two-component device<br>6 without an individual reservoir for holding fluid.<br><br>(2014 Findings of Fact and Conclusions of Law at 20; *see also* 2014 Trial Transcript 1507-1508, 1570 (testimony by Asetek's expert).) |

**B.** **An "upper/pump chamber" and a "lower/thermal exchange chamber" cannot be separable components screwed together, plugged or put together, or otherwise connected by tubing to become a single receptacle of the claimed "reservoir."**

| Asetek's prior positions | Corresponding support |
|---|---|
| The claimed "reservoir" is a single receptacle with dual chambers in it. It is not two components (i.e., an "upper/pump chamber" component and a "lower/thermal exchange chamber" component) that are separable being screwed together. | This statement clarifies that the "single receptacle" in the claimed "reservoir" cannot comprise an "upper/pump chamber" and a "lower/thermal exchange chamber" as separable components being screwed together.<br><br>13  Q.   And all of the claims of the '764 patent recite a<br>14  reservoir, which was construed by the Court to be a single<br>15  receptacle that has dual chambers in it.  Correct?<br>16  A.   That's correct.  It's a receptacle with two chambers in<br>17  it; not two components that are separable being screwed<br>18  together or clipped together.<br><br>(2014 Trial Transcript at 1444:13-18 (testimony by Asetek's expert).).)<br><br>c.  What difference, if any, existed between the claimed invention and the prior art at the time of the claimed invention?<br><br>_____ Asetek's patented invention is directed to a closed loop liquid cooling system in which cooling liquid is pumped continuously between a pump head and a heat radiator (positioned remote from the pump head). Rather than connecting together multiple separate components (as in the prior art), Asetek's patented pump head design combines, into a single unit, a pump and the claimed "reservoir" that has, among other things, dual chambers and is bounded by a removable cold plate. Also, the claimed "reservoir" in Asetek's invention is a single receptacle that is divided into an upper chamber and a lower chamber, with the upper chamber providing the pumping function and the lower chamber providing the thermal exchange function. ~~Asetek's dual-chamber design allows the pumping and the heat exchange functionalities to be independently optimized in the separate chambers.~~ In addition to providing efficient heat removal, Asetek's patented invention includes ~~the benefits of~~ a compact (narrow) profile, cost-effective manufacturing, ~~and~~ reduced risk of fluid leakage. (Asetek's position) *at least one of the following benefits over each example of prior art :)*<br><br>_____ There were no meaningful differences between the scope of the claimed invention and what was known in the prior art. (CMI USA's position)<br><br>__X__ other, specify _ASETEKS POSITION ABOVE WITH NOTED_<br>_____ _CHANGES_<br><br>(2014 Jury Verdict at 4.) |

| Asetek's prior positions | Corresponding support |
|---|---|
| | 22 ... 1147:3-10, 12-25; 1148:1-8; 1148:14-1149:21; 1150:17-20, Dr. Tilton disagreed, explaining<br>23 that Ryu does not teach a dual-chambered reservoir, but rather describes two receptacles that are<br>24 separate structural and functional components, Tilton 1441:24-1443:7; 1444:13-25. The experts<br>25 agreed, however, that Ryu's two chambers/components are connected to allow fluid to pass<br> between them. Id. at 1442:22-1443:7; Carman 1142:13-1143:7.<br><br>(2014 Findings of Fact and Conclusions of Law at 8.)<br><br>10 practice" as the devices disclosed in Asetek's patents. Id. at 1441:24-1442:6. Specifically,<br>11 nowhere does Ryu teach or suggest a dual-chambered reservoir comprising an upper/pump<br>12 chamber and a lower/thermal exchange chamber; instead, Ryu describes two separate receptacles<br>13 that are connected with screws or clips, or are laminated together. Id. at 1442:7-1443:7; 1443:12-<br>14 1444:12<br><br>(2014 Findings of Fact and Conclusions of Law at 10.)<br><br>19 CMI also has not shown that Ryu discloses a reservoir—a receptacle or chamber for<br>20 holding a liquid or fluid that includes a pump chamber and a thermal exchange chamber—as is<br>21 required by all asserted claims of the '764 patent. Dr. Tilton testified that Ryu is a device<br>22 composed of two separate components that probably would not be manufactured as a single piece,<br>23 not a single receptacle with two chambers. Tilton 1442:7-1444:25; 1506:20-1507:9. In particular,<br><br>(2014 Findings of Fact and Conclusions of Law at 19.) |
| Two separate receptacles or components (i.e., an "upper/pump chamber" component and a "lower/thermal exchange chamber" component) that are plugged together or put together do not become a single receptacle with two chambers inside it. | This statement also clarifies that an "upper/pump chamber" and a "lower/thermal exchange chamber" as separate receptacles or components cannot be plugged together or put together to become a "single receptacle" of the claimed "reservoir" with two chambers inside the "single receptacle."<br><br>5 Q. So let's move on to the validity of the '362 patent<br>6 over -- over Ryu.<br>7 Dr. Carman testified yesterday that Ryu -- Ryu renders<br>8 obvious the Asserted Claims of the '362 patent. Do you agree?<br>9 A. I disagree. Again, the primary reason is Ryu is two<br>10 separate receptacles or components that are just plugged<br>11 together, not a receptacle with two chambers in it.<br><br>(2014 Trial Transcript at 1522:5-11 (testimony by Asetek's expert).) |

| Asetek's prior positions | Corresponding support |
|---|---|
| | 13     Claim 14 recites, among other things, a reservoir having 14  an upper chamber and a lower chamber. Why is this limitation 15  missing from Ryu? 16  **A.**  Yeah. We've already talked about that several times. The 17  Ryu device doesn't have a reservoir with two chambers inside 18  it: An upper and lower chamber. It's two components that are 19  put together.<br><br>(2014 Trial Transcript at 1530:13-19 (testimony by Asetek's expert).)<br><br>22  22; 1147:3-10, 12-25; 1148:1-8; 1148:14-1149:21; 1150:17-20, Dr. Tilton disagreed, explaining 23  that Ryu does not teach a dual-chambered reservoir, but rather describes two receptacles that are 24  separate structural and functional components, Tilton 1441:24-1443:7; 1444:13-25. The experts 25  agreed, however, that Ryu's two chambers/components are connected to allow fluid to pass  between them. Id. at 1442:22-1443:7; Carman 1142:13-1143:7.<br><br>(2014 Findings of Fact and Conclusions of Law at 8.)<br><br>19  CMI also has not shown that Ryu discloses a reservoir—a receptacle or chamber for 20  holding a liquid or fluid that includes a pump chamber and a thermal exchange chamber—as is 21  required by all asserted claims of the '764 patent. Dr. Tilton testified that Ryu is a device 22  composed of two separate components that probably would not be manufactured as a single piece, 23  not a single receptacle with two chambers. Tilton 1442:7-1444:25; 1506:20-1507:9. In particular,<br><br>(2014 Findings of Fact and Conclusions of Law at 19.)<br><br>2     CMI has also not shown that the '362 patent is invalid for obviousness. Most notably, and 3  as discussed more fully in section II.A.4, supra, with respect to the '764 patent, neither Ryu nor 4  Koga disclose a dual-chambered reservoir, a limitation of independent claims 14 and 17 of the 5  '362 patent (on which all other claims asserted here—claims 15, 18, and 19—depend). See also 6  Tilton 1522:5-25; 1530:9-23. Ryu's pump driver 30 (the alleged upper chamber) and water jacket<br><br>(2014 Findings of Fact and Conclusions of Law at 22.) |
| Two separate upper/pump chamber and lower/thermal exchange chamber connected by tubing are separate components and do not satisfy a reservoir's | This statement similarly clarifies that two separate "upper/pump chamber" and "lower/thermal exchange chamber" connected by tubing are separate components that cannot satisfy the "single receptacle" of the claimed "reservoir" containing two chambers inside the "single receptacle." |

| Asetek's prior positions | Corresponding support |
|---|---|
| single receptacle containing two chambers inside it. | 10 **Q.**   So if one were to place this water jacket 20 on top of the<br>11 CPU, and move this pump driver away -- basically make this<br>12 connection tube a little longer, and move this out of the PC<br>13 case outside -- and still have them connected by a tube, it<br>14 will still work.   Correct?<br>15 **A.**   That's correct.   They're completely separate components<br>16 connected by tubing.   The only thing that's described in Ryu is<br>17 whether the -- whether they're gasketed together directly with<br>18 the tubes on water jacket 20 penetrating up into the pump<br>19 circulator, or whether they're spatially separated.<br>20    They're the same components.   They can be mounted in two<br>21 different configurations.   So by all of the definitions that<br>22 we've used in this, components that are spatially separated by<br>23 tubing, connected by tubing, are separate components.<br><br>(2014 Trial Transcript at 1445:10-23 (testimony by Asetek's expert).)<br><br>1    Further, Dr. Tilton pointed out in his testimony that Ryu's pump chamber and water jacket<br>2 are not just separate components, but can be spatially separated and connected by tubing, yet still<br>3 meet the functional requirements of the device, unlike the device disclosed in the '764 patent.<br>4 Tilton 1445:1-1447:21; see also Tr. Ex. 529 (Ryu).  This testimony all suggests that Ryu does not<br>5 disclose a reservoir containing two separate chambers, but rather is a two-component device<br>6 without an individual reservoir for holding fluid.<br><br>(2014 Findings of Fact and Conclusions of Law at 20.) |

## C.    Asetek should be held to its prior positions, *regardless* of Asetek's new infringement theories on CoolIT's new design.

Asetek raises the specter of "context" to try to explain away its shifting interpretations of its own patents, but this precisely illustrates why estoppel exists and why the Court should resolve the issue now.  Asetek's arguments that it should be permitted to change its interpretation in every new "context" would make the doctrines of collateral estoppel and judicial estoppel meaningless.  Asetek should be held to its prior litigation positions identified in the Sections above, or in the alternative, the Court should grant Defendants' motion to amend the answers to include the defenses of collateral and judicial estoppel.  The positions stated in the Sections above are based on the indisputable trial record.

1  Specifically, Asetek took the position that its claimed "reservoir" requires a ***single*** **receptacle divided**

2  **into a functional pump chamber and a functional thermal exchange chamber within the single**

3  **receptacle**.   The pump chamber and the thermal exchange chamber thus cannot be two separable

4  components screwed together.

```
13   Q.   And all of the claims of the '764 patent recite a
14   reservoir, which was construed by the Court to be a single
15   receptacle that has dual chambers in it.   Correct?
16   A.   That's correct.   It's a receptacle with two chambers in
17   it; not two components that are separable being screwed
18   together or clipped together.
```

(2014 Trial Transcript at 1444:13-18 (testimony by Asetek's expert).)

```
10   Q.   But the same is not true of the Asetek's invention.
11   Correct?
12   A.   That's correct.   There's no way to make those components
13   separable.   If I took the -- what the Eriksen invention's
14   define as the upper chamber off of the thermal exchange
15   chamber, I'd have part of each -- I'd either have a fully
16   enclosed thermal-exchange chamber and a nonfunctional pump, or
17   vice versa.
18       And I think this, again, speaks to -- the specific
19   structure is what they're capturing; is that the functional
20   elements are integrated into a device with fewer parts.   And so
21   that's, again, one of the primary benefits of the invention.
```

(2014 Trial Transcript at 1447:10-21 (testimony by Asetek's expert).)

c.  What difference, if any, existed between the claimed invention and the prior art at the time of the claimed invention?

_____ Asetek's patented invention is directed to a closed loop liquid cooling system in which cooling liquid is pumped continuously between a pump head and a heat radiator (positioned remote from the pump head). Rather than connecting together multiple separate components (as in the prior art), Asetek's patented pump head design combines, into a single unit, a pump and the claimed "reservoir" that has, among other things, dual chambers and is bounded by a removable cold plate. Also, the claimed "reservoir" in Asetek's invention is a single receptacle that is divided into an upper chamber and a lower chamber, with the upper chamber providing the pumping function and the lower chamber providing the thermal exchange function. Asetek's dual-chamber design allows the pumping and the heat exchange functionalities to be independently optimized in the separate chambers. In addition to providing efficient heat removal, Asetek's patented invention includes the benefits of a compact (narrow) profile, cost-effective manufacturing, and reduced risk of fluid leakage. (Asetek's position)  *at least one of the following benefits over each example of prior art :*

_____ There were no meaningful differences between the scope of the claimed invention and what was known in the prior art. (CMI USA's position)

__X__ other, specify  ASETEKS POSITION ABOVE WITH NOTED CHANGES

(2014 Jury Verdict at 4.)

Asetek cannot erase the fact that it referred to its claimed "reservoir" as having a single receptacle divided into a functional "upper/pump chamber" and a functional "lower/thermal exchange chamber" within the single receptacle, *regardless* of Asetek's new infringement theories on CoolIT's new design. Asetek's arguments on pages 28-40 below attempt to sow confusion by arguing that what Asetek meant when it said "component" in comparing the prior art's upper/pump chamber component and lower/thermal exchange chamber component with Asetek's claimed single-receptacle "reservoir" somehow meant something else. Asetek's shifting theories as to what its patents cover is why it must be estopped from telling the Court and the jury one thing, having the Court and the jury rely on that, and then changing its "interpretations" as the "context" demands.

Tellingly, Asetek attempts to distance its new infringement theories from its prior positions by relabeling the separable upper/pump chamber component and lower/thermal exchange chamber component in CoolIT's new design as "subcomponents" rather than "components," and by arguing that, even though the separable upper/pump chamber component and lower/thermal exchange chamber

1  component in the new design can be physically separated but are screwed together in an assembly,

2  they are somehow "subcomponents" within a single receptacle.  But whatever disputes the parties will

3  have over the meaning of "components" and "subcomponents," the Court need not decide them at this

4  juncture while still holding Asetek to the positions and language Asetek used in the *CMI* case.

5  Nonetheless, to avoid unnecessary confusion, CoolIT responds to Asetek's arguments below.

6

7      <u>Asetek's claimed inventions</u>:  Asetek's

8  claimed inventions require a single receptacle

9  "reservoir."  An example is shown in the figure

10  (to the right) from Asetek's patents (depicting a

11  reservoir 14, containing within it upper/pump

12  and lower/thermal exchange chambers, and also

13  showing a chip 1 to be cooled).



upper/
pump chamber

lower/
thermal exchange
chamber

*FIG. 9*

14

15

16      <u>CoolIT's new design</u>:  Unlike Asetek's claimed inventions, CoolIT's new design (below) has

17  two separable functional chambers—the upper/pump chamber and the lower/thermal exchange

18  chamber—that are connected

19  via tubing (gasket) and are

20  screwed together.  Therefore,

21  there is no single receptacle

22  "reservoir" divided into a

23  functional "upper / pump

24  chamber" and a functional

25  "lower / thermal exchange

26  chamber."





Tubing
(gasket)

27

28

1    Asetek disagrees, and argues that the "top chamber" in CoolIT's new design is a

2    "[s]ubcomponent" "nestled" within a "reservoir housing":



14   But this argument is both incorrect[1] and irrelevant.  This is because the surrounding walls of

15   the so-called "reservoir housing" within which the "top chamber" is allegedly "nestled" are merely for

16   cosmetic purposes.  These walls just avoid a visually displeasing parting line between the upper/pump

17   chamber component and the lower/thermal exchange chamber component appearing on the ***outside*** of

18   the device, and do not serve any pumping function and, in fact, do not even touch any liquid.  It is

19   important to note that the "reservoir" corresponds to a "single receptacle defining a *fluid flow path*"

20   containing two *fluidly functioning* chambers, and is not merely a "housing" to house components as

21   incorrectly characterized by Asetek's expert.  As CoolIT's expert will explain in his report (to be

22   served on December 8), if the walls surrounding the purported "top chamber" are removed (colored

23   in light blue on the below-left), the device will function fluidly just the same, as shown below:

27   _____

28   [1] The pump chamber is also not "nestled" in the "reservoir housing" for at least the following
     reasons:  the pump chamber includes a portion of the pump volute (shown) and the pump stator (not
     shown) that is above the alleged "reservoir housing," and the pump chamber is not enclosed by a
     separate top surface of the housing.



As shown above right and below left, the new design does not need the walls surrounding the upper/pump chamber component to function fluidly, which are dry and serve no fluid related function during operation.  That is, CoolIT's new design simply does not have a single receptacle divided into a fluidly functional upper/pump chamber and a fluidly functional lower/thermal exchange chamber. Rather, there are separable functional pump and thermal exchange chambers being connected by tubing (gasket) and screwed together (below right).

Tubing
(gasket)



17

1    Prior art: Asetek also argues in its section below that statements it made to distinguish its

2    claimed invention from the prior art, including in the jury verdict, are limited to the prior art identified

3    in the figures in its patents. Not so. As the trial record, including the Findings of Fact, clearly

4    demonstrate, Astetek repeatedly distinguished its claimed invention from prior art such as Ryu, which

5    had two separable pump and thermal exchange components.

> 22    22; 1147:3-10, 12-25; 1148:1-8; 1148:14-1149:21; 1150:17-20, Dr. Tilton disagreed, explaining
>
> 23    that Ryu does not teach a dual-chambered reservoir, but rather describes two receptacles that are
>
> 24    separate structural and functional components, Tilton 1441:24-1443:7; 1444:13-25. The experts
>
> 25    agreed, however, that Ryu's two chambers/components are connected to allow fluid to pass
>
> between them. Id. at 1442:22-1443:7; Carman 1142:13-1143:7.

11   (2014 Findings of Fact and Conclusions of Law at 8.)

> 19    CMI also has not shown that Ryu discloses a reservoir—a receptacle or chamber for
>
> 20    holding a liquid or fluid that includes a pump chamber and a thermal exchange chamber—as is
>
> 21    required by all asserted claims of the '764 patent. Dr. Tilton testified that Ryu is a device
>
> 22    composed of two separate components that probably would not be manufactured as a single piece,
>
> 23    not a single receptacle with two chambers. Tilton 1442:7-1444:25; 1506:20-1507:9. In particular,

17   (2014 Findings of Fact and Conclusions of Law at 19.)

18    In Ryu, the pump drive 30 corresponds to the claimed "upper/pump chamber" and the water

19   jacket 20 to the "lower/thermal exchange chamber."

FIG. 2




1      As can be seen above, and as testified by Asetek's expert (and cited by the trial court in the

2 2014 Findings of Fact and Conclusions of Law at 20), there are *two* possible configurations in Ryu,

3 but they are the same in having two separate and separable components:

```
10   Q.   So if one were to place this water jacket 20 on top of the
11   CPU, and move this pump driver away -- basically make this
12   connection tube a little longer, and move this out of the PC
13   case outside -- and still have them connected by a tube, it
14   will still work.   Correct?
15   A.   That's correct.   They're completely separate components
16   connected by tubing.   The only thing that's described in Ryu is
17   whether the -- whether they're gasketed together directly with
18   the tubes on water jacket 20 penetrating up into the pump
19   circulator, or whether they're spatially separated.
20        They're the same components.   They can be mounted in two
21   different configurations.   So by all of the definitions that
22   we've used in this, components that are spatially separated by
23   tubing, connected by tubing, are separate components.
```

(Trial Transcript at 1445:10-23 (testimony by Asetek's expert).)  Asetek's expert made clear that in

either configuration, Ryu has an "upper/pump chamber" component and a "lower/thermal exchange

chamber" component that are separable and thus can be physically separated:

```
 5   Q.   So let's move on to the validity of the '362 patent
 6   over -- over Ryu.
 7        Dr. Carman testified yesterday that Ryu -- Ryu renders
 8   obvious the Asserted Claims of the '362 patent.  Do you agree?
 9   A.   I disagree.  Again, the primary reason is Ryu is two
10   separate receptacles or components that are just plugged
11   together, not a receptacle with two chambers in it.
12   Q.   Yes.  Yesterday we had talked about this -- this
13   particular limitation with respect to the '764 patent.  Is your
14   opinion regarding this limitation same -- for the '362 patent
15   the same as that of the '764?
16   A.   Yes.  Yes, it is.
17   Q.   So we're not going to spend much time on this, in the
18   interest of time; but do you think that needs any further
19   explanation?
20   A.   I don't believe it needs any further explanation.  Again,
21   these are two separate components that are -- they can be
22   placed apart and connected together, like with tubing, or they
23   can be placed directly on top of each other and screwed
24   together or laminated, bonded together, what-have-you.  It
25   doesn't matter.  They're still two separate components.  The --
```

(2014 Trial Transcript at 1522:5-25 (testimony by Asetek's expert).)  As Asetek's expert expressly made clear, unlike Asetek's purported invention, the two receptacles in Ryu "can be placed apart and connected together, like with tubing, or they can be placed directly on top of each other and screwed together or laminated, bonded together, what-have-you."  And as explained above on pages 15-17, CoolIT's new design similarly has two receptacles that are placed on top of each other, connected together with tubing, and screwed together.

STIPULATION
CASE NO. 3:19-cv-00410-EMC

Asetek's argument that the two receptacles in CoolIT's new design will not function after they are separated is incorrect.  As an initial matter, CoolIT's two receptacles are already separated and connected via tubing with screws, as discussed above.  The two receptacles *can* also continue to function even if they are further spatially separated with properly extended tubing to connect them, just like Ryu's second embodiment in Fig. 2(b).  As discussed above, Asetek's expert pointed out Ryu had two configurations – one with the two receptacles stacked directly on top of each other (Fig. 2(a) at below left) and the other with the two receptacles spatially separated but connected via tubing (Fig. 2(b) at below right), both of which are distinct from Asetek's purported invention:





(Ryu's Fig. 2 (annotated to show separation of the pump drive 30 and the water jacket 20 that are then connected via tubing).)  *To the extent Asetek's argument is that CoolIT's two receptacles do not function if they are fully assembled in a complete product and then separated without tubing, effectively destroying the product, the same applies to Ryu.  Asetek's argument is preposterous because Ryu's two receptacles also will not function if spatially separated without tubing.*

In sum, while this is a disputed issue that the Court does not need to resolve right now, CoolIT's new design has structures that are functionally no different from Ryu's separable receptacles or chambers.  As Asetek's expert pointed out, "[i]t doesn't matter" whether two receptacles or chambers are stacked on top of each other or spatially separated but connected via tubing because "[t]hey're still two separate components."  (2014 Trial Transcript at 1522:9-25 (testimony by Asetek's expert).)

1    **D.    CoolIT should not be subject to collateral or judicial estoppel.**

2          Faced with its own previous statements, Asetek now resorts to arguing that statements CoolIT

3    made, that were not part of any judgment, should be cherry picked and held against CoolIT.  The Court

4    should not entertain Asetek's gamesmanship for several reasons.

5          First, Asetek never moved to add collateral and judicial estoppel defenses to the case, and the

6    Court's instructions at the October 7 and October 21 hearings were specific to the parties submitting

7    a joint paper regarding Asetek's prior litigation positions on its own patents.  Asetek has filed an

8    opposition to Defendants' Motion for Leave to Amend, but has the gall here to argue that it does not

9    have to abide by the Court's rules and move for leave to amend as CoolIT has.

10         Second, the fact that the primary references relied on in CoolIT's IPRs—Duan and

11   Batchelder—have a "reservoir" was never a disputed issue in the proceedings.  Asetek never disputed

12   that these references satisfy the "reservoir" limitation.  Rather, the disputes in the IPRs concerned

13   other claim limitations or issues. Therefore, none of the alleged inconsistencies in the statements that

14   Asetek identifies below involves "an issue necessarily decided at the previous proceeding" (collateral

15   estoppel) or an issue that CoolIT "succeeded in persuading a court to accept" (judicial estoppel).

16         Moreover, CoolIT's positions in its IPRs are consistent with the positions it is taking in the

17   district court litigation.  Asetek mischaracterizes CoolIT's statements and takes them out of context.

18   CoolIT has consistently taken the position that the claimed "reservoir" in Asetek's patents must be a

19   **"single receptacle"** that includes **both** the "upper/pump chamber" and the "lower/thermal exchange

20   chamber" within the "single receptacle."  That is, the claims of Asetek's patents do not permit an

21   "upper/pump chamber" component and a "lower/thermal exchange chamber" component that are

22   separable to be contained in the "single receptacle" of the "reservoir."  This position is entirely

23   consistent with the jury verdict in the CMI case:  "[T]he claimed 'reservoir' in Asetek's invention is

24   **a single receptacle that is divided** into an upper chamber and a lower chamber with the upper

25   chamber providing the pumping function and the lower chamber providing the thermal exchange

26   function."  But this position does not mean that other components cannot be added or made part of the

27   reservoir.  In fact, the claim language of the '355 makes clear that other components can be part of the

28   "reservoir."  For example, claim 1 of the '355 includes the following claim elements:  "the reservoir

including:  a pump chamber housing an impeller and defined at least in part by an impeller cover and a double sided chassis, the impeller being positioned on one side of the chassis and a stator of the pump is positioned on an opposite side of the chassis."  As can be seen, there are multiple components that are included in the pump chamber of the "reservoir," having at least additionally "an impeller," an "impeller cover," and a "double-sided chassis."

CoolIT's mapping of Duan and Batchelder to the "reservoir" limitation likewise points to a structure, while containing other components, includes a single receptacle that is divided into an "upper/pump chamber" and a "lower/thermal exchange chamber" within the single receptacle.  As the claim language makes clear, however, the reservoir can include other components.  The single receptacles of Duan's and Batchelder's respective reservoirs that each contain an "upper/pump chamber" and a "lower/thermal exchange chamber" within a "single receptacle" is shown in the following figures (within the teal outlines).



accommodation chamber 21
(in liquid driving module 2)

"single receptacle"
of "reservoir"

"upper/pump chamber"

"lower/thermal exchange chamber"

FIG. 3

Fan

Radiator

"single receptacle" of
"reservoir"

1    Asetek points to isolated statements in CoolIT's IPR petitions that merely noted the prior-art

2   reservoirs had multiple components, which as discussed above, is permissible as exemplarily shown

3   by claim 1 of the '355 patent (reciting a "reservoir" including additionally at least an "impeller," an

4   "impeller cover," and a "double-sided chassis").  Thus, CoolIT's statements are consistent with the

5   meaning of "reservoir" requiring a "single receptacle defining a fluid flow path," and do not negate

6   the fact that the claim language of the Asetek patents has the further requirement that within the single

7   receptacle of the reservoir there must also be a functional pump chamber and a functional thermal

8   exchange chamber, as further explained below.

9    Based on the agreed-upon constructions, the overall claim language, and the prior 2014 trial

10   records, Asetek's claimed "reservoir" must meet the following four separate requirements:

11    (1) having a "receptacle defining a fluid flow path";

12    (2) the "receptacle" being "single";

13    (3) having an "upper/pump chamber" and a "lower/thermal exchange chamber";

14    (4) the two "chambers" being within the "receptacle."

15    During the IPR proceedings, CoolIT separately addressed one or more of these four "reservoir"

16   requirements in various places.  In each place, CoolIT identified and discussed all of the disclosures

17   or teachings it could find in the prior art regarding one or more of the particular requirements.  But in

18   each identification and discussion, the particular disclosures or teachings did not necessarily meet all

19   four requirements of the "reservoir" at the same time.  Rather, they were meant to show only the

20   requirements at issue in that particular place.

21    For example, within respect to Shin, CoolIT never stated that Shin disclosed or taught the

22   requirement (2) of the "reservoir" being "single."  Rather, CoolIT merely stated that Shin's structures

23   that it interpreted as a prior-art reservoir disclosed or taught requirements (1), (3) and (4) of the claimed

24   "reservoir" (*i.e.*, having a receptacle containing an upper chamber and a lower chamber) as follows:

25

26    Shin also discloses a reservoir (e.g., an integrated structure) for providing liquid
  cooling of computing components: "the pump is secured to the top part of the liquid

27    cooled heat sink, forming a structure that allows the pump and liquid cooled heat
  sink to be handled as an integral structure." (Ex. 1007 at [0008].)

28

25

… Based on these disclosures, a POSITA would understand that Shin discloses a reservoir (e.g., a receptacle containing a heat sink 4, flexible hose 6, coolant discharge section coupler 7, water supply coupler 9, and impeller case 11) configured to circulate a cooling liquid therethrough. (Ex. 1003 at ¶¶56-59.)

(IPR2020-00523 Petition (regarding the '354 patent), at 12-14.)  As can be seen above, CoolIT merely stated that Shin's structures disclosed or taught a receptacle that included an upper chamber (e.g., impeller case 11), a lower chamber (e.g., heat sink 4), and other additional components.  That is, CoolIT identified and discussed Shin's structures as meeting only the requirements (1), (3), and (4) of the claimed "reservoir."  CoolIT never stated that the receptacle in Shin was "single" as in the requirement (2) of Asetek's claimed "reservoir" and, therefore, disclosed a single receptacle defining a fluid flow path, that also contained a pump chamber and a thermal exchange chamber within tha single receptacle.  Rather, CoolIT used Batchelder, whose Figure 2 disclosed or taught the "single receptacle" requirement (2) of the claimed "reservoir," as the primary reference and combined it with Shin.

Asetek misleadingly and selectively quoted CoolIT's expert to create the incorrect impression that he somehow admitted that Shin disclosed a "reservoir" as meeting the "single" requirement (2) discussed above.  But the reality is completely the opposite because CoolIT's expert actually responded to Asetek's counsel during deposition that he "wouldn't consider Figure 1 of Shin to constitute a reservoir the way you have defined it as *a single receptacle* defining a fluid flow path." (Ex. K (36:4-7 (emphasis added); *see also id.* 36:17-18 ("I do not consider Shin to have disclosed a reservoir [as having a single receptacle]."))  In conclusion, CoolIT's expert clarified that while his "declaration defines reservoir as a single receptacle defining a fluid flow path[,]" he "didn't view Shin in and of itself as a single receptacle." (*Id.* 81:1-4.)  All in all, considering the IPR2020-00523 petition (that included the Batchelder and Shin references) as a whole, and not just the figures or statements each in isolation that Asetek cited misleadingly and selectively, the only embodiment that CoolIT ever stated disclosed or taught all *four* "reservoir" requirements was the active spreader plate 20 in a red box annotated in Figure 2 of Batchelder, as follows:

This active spreader plate 20 is a single, unitary receptacle and defines a fluid flow path (60). (*See* Ex. 1003 at ¶54; Ex. 1006 at 5:26-28 ("In the most preferred embodiment the impeller (54) is a centripetal or centrifugal pump that impels the

heat transfer fluid to circulate as indicated (60) …").) The following annotated version of FIG. 2 illustrates reservoir (e.g., active spreader plate 20) outlined by the red box:



(*Id.* at FIG. 2 (emphasis added.).) … As discussed above, the parties agree that "chamber" should be construed as a "compartment within the reservoir." (Ex. 1005 at 2.) Batchelder discloses this limitation as construed in the following annotated [Figure 2]:



(IPR2020-00523 Petition (regarding the '354 patent), at 11-12, 16-17 (yellow highlighting added).) As can be seen above, only the red box annotated on Figure 2 of Batchelder was identified and discussed as meeting all four "reservoir" requirements.  Contrary to Asetek's misleading citation to Figures 7 and 8 of Batchelder in isolation, CoolIT's petition never stated that those figures disclosed or taught a "single receptacle" of the claimed "reservoir."  As shown above, CoolIT's petition only identified and discussed what was in the red box in Figure 2 of Batchelder as disclosing and teaching a "single receptacle," which also included the "upper chamber" and the "lower chamber."

**Asetek's Statement**

In addition to the stipulated points 1-3 in section I above, Asetek is also willing to be bound by the following points 4 and 5 as stated below, but Defendants have refused:

4. With the clarification that the phrase "connecting together multiple separate components (as in the prior art)" means connecting a separate prior art pump, a separate prior art reservoir, and a separate prior art heat exchanger by tubing, as stated in point 2 in Section I, and as shown in prior art Figure 3 of the Asetek patents, Asetek agrees to be bound by the position: "Asetek's patented invention is directed to a closed loop liquid cooling system in which cooling liquid is pumped continuously between a pump head and a heat radiator (positioned remote from the pump head). Rather than connecting together multiple separate components (as in the prior art), Asetek's patented pump head design combines, into a single unit, a pump and the claimed 'reservoir' that has, among other things, dual chambers and is bounded by a removable cold plate." Asetek does not agree that the above stipulation precludes Asetek from arguing that the claimed "reservoir" can include multiple separate subcomponents.

5. With the clarification that Asetek does not agree that CoolIT's Tamriel I and Tamriel II prototypes, also referred to as the "new design" pump heads, include separate receptacles, Asetek agrees to be bound by the position: "Two separate receptacles screwed together cannot form a single receptacle."

STIPULATION
CASE No. 3:19-cv-00410-EMC

**1. Defendants' estoppel positions are an overreach based on cherry-picked statements by Asetek's expert that are divorced from the context in which his testimony was provided.**

Asetek is not taking positions in this case that are inconsistent with its positions in the *Asetek Danmark A/S v. CMI USA, Inc.* case. As shown in Section I above, Asetek is willing stipulate to certain facts and positions in the jury verdict and in Judge Tigar's Findings of Facts and Conclusions of Law and has tried to reach agreement with Defendants on appropriate additional stipulations. In that regard, Asetek is also willing to stipulate to two additional positions (points 4 and 5 stated above) with the noted clarifications. (*See* discussion in chart below). Defendants' refusal to accept these reasonable clarifications is unreasonable and demonstrates their overreach with the estoppel positions as explained below.

With regard to the other alleged positions Defendants attribute to Asetek, Defendants' characterizations of the record and/or Asetek's positions in prior litigations are inaccurate, omit critical context, and are incomplete. For example, in the prior litigation, both Asetek's expert and Judge Tigar's Findings of Fact/Conclusions of Law ("FoF/CoL") stated that in a "reservoir," if one separates the upper/pump and lower/thermal exchange chambers, the unit will not function. *See supra*, pp. 6-8 (noting that unlike Ryu, the claimed reservoir would become nonfunctional if the upper/pump and lower/thermal exchange chambers were separated). And in this case, Asetek's infringement expert report consistently explains that the accused Tamriel prototypes include a reservoir because, among other things, the prototypes would become non-functional if the two chambers were separated (by unscrewing them from one another or sawing them apart). Asetek's expert's opinion in this case is thus fully consistent with the complete testimony and FoF/CoL from the prior litigation. Defendants' estoppel arguments, however, crop and mischaracterize the full testimony and FoF/CoL from the prior litigation in an attempt to prevent Asetek's expert from presenting his consistent opinion in this case. For example, Defendants erroneously contend that whether a structure is a "reservoir" turns only on whether the upper/pump chamber and the lower/thermal exchange chamber can be physically separated, arguing that the Tamriel is not a reservoir because its upper and lower chambers can be separated, but that is a cropped mischaracterization of the test that was applied in the prior litigation by Asetek's expert and Judge Tigar. Defendants ignore that Asetek's expert and Judge Tigar's FoF/CoL focused on not just whether the chambers could be separated or not, but on whether the

1    upper/pump chamber and the lower/thermal exchange chamber, and the device as a whole, would

2    become *non-functional* if the chambers were physically separated. *See supra*, pp. 6-8. As Asetek's

3    expert explained in his expert report, the physical separation and reconnection of Ryu's pump driving

4    unit 30 and water jacket 20 would not destroy the functionality/operability of the Ryu device because

5    pump driving unit 30 and water jacket 20 are independent, modular devices that can be reconnected

6    by tubing, but the same is not true of the Tamriel prototypes. Defendants disagree, but the similarities

7    and differences between Ryu and the Tamriel prototypes and whether the devices would remain

8    functional following physical separation are fact issues that must be decided by the jury following

9    expert testimony. Asetek should not be estopped without giving Asetek's expert an opportunity to

10   explain these differences between Ryu and the Tamriel prototypes.

11   Defendants similarly crop and mischaracterize the full testimony and FoF/CoL from the prior

12   litigation with regard to distinctions over the Ryu reference. For example, Judge Tigar's FoF/CoL

13   noted that unlike the "reservoir," Ryu's receptacles were made of different materials and thus "would

14   not be manufactured as a single piece," and that Ryu's two receptacles "can be spatially separated and

15   connected by tubing, yet still meet the functional requirements of the [Ryu] device." *See* FoF/CoL at

16   19, 20. There are multiple factors that differentiated the Ryu device from the claimed "reservoir" (with

17   none of them being dispositive by itself), and not just the snippets that Defendants point to in this Joint

18   Statement. Thus, any analysis of whether the Tamriel has a "reservoir" must take into consideration

19   the totality of facts and circumstances that distinguish the claimed "reservoir" from the prior art, as

20   in Asetek's expert's report in this case, and not just the isolated statements referenced by Defendants.

21   Furthermore, Defendants are attempting to take statements from the prior litigation out of

22   context, and to unfairly apply estoppel doctrines to bind Asetek to positions that were not at issue in

23   the previous case. In particular, Defendants are mischaracterizing what Asetek's witnesses meant by

24   the terms "receptacle" and "components" in the prior litigation (which was context dependent).

25   Defendants are attempting to tie Asetek's hands with those mischaracterizations and exaggerations.

26   For example, Defendants are misconstruing what was meant by "component" in other contexts in an

27   attempt to preclude Asetek from contending that Defendants' Tamriel prototypes, which were never

28   at issue in any prior litigation, comprise a reservoir made up of multiple components that infringe

1   Asetek's patents. Asetek does not agree that it is precluded from arguing that the claimed "reservoir"

2   can include multiple separate components or subcomponents, as CoolIT now contends, based on

3   statements about "components" that were made in different contexts and about prior-art structures

4   very different from the Tamriel prototypes that are accused of infringement in this action. Accordingly,

5   Asetek has declined the additional stipulations Defendants proposed. Moreover, Defendants are

6   attempting to take positions about the meaning of "reservoir" here that are directly contrary to

7   positions on which they prevailed in the IPRs (explained below), which cannot be permitted.

8          Importantly, the Court should not lose sight of the fact that Defendants filed a motion to amend

9   their answers to include estoppel defenses. That dispute has now morphed into this Joint Statement

10  regarding specific terms/statements and disputes never addressed in Defendants' motion. Defendants'

11  request for estoppel regarding the disputed statements above should be denied for the reasons

12  explained in the chart below and in the discussion that follows the chart.  But in any event, Defendants'

13  request for estoppel should not be granted without full briefing, which would give Asetek the

14  opportunity to provide the full contextual backdrop (e.g., for the prior cases, the IPRs, and this case)

15  and expert opinions on these disputed issues.

| Alleged prior positions disputed by Asetek | Support Cited by Defendants | Asetek's comment |
|---|---|---|
| Two separate receptacles screwed together cannot form a single receptacle. | pp. 3-4 | Contrary to CoolIT's allegations, Asetek is not "walking back" on positions it expressly told the Court it would stipulate to at the hearing on CoolIT's motion. Rather, as stated above, Asetek is willing to stipulate to this position with the understanding, as explained in the hearing transcript, that Asetek does not agree that CoolIT's Tamriel I and Tamriel II prototypes, also referred to as the "new design" pump heads, include separate receptacles. Asetek understandably needs to be sure that such a stipulation will not be mischaracterized by Defendants to mean something that Asetek never intended.

Importantly, Asetek's clarification of this position was expressly discussed in the October 7 hearing in this Court:

    "MS. BHATTACHARYYA: Your Honor, Asetek would -- will be fine signing a stipulation that |

| Alleged prior positions disputed by Asetek | Support Cited by Defendants | Asetek's comment |
|---|---|---|
| | | Asetek is not going to take the position that two separate receptacles screwed together can form a single receptacle.<br>    **There is difference of opinion on what a 'receptacle' really means. Asetek's expert disagrees that certain parts, which Asetek's expert calls subcomponents, those are not receptacles. So ultimately, it comes down -- will come down to whether a part is a subcomponent or a receptacle or something.** But Asetek's expert has already said he's not going to take the position that two or more receptacles can form a single receptacle. His expert report already says that. So Asetek is willing to agree to a stipulation on the point that Mr. Chen has raised."<br><br>Ex. J (October 7 Hearing Transcript), 29:23-30:11 (emphasis added).<br><br>Defendants' refusal to accept this reasonable clarification demonstrates that Defendants are planning to mischaracterize any stipulation to try to estop Asetek from presenting expert testimony on the meaning of "receptacle" to those skilled in the art and whether the accused devices have one or more "receptacles." |
| Asetek's patented invention is directed to a closed loop liquid cooling system in which cooling liquid is pumped continuously between a pump head and a heat radiator (positioned remote from the pump head). Rather than connecting together multiple separate components (as in the prior art), Asetek's patented pump head design combines, into a single unit, a | p. 5 | As stated above, Asetek is willing to stipulate to this position with the clarification that the phrase "connecting together multiple separate components (as in the prior art)" in the jury verdict means connecting a separate prior art pump, a separate prior art reservoir, and a separate prior art heat exchanger by tubing, as stated in point 2 in Section I above, and as shown in prior art Figure 3 of the Asetek patents, and that this statement does not preclude Asetek from arguing that the claimed "reservoir" can have multiple separate subcomponents.<br><br>Specifically, in a meet and confer between counsel on November 10, Defendants' counsel insisted that the phrase "[r]ather than connecting together multiple separate components (as in the prior art)" precluded Asetek from arguing that the claimed "reservoir" can have multiple components or subcomponents. Asetek's counsel disagreed and explained that the referenced |

| Alleged prior positions disputed by Asetek | Support Cited by Defendants | Asetek's comment |
|---|---|---|
| pump and the claimed 'reservoir' that has, among other things, dual chambers and is bounded by a removable cold plate. | | statement in the jury verdict was about the prior art Figure 3 in Asetek's patents, and that when the statement is read *as a whole* and in the context of the surrounding testimony, it means Asetek's invention combines the pump and the claimed "reservoir" (which includes the cold plate) into a single pump head, unlike the prior art. This particular statement in the jury verdict is not relevant to the configuration of the claimed "reservoir." Rather, this statement is about the overall "pump head design" which includes a pump and a "reservoir"; this statement is not directly solely to the claimed "reservoir."<br><br>Despite Asetek's counsel's clarification during the meet and confer, which Defendants' counsel could not refute, Defendants insisted on trying to pin their mischaracterizations on Asetek. This further demonstrates Defendants' gamesmanship with the alleged estoppel positions and their intention of taking statements in the prior litigation out of context and twisting the meaning of those statements to suit their current litigation positions. |
| In the claimed invention, the upper/pump chamber and lower/thermal exchange chamber are not separable (and thus cannot be physically separated). | pp. 5-8 | Defendants oversimplify the cited trial testimony and Judge Tigar's FoF/CoL and disregard important distinctions over the prior art that were noted by Asetek's expert and in the FoF/CoL. The excerpted testimony and the FoF/CoL make clear that in prior art devices, e.g., Ryu and the Prior Art Figure 3 in Asetek's patent, the upper/pump chamber and the lower/thermal exchange chamber are not just physically separable components, rather they are separate and separable *functional* components. That is, Defendants gloss over the fact that in the prior litigation, Asetek's expert and Judge Tigar's FoF/CoL noted that the upper/pump and lower/thermal exchange chambers in the prior art devices could be both physically separated and still function (unlike Asetek's invention).  Defendants crop and mischaracterize that test by improperly focusing on only the physical separability of the receptacles (which is only one aspect of the analysis and not dispositive) |
| The claimed "reservoir" is a single receptacle with dual chambers in | pp. 9-10 | Asetek does not disagree that "[t]he claimed 'reservoir' is a single receptacle with dual chambers in it," and has already stipulated to a similar statement (*see* Section I, |

| Alleged prior positions disputed by Asetek | Support Cited by Defendants | Asetek's comment |
|---|---|---|
| it.  It is not two components (i.e., an "upper/pump chamber" component and a "lower/thermal exchange chamber" component) that are separable being screwed together. | | point 1). Asetek disputes Defendants' use of the terms "upper/pump chamber component" and a "lower/thermal exchange chamber component" which are ambiguous and were never used in the prior litigation or previously in this case. Asetek should not be limited by positions it did not take in the earlier action. Indeed, Defendants have coined the terms "upper/pump chamber component" and "lower/thermal exchange chamber component" for the first time in this Joint Statement to expand the scope of estoppel beyond the issues that were previously litigated in an attempt to create a noninfringement position where none exists.<br><br>As discussed in the row above, Defendants also crop and mischaracterize the test applied by Asetek's expert and Judge Tigar's FoF/CoL in the prior litigation. Defendants improperly focus only on physical separability (which is only one aspect of the analysis and not dispositive), and overlook that the prior art devices had structurally and _functionally_ independent, modular components (unlike Asetek's invention). That is, Defendants are improperly attempting to estop Asetek from arguing that the accused Tamriel prototypes' integrated components or subcomponents comprise a reservoir where the upper/pump and lower/thermal exchange chambers will not function if separated. That position in this case is fully consistent with Asetek's positions and the FoF/CoL in the prior case. |
| Two separate receptacles or components (i.e., an "upper/pump chamber" component and a "lower/thermal exchange chamber" component) that are plugged together or put together do not become a single receptacle with two chambers inside it. | pp. 10-11 | Asetek is already willing to stipulate to the position that "two separate receptacles screwed together cannot form a single receptacle" (subject to the clarification about Tamriel). _See_ row 1 of this chart. Asetek should not be estopped from anything further based on fragments of testimony — about components "plugged together" or "put together" — that are divorced from their surrounding context.<br><br>Asetek further objects to Defendants' use of the new and unclear terms "upper/pump chamber component" and a "lower/thermal exchange chamber component" because they improperly expand the scope of estoppel beyond issues that were previously litigated, as explained above. |

| Alleged prior positions disputed by Asetek | Support Cited by Defendants | Asetek's comment |
|---|---|---|
| | | Defendants also disregard the testimony and FoF/CoL that that the prior art had two receptacles that are "separate structural and functional components" that "probably would not be manufactured as a single piece." *See* FoF/CoL at 8, 19. Instead, Defendants are trying to improperly preclude Asetek from arguing that the claimed "reservoir" can have connected or integrated components as long as the upper/pump and lower/thermal exchange chamber will not function if separated. Defendants' error is compounded by the fact that Defendants took the exact same position (i.e., that a reservoir can comprise a component that defines an upper/pump chamber and another component that defines a lower/thermal exchange chamber) that they are now trying to estop Asetek from in its IPRs (more on this below). |
| Two separate upper/pump chamber and lower/thermal exchange chamber connected by tubing are separate components and do not satisfy a reservoir's single receptacle containing two chambers in it. | pp. 11-12 | Defendants improperly focus on the phrase "separate components" to try to expand the scope of estoppel, even though the cited portion of the FoF/CoL makes it clear that "Ryu's pump chamber and water jacket *are not just* separate components, but can be spatially separated and connected by tubing, *yet still meet the functional requirements* of the [Ryu] device, unlike the [claimed] device[.]" FoF/CoL at 20 (emphases added). Defendants disregard the context and full scope of Judge Tigar's finding, and instead stitch together isolated phrases from Asetek's expert's testimony to fabricate positions that are incorrect when viewed in the context of the relevant prior art and surrounding testimony. |

More specifically, Defendants are seeking to limit Asetek based on snippets of testimony regarding the prior art by Asetek's expert in the prior litigation, divorced from the context in which those statements about the prior art were made. Importantly, Defendants are attempting to use general terms like "component" and "receptacle" that were used in one context to describe certain prior art with a different structure to preclude Asetek from using those same terms — "component" and "receptable" — to prove infringement in the current litigation, even though the meaning of those terms is context-dependent and varies from one system/device to the other.

1    Defendants' overreach is exemplified by their position regarding the following statement in

2    the jury verdict form: "Rather than connecting together multiple separate components (as in the prior

3    art), Asetek's patented pump head design combines, into a single unit, a pump and the claimed

4    'reservoir' that has, among other things, dual chambers and is bounded by a removable cold plate."

5    Defendants cite this sentence to argue that the "reservoir" cannot be two components screwed together

6    or otherwise connected together. But the verdict form does not say that, and Defendants' spin takes

7    the verdict form out of context.  When the verdict statement is read in its entirety and in the context of

8    the relevant trial testimony, it is clear that this statement distinguishes Prior Art Figure 3 in Asetek's

9    patents (shown below) from Asetek's claimed invention.[2]

10   More specifically, this statement in the jury verdict describes prior art liquid cooling systems

11   that had several independent, separate *modular* components (such as a prior art heat exchanger, a prior

12   art liquid reservoir, a prior art pump, and a prior art heat radiator) that were connected by tubing to

13   form a liquid cooling system. Asetek's invention, in contrast, combines a pump, a dual-chambered

14   "reservoir," and a heat exchanging interface (i.e., a cold plate) into a single pump head/unit. Despite

15   this clear contextual meaning, Defendants have isolated the phrase "[r]ather than connecting together

16   multiple separate components (as in the prior art)" from the rest of the statement to argue that Asetek

17   is allegedly estopped from arguing that the claimed "reservoir" can comprise multiple separate

18   components.

---

25   [2] Defendants erroneously asserted in their underlying motion to amend their pleadings that Asetek is
26   supposedly "running away" from this finding in the jury verdict, which is incorrect as explained
     during the hearing and herein. In this joint statement, Defendants also incorrectly contend that
     Asetek is supposedly trying to "erase" the fact that the claimed reservoir is a single receptacle
27   divided into a functional upper/pump chamber and a functional lower/thermal exchange chamber
     within the single receptacle. *See* p. 14  That is also not true; Asetek agrees with that statement about
28   the claimed "reservoir" and has never contended otherwise. Defendants repeated
     mischaracterizations of Asetek's positions betray the fallacies in Defendants' arguments

1
2
3
4
5
6
7
8
9
10



11
12

**Asetek's demonstrative slide used with Asetek's expert's testimony during the *Asetek Danmark A/S v. CMI USA, Inc.* trial**

13      Defendants continue with their unreasonable estoppel arguments by cherry-picking statements

14 made by Asetek's expert in the context of the structure of the prior art Ryu device. Defendants isolate

15 certain phrases from the surrounding testimony and the framework provided by Ryu, and attempt to

16 estop Asetek from using the same or similar wording to demonstrate how CoolIT's Tamriel designs

17 infringe Asetek's patents. This should not be permitted because the terms "component," "receptacle,"

18 etc. are general terms and context dependent, and can mean different things in different contexts. The

19 context in which these terms are used (e.g., in discussing Ryu, the prior art, or the Tamriel prototypes

20 accused in this action) is thus critically important. In the context of Ryu, much like prior art Figure 3

21 in Asetek's patents, the term "component" or "receptacle" was used to describe *structurally and

22 functionally independent*, modular devices. But those general terms have different meanings in the

23 context of other devices, including the Tamriel prototypes, which do not have structurally and

24 functionally independent, modular devices. Therefore, Defendants cannot simply label certain

25 structures as "components" or "receptacles," and argue that Asetek is estopped from arguing that those

26 structures are integrated to form the "reservoir" (as they are trying to do here). Rather, the jury must

27 decide whether an accused design indeed has a "reservoir," i.e., a single receptacle defining a fluid

28 flow path.

1     Defendants seem to agree that the Court need not decide the meaning of "components" or

2 "subcomponents" at this juncture, but they nevertheless insist that Asetek should be estopped from

3 saying that the "reservoir" can have "components" connected together (even through Defendants

4 argued to the contrary in the IPRs against Asetek's patents that the "reservoir" can have multiple

5 components that are integrated to serve as a single receptacle). But Asetek should not be estopped

6 wholesale from statements using terms like "components" that mean one thing in the context of Ryu

7 and another in the context of an accused device because there is no inconsistency in Asetek's positions.

8 Contrary to Defendants' allegations, Asetek is not changing its interpretation of the claimed invention

9 or "shifting theories." This is demonstrated by Asetek's willingness to stipulate to reasonable

10 positions, as shown in Section I. Asetek is simply asking that isolated statements by Asetek's expert

11 to describe the Prior Art Figure 3 or the Ryu device should not be used to recharacterize Asetek's

12 invention, reconstrue the meaning of "reservoir"/"single receptacle," or limit the scope of Asetek's

13 claims, as Defendants are attempting to do. Defendants have provided no case law, nor is Asetek aware

14 of any, to support limiting Asetek's invention based on statements at trial that are divorced from the

15 context provided by the configuration of the prior-art devices. In particular, Defendants should not be

16 allowed to expand the scope of estoppel by relying on isolated statements by Asetek's expert regarding

17 the prior art Ryu device, which is structurally and functionally different from the accused Tamriel

18 prototypes (as discussed below). Defendants disagree that Ryu and the Tamriel prototypes are

19 different, but any similarity or difference between Ryu and Tamriel, and particularly whether the

20 Tamriel prototypes have "receptacles" or structurally and functionally independent "components" like

21 Ryu, are fact issues that should properly be decided by the jury following expert testimony. Asetek

22 should not be estopped now before the jury has any opportunity to weigh the similarities or differences

23 between Ryu and the Tamriel prototypes.

24

25

26

27

28

Defendants' estoppel positions are an overreach particularly in view of the clear differences between the Ryu device and the updated Tamriel design that Defendants are planning to commercialize. As shown below, the updated Tamriel includes a single reservoir housing (shown below) in which a subcomponent defining a pump volute is fitted in. The subcomponent that is nestled within the reservoir housing forms the upper/pump chamber of the claimed "reservoir." The same reservoir housing also includes the lower/thermal exchange chamber of the "reservoir."



Reservoir



1    CoolIT's updated Tamriel design is very much like the reservoir depicted in Asetek's patents

2    and distinctly different from Ryu because in Ryu the pump device (pump driving unit 30) and the heat

3    exchanging device (water jacket 20) are structurally and functionally independent devices that can be

4    stacked on top of each other in some embodiments or physically separated from one another in other

5    embodiments. *See* Figures 2(a) and 2(b) of Ryu (depicted below). In contrast, in the updated Tamriel,

6    the subcomponent (i.e., impeller cover) forming the upper/pump chamber is nestled within a single

7    reservoir housing that includes the lower/thermal exchange chamber.[3] Unlike in Ryu, the "top

8    chamber" subcomponent in the Tamriel is not a structurally separate and functionally independent

9    device like pump driving unit 30 of Ryu. The differences between the prior art Ryu and Tamriel

10   highlight the importance and necessity of context, and why the terms or terminology that Defendants

11   are trying to estop Asetek from using have different meanings in different designs/configurations.

12

13   

14

15   

16

17   

18

19

20

21

22

23   [3] Defendants modify their own design drawings of the Tamriel in page 17 of this Joint Statement to

24   argue that *if* the outer walls of the Tamriel are removed, *then* the "top chamber" subcomponent
     would not be nestled in the reservoir housing. But that is not an accurate representation of the

25   Tamriel pump head design. In the Tamriel prototype sample provided to Asetek in discovery as well
     as in the design drawings of the Tamriel that Defendants produced in this case, the "top chamber"

26   subcomponent is indeed nestled within the reservoir housing, as shown in the above figures.
     Defendants also try to create a new requirement that every part of the "reservoir" must receive

27   liquid, otherwise it is not a "reservoir" and simply a cosmetic housing. While the "reservoir" defines
     a fluid flow path therethrough, nothing in the patent specification, claims, or testimony in the prior

28   litigation requires liquid to touch every part of the claimed "reservoir."

1

**2. Defendants' estoppel positions must be juxtaposed with their own contrary
positions in the IPRs against Asetek's position.**

2

3       Defendants' non-infringement positions are clearly inconsistent with positions taken in the

4   IPRs against Asetek's patent (shown in the chart below). Defendants' inconsistent statements in the

5   IPRs, and their post hoc attempt in this Joint Statement to distance themselves from the contrary IPR

6   statements, highlight the importance of context in determining the scope of estoppel. Specifically,

7   CoolIT argued in the IPR petitions, with regard to three different prior-art references, that multiple

8   components — i.e., a component that defines an upper/pump chamber and another separate component

9   that defines a lower/thermal exchange chamber — can be integrated to serve as a "reservoir," i.e., a

10  "single receptacle defining a fluid flow path" per the parties' stipulated construction. Yet, Defendants

11  are attempting to estop Asetek from arguing that "[a]n 'upper/pump chamber' and a 'lower/thermal

12  exchange chamber' cannot be seperable [sic] components screwed together, plugged or put together,

13  or otherwise connected by tubing to become a single receptacle of the claimed 'reservoir.'" *See* Section

14  II.B, above.

15      Defendants' attempt to distinguish their positions in the IPR are specious. Defendants now

16  argue that the claimed "reservoir" must meet four criteria in this case, but that the same is not true for

17  **prior art that Defendants argued in the IPR contained Asetek's claimed "reservoir" using the**

18  **parties' stipulated definition of "reservoir" from this case.** *See supra*, pp. 25-26. Defendants'

19  argument cannot be reconciled with their unequivocal representation to the PTAB that each of the

20  prior art references (Duan, Batchelder, and Shin) comprised the claimed "reservoir." Defendants'

21  current arguments that the prior art devices they asserted in the IPR had some but not all four

22  "reservoir" requirements fly in the face of the positions Defendants successfully argued to the PTAB,

23  as shown in the chart below, and Defendants' IPR experts' testimony that he applied the parties'

24  stipulated construction of "reservoir" from this case and that he opined that Shin's *separate* impeller

25

26

27

28

STIPULATION
CASE NO. 3:19-cv-00410-EMC

case 11 (alleged "upper chamber") and heat sink 4 (alleged "lower chamber") formed the claimed "reservoir." Ex. K (Hodes Dep. Tr.) at 35:10-15, 54:1-60:12.[4]

Defendants should be judicially estopped from taking positions that contradict their positions in the IPRs that successfully invalidated Asetek's claims.[5] To find otherwise would be grossly unfair and highly prejudicial to Asetek.

| CoolIT's prior positions in the IPRs against Asetek's '354 and '355 patent | Corresponding support |
|---|---|
| Multiple components can be integrated to serve as a reservoir, i.e., a single receptacle defining a fluid flow path. | Petition (Ex. E), IPR2020-00522, pp. 25-28<br><br>"Regarding the reservoir, Duan discloses a structure formed by an accommodation chamber 21, cap 3, and cooling plate 1 configured to pass cooling liquid there-through. . . . **These components together form the claimed reservoir**. . . . Duan's accommodation chamber 21 (of which the interior is colored lime green), cap 3 (light blue), and cooling plate 1 (dark blue) form the physical boundaries of a housing the discloses the claimed "reservoir." . . . Thus, **these components are described to be integrated to serve as a single receptacle defining a fluid flow path**. This is explained in greater detail below with respect to the remaining elements that further defined the claimed 'reservoir.'" (Emphases added.) |

---

[4] Although Defendants' IPR expert initially testified, and during redirect after discussions with Defendants' counsel, that he would not consider Shin to have a "reservoir" or "single receptacle," *see* Ex. K at 36:4-7 and 81:1-16, when he was confronted with his declaration in the IPR against Asetek's '354 patent, he backtracked and admitted that he in fact disclosed Shin as having the claimed "reservoir" in the '354 patent IPR, that he had not reviewed his declaration for the '354 patent IPR before testifying about the '355 patent IPR, and that "reservoir" means the same for both patents, *see id* at 54:16-57:5.

[5] Unlike Defendants, Asetek is not seeking collateral estoppel. Asetek is only asking that Defendants be judicially estopped — which need not be pled as an affirmative defense — from taking non-infringement position that are clearly inconsistent from invalidity positions taken in the IPRs,



*Id.* at 26 (showing Duan's alleged "reservoir")

PTAB Final Written Decision (Ex. F), IPR2020-00522, p. 23

"We have reviewed Petitioner's contentions and for the reasons set forth by Petitioner, determine that Petitioner has shown Duan anticipates claim 1 by a preponderance of the evidence. *See* Pet. 21–58."

Petition (Ex. G), IPR2020-00523, p. 11

"Batchelder discloses **a reservoir (e.g., active spreader plate 20)** configured to circulate a cooling liquid therethrough . . .
This active spreader plate 20 is a **single, unitary receptacle and defines a fluid flow path** (60)." (Emphases added.)

*Id.* at pp. 12-14 ("Shin also discloses a **reservoir (e.g., an integrated structure)** for providing liquid cooling of computing components . . . a POSITA would understand that Shin discloses **a reservoir (e.g., a receptacle containing a heat sink 4, flexible hose 6, coolant discharge section coupler 7, water supply coupler 9, and impeller case 11)** configured to circulate a cooling liquid therethrough.") (Emphases added.)



FIG. 2

*Id.* at 15 (CoolIT's annotations of Shin's liquid cooler; the yellow portion (impeller case 11) is the alleged upper chamber and the blue portion (heat sink 4) is the alleged lower chamber of the alleged "reservoir" in Shin).

*Id.* at p. 18 ("Batchelder discloses **a reservoir (e.g., a spreader plate 20)** that an includes an upper chamber (or compartment) as the space below top surface 26 in FIG. 2 and the space below upper stamped plate 208 and channel forming sheet 210 in FIGS. 7 and 8. Batchelder's reservoir also includes a lower chamber (or compartment) as the flow channels 50, the space above lower surface 24 in FIG. 2 and above upper stamped plate 204 in FIGS. 7 and 8." (Emphasis added.)



*Id.* at 18 (showing Batchelder's Fig. 7).

| | |
|---|---|
| | Batchelder (Ex. H), 7:23-8:12 |
| | Batchelder describes that heat spreader plate 20 is formed by multiple sheets (202, 204, 206, 208, 210 and 212) that are "designed to be stamped from sheets and subsequently assembled with adhesives, ultrasonic bonding, solvent bonding, or welding. Those skilled in the art will recognize that **the individual components of the active spreader plate could be molded, and that several of the described components can be functionally combined if the components are molded**." (Emphasis added.) |
| | PTAB Final Written Decision (Ex. I), IPR2020-00523, p. 11 |
| | "Claim 1 requires both an 'upper chamber' and a 'lower chamber,' which Petitioner maps to the flow channels on the top and bottom of Batchelder's active spreader plate, respectively. Pet. 16–18 (showing annotated versions of Batchelder's Figures 2, 7, and 8)." |
| | *Id.* at 19-20 ("We have reviewed the record, including both parties' contentions and evidence, and conclude that Petitioner has shown by a preponderance of the evidence that the combination of Batchelder and Shin discloses the limitations of claim 1, and that skilled artisans would have had reason to make the combination as asserted, with a reasonable expectation of success."). |

Asetek disagrees with Defendants' counsel that the chart above is not appropriate or should not be considered as part of this Joint Statement. Defendants' estoppel arguments must be considered in light of Defendants' contradictory positions in the IPRs. If the Court decides the scope of estoppel now without the benefit of additional briefing by the parties to explain the relevant context of prior statements, then the Court should also use its inherent discretion to preserve the integrity of the judicial process by prohibiting Defendants from taking positions that are clearly inconsistent with the positions taken in the IPRs to invalidate Asetek's patents.

Respectfully submitted,

Dated: November 23, 2021

FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP

By:      */s/ Arpita Bhattacharyya*
    Arpita Bhattacharyya

    Robert F. McCauley (SBN 162056)
    robert.mccauley@finnegan.com
    Arpita Bhattacharyya (SBN 316454)
    arpita.bhattacharyya@finnegan.com
    Jeffrey D. Smyth (SBN 280665)
    jeffrey.smyth@finnegan.com
    **FINNEGAN, HENDERSON, FARABOW,
      GARRETT & DUNNER, LLP**
    3300 Hillview Avenue
    Palo Alto, California  94304
    Telephone:(650) 849-6600
    Facsimile: (650) 849-6666

    *Attorneys for Plaintiff and Counterdefendant*
    *ASETEK DANMARK A/S*

1    Dated: November 23, 2021                    COOLEY LLP

2

3                                               By:   /s/ Reuben H. Chen
                                                     Reuben H. Chen
4
                                                Heidi L. Keefe (SBN 178960)
5                                               hkeefe@cooley.com
                                                Reuben H. Chen (SNB 228725)
6                                               rchen@cooley.com
                                                Daniel J. Knauss (SBN 267414
7                                               dknauss@cooley.com
                                                Lam K. Nguyen (SNB 265285)
8                                               lnguyen@cooley.com
                                                Deepa Kannappan (SBN 313573)
9                                               dkannappan@cooley.com
                                                Alexandra Leeper (SBN 307310)
10                                                aleeper@cooley.com
                                                **COOLEY LLP**
11                                              3175 Hanover Street
                                                Palo Alto, CA 94304-1130
12                                              Telephone: (650) 843-5000
                                                Facsimile:  (650) 849-7400
13
                                                Dustin M. Knight (*pro hac vice*)
14                                              dknight@cooley.com
                                                **COOLEY LLP**
15                                              11951 Freedom Drive, 16th Floor
                                                Reston, VA 20190
16                                              Telephone: (703) 456-8000
                                                Facsimile:  (703) 456-8100
17
                                                *Attorneys for Defendant and Counterclaimant*
18                                              *COOLIT SYSTEMS, INC. and Defendants COOLIT*
                                                *SYSTEMS USA INC., COOLIT SYSTEMS ASIA*
19                                              *PACIFIC LIMITED, COOLIT SYSTEMS*
                                                *(SHENZHEN) CO., LTD., CORSAIR GAMING,*
20                                              *INC. and CORSAIR MEMORY, INC.*

21                                              Kyle D. Chen (SBN 239501)
                                                kchen@gtlaw.com
22                                              **GREENBERG TRAURIG, LLP**
                                                1900 University, Avenue, 5th Floor
23                                              East Palo Alto, CA 94304
                                                Telephone: (650) 289-7887
24                                              Facsimile:  (650) 328-8508

25                                              *Attorneys for Defendant and Counterclaimant*
                                                *COOLIT SYSTEMS, INC.*
26
                                                Kenneth J. Dyer (SBN 191192)
27                                              KDyer@dickinsonwright.com
                                                **DICKINSON WRIGHT RLLP**
28                                              800 West California Avenue, Suite 110
                                                Sunnyvale, CA 94086

                                        47

1
2

Telephone: (408) 701-6170
Facsimile:  (884) 670-6009

*Attorneys for Defendant and Counterclaimant*
*COOLIT SYSTEMS, INC. and Defendants COOLIT*
*SYSTEMS USA INC., COOLIT SYSTEMS ASIA*
*PACIFIC LIMITED, COOLIT SYSTEMS*
*(SHENZHEN) CO., LTD.*

3
4
5
6
7
8
9

10

## ATTESTATION

11          Counsel for CoolIT Systems, Inc. hereby attests by his signature below that concurrence in

12   the filing of this document was obtained from counsel for Asetek Danmark A/S.

13

14   Dated: November 23, 2021          FINNEGAN, HENDERSON, FARABOW,
                                          GARRETT & DUNNER, LLP
15

16                                      By:___*/s/ Reuben H. Chen*_____
                                          Reuben H. Chen
17                                        Attorneys for Defendant and Counterclaimaint
                                          COOLIT SYSTEMS, INC.
18
19
20
21
22
23
24
25
26
27
28