1   Robert F. McCauley (SBN 162056)
    robert.mccauley@finnegan.com
2   Arpita Bhattacharyya (SBN 316454)
    arpita.bhattacharyya@finnegan.com
3   Jeffrey D. Smyth (SBN 280665)
    jeffrey.smyth@finnegan.com
4   **FINNEGAN, HENDERSON, FARABOW,**
     **GARRETT & DUNNER, LLP**
5   3300 Hillview Avenue
    Palo Alto, California  94304
6   Telephone:    (650) 849-6600
    Facsimile:    (650) 849-6666
7
    Attorneys for Plaintiff and Counterdefendant
8   ASETEK DANMARK A/S and
    Counterdefendant ASETEK USA, INC.
9

10                **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
11                  **SAN FRANCISCO DIVISION**

12

13  ASETEK DANMARK A/S,                    CASE NO. 3:19-cv-00410-EMC

14                   Plaintiff and        **ASETEK DANMARK A/S'S AND ASETEK**
                     Counterdefendant,    **USA, INC.'S NOTICE OF MOTION AND**
15                                         **MOTION TO EXCLUDE OPINIONS OF**
    ASETEK USA, INC.,                     **MR. JOHN L. HANSEN CONCERNING**
16                                         **COOLIT'S DAMAGES**
                     Counterdefendant,
17
             v.                            Date:      May 5, 2022
18                                         Time:      1:30 PM
    COOLIT SYSTEMS, INC.,                 Location:   Courtroom 5, 17th Floor
19                                         Judge:     Hon. Edward M. Chen
                     Defendant and
20                   Counterclaimant,

21  COOLIT SYSTEMS USA INC., COOLIT
    SYSTEMS ASIA PACIFIC LIMITED,
22  COOLIT SYSTEMS (SHENZHEN) CO.,        **REDACTED VERSION**
    LTD.,
23
                     Defendants,
24
    CORSAIR GAMING, INC. and CORSAIR
25  MEMORY, INC.,

26                   Defendants.

27

28

## NOTICE OF MOTION

TO ALL PARTIES AND THEIR RESPECTIVE COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on May 5, 2022 at 1:30 p.m. in Courtroom 5, located on the 17th Floor of the above-entitled court at 450 Golden Gate Avenue, San Francisco, California, or a soon thereafter as the matter may be heard before Honorable Edward M. Chen, Plaintiff and Counterdefenant Asetek Danmark A/S and Asetek USA, Inc. will and hereby do move to exclude certain opinions of Mr. John L. Hansen concerning CoolIT's damages.

This Motion is based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Jeffrey D. Smyth and the exhibits thereto, the [Proposed] Order filed concurrently herewith, all other papers or pleadings in this action, evidence and argument that the parties may present before or at the hearing on this matter, and any other matters of which this Court may take judicial notice.

# **TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................................1

II.   FACTUAL BACKGROUND .................................................................................2

    A.    Asetek's Patents Cover a Complete Liquid Cooling Device ....................................2

    B.    The Asserted Claims of CoolIT's Patents are All Directed to a Cold Plate Component in a Liquid Cooling System ...........................................................2

    C.    Mr. Hansen Applied His Royalty Rate to the Entire Value of the Accused Asetek Liquid Cooling System Products, Even Though the CoolIT Patents Cover Only the Cold Plate Component of the Accused Liquid Cooling System Products....................................................................................................4

    D.    With No Established Royalty for the CoolIT Patents, Mr. Hansen Relied on an Incomparable 2012 Asetek-Corsair License Agreement for Asetek's Patents and Superior Technology ...................................................................6

    E.    Mr. Hansen Has Unreasonably Relied on Another CoolIT Expert's Unsupported and Unexplained Opinion That CoolIT's Patents Are More Valuable Than Asetek's ..........................................................................7

III.  ARGUMENT .........................................................................................................9

    A.    Legal Standards.................................................................................................9

    B.    Because There is No Evidence that CoolIT's Asserted Patent Claims Drive Demand for Asetek's Products, Mr. Hansen Cannot Rely on the Entire Market Value Rule ...........................................................................9

    C.    Mr. Hansen Did Not Apportion His Royalty Base, And Instead Disregarded His Own Calculation That Only About 2.9% Of Asetek's Revenue Is Attributable to CoolIT's Asserted Patent Claims ...................................12

    D.    Mr. Hansen Did Not Apportion His Royalty Rate.................................................12

        1.    Mr. Hansen did not apportion the royalty rate from the Asetek-Corsair license, and he should not have relied upon that license anyway because it is not comparable to the license that could have resulted from the hypothetical negotiation. ...................................................13

        2.    Mr. Hansen's reliance on Dr. Abraham to support a 7% royalty is also misplaced because Dr. Abraham's valuation opinions are irrelevant and unreliable.........................................................................14

    E.    Mr. Hansen's Royalty Base Improperly Includes a Portion of Overseas Sales to Corsair That He Speculates Are Later Sold in the U.S.....................................18

    F.    Mr. Hansen's Royalty Base Improperly Includes Damages for Sales Made by Asetek USA More Than Six Years Before It Became a Party in this Suit, Which Damages are Not Recoverable by Statute .................................................20

ASETEK'S MOTION TO EXCLUDE OPINIONS
of J. HANSEN CONCERNING COOLIT'S DAMAGES
CASE NO. 3:19-cv-00410-EMC

IV.    CONCLUSION..................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Asetek Danmark A/S v. CMI USA Inc.,*
    852 F.3d 1352 (Fed. Cir. 2017)...........................................................................................7

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579 (1994)....................................................................................................1, 9

*Eidos Display, LLC v. Chi Mei Innolux Corp.,*
    Case No. 11-CV-00201-JRG, 2017 WL 1322555 (E.D. Tex. Apr. 6, 2017)...............19

*Enplas Display Device Corp. v. Seoul Semiconductor Co., Ltd.,*
    909 F.3d 398 (Fed. Cir. 2018)..................................................................................18

*Ericsson, Inc. v. D-Link Sys., Inc.,*
    773 F.3d 1201 (Fed. Cir. 2014)................................................................................12

*GPNE Corp. v. Apple, Inc.,*
    Case No. 12-CV-02885-LHK, 2014 WL 1494247 (N.D. Cal. Apr. 16, 2014)......16, 17

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999).....................................................................................................9

*LaserDynamics, Inc. v. Quanta Computer, Inc.,*
    694 F.3d 51 (Fed. Cir. 2012).............................................................................. *passim*

*Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.,*
    476 F. Supp. 2d 1143 (N.D. Cal. 2007) ..................................................................19

*NetFuel, Inc. v. Cisco Sys. Inc.,*
    Case No. 18-CV-02352-EJD, 2020 WL 1274985 (N.D. Cal. Mar. 17, 2020)............14, 15, 16, 17

*Oiness v. Walgreen Co.,*
    88 F.3d 1025, 39 U.S.P.Q.2d 1304 (Fed. Cir. 1996) ...............................................18

*Open Text S.A. v. Box, Inc.,*
    Case No. 13-CV-04910-JD, 2015 WL 349197 (N.D. Cal. Jan. 23, 2015) ............16, 17

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.,*
    904 F.3d 965 (Fed. Cir. 2018)....................................................................................9

*ResQNet.com, Inc. v. Lansa, Inc.,*
    594 F.3d 860 (Fed. Cir. 2010)..................................................................................13

*Uniloc USA, Inc. v. Microsoft Corp.,*
    632 F.3d 1292 (Fed. Cir. 2011).............................................................................9, 11

*Virnetx, Inc. v. Cisco Sys., Inc.*,
   767 F.3d 1308 (Fed. Cir. 2014)...................................................................................1, 9, 10, 11

*Wordtech Systems, Inc v. Integrated Networks Solutions, Inc.*,
   609 F.3d 1308 (Fed. Cir. 2010).................................................................................................18

**Statutes**

35 U.S.C. §286................................................................................................................................6, 20

**Other Authorities**

Federal Rule of Evidence 702...........................................................................................................9

I.       **INTRODUCTION**

Defendant CoolIT and its damages expert are improperly attempting to inflate CoolIT's damages claim(s) with unreliable expert opinion, including a failure to apportion, as required by Federal Circuit precedent, between patented and unpatented features in the Asetek products that CoolIT has accused of infringement. Accordingly, Plaintiff Asetek asks the Court to preclude these improper opinions by "exercis[ing] its gatekeeping authority [under *Daubert*] to ensure that only theories comporting with settled principles of apportionment [are] allowed to reach the jury." *See Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1325-34 (Fed. Cir. 2014).

When a patent covers only one component of a multi-component product, the Federal Circuit has held that damages experts cannot calculate a reasonable royalty using revenue of the entire product without establishing that the patented component drives demand for the product. *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67-70 (Fed. Cir. 2012) (vacating damages award and remanding where the royalty base relied on the entire market value without demonstrating that the patented features drove demand); *see also Virnetx*, 767 F.3d at 1325-34 (same). CoolIT's patents cover only one component of the accused Asetek products—the cold plate—but Mr. Hansen improperly calculated reasonable royalty damages using all revenue received by Asetek for the accused products, in violation of Federal Circuit precedent, and significantly and improperly enlarging CoolIT's damages.

Mr. Hansen argues that his analysis is not in violation of Federal Circuit authority because his understanding is that ██████████████████████████████████████████ ████████████ and that ████████████████████████████████████████████████ ████████████████ Ex. 1 at 176:23-177:4. The Federal Circuit decisions in *LaserDynamics* and *Virnetx* are not so easily avoided. And even if Mr. Hansen's understanding were correct, he did not adjust either the royalty rate or the royalty base. Instead, Mr. Hansen applied his maximum royalty rate from the Asetek-Corsair license to the full amount of revenue received by Asetek for sales of the accused liquid cooling products. And Mr. Hansen's reliance on Dr. Abraham to support his analysis is misplaced because Dr. Abraham's purported valuation comparison is baseless and unreliable.

Mr. Hansen's opinions concerning CoolIT's damages should be excluded.

## II.    FACTUAL BACKGROUND

### A.    Asetek's Patents Cover a Complete Liquid Cooling Device

Andre Eriksen, CEO of Asetek, invented pioneering liquid cooling technology that created the now thriving market for liquid cooling devices and he obtained patents that cover a complete cooling system. Prior art liquid cooling systems were bulky and risked leakage with several components coupled together using tubes. Such a configuration is illustrated below in Prior Art Figure 3 of Asetek's '362 patent, showing a prior art heat exchanger 7, a prior art liquid reservoir 8, a prior art pump 9, and a prior art heat radiator 11 connected in a closed loop using tubes. *See, e.g.*, Ex. 2, Fig. 3 (prior art). Mr. Eriksen invented a novel design that combined several prior art components into a compact configurations that are now often referred to as an "all-in-one" pump head coupled to a radiator and fan. *See id.*, Fig. 8.



FIG. 3
PRIOR ART

FIG. 8

Asetek's patent claims are directed to complete liquid cooling device systems that have, among other features, a pump unit that combines a pump, reservoir, and heat exchanging interface (i.e., a cold plate) into a single component, and also elements, including a radiator and a fan, to form a complete liquid cooling system as shown in the embodiment in Figure 8 above.

### B.    The Asserted Claims of CoolIT's Patents are All Directed to a Cold Plate Component in a Liquid Cooling System

All of the asserted claims in the CoolIT patents are directed to a "fluid heat exchanger" (Smyth Decl., ¶ 15), which CoolIT's technical expert confirmed is the cold plate component of a liquid cooling system during his deposition. *See* Ex. 3 at 2. The Court agreed in its claim

construction order, based on CoolIT's expert's testimony as well as the Court's detailed examination of the specifications of CoolIT's patents. *See* Dkt. 149 at PDF pp. 19-25 (ruling that the claimed "fluid heat exchanger" is not the liquid cooling system, but instead is limited to the cold plate, i.e., a "component that transfers heat from a heat source to a cooling liquid circulated by a pump that is external to the component."). Moreover, in the claim construction order, the Court specifically distinguished CoolIT's claims directed to a "fluid heat exchanger," which are limited to the cold plate component, from CoolIT's claims directed to "heat exchange systems," which are directed to liquid cooling systems. *Id*. at 22. At this juncture of this case, all of CoolIT's remaining asserted claims are directed to a "fluid heat exchanger" (the cold plate). Smyth Decl., ¶¶ 15-16.

CoolIT's asserted patent claims are directed to specific embodiments of "split flow" cold plates. The concept of split flow cold plates was not new; it was known for years before CoolIT filed its patents. Indeed, Asetek used a split flow cold plate in a prior art Asetek product (Antarctica) asserted against CoolIT in this action. Smyth Decl., ¶ 17. During his deposition, CoolIT's expert, Dr. Pokharna, confirmed that the "fluid heat exchanger" claimed in CoolIT's patents refers only to the cold plate component, which he annotated as shown below during his deposition:



Ex. 3 at 2; *see also* Dkt. 149 at PDF p. 24. CoolIT's expert also separately labeled the pump components in his annotation shown above. The pump components are some of the many components in Asetek's and CoolIT's liquid cooling system products outside the scope of all of the

asserted claims in the CoolIT patents, which are all directed to a "fluid heat exchanger." Smyth

Decl., ¶¶ 15-16.

        **C.**       **Mr. Hansen Applied His Royalty Rate to the Entire Value of the Accused
Asetek Liquid Cooling System Products, Even Though the CoolIT
Patents Cover Only the Cold Plate Component of the Accused Liquid
Cooling System Products**

       Mr. Hansen, CoolIT's damages expert, presented his damages reasonable royalty opinions in

his supplemental report on December 2, 2021, which are purportedly based on a hypothetical

negotiation under the *Georgia-Pacific* framework.[1] As background for his reasonable royalty

analysis, Mr. Hansen explained the following:

Ex. 4, ¶ 82 (emphasis added, citations omitted).[2]

       Mr. Hansen stated in his report that he set out to ███████████████████████

███████████████████████████ Ex. 4, ¶ 83. He considered the copper cold

plate of Asetek's products to be the smallest saleable patent practicing unit, and he determined that

the cold plate cost ranged from between ██████ and ██████ per unit, with a weighted average cost of

_____

[1] ████████████████████████████████████████████████. Ex. 1, at 147:24-148:2.

[2] ███████████████████████████████████████████████████████████████
██████████████████████████████ Ex. 5; Ex. 1 at 195:1-196:18.

1   ████ per unit. *Id.* ¶ 87. He compared that average cost to Asetek's gross profit margins and

2   determined that Asetek's gross profit per unit on its cold plates ranged from between ████ and

3   ████ per unit, with a weighted average gross profit of ████ per unit on the cold plates. *Id.*, ¶ 89. He

4   concluded that the amount of Asetek's profit attributable to the cold plates was only ████ of

5   Asetek's revenue on its sales of the accused liquid cooling system products. *Id.* Said another way,

6   Mr. Hansen's analysis shows that ████ of Asetek's revenue for sales of the accused liquid cooling

7   system products is not profit attributable to the CoolIT patents-in-suit.

8          Despite his determination of the relatively small incremental value of CoolIT's asserted

9   patent claims to Asetek's liquid cooling system products, Mr. Hansen calculated royalty damages by

10  using 100% of Asetek's revenue for sales of the accused liquid cooling products (which he estimated

11  at about ████) as his royalty base. ████████████████████████████

12  ████ *See* Ex. 1 at 189:12-190:5.

13         In arriving at his chosen royalty base, Mr. Hansen further added ████████ to the royalty

14  base (for a sum of about ████████ by *merely assuming* ████████ of products that Asetek

15  sold to Corsair outside the United States were resold by Corsair in the United States. Ex. 1 at 166:4-

16  168:1; Ex. 4, ¶ 14. ████████████████████████████████

17  ████████████████████████████████████

18  ████████████████████████████

19  ████████████████. More specifically, Mr. Hansen

20  initially determined a royalty base of approximately ████████ in revenues to Asetek Danmark

21  A/S and Asetek USA, Inc. for sales of products in or to the United States, based on the Asetek's

22  detailed sales data provided in discovery. Ex. 4 at ¶ 13.[3] Asetek's sales data spreadsheets relied upon

23  by Mr. Hansen showed Asetek's sales to Corsair with a U.S. shipping address, and these were

24  included in Mr. Hansen's ████████. But Mr. Hansen then added to that ████████ figure his

25  assumed additional ████████ in revenue for Asetek's sales to Corsair outside the United States

26  ────────────────

27  [3] ████████████████████████████████

28  ████████████████████████████

1    that ███████████████████████████████████

2    ███████ *Id.* at ¶ 14.[4] ███████████████████

3    ███████ Ex. 1 at 166:4-168:1.

4       Mr. Hansen also improperly expanded his chosen royalty base by including sales made by

5    Asetek USA between June 10, 2014 and October 21, 2015, (Ex. 4, ¶ 13), despite that under 35

6    U.S.C. §286 CoolIT is only entitled to damages for up to six years prior to when Asetek USA was

7    added as a party (on October 22, 2021). Because damages can only extend back to October 22, 2015,

8    Mr. Hansen's inclusion of these sales had the effect of adding ███████ in revenue to the royalty

9    base that should not be there. Ex. 10, Exhibit 5.1. Once subtracted from his ███████ figure,

10    the unapportioned royalty base would be $███████.

11       Nevertheless, Mr. Hansen ultimately intends to testify that the royalty base should be ███

12    ███, and that CoolIT's reasonable royalty damages are ███████. Ex. 4, ¶¶ 13-14.

13      **D.**    **With No Established Royalty for the CoolIT Patents, Mr. Hansen Relied on an Incomparable 2012 Asetek-Corsair License Agreement for Asetek's Patents and Superior Technology**

15       Mr. Hansen's reasonable royalty damages opinion is also flawed because it uses an improper

16    royalty rate that is derived from a license agreement between Asetek and Corsair that is not

17    comparable to the negotiation between Asetek and CoolIT. ███████████

18    ███████████████

19    ███████ Ex. 6 at 150:19-23. ███████████

20    ███ *Id.* at 152:6-23. ███████████

21    ███████ *Id.* at 157:2-24. So there is no established royalty for the CoolIT patents.

22    ███████████████

23    ███████████████

24    ███████ In 2012, Asetek briefly licensed its patents to Corsair

26    [4] Mr. Hansen's additional ███████ in the royalty base ███████

27 ███████████████

28    Ex. 1 at 10:22-25; 167:7-168:1.

1  (then Asetek's largest customer) in exchange for a minimum-purchase requirement and a running

2  royalty of between 2% and 7% (depending on purchase volume). Asetek's damages expert, Dr.

3  Mody, previously opined that because of the supplier-customer relationship between Asetek and

4  Corsair at that time, and because of the sliding scale royalty rates and minimum purchase

5  requirements, that 2012 license had an effective royalty rate between 10-19%, which was terminated

6  in January 2013. The Federal Circuit upheld a challenge to Asetek's damages expert opinion on that

7  point in *Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352 (Fed. Cir. 2017). On the other hand,

8  ████████████████████████████████████████████████████ (Ex. 4, ¶ 74),

9  which is essentially the same argument advanced by prior Defendant CMI USA and which was

10  rejected by the Federal Circuit. *See Asetek*, 852 F.3d at 1362-63 (rejecting argument that maximum

11  royalty rate was 7%).

12     Although the Asetek-Corsair license agreement concerns Asetek's patents covering entire

13  liquid cooling system products, ████████████████████████████████████████

14  ████████████████████████████████████████████. Ex. 1 at

15  189:12-21. ████████████████████████████████████████████████

16  ████████████████████████████████████████████████████

17  Ex. 4, ¶¶ 13-14.

18     **E.  Mr. Hansen Has Unreasonably Relied on Another CoolIT Expert's Unsupported and Unexplained Opinion That CoolIT's Patents Are More Valuable Than Asetek's**

19

20  ████████████████████████████████████████████████

21  ████████████████████████████████████████████████████

22  ████████████████████████████████████████████

23  ███████████ (Ex. 4, ¶ 96), ████████████████████████████████

24  ████████████ (*id.*, ¶ 91), but Dr. Abraham's opinion is unsupported and unreliable. Dr.

25  Abraham did not disclose that opinion in either of his expert reports and the underlying methodology

26  by which he supposedly reached that conclusion, if any, is unclear. Dr. Abraham did not speak to

27  any customers to understand what features they find valuable or their views on the value of Asetek's

28  or CoolIT's patents. Ex. 7 at 113:11-14; Ex. 8 at 177:23-178:7. Instead, Dr. Abraham—who is not an

economist or expert in the valuation of intellectual property—appears to have just relied on his "experience." Ex. 8 at 176:17-178:7.

Dr. Abraham's plucked-from-thin-air 20%—his only attempt at concrete numbers to provide an air of credibility to his opinions—is unreliable and irrelevant. Mr. Hansen said in his report that Dr. Abraham informed him that that there are five primary systems in the accused liquid cooling devices and "the cold plate is at least as important as the other systems, contributing at least 20% of the value of the product" (Ex. 4, ¶ 91), but Dr. Abraham was adamant that he ***did not*** tell Mr. Hansen that the CoolIT patents-in-suit contribute 20% of the value of the Asetek accused products. Ex. 7 at 151:18-152:1, 155:1-23. In his deposition, ████████████████████████████████████ ████████████████ (Ex. 1 at 203:19-205:8), which demonstrates that Dr. Abraham's 20% figure is not reliable and not appropriate for use in damages calculations. Dr. Abraham claimed his 20% is merely a "performance value," though it is unclear what that means. *Id.* And as mentioned, Dr. Abraham admitted that he did not tell Mr. Hansen that the CoolIT patents-in-suit contribute 20% of the value of the Asetek accused products. *Id.* at 155:1-23.

Moreover, Mr. Hansen's and Dr. Abraham's opinions concerning the relative value of the Asetek and CoolIT patents do not address the objective evidence showing that the Asetek patents are far more valuable that the CoolIT patents. For example, Dr. Abraham and Mr. Hansen did not discuss or consider CoolIT's poor-selling Domino ALC product as part of their valuation discussion. Ex. 4, ¶¶ 61, 81-93; Ex. 9 at 33:19-34:17. ████████████████████████████████████████ █████████████████████████████████████████████████████ Ex. 12 at 100:2-101:8; Ex. 13 at 2. In the Domino ALC, the pump is located in the radiator.



Pump

1  Ex. 13 at 2 (annotated). Thus, the Domino ALC represents a liquid cooling product that isolates

2  CoolIT's split flow patents from Asetek's patents. ███████████████████████████

3  ████████████████████████████. Ex. 9 at 33:19-34:17. ███████████

4  █████████████████████████████████████████████████████

5  ███████████████ Ex. 6 at 146:12-147:16. █████████████████████

6  ███████████████████████████████████████████ *See id.*

7  Mr. Hansen's analysis, which ignores objective evidence such as CoolIT's minimal sales of the

8  Domino ALC and relies instead on conclusory opinions from Dr. Abraham, is unreliable.

9  **III.   ARGUMENT**

10        **A.     Legal Standards**

11        Federal Rule of Evidence 702 allows a jury to hear expert testimony only if its proponent can

12  establish that the testimony is based on "sufficient facts or data," is the "product of reliable

13  principles and methods," and if it "will help the trier of fact to understand the evidence or determine

14  a fact in issue." Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-97

15  (1994). The district court's "gatekeeping obligation" applies to all types of expert testimony. *Kumho*

16  *Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). Like any expert testimony, expert opinions

17  concerning patent damages must be based on sound economic principles and reliable data. *See*

18  *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011). The Court has an

19  obligation to shield the jury from unreliable opinions that violate established apportionment

20  standards. *Virnetx*, 767 F.3d at 1328-29.

21        **B.     Because There is No Evidence that CoolIT's Asserted Patent Claims**
22              **Drive Demand for Asetek's Products, Mr. Hansen Cannot Rely on the**
             **Entire Market Value Rule**

23        For over a decade the Federal Circuit has held that where the patented component is but one

24  component of a multi-component product, calculating reasonable royalty damages by using the

25  revenue of the entire product as a royalty base "carries a considerable risk that the patentee will be

26  improperly compensated for non-infringing components of that product." *LaserDynamics*, 694 F.3d

27  at 67; *see also Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977

28  (Fed. Cir. 2018). Where a patent covers only a component of an accused product, the Federal Circuit

1    usually requires that any asserted damages for infringement must apportion between the patented

2    feature(s) of the accused product and the non-patented features of the accused product.

3    *LaserDynamics*, 694 F.3d at 67. One narrow exception to the general requirement for apportionment

4    is the entire market value rule, which may only be used if the patentee shows that its patented feature

5    drives the demand for an entire multi-component product. *Id*. If the patentee succeeds in making that

6    showing, then the patentee may be awarded damages as a percentage of revenues or profits

7    attributable to sales of the entire product. *Id*. But if the patentee cannot meet that burden, then the

8    patentee must begin at a more realistic starting point. *Id.*, *see also* Ex. 1, ¶ 82.

9         Mr. Hansen's grossly overstated damages opinion uses as a royalty base of about ███

10   ███ in revenue for sales of Asetek's complete products; Mr. Hansen's royalty base is not limited

11   to revenues attributable to the cold plate covered by the patent claims asserted by CoolIT. Because

12   Mr. Hansen has not opined or contended that CoolIT's patented features drive demand for Asetek's

13   entire products, he cannot use the entire market value rule to justify his use of Asetek's ███████

14   as his royalty base. He must choose a more realistic starting point.

15        In *LaserDynamics*, the Federal Circuit vacated a damages verdict because the expert

16   improperly used the entire market value for a royalty base in calculating damages. To avoid errors

17   that result from improper use of the entire market value rule, the Federal Circuit has approved of

18   using the smallest saleable patent practicing unit ("SSPPU") to establish the royalty base, which

19   helps ensure that damages are commensurate in scope with the harm caused by the infringement.

20   *See, e.g.*, *Virnetx*, 767 F.3d at 1327 ("[T]he smallest salable unit approach was intended to produce a

21   royalty base much more closely tied to the claimed invention than the entire market value of the

22   accused products.").

23        *LaserDynamics* is particularly instructive because there the patentee was awarded damages

24   based on the value of an entire laptop when the patent covered only a disk drive, much like the way

25   CoolIT seeks damages based on the value of an entire liquid cooling system as its royalty base, even

26   though CoolIT's patents cover only a cold plate. The Federal Circuit noted that because the royalty

27   was expressly calculated as a percentage of the value of the laptop, the expert opinion was "by

28   definition" an application of the entire market value rule and it could not stand absent evidence that

1  the disk drive drove demand for the entire laptop. *LaserDynamics*, 694 F.3d at 68-69. Because the

2  patentee had made no attempt to prove the patented feature drove demand, the expert's opinion was

3  improper and could not support the jury verdict. *Id.*

4        *Virnetx* is similarly instructive because the patentee's damages expert used the entire value of

5  accused iOS products as a royalty base, even though the patents only covered certain features of

6  those devices. *Virnetx*, 767 F.3d at 1325. The Federal Circuit was critical of the trial court,

7  emphasizing that "the district court should have exercised its gatekeeping authority to ensure that

8  only theories comporting with settled principles of apportionment were allowed to reach the jury."

9  *Id.* at 1328. Because the expert did not even attempt to link demand for the accused devices to the

10  patented feature, and failed to apportion between patented features and unpatented features, his

11  testimony "was inadmissible and should have been excluded." *Id.* at 1329. In this case, Mr. Hansen

12  committed the same errors as the expert in *Virnetx*, in which the Federal Circuit reversed the verdict

13  and remanded for a new trial on damages.

14        Pursuant to *LaserDynamics* and *Virnetx*, here the Court must exercise its gatekeeping

15  function and prevent CoolIT from presenting expert testimony that plainly violates the entire market

16  value rule. ████████████████████████████████████████████████████████

17  ███████████████████████████████████████████████████████████████

18  ███████████████████████████████████████████████████████████████

19  ████████████████████████████████ As in *LaserDynamics*, that was, by definition, an

20  improper application of the entire market value rule. *See LaserDynamics*, 694 F.3d at 69. Moreover,

21  as in *LaserDynamics*, if Mr. Hansen is allowed to present his damages opinion using almost ████

22  ████ in revenue from accused products as his royalty base (Ex. 4 at ¶ 13-14), there is considerable

23  risk that CoolIT will be improperly compensated for non-infringing components of accused products

24  if the jury finds that Asetek's products infringe.[5]

27      [5] Mr. Hansen's use of ████████ also very much risks skewing the damages horizon for

28  the jury. *See LaserDynamics*, 694 F.3d at 67-68; *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011).

**C.** **Mr. Hansen Did Not Apportion His Royalty <u>Base</u>, And Instead Disregarded His Own Calculation That Only About 2.9% Of Asetek's Revenue Is Attributable to CoolIT's Asserted Patent Claims**

Mr. Hansen stated in his report that where the entire value of a device is not attributable to the patented feature "courts must insist on a more realistic starting point for the royalty calculations by juries—often, the smallest salable unit and, at times, even less." Ex. 4 at ¶ 82 (quoting *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201 (Fed. Cir. 2014)). Accordingly, he analyzed the profit attributable to the cold plate in the accused Asetek devices (*see id.* at ¶¶ 84-89) and concluded that his ███████████████████████████████████████████████ ██████████████████████████████████████████████████ *Id.*, ¶ 93. From there, if Mr. Hansen had properly started from the SSPPU, he should have multiplied Asetek's ████ ███████ in revenues from sales of accused products by ████ and reached a royalty base of no more than ████████. But Mr. Hansen and CoolIT clearly did not like the results of Mr. Hansen's calculation and the implications for the appropriate royalty base, so Mr. Hansen simply ignored his own calculation and used a non-apportioned royalty base of ██████████ to calculate damages. This was improper and in violation of the Federal Circuit's clear authority. And furthermore, Mr. Hansen should not be permitted to mislead the jury by giving lip service to the requirement for apportionment, claiming that did so in calculating his ████ figure, and then burying it by instead using Asetek's full ████████ in revenue as his royalty base.

**D.** **Mr. Hansen Did Not Apportion His Royalty <u>Rate</u>**

Mr. Hansen's failure to use a more realistic royalty base is compounded by his failure to apportion his royalty rate. ████████████████████████████████ ████████████████████████████████████████████████████ Ex. 1 at 176:23-177:4. To the contrary, Mr. Hansen applied his understanding of the maximum royalty rate under the Asetek-Corsair license to the maximum royalty base (Asetek's ████████ revenue from sales of the accused products). This was improper and contrary to Federal Circuit requirements.

1            **1.**      **Mr. Hansen did not apportion the royalty rate from the Asetek-Corsair license, and he should not have relied upon that license anyway because it is not comparable to the license that could have resulted from the hypothetical negotiation.**

2

3

4 ████████████████████████████████████████████████████████████

5 █████████████████████████████████████████████ Ex. 6 at

6 150:19-23; 152:6-23; 157:2-24. ██████████████████████████████

7 ████████████████████████ alone calls into question Mr. Hansen's opinion that Asetek

8 would agree to give CoolIT 7% of its total revenue for a license to CoolIT's patents.

9 ██████████████████████████████████████, Mr. Hansen used the Asetek-

10 Corsair license (a license for *Asetek's* patents) as a proxy, but he did not account or apportion for the

11 technological and scope differences between the patents. The Federal Circuit has cautioned that

12 "district courts performing reasonable royalty calculations [must] exercise vigilance when

13 considering past licenses to technologies other than the patent in suit." *ResQNet.com, Inc. v. Lansa,*

14 *Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010). In *ResQNet*, the Federal Circuit vacated a damages award

15 where the district court relied on license agreements for royalty damages but did not include any

16 factual findings discussing or accounting for the technological and economic differences in the

17 circumstances. *ResQNet*, 594 F.3d at 873. "A reasonable royalty based on such speculative evidence

18 violates the statutory requirement that damages under § 284 be 'adequate to compensate for the

19 infringement.'" *Id.* And in *LaserDynamics*, the Federal Circuit criticized the district court for

20 allowing an expert to testify about licenses when comparability of those licenses with the

21 hypothetical negotiation was not established, commenting that "[w]hen relying on licenses to prove a

22 reasonable royalty, alleging a loose or vague comparability between different technologies or

23 licenses does not suffice." *LaserDynamics*, 694 F.3d at 79-80.

24      Under *ResQNet* and *LaserDynamics*, Mr. Hansen was at a minimum required to adjust his

25 assessment of reasonable royalty damages to reflect the differences between (1) the licensed Asetek

26 patents (which cover full liquid cooling product systems) and corresponding royalty base in the

27 Asetek-Corsair license as compared to (2) the CoolIT patents (which cover only the cold plate) and

28 the corresponding smaller royalty base in the hypothetical negotiation. Mr. Hansen did not do so,

1   and he instead applied what he believes is the maximum royalty in the Asetek-Corsair license (7%)

2   against the same royalty base (full revenues for sales of liquid cooling system products). This failure

3   to apportion the royalty rate in the Asetek-Corsair license, combined with Mr. Hansen's failure to

4   apportion the royalty base (discussed *supra*), establish that he did not apportion his reasonable

5   royalty damages opinion as required by Federal Circuit precedent.

6          Mr. Hansen also tries to duck the requirement to show that the Asetek-Corsair license was

7   comparable by citing in conclusory fashion "input" from CoolIT's expert Dr. Abraham: ███████

8   ████████████████████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████████████████████

10  ████████ Ex. 4, ¶ 70. The Federal Circuit, in *LaserDynamics*, criticized patentees who allege

11  "loose or vague comparability between different technologies or licenses" (*LaserDynamics*, 694

12  F.3d at 79), and that is all that Mr. Hansen and Dr. Abraham have provided. Because CoolIT and Mr.

13  Hansen have not established the Asetek-Corsair license is comparable, Mr. Hansen's opinions

14  relying on that license for a 7% royalty are unreliable and should be excluded.

15             **2.      Mr. Hansen's reliance on Dr. Abraham to support a 7% royalty is**
16                       **also misplaced because Dr. Abraham's valuation opinions are**
                         **irrelevant and unreliable.**

17         Mr. Hansen also relies heavily on a conversation he had with Dr. Abraham concerning the

18  relative value of the Asetek and CoolIT patents, but Dr. Abraham's opinions are unreliable and thus

19  cannot be used by Mr. Hansen to support his opinion.

20         A damages expert cannot blindly rely on a technical expert to fill gaps in their economic

21  analysis, and so Mr. Hansen cannot rely on Dr. Abraham's opinions on the relative value of the

22  Asetek and CoolIT patents unless those opinions themselves are the products of sound methodology.

23  *See NetFuel, Inc. v. Cisco Sys. Inc.*, Case No. 18-CV-02352-EJD, 2020 WL 1274985, at *6, n.5

24  (N.D. Cal. Mar. 17, 2020) (striking damages opinion that depended on unreliable analysis from a

25  technical expert). In *NetFuel*, Judge Davila struck portions of the patentee's damages expert report

26  where the damages expert relied on unsound, unreliable opinions from a technical expert in

27  determining how to apportion. The technical expert testified, for example, that "[a]pportionment of

28  33% for the profits allegedly representing the 'contribution of security, reliability, and availability'

to the Accused Operating Systems" would be appropriate. *NetFuel*, 2020 WL 1274985, at \*6. The plaintiff argued these opinions were reliable because the technical expert considered:

> (1) industry research (including Defendant's own statements concerning the security, reliability, and availability of the Accused Operating Systems);
> (2) his knowledge and understanding of the Accused Devices (gained by his review of Cisco-produced technical documents and his testing of the Accused Devices);
> (3) his knowledge and understanding of Defendant's networking operating systems (gained by his extensive review of Cisco-produced technical documents and by his review of Cisco operating system source code);
> (4) his experience and specialized expertise in computer networking and security; and
> (5) his expert knowledge of the nature and function of routers and switches.

*Id.* The court rejected those arguments, finding that the technical expert's opinions were an impermissible "black box" without sound economic principles and factual predicates. *Id.* at \*7. The court further noted that "experience" does not constitute facts or data that would be necessary to render the opinion reliable. *Id.* Vigorous cross-examination would not cure the problem, because without a methodology, cross examination is futile. *Id.* And because the opinions of the technical expert were unsound, the damages expert could not rely on them to support his apportionment analysis. *Id.*, n.5.

Mr. Hansen's and Dr. Abraham's opinions suffer from the same problems as the experts in *NetFuel*, at least because they presented no reliable facts or data to support their understanding/opinion that CoolIT's patents are more monetarily valuable than Asetek's patents. Of CoolIT's experts, Mr. Hansen is the one experienced in financial, economic, and accounting matters. Mr. Hansen has ███████████████████████████████████████████ ██████████████ and ███████████████████████████████████████ Ex. 4, ¶ 2. But Mr. Hansen did not offer an opinion concerning the relative value of the CoolIT patents and Asetek patents. Mr. Hansen relied exclusively on Dr. Abraham for that valuation analysis.

Dr. Abraham is a technical expert, not an economist. He did not provide an economic analysis to Mr. Hansen. *See* Ex. 7 at 151:25-152:1 ("I'm not providing an economic analysis, and I did not provide an economic analysis to Mr. Hansen."). Indeed, Dr. Abraham does not appear or claim to be qualified to opine on the monetary value of the Asetek patents or the CoolIT patents, let

1  alone to compare the values of the two. Moreover, Dr. Abraham based his opinion on his own

2  "experience," and did not speak to any customers—including Corsair—concerning the relative value

3  of the Asetek and CoolIT patents. Ex. 7 at 113:4-22; Ex. 8 at 176:16-178:7. But experience is not

4  facts, data, or a reliable methodology necessary to render an expert opinion reliable. *See NetFuel*,

5  2020 WL 1274985, at *7; *see also GPNE Corp. v. Apple, Inc.*, Case No. 12-CV-02885-LHK, 2014

6  WL 1494247, at *5 (N.D. Cal. Apr. 16, 2014) (excluding damages expert testimony and noting that

7  "'30 years of experience' does not constitute 'sufficient facts or data,' or 'reliable principles and

8  methods.'"). Neither Dr. Abraham nor Mr. Hansen provided an explanation for how they weighed

9  the relative "value" of the Asetek patents and CoolIT patents, nor did they provide any quantitative

10 or scientific analysis on which his opinions were allegedly based.[6] This is the exact type of "black

11 box" analysis thrown out in *GPNE* and *NetFuel*, and which the Court should exclude here.

12     The present circumstances are also similar to those in *Open Text S.A. v. Box, Inc.*, Case No.

13 13-CV-04910-JD, 2015 WL 349197 (N.D. Cal. Jan. 23, 2015). There, shortly before trial, the court

14 excluded a damages expert who did not apportion the royalty base between patented and unpatented

15 features and could not explain how she reached a 15% royalty rate. *Id.* at *4. Judge Donato

16 commented that the link between the inputs and conclusion, if any, was "written in invisible ink,"

17 and that the expert's opinions should be excluded. *Id.* at *6. "Rather than spelling out the steps she

18 took to go from the data to the royalty rate opinion, [the expert] cites her 'experience'—an

19 abstraction not visible to the eyes of the Court, the jury, and opposing counsel, or testable in the

20 crucible of cross-examination." *Id.* The same is true in this case. Dr. Abraham's approach to

21 determining the CoolIT patents are allegedly more valuable than the Asetek patents, if any, is a

22 "black box." Any math that Mr. Hansen employed in concluding that the relative valuation supports

23 a royalty of 7% is, at best, "written in invisible ink." Opinions like these are not testable through

24 cross-examination, and instead require exclusion, as in *Open Text*.

---

[6] The CoolIT patents would need to be 34 times more valuable than the Asetek patents to offset Mr. Hansen's opinion that only 2.9% of Asetek's revenue is attributable to CoolIT's patents ($2.9\% \div 100\% = 34.5$).

1    Instead, the objective evidence shows CoolIT's patents are not as valuable as Asetek's. For

2    example, ███████████████████████████████████████████

3    ████████████████████████████████ Ex. 9 at 33:19-34:17. Mr. Hansen and

4    Dr. Abraham did not consider this product when considering the relative value of Asetek's and

5    CoolIT's patents.

6        The only seemingly quantitative valuation analysis recounted in Mr. Hansen's report is Dr.

7    Abraham's alleged statement that the cold plate contributes 20% of the value of the accused products

8    (Ex. 4, ¶ 91), but Mr. Hansen's expert report is incorrect on this point because Dr. Abraham testified

9    that he did not provide such a valuation to Mr. Hansen. Ex. 7 at 155:1-5 ("Q. [D]id you give an

10   opinion to Mr. Hansen that the technology claimed in the CoolIT patents-in-suit contributes at least

11   20 percent of the value of the Asetek accused product? A. No, that is not what I said to Mr.

12   Hansen."); *see also* 152:3-154:25. To the contrary, what Dr. Abraham did is arbitrarily identify "five

13   primary systems" and then state that the relative ***performance*** value of the cold plate to the other

14   primary systems (it is one of five systems) is at least 20%. Ex. 7 at 107:9-109:3, 147:19-148:6. Mr.

15   Hansen confirmed that Dr. Abraham's "analysis" related to a relative "performance value" and is not

16   an indication that CoolIT's patents contribute 20% of the revenue or profit. Ex. 1 at 204:4-205:8.

17   How this played into Mr. Hansen's economic analysis is an unreliable, unexplained mystery and no

18   basis for presentation to the jury. Notably, under this rubric the "performance value" of Asetek's

19   patents would be 100%, because the Asetek patent claims cover all five of Dr. Abraham's "primary

20   systems." Again, as in *Open Text* and *GPNE* and *NetFuel*, it is not at all clear how, if at all, Mr.

21   Hansen relied on "analysis" from Dr. Abraham, or how Dr. Abraham's 20% opinion influenced Mr.

22   Hansen's conclusions.

23       For all these reasons, Mr. Hansen's application of a 7% royalty to the entire market value of

24   Asetek's products fails to apportion in contravention of Federal Circuit requirements grossly

25   overestimates CoolIT's damages, and should be excluded.

26

27

28

1

      **E.**    **Mr. Hansen's Royalty Base Improperly Includes a Portion of Overseas Sales to Corsair That He Speculates Are Later Sold in the U.S.**

2

3          In addition to Mr. Hansen's improper use of the entire value of Asetek's products to

4  construct his royalty base, he further inflates the royalty base by adding ███████ of non-

5  infringing sales made outside of the United States, which Mr. Hansen speculates without direct

6  support are later shipped into the U.S. by Corsair.

7          The Federal Circuit rejects damages awards that are based on speculation and guesswork. For

8  example, in *Wordtech Systems, Inc v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1318-20

9  (Fed. Cir. 2010), the Federal Circuit reversed and remanded for a new trial on damages where the

10  alleged royalty base was calculated using a "phantom value" derived by a non-expert from the

11  Defendant's invoices, and the royalty base number changed between the trial and appeal without

12  explanation. *Id.; see also Oiness v. Walgreen Co.*, 88 F.3d 1025, 1033, 39 U.S.P.Q.2d 1304 (Fed.

13  Cir. 1996) (award of lost future profits reversed and noting "[w]ithout credible economic testimony,

14  this court cannot permit a jury to base its award on speculation."). And the Federal Circuit rejects

15  damages awards that include non-infringing sales. *See, e.g.*, *Enplas Display Device Corp. v. Seoul*

16  *Semiconductor Co., Ltd.*, 909 F.3d 398, 412 (Fed. Cir. 2018) (vacating $4 million damages award

17  because "damages calculated by applying a royalty to sales of non-accused lenses cannot support a

18  jury's verdict on damages."). As in the above cases, Mr. Hansen's estimated damages are unreliable

19  because, aside from resorting to improper speculation, he has no basis to understand that the revenue

20  relates to acts of infringement.

21          To support his addition of ████████ to the royalty base, Mr. Hansen also engages in some

22  specious calculations that were pre-designed to arrive at his conclusion regardless of the inputs. ███

23  ████████████████████████████████████████████████.[7] Ex. 11.

24  Next, using Asetek's total worldwide revenue for sales to Corsair ████████████████████

25

26        [7] Those percentages come from a 2021 Corsair 10Q statement and a 2020 Corsair 10K

27  statement, but the sales percentages are not specific to liquid cooling products, and instead include more broadly "gaming keyboards, mice, headsets, controllers, and streaming gear, which includes capture cards, Stream Decks, USB microphones, studio accessories and EpocCam software," among

28  other things. Ex. 10, ¶¶ 29-34; Ex. 1 at 158:17-24. CoolIT and Mr. Hansen did not obtain more accurate or granular information from Corsair.

1 ████████████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████

3 ███████████ *Id.* (This number is not determined by actual confirmed U.S. sales or U.S. sales data.)

4 From that $████████ **speculative/assumed figure,** ██████████████████████████████████

5 ████████████████████████████████████████████████). *Id.* Mr. Hansen is left

6 with a figure ███████████—that he then calls "additional U.S. revenue" that he adds to his royalty

7 base. And Presto! This magically amounts to the speculative ███████ assumption he started

8 with, which would be the result under his "formula" regardless of the actual documented sales

9 number (provided it was less than his assumed ███████████). *Id.* ██████████████████

10 █████████████████████████████████████████████████████████████████

11 ███████████████████████████████████████████████████████████████

12 ██████████████████████████████████████ Ex. 1 at 161:10-162:14. This

13 specious formula and analysis has no merit at all, and is the result of pure speculation. It is not

14 reliable evidence of Asetek's alleged infringing sales. ███████████████████████████

15 ███████████████████████████████████████████████████████████████

16 ███████████████████████ *Id.* at 167:19-168:1.

17       Moreover, because CoolIT has the burden of establishing its damages, and because it is

18 indemnifying Corsair and represented by the same counsel, CoolIT and Mr. Hansen could have, and

19 should have, obtained actual, reliable data from Corsair, which they needed to ensure that Mr.

20 Hansen was not required to resort to pure speculation. *Id.* at 166:4-167:12; *see also Monolithic*

21 *Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 476 F. Supp. 2d 1143, 1155-56 (N.D. Cal. 2007) (granting

22 summary judgment finding the patentee could not prove damages where damages expert report was

23 flawed and patentee did not obtain information its expert needed during discovery). In *Eidos*

24 *Display, LLC v. Chi Mei Innolux Corp.*, Case No. 11-CV-00201-JRG, 2017 WL 1322555, at *6

25 (E.D. Tex. Apr. 6, 2017), the Court rejected an expert's attempt to rely on general statistics and data

26 from 10-K forms "to expand or infer damages for indirect sales." The Court limited the expert's

27 damages opinions to "only where there is specific evidence of importation or sales by a specific

28 customer." *Id.* The same logic applies here. Mr. Hansen cannot rely on Corsair's general sales

1  statistics across all product categories to speculate what amount of Asetek revenue is derived from

2  products sold to Corsair, then imported or sold by Corsair into the U.S., imported without Asetek's

3  knowledge.

4  Mr. Hansen cannot be permitted to present the jury with speculation in the form of a $13.69

5  million addition to the royalty base, particularly when he and CoolIT failed to obtain actual data

6  from Corsair that would have been reliable and eliminated the need for his specious formula and

7  guesswork.

8  **F.  Mr. Hansen's Royalty Base Improperly Includes Damages for Sales Made**
   **by Asetek USA More Than Six Years Before It Became a Party in this**
9  **Suit, Which Damages are Not Recoverable by Statute**

10  Mr. Hansen also incorrectly expanded his royalty base by including sales made by Asetek

11  USA more than six years before CoolIT added Asetek USA as a defendant in this action, in

12  contravention of 35 U.S.C. § 286. "Except as otherwise provided by law, no recovery shall be had

13  for any infringement committed more than six years prior to the filing of the complaint or

14  counterclaim for infringement in the action." 35 U.S.C. § 286. Asetek USA was not added as a party

15  until CoolIT's Fourth Amended Counterclaims on October 22, 2021 (Dkt. 333), and so damages are

16  only statutorily recoverable by CoolIT for alleged infringement by Asetek USA occurring on

17  October 22, 2015 or later. Mr. Hansen included ███████ in revenue for Asetek USA between

18  June 10, 2014 and October 21, 2015. Ex. 10, Exhibit 5.1. This revenue should not be included, and

19  the Court should exclude Mr. Hansen's opinion to the extent it includes this revenue.

20  **IV.  CONCLUSION**

21  Asetek respectfully requests that the Court exercise its gatekeeping function and exclude Mr.

22  Hansen's opinions regarding CoolIT's damages in their entirety. At a minimum, the Court should

23  require that Mr. Hansen modify his royalty base to correct the errors described above, and start from

24  a more realistic starting point, such that his royalty base be no more than ████████.[8]

25  _____

26  [8] ████████████████████████████████████████████████████

27  ████████████████████████████████████. Even this amount overstates the

28  appropriate royalty base because Mr. Hansen failed to account failed for the different notice dates for
   CoolIT's patents and Asetek's different product generations.

Dated: March 31, 2022

FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP

By: */s/ Jeffrey D. Smyth*
Jeffrey D. Smyth
Attorneys for Plaintiff and Counterdefendant
ASETEK DANMARK A/S and
Counterdefendant ASETEK USA, INC.