Robert F. McCauley (SBN 162056)
robert.mccauley@finnegan.com
Arpita Bhattacharyya (SBN 316454)
arpita.bhattacharyya@finnegan.com
Jeffrey D. Smyth (SBN 280665)
jeffrey.smyth@finnegan.com
**FINNEGAN, HENDERSON, FARABOW,**
  **GARRETT & DUNNER, LLP**
3300 Hillview Avenue
Palo Alto, California  94304
Telephone:     (650) 849-6600
Facsimile:      (650) 849-6666

Attorneys for Plaintiff and Counterdefendant
ASETEK DANMARK A/S and
Counterdefendant ASETEK USA, INC.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| ASETEK DANMARK A/S, | CASE NO. 3:19-cv-00410-EMC |
| Plaintiff and Counterdefendant, | **ASETEK DANMARK A/S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE EXHIBIT 275** |
| ASETEK USA, INC., | |
| Counterdefendant, | Date:       May 5, 2022 |
| v. | Time:       1:30 PM |
| | Location:   Courtroom 5, 17th Floor |
| COOLIT SYSTEMS, INC., | Judge:      Hon. Edward M. Chen |
| Defendant and Counterclaimant, | |
| COOLIT SYSTEMS USA INC., COOLIT SYSTEMS ASIA PACIFIC LIMITED, COOLIT SYSTEMS (SHENZHEN) CO., LTD., | |
| Defendants, | |
| CORSAIR GAMING, INC. and CORSAIR MEMORY, INC., | |
| Defendants. | |

# **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................1

II.     FACTUAL BACKGROUND ...............................................................................2

     A.      Dr. Tuckerman Measured the Channels of the Antarctica Device at the Base, Where Most Heat Transfer Occurs ............................................................2

     B.      Dr. Pokharna Measured the Antarctica Channels at the Top, Away from Where Heat Transfer Occurs ........................................................................3

     C.      Dr. Tuckerman Explained the Flaws in Dr. Pokharna's Measurement Method in His First Deposition ................................................................................3

     D.      Defendants' Expert, Dr. Pokharna, Considered Exhibit 275 Before Sitting for His Deposition, and Opined About Exhibit 275 at His Deposition ...................5

     E.      CoolIT's Counsel Questioned Dr. Tuckerman Extensively About His Antarctica Measurements and Exhibit 275 at His March 2022 Deposition............5

     F.      CoolIT Did Not Seek or Pursue Discovery on Asetek's Manufacturing Tools for the Antarctica Device ...........................................................................6

III.    ARGUMENT .....................................................................................................7

     A.      Because CoolIT Never Requested Documents Related to Manufacturing Tools for the Antarctica, Rule 37 Does Not Apply and There is No Basis for Striking Exhibit 275 ................................................................................................7

     B.      Even if Rule 37 Applied, the Court Should Deny CoolIT's Motion Because the Two Express Exceptions to Exclusion Under Rule 37 Apply Here .................8

         1.      Asetek's production of Exhibit 275 was substantially justified as a response to Dr. Pokharna's previously undisclosed positions. ...................9

         2.      Asetek's production of Exhibit 275 was harmless because both parties' experts testified about it during their depositions, trial is almost a year away, and Dr. Tuckerman's opinion has not changed. ............................11

     C.      CoolIT's Request That All Expert Testimony Relying on Exhibit 275 Be Struck is Meritless.................................................................................13

IV.     CONCLUSION.................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Asetek Danmark A/S v. CMI USA, Inc.*,
  Case No. 13-CV-00457-JST, 2014 WL 6997670 (N.D. Cal. Dec. 9, 2014) ...............................11

*Cave Consulting Grp., Inc. v. OptumInsight, Inc.*,
  Case No. 15-CV-03424-JCS, 2018 WL 1938555 (N.D. Cal. Apr. 25, 2018) ...............................9

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ...................................................................................................12, 15

*Elliott v. Google, Inc.*,
  860 F.3d 1151 (9th Cir. 2017) ...........................................................................................13

*Fujifilm Corp. v. Motorola Mobility LLC*,
  Case No. 12-cv-03587-WHO, 2015 WL 12622055 (N.D. Cal. Mar. 19, 2015)...........................13

*Galentine v. Holland America Line–Westours, Inc.*,
  333 F.Supp.2d 991 (W.D. Wash. 2004).................................................................................11

*Ingenco Holdings, Ltd. Liab. Co. v. ACE Am. Ins. Co.*,
  921 F.3d 803 (9th Cir. 2019) ...........................................................................................13

*McLean v. 988011 Ontario, Ltd.*,
  224 F3d 797 (6th Cir. 2000) ...........................................................................................15

*MLC Intell. Prop. v. Micron Tech.*,
  Case No. 14-cv-03657-SI, 2019 WL 2863585 (N.D. Cal. July 2, 2019)...................................13

*MLC Intell. Prop. v. Micron Tech.*,
  10 F.4th 1358 (Fed. Cir. 2021) ...................................................................................10, 13

*nCube Corp. v. SeaChange Int'l, Inc.*,
  809 F. Supp. 2d 337 (D. Del. 2011).....................................................................................13

*Paddack v. Dave Christensen, Inc.*,
  745 F.2d 1254 (9th Cir. 1984) ...........................................................................................14

*Quality Packaging, Inc. v. Snak Club*,
  Case No. C 03-5240 SI, 2005 WL 8177597 (N.D. Cal. Apr. 26, 2005)......................................15

*Sportspower Ltd. v. Crowntec Fitness Mfg. Ltd.*,
  Case No. 817CV02032JLSKES, 2020 WL 7347860 (C.D. Cal. Nov. 18, 2020)..........................9

*Stored Value Sols., Inc. v. Card Activation Techs., Inc.*,
  Case No. 09-495-LPS, 2010 WL 3834457 (D. Del. Sept. 27, 2010)..........................................9

*Tubular Rollers, LLC v. Maximus Oilfield Prod., LLC*,
 Case o. 4:19-CV-03113, 2021 WL 5991744 (S.D. Tex. Dec. 16, 2021)......................................15

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
 259 F.3d 1101 (9th Cir. 2001) ......................................................................................11

**Other Authorities**

Fed. R. Civ. P. 34(b)(1)(A) ..............................................................................................8

Fed. R. Civ. P 37(c)(1)........................................................................................1, 8, 9

Fed. R. Evid. 703 ............................................................................................................14

# I.   INTRODUCTION

CoolIT asks the Court to strike Exhibit 275, a document that came into this case in response to criticisms first included in the rebuttal report of CoolIT's expert, but CoolIT's request is not supported by the Federal Rules of Civil Procedure and its motion should be denied.[1] Rule 37(c)(1)—the Rule CoolIT relies on—does not support exclusion of a document that CoolIT did not request during discovery. Contrary to the assertions in its motion, CoolIT did not request Exhibit 275 during discovery, but instead served document requests related to the *structure* of the prior art Antarctica device, not documents related to the *manufacturing* of that product, much less the *tools* that were used to manufacture that product (as in Exhibit 275). Asetek agreed to and did produce documents sufficient to show the structure of the Antarctica device in discovery. CoolIT never asked for more. Because CoolIT did not seek documents relating to the tools used to manufacture the Antarctica, there is no violation of Rule 37 for Asetek having not produced Exhibit 275 earlier.

Moreover, even if Rule 37 were applicable here (and it is not), there should be no exclusion of Exhibit 275 because each of the two exceptions to exclusion stated in the rule apply:  the timing of Asetek's production of Exhibit 275 was (1) substantially justified and (2) harmless to CoolIT. (Rule 37 states these exceptions to exclusion in the disjunctive, so either one supports denial of CoolIT's motion.) The timing was substantially justified because Asetek's expert, Dr. Tuckerman, sought the information in Exhibit 275 as a direct response to criticisms articulated for the first time in CoolIT's expert's rebuttal report. Dr. Tuckerman's deposition—where he testified about the machining information in Exhibit 275 (which he had just received from Asetek) in response to questions from CoolIT's counsel—was less than two weeks after he received Dr. Pokharna's criticisms. Dr. Tuckerman did not articulate any *new* opinions or invalidity theories in connection with Exhibit 275; rather, he cited Exhibit 275 to respond to the critiques in CoolIT's expert's rebuttal report, and as further support for the same opinions he expressed in his initial report.

---

[1] The Motion to Strike Exhibit 275 is purportedly submitted on behalf of "Defendants," but Corsair Gaming, Inc. and Corsair Memory, Inc. have no interest in the CoolIT patents-in-suit and Exhibit 275 concerns evidence related to whether CoolIT's patents are valid over the prior art. Because Corsair has no interest in the validity of CoolIT's patents, Asetek's opposition treats the motion as one filed by CoolIT and not all defendants.

1

In addition, CoolIT has not been harmed by Asetek's production of Exhibit 275. CoolIT has

2

had months to consider Exhibit 275, CoolIT questioned Dr. Tuckerman about Exhibit 275 in his

3

deposition in March (three months after Exhibit 275 was produced), and CoolIT's expert considered

4

Exhibit 275 and responded to it in his own deposition. With nearly a year until trial, this case does

5

not present circumstances like those where judges have found harm from late disclosure. CoolIT has

6

not been "ambushed" on the eve of trial or anything along those lines.

7

Rather than address this case and the expert's differences on the merits, CoolIT is trying to

8

keep relevant evidence from the jury that corroborates Dr. Tuckerman's opinions and measurements.

9

Because Rule 37 does not apply here, and because Asetek's production of Exhibit 275 was

10

substantially justified and harmless, the Court has three independent bases on which it can—and

11

should—deny CoolIT's motion.

12

## II.      FACTUAL BACKGROUND

13

### A.      Dr. Tuckerman Measured the Channels of the Antarctica Device at the Base, Where Most Heat Transfer Occurs

14

15

In preparing his opinions on the invalidity of CoolIT's patents, Dr. Tuckerman personally

16

analyzed and measured a physical sample of Asetek's Antarctica device, and wrote in his opening

17

that "the space between adjacent fins is about 0.9 - 1.0 mm, and therefore the channels formed

18

between adjacent fins are microchannels per the parties' stipulation that 'microchannels' means

19

'channels with widths up to 1 millimeter.'" Dkt. 389-2, ¶ 57. Dr. Tuckerman noted his measurements

20

comport with the deposition testimony of Andre Eriksen, Asetek's CEO and the designer of the

21

Antarctica waterblock, who had estimated the microchannel width at between 0.6 and 0.8

22

millimeters. *Id.* Dr. Tuckerman explained in his deposition that he measured the microchannels with

23

calipers (Dkt. 389-3 at 138:10-13), that he inspected the device on July 5, 2022 (before he submitted

24

his report) (*id.* at 122:20-123:11), and that he measured the channels at the base, "because the base

25

of the fins is where most of the heat transfer occurs." (*id.* at 137:22-138:9). CoolIT does not dispute

26

the reliability or appropriateness of Dr. Tuckerman's methodology of measuring the microchannels

27

at the base with calipers.

28

**B.     Dr. Pokharna Measured the Antarctica Channels at the Top, Away from Where Heat Transfer Occurs**

CoolIT's expert, Dr. Pokharna, used a different measuring methodology than Dr. Tuckerman, and based on his differing methodology, Dr. Pokharna's rebuttal report criticized Dr. Tuckerman's opinions. Rather than measure the microchannels near the base, the area most relevant for the thermal exchange function performed by the devices at issue, Dr. Pokharna measured the channel width at the top of the cold plate, the part furthest away from the heat-generating component and thermal exchange functions. From this different measuring location, Dr. Pokharna says his measurements showed microchannels of greater than 1 millimeter, and he disagreed with Dr. Tuckerman as to whether the Antarctica device has "microchannels." Dkt. 389-5, ¶ 74. CoolIT had not communicated Dr. Pokharna's rebuttal opinions regarding the measurement of the Antarctica device before serving his rebuttal report on December 8, 2021. Smyth Decl., ¶ 4.

**C.     Dr. Tuckerman Explained the Flaws in Dr. Pokharna's Measurement Method in His First Deposition**

Less than two weeks after Asetek received Dr. Pokharna's rebuttal expert report, Dr. Tuckerman sat for a deposition on his invalidity report and explained why he disagreed with Dr. Pokharna's approach to measuring the Antarctica device at the top of the microchannels:

> He measured the fins at the top; I had measured them at the bottom. . . . I would have expected fins to be larger at the top, that is an inherent -- channel widths to be larger at the top. That's an inherent feature of machining. And the technique that Dr. Pokharna used to measure is subject to error if you, you know, apply excessive force to the -- you know, to it because the copper is very, very soft. And so the slightest little bit of force will put an indentation in the copper and give you a high reading.

Dkt. 389-3 at 138:24-139:11. After seeing Dr. Pokharna's opinions in his rebuttal report, Dr. Tuckerman wondered whether any documentation from Asetek (the manufacturer of the Antarctica) could resolve the discrepancy. *Id.* at 139:12-14. Asetek then located the machining tools used for manufacturing the Antarctica device (pictured in Exhibit 275), which showed the width of the machining blade was 0.93 millimeters (Dkt. 395-5), a measurement that corroborates Dr. Tuckerman's measurements and not Dr. Pokharna's.

In response to questions from Defendants' counsel during his deposition on December 20, 2021, Dr. Tuckerman testified that he consulted Exhibit 275 for additional corroboration of the widths of the Antarctica channels, and that he was able to confirm based on a legend below the picture of the blades (that Asetek advised was used to machine the channels in Antarctica) that the blades were indeed "intended to give you a nominal 1-millimeter" cut. Dkt. 389-3 at 138:10-140:23. CoolIT's counsel did not follow up on Exhibit 275 or the legend, which is in English (not Danish), and Asetek's counsel redirected Dr. Tuckerman on the legend to clarify and complete the record:

> Q. Dr. Tuckerman, earlier in your deposition when CoolIT and Corsair's counsel was questioning you, you mentioned at looking at a machining document. Is Exhibit 275 the document that you were referring to?
>
> . . .
>
> A: Yes, I recall you show -- you showing this to me.
>
> Q. And is this Exhibit 275 the document that you referred to as the Asetek machining document earlier in your deposition?
>
> . . .
>
> A. It is what I referred to, yes.
>
> . . .
>
> Q. Earlier in your deposition you said that Exhibit 275 showed you a tool that was -- that is, based on your understanding, the tool that was used to machine the microchannels in the Antarctica device. You do you recall that?
>
> . . .
>
> A. Yes. It's my understanding that it's Asetek's assertion that this is the blade that was used to cut the microchannels, and it is evident from the picture that it had a [thickness] of 0.93 millimeters, which -- and then the box that it's showing below, you may want to zoom out a little bit, the -- Asetek asserts that that box contains, I believe, the saw blades. And [from] the labeling on the box, I am a making an inference from the 50-by-1-by-13, that the 50 is probably a blade diameter, and the 1 refers to the thick -- the nominal thickness of the cut that it's supposed to make. In other words, you know, if you're trying to make a nominal 1-millimeter cut, you're going to use a blade that is thinner than that because there's what's called a kerf width that you always get when you cut. So it always -- you always end up with a groove that's a little larger than your blade. But that blade would be consistent with the kind of channels I saw on Antarctica.

*Id.* at 261:20-264:15 (emphases added). The testimony above shows that Document 275 is not entirely in Danish; that Dr. Tuckerman was able to read some parts of it and learn relevant information from it; and that Dr. Tuckerman was relying on representation from Asetek (relayed

1   through counsel) that the blades in Exhibit 275 are the blades used for machining Antarctica.

2   CoolIT's counsel objected and did not otherwise question Dr. Tuckerman about Exhibit 275 in that

3   first deposition. *Id.*

4          **D.      Defendants' Expert, Dr. Pokharna, Considered Exhibit 275 Before Sitting**

5          **for His Deposition, and Opined About Exhibit 275 at His Deposition**

6          More than two weeks after Dr. Tuckerman's deposition, Dr. Pokharna sat for his own

7   deposition and offered his own opinions on Asetek's machining evidence in Exhibit 275. Smyth

8   Decl., Ex. A at 125:24-126:10. Dr. Pokharna offered his view that it is "physically impossible to

9   make something that is .9 wide using a .93 tool. Because the width of a channel is always more than

10  the width of the tool being used." *Id.* 126:17-22. He continued: "In all practical implementations, all

11  it means is that it's going to be more than .93. How much more than .93 is a function of the fixture

12  rate, how well has been fixtured, the extension of the tool from where it is really, you know, fastened

13  to the machine because that defines the amplitude of how much the tool you can radius the tip. So

14  basically without going into too much detail, the channel has to be more than .93." *Id.* at 127:4-12.

15  In short, Dr. Pokharna considered Exhibit 275 and testified as to why, in his opinion, Exhibit 275

16  does not support Dr. Tuckerman's measurement.

17         **E.      CoolIT's Counsel Questioned Dr. Tuckerman Extensively About His**

18         **Antarctica Measurements and Exhibit 275 at His March 2022 Deposition**

19         After the completion of expert depositions, Judge Beeler granted CoolIT an additional two

20  hours of deposition time with Dr. Tuckerman, which CoolIT used to question him about Exhibit 275

21  in March 2022. Indeed, even though Exhibit 275 was not among the topics CoolIT's counsel

22  identified for the deposition (as it was required to do by Judge Beeler (Dkt. 370)), CoolIT

23  affirmatively asked Dr. Tuckerman numerous questions about Exhibit 275 for twenty minutes.

24  Smyth Decl., Ex. B at 17:7-30:13. Dr. Tuckerman explained his understanding that Exhibit 275

25  depicts the blade used by Asetek to manufacture the Antarctica device (*id.*), the width of which is

26  readily apparent from the picture in Exhibit 275. Dr. Tuckerman also testified about Dr. Pokharna's

27  opinion that the actual channel must be wider than the blade, noting:

28         [G]enerally with that type of machining with blades, you -- you get a taper. Okay?
           There's blade wobble, and such. And you -- you know, you get something that's

wider at the top than at the bottom. At the bottom you would expect to get -- you know, either exactly the blade width, or if the blade has worn, you know, because when blades have been used for a while they can, you know, get -- get narrower, maybe it would be even less.

*Id.* at 24:7-16.

Importantly, Dr. Tuckerman was clear in his March 2022 deposition (as he has been throughout) that his opinion that the Antarctica has microchannels of less than one millimeter is based on his own measurements of the physical device, not on what is depicted in Exhibit 275. *Id.* at 25:23-26:3 ("[T]he only thing I can actually assert about the dimensions of that particular Antarctica were the measurements that I took on that particular sample, which I measured with calipers at the base of the samples, and got numbers that were close to but not in excess of 1 millimeter."). Dr. Tuckerman only considered Exhibit 275 as "corroboration" of his own personal inspection and measurements of the Antarctica device. *Id.* at 26:4-10. Dr. Tuckerman also explained again in his deposition how he measured the microchannels on the Antarctica device (using calipers at the base) and when he took those measurements (on or around July 5th, 2021). *Id.* at 14:3-11. Dr. Tuckerman had no opportunity other than during his depositions to address the new opinions in Dr. Pokharna's rebuttal report, because there were no reply expert reports in the case schedule. Dkt. 325 at 1.

### F.    CoolIT Did Not Seek or Pursue Discovery on Asetek's Manufacturing Tools for the Antarctica Device

Fact discovery in this case lasted for the better part of two years, and CoolIT never sought documentation or discovery on the tools Asetek used to manufacture the Antarctica device, although it was free to do so. Instead, CoolIT's document requests for the Antarctica consisted of a few overbroad requests that focused on the structure of the device (which CoolIT could also observe from the physical product sample), not the tools or methods for manufacturing the product. The two requests identified in CoolIT's motion are stated below.

CoolIT's Request No. 99 sought "ALL DOCUMENTS concerning the ANTARCTICA "WATER CHILL" LIQUID COOLING KIT as it existed before August 9, 2007." Dkt. 389-8 at 2. This request is not focused on any particular type of document at all. Asetek objected to CoolIT's request for "all documents" as overbroad, unduly burdensome, and vague on its face. *Id.* Asetek

1   separately objected that this request is vague and ambiguous and "fails to describe the documents

2   sought with reasonable particularity." *Id.* at 2-3. Asetek "agreed to search for and produce specific

3   categories of documents related to the Antarctica device as outlined in response to CoolIT's other

4   document requests below." *Id.* at 3. Thus, Asetek did not agree to produce "all documents" related to

5   the Antarctica device in response to this request, and Asetek duly made the Antarctica device

6   available for inspection and only produced documents relating to the structure, marketing, and sales

7   of the Antarctica. Smyth Decl., ¶ 5. CoolIT never raised any complaints about Asetek's objections,

8   response, or production related to this document request. *Id.*, ¶ 6.

9        CoolIT's Request 102, sought "All DOCUMENTS concerning the design, structure, and

10   operation of the ANTARCTICA "WATER CHILL" LIQUID COOLING KIT as it existed before

11   August 9, 2007, including but not limited to user manuals, installation manels, technical manuals,

12   specifications, engineering drawings, and other documentation." Dkt. 389-8 at 4. Asetek again

13   objected to the request for "all documents" as overbroad, unduly burdensome, and vague on its face.

14   *Id.* Asetek also noted that because the physical device was available for inspection at Finnegan's

15   offices in Palo Alto, "documents related to the design, structure, and operation" of the Antarctica

16   were redundant. *Id.* at 4-5. Nevertheless, Asetek agreed to "conduct a reasonable search for

17   documents sufficient to show the structure of the Antarctica device," *id.* at 5, which Asetek

18   produced. CoolIT never raised any complaints about Asetek's objections, response, or production

19   related to this document request. Smyth Decl., ¶ 6.

20        Thus, contrary to the allegations in their motion, CoolIT never asked for discovery or

21   documents related to the *tools* used for *manufacturing* the Antarctica device, and never specifically

22   requested that Asetek produce any such discovery or information. Dkt. 389-8; Smyth Decl., ¶ 6.

23   **III.    ARGUMENT**

24        **A.    Because CoolIT Never Requested Documents Related to Manufacturing
              Tools for the Antarctica, Rule 37 Does Not Apply and There is No Basis**
25            **for Striking Exhibit 275**

26        CoolIT's motion to strike is fatally flawed because CoolIT never sought manufacturing

27   information for the Antarctica device (like that in Exhibit 275) and Asetek never agreed to search for

28   or produce such documents. The only two requests CoolIT identified in its motion are vague and

1   overbroad and do not request manufacturing documents. Asetek objected and responded to those

2   requests by stating the kinds of documents it would search for and produce, which did not include

3   anything relating to the tools used to manufacture the Antarctica, Defendants never complained or

4   requested anything more. This alone warrants denial of CoolIT's motion.

5          For the Court to grant CoolIT's request to strike Exhibit 275, CoolIT must first demonstrate

6   Rule 37(c)(1) applies, but it has failed to do so. Rule 37(c)(1) is only a basis to exclude information

7   that was not disclosed as required by Rule 26(a) or (e). Fed. R. Civ. P 37(c)(1). CoolIT argues that

8   Asetek should have produced Exhibit 275 during fact discovery—citing two document requests—

9   and implies that Asetek's failure to do so was a violation of Rule 26(e) (which would then trigger

10  Rule 37(c)(1)). But Rule 26(e) only requires supplementation of responses to document productions

11  that are incomplete. Neither of CoolIT's Request Nos. 99 and 102 seek manufacturing documents

12  with "reasonable particularity," as would be required if Defendants had sought those documents in

13  discovery. Fed. R. Civ. P. 34(b)(1)(A). Asetek's responses were not incomplete because Asetek

14  objected and never agreed to produce documents relating to manufacturing tools. Asetek fairly and

15  properly objected to CoolIT's request for "all documents" as overbroad and lacking "reasonable

16  particularity." Asetek's response to Request Nos. 99 and 102 was unambiguous in what Asetek

17  agreed to produce (documents "sufficient to show" the structure of the Antarctica device), and

18  CoolIT never asked for more or served additional requests. Asetek had no obligation to produce

19  documents that were not asked for with reasonable particularity and so neither Rule 26(e) nor Rule

20  37(c)(1) apply to Exhibit 275.

21         Based on CoolIT's failure to request Exhibit 275 alone, the Court should deny in its entirety

22  CoolIT's motion to strike Exhibit 275.

23     **B.     Even if Rule 37 Applied, the Court Should Deny CoolIT's Motion
                Because the Two Express Exceptions to Exclusion Under Rule 37 Apply
24              Here**

25         Even if CoolIT were able to demonstrate that Asetek failed to comply with Rule 26(a) or

26  26(e) in some respect—which it has not—there are two important exceptions to exclusion that are

27  expressly stated in Rule 37: "the party is not allowed to use that information or witness to supply

28  evidence on a motion, at a hearing, or at a trial, *unless the failure was substantially justified **or** is*

*harmless*. Fed. R. Civ. P. 37(c)(1) (emphasis added). The exceptions are stated in the disjunctive ("or") so either one supports denial of Defendants' motion to exclude. Here, Asetek's introduction of Exhibit 275 in expert discovery to rebut the previously undisclosed opinions of CoolIT's expert was substantially justified *and* harmless to CoolIT.

> **1.    Asetek's production of Exhibit 275 was substantially justified as a response to Dr. Pokharna's previously undisclosed positions.**

Asetek's production of Exhibit 275 in connection with Dr. Tuckerman's response to previously undisclosed criticisms in Dr. Pokharna's rebuttal report was substantially justified. In similar circumstances, judges in this district have allowed expert witnesses to respond to new criticisms in rebuttal expert reports from the opposing side. *See Cave Consulting Grp., Inc. v. OptumInsight, Inc.*, Case No. 15-CV-03424-JCS, 2018 WL 1938555, at *4 (N.D. Cal. Apr. 25, 2018) ("The experts may, however, testify at their depositions regarding not only the subject matter of their initial reports but also any critiques of their opinions presented in the rebuttal reports…"); *see also Sportspower Ltd. v. Crowntec Fitness Mfg. Ltd.*, Case No. 817CV02032JLSKES, 2020 WL 7347860, at *3 (C.D. Cal. Nov. 18, 2020) (citing *Cave* and denying motion *in limine* to exclude expert analysis). In *Cave*, there were no reply expert reports under the schedule, the Court allowed the experts to respond to criticisms in deposition, as long as no new opinions were included. That is exactly the same situation here, because without reply expert reports, Dr. Tuckerman's deposition was his only opportunity to respond to Dr. Pokharna's criticisms. Moreover, Dr. Tuckerman did not introduce new theories, but merely cited to additional corroboration of his previously disclosed opinions.

Courts have also allowed an expert to respond to criticisms via deposition testimony in view of the difficulty of anticipating rebuttal expert opinions with precision before they are received. *See Stored Value Sols., Inc. v. Card Activation Techs., Inc.*, Case No. 09-495-LPS, 2010 WL 3834457, at *2 (D. Del. Sept. 27, 2010) (denying motion to strike expert rebuttal report and noting that "the specifics of one expert's response to another expert's critique of the first expert's initial report cannot be anticipated with precision prior to receipt of the second expert's critiquing report."). The

1    circumstances in *Stored Value* are similar to this case, because Dr. Tuckerman could not precisely

2    anticipate Dr. Pokharna's specific criticisms before he received and reviewed Dr. Pokharna's report.

3         As in the above cases, Dr. Tuckerman's deposition testimony concerning Exhibit 275 was in

4    direct response to the criticisms in Dr. Pokharna's rebuttal report, and critically did not advance any

5    *new* opinions, Dr. Tuckerman merely cited corroborating evidence for the same opinions expressed

6    in his original report. As he explained in his deposition, Dr. Tuckerman believes the bottom of the

7    microchannel is the most relevant portion to measure, since that is the part closest to the source of

8    heat that the device is seeking to cool, and that measuring at the bottom of the microchannel is the

9    correct measurement. Dkt. 389-3 at 138:1-4. It was not until Dr. Pokharna provided his rebuttal

10   report in December of 2021 that Dr. Tuckerman learned of Dr. Pokharna's opinion that Dr.

11   Tuckerman's measurements were incorrect.[2] Although Dr. Tuckerman did not think it was necessary

12   to look at the manufacturing tool documents to confirm his measurements when he prepared his

13   initial report, after Dr. Pokharna arrived at different measurements with a different approach, Dr.

14   Tuckerman sought corroboration of his original measurements on that narrow issue. *Id.* at 138:17-

15   140:23. Doing so was substantially justified.

16        CoolIT's reliance on *MLC Intellectual Property, LLC v. Micron Technology, Inc.*, 10 F.4th

17   1358, 1371 (Fed. Cir. 2021), is inapplicable because in that case the document at issue had been

18   requested in fact discovery, which is not the case here. Thus, the fact that the evidence was in the

19   party's possession from the outset is inapposite, because the party in *MLC* failed to comply with its

20   Rule 26 obligations, but the same is not true for Asetek.

21        Moreover, Dr. Tuckerman and Asetek provided Exhibit 275 to CoolIT less than two weeks

22   after receiving Dr. Pokharna's rebuttal report. CoolIT's focus on the four months between the close

23   of fact discovery and Dr. Tuckerman's deposition is incorrect because Exhibit 275 was not called for

24   until receipt of Dr. Pokharna's rebuttal report on December 8. The timing of Asetek's production of

25

26   _____

27        [2] Although CoolIT produced some of the images Dr. Pokharna relied in in his expert report,
     they were included a collection of about 150 documents measuring all aspects of the physical prior
28   art devices. Importantly, CoolIT provided no explanation of which images Dr. Pokharna would use
     or what Dr. Pokharna's rebuttal opinions would be until his expert report was served on December 8,
     2022. Smyth Decl., 6.

Exhibit 275—less than two weeks after receiving Dr. Pokharna's rebuttal report and more than two weeks *before* Dr. Pokharna's deposition (during which he testified about it)—was substantially justified under the circumstances.

> **2.     Asetek's production of Exhibit 275 was harmless because both parties' experts testified about it during their depositions, trial is almost a year away, and Dr. Tuckerman's opinion has not changed.**

CoolIT has not been harmed by the timing of Asetek's production of Exhibit 275, and its motion resorts only to generalized and unsubstantiated allegations of prejudice. This is an additional and independent reason why CoolIT's motion should be denied.

CoolIT does not cite any cases on the "harmless" exception to Rule 37 in its brief, but the courts generally only find harm in circumstances that are not present here, like imminent trial and/or the lack of opportunity to conduct discovery. For example, in *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001), a seminal case in the 9th Circuit on exclusion of belated expert opinion under Rule 26 and Rule 37, the Court found harm because the objecting party would need to depose the expert to be able to respond. In *Asetek Danmark A/S v. CMI USA*, the court precluded an expert from giving certain opinions at trial because "the ***late disclosure came literally on the eve of trial***, and the Court's only choice to remedy the prejudice to Asetek [was] to exclude" the testimony. *Asetek Danmark A/S v. CMI USA, Inc.*, Case No. 13-CV-00457-JST, 2014 WL 6997670, at *2 (N.D. Cal. Dec. 9, 2014) (emphasis added). Specifically, in *Asetek*, the court found that the untimely expert opinion was not in the expert's report or clearly disclosed during his deposition, and thus "Asetek was harmed by being unable to cross-examine Dr. Carman prior to trial regarding his opinion." *Id.* at *1-2. The court recognized situations where late disclosure did not warrant exclusion, like where the disclosure came "several months before trial" and any potential harm to the opposing party was mitigated by additional discovery. *See id.* at *2 (discussing and citing *Galentine v. Holland America Line–Westours, Inc.*, 333 F.Supp.2d 991, 993 (W.D. Wash. 2004)). Ultimately, the court in *Asetek* excluded the untimely testimony from CMI's expert because it came "on the eve of trial" and there was no way to mitigate prejudice to Asetek through additional discovery. *See id.* The facts here are markedly different.

To begin with, CoolIT has already had the opportunity to depose Dr. Tuckerman twice on Exhibit 275 and CoolIT's own expert, Dr. Pokharna, has already provided his own opinions, so CoolIT has not been harmed or prejudiced. In the March deposition, CoolIT's counsel questioned Dr. Tuckerman extensively about Exhibit 275, attempting to develop lines of cross-examination for trial. Smyth Decl., Ex. B at 17:7-30:13. For example, CoolIT now criticizes Dr. Tuckerman for considering Exhibit 275 because portions of it are in Danish (ignoring that Dr. Tuckerman relied on the labeling on the box and the caliper measurements, which are not in Danish). *See* Dkt. 389-3 at 261:20-264:15. CoolIT did its best to develop this line of attack during Dr. Tuckerman's second deposition in March, even though Dr. Tuckerman defused these arguments.[3] That is, Dr. Tuckerman testified that he was relying on the box labeling (which is in English) even though CoolIT's counsel (1) refused to show him Exhibit 275 at the deposition, (2) misrepresented that the document was entirely in Danish, and (3) forced Dr. Tuckerman to answer questions from memory. Smyth Decl., Ex. B at 25:15-30:13, 89:24-94:15. CoolIT has had a full opportunity to cross examine Dr. Tuckerman regarding Exhibit 275.

CoolIT asserts that "Dr. Pokharna will not have an opportunity to evaluate and provide opinions related to the image shown in Exhibit 275," (Dkt. 389 at 6), but that argument is meritless. Dr. Pokharna has already considered Exhibit 275, formed opinions on it, and testified about it in his January deposition. *See* Section II.D, *supra*. In particular, Dr. Pokharna has already opined that Exhibit 275 shows Dr. Tuckerman's measurements are too narrow. Smyth Decl., Ex. A at 125:24-126:22. Dr. Tuckerman has since responded to that, pointing out that the width of the blade can get smaller as it wears. Smyth Decl., Ex. B at 24:7-18. Expert discovery is already complete.

Moreover, any suggestion by CoolIT that it was "surprised" or "ambushed" by Dr. Tuckerman's testimony concerning Exhibit 275 are erroneous because Dr. Tuckerman's testimony does not express opinions "beyond the scope of [his] expert's written report," but rather opinions that are "consistent with [it] and is a reasonable synthesis and/or elaboration of the opinions

---

[3] Ultimately, CoolIT's criticisms go to the weight of Dr. Tuckerman's opinions, not their admissibility. See *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.")

1   contained in [his] expert's report." *Fujifilm Corp. v. Motorola Mobility LLC*, Case No. 12-cv-03587-

2   WHO, 2015 WL 12622055, at *4 (N.D. Cal. Mar. 19, 2015) (quoting *nCube Corp. v. SeaChange*

3   *Int'l, Inc.*, 809 F. Supp. 2d 337, 347 (D. Del. 2011)). With the introduction of Exhibit 275, Asetek

4   has not introduced a new theory or issue into the case, but instead Dr. Tuckerman's opinion is the

5   same as it has been from the outset: "[t]he space between adjacent fins is about 0.9 - 1.0 mm."

6   Dkt. 389-2, ¶ 57. Exhibit 275 merely corroborates Dr. Tuckerman's measurements.

7          CoolIT cannot credibly assert any harm or prejudice from Exhibit 275. Because Asetek's

8   production of Exhibit 275 was harmless, and so even if Rule 37 applied here (which it does not)

9   there would be no basis for striking Exhibit 275.

10         **C.     CoolIT's Request That All Expert Testimony Relying on Exhibit 275 Be**
               **Struck is Meritless**

11

12         CoolIT seeks to strike both Exhibit 275 *and* also all of Dr. Tuckerman's opinions relying on

13   Exhibit 275, but CoolIT's request should be rejected:  Rule 37 is inapplicable, and Dr. Tuckerman's

14   opinions are sound, as explained above. Importantly, Asetek will not use Dr. Tuckerman to establish

15   the admissibility of Exhibit 275 itself, rather an Asetek witness will establish the evidentiary basis

16   for the admissibility of Exhibit 275. Dr. Tuckerman will testify about what he is able to glean from

17   Exhibit 275, which merely corroborates the measurements he personally took of the Antarctica

18   device.

19         The cases CoolIT cited in its brief regarding the exclusion of expert testimony are

20   inapplicable because they each rely on Rule 37, and Rule 37 is inapplicable to Exhibit 275 (as

21   outlined above). For example, in *MLC*, a party failed to produce licenses that were required to be

22   produced in discovery under Rule 26, and so the expert could not rely on them. *See MLC Intell.*

23   *Prop. v. Micron Tech.*, Case No. 14-cv-03657-SI, 2019 WL 2863585, at *14-15 (N.D. Cal. July 2,

24   2019). In *Ingenco*, the party whose expert testimony was struck ignored the written interrogatories

25   on damages and never even attempted to comply with its discovery obligations until the last day of

26   discovery. *Ingenco Holdings, Ltd. Liab. Co. v. ACE Am. Ins. Co.*, 921 F.3d 803, 822 (9th Cir. 2019).

27   And in *Elliott*, the district court concluded the documents should have been produced in discovery,

28   but also commented that even if they had been timely disclosed, they were largely irrelevant. *Elliott*

*v. Google, Inc.*, 860 F.3d 1151, 1161 (9th Cir. 2017). Unlike these cases, CoolIT has not established the first requirement, that the information was owed under Rule 26, and so none of the cases are applicable.

CoolIT separately suggests there is a hearsay problem with Dr. Tuckerman's opinions (Dkt. 389 at 5), but CoolIT is wrong. As mentioned, a knowledgeable Asetek witness, not Dr. Tuckerman, will establish the foundation and admissibility of Exhibit 275 at trial. All of this is routine and permissible under Rule 703 of the Federal Rules of Evidence: "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Fed. R. Evid. 703. The Advisory Committee Notes to Rule 703 summarize the Rule by describing three potential sources for facts and data upon which an expert opinion may be based:  (1) firsthand observation of the witness, (2) presentation at the trial, and (3) presentation of data to the expert outside of court and other than by his own perception. Fed. R. Evid. 703 Advisory Committee Notes on Proposed Rules. Experts routinely and properly assume the truth of facts and hypotheticals in rendering their opinions under Rule 703, as recognized by the Advisory Committee Notes, which state in part:

> The second source [of facts or data upon which an expert may render an opinion], presentation at trial, also reflects existing practice.  The technique may be the familiar hypothetical question or having the expert attend the trial and hear the testimony establishing facts.

*Id*. Thus, Dr. Tuckerman may base his expert opinions on information that will be presented at trial, including information provided by a knowledgeable Asetek witness concerning the manufacturing tools for the Antarctica device and/or Exhibit 275. Accordingly, CoolIT's request to strike Dr. Tuckerman's opinions is baseless.

In addition, Rule 703 permits experts to rely on hearsay, or other inadmissible evidence, if experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion. *See* Fed. R. Evid. 703; *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1261-62 (9th Cir. 1984) (noting Rule 703 permits hearsay or other inadmissible evidence to be admitted to explain the basis of the expert's opinion). Dr. Tuckerman, who is basing his testimony on what he can glean

from the document itself, is unlike the expert in *Tubular Rollers*, who was relying on information

provided to him by an individual who "ha[d] never seen the product used in the field," and the expert

himself "ha[d] never seen in person the alleged infringing product at all." *Tubular Rollers, LLC v.*

*Maximus Oilfield Prod.*, *LLC*, Case o. 4:19-CV-03113, 2021 WL 5991744, at *3-4 (S.D. Tex. Dec.

16, 2021). Dr. Tuckerman is familiar with what tools for manufacturing microchannels look like and

can read the caliper measuring the width of the blade for himself. Thus, CoolIT's alleged hearsay

issues are not a legitimate basis for excluding Dr. Tuckerman's opinions.

Finally, by its motion, CoolIT attempts to cast doubt on Exhibit 275 and Dr. Tuckerman's

reliance on it, but it is generally recognized that any alleged weaknesses in the factual basis of or

sources underlying an expert's opinions "bear on the weight of the evidence rather than on its

admissibility." *See McLean v. 988011 Ontario, Ltd.*, 224 F3d 797, 801 (6th Cir. 2000); *see also*

*Quality Packaging, Inc. v. Snak Club*, Case No. C 03-5240 SI, 2005 WL 8177597, at *5 (N.D. Cal.

Apr. 26, 2005) (overruling unopposed objection that expert report was not based on sufficient facts

and data, noting that weakness in the factual basis generally bears on the weight of the evidence, not

the admissibility). "Vigorous cross-examination, presentation of contrary evidence, and careful

instruction on the burden of proof are the traditional and appropriate means of attacking shaky but

admissible evidence. *Daubert*, 509 U.S. at 596. CoolIT attempts to chip away at Dr. Tuckerman's

opinions, but CoolIT's criticisms should be resolved by cross-examination of Dr. Tuckerman and the

presentation of contradictory testimony by Dr. Pokharna, not by the exclusion of any of Dr.

Tuckerman's opinions.

## IV.    CONCLUSION

Rule 37 does not apply here, and even if it did Asetek's production of Exhibit 275 was

substantially justified and harmless, so the Court should deny CoolIT's motion.

1  Dated: April 14, 2022                        FINNEGAN, HENDERSON, FARABOW,
2                                                 GARRETT & DUNNER, LLP

3                                               By:   /s/ Jeffrey D. Smyth
4                                                     Jeffrey D. Smyth
                                                     Attorneys for Plaintiff and Counterdefendant
5                                                    ASETEK DANMARK A/S and
                                                     Counterdefendant ASETEK USA, INC.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28