1   COOLEY LLP                                  DUSTIN M. KNIGHT (*pro hac vice*)
    HEIDI L. KEEFE (178960)                     (dknight@cooley.com)
2   (hkeefe@cooley.com)                         11951 Freedom Drive, 16th Floor
    REUBEN H. CHEN (228725)                     Reston, VA 20190
3   (rchen@cooley.com)                          Telephone: (703) 456-8000
    DANIEL J. KNAUSS (267414)                   Facsimile: (703) 456-8100
4   (dknauss@cooley.com)
    ALEXANDRA LEEPER (307310)                   GREENBERG TRAURIG, LLP
5   (aleeper@cooley.com)                        KYLE D. CHEN (SBN 239501)
    DEEPA KANNAPPAN (313573)                    kchen@gtlaw.com
6   (dkannappan@cooley.com)                     1900 University, Avenue, 5th Floor
    3175 Hanover Street                         East Palo Alto, CA 94304
7   Palo Alto, CA  94304-1130                   Telephone:   (650) 289-7887
    Telephone:   (650) 843-5000                 Facsimile:   (650) 328-8508
8   Facsimile:   (650) 849-7400

9

10  Attorneys for Defendant and Counter-claimant
    COOLIT SYSTEMS, INC. and Defendants
11  CORSAIR GAMING, INC. and CORSAIR
    MEMORY, INC.

12                          UNITED STATES DISTRICT COURT

13                        NORTHERN DISTRICT OF CALIFORNIA

14                              SAN FRANCISCO DIVISION

15

16

17  ASETEK DANMARK A/S,                         Case No.  3:19-cv-00410-EMC

                Plaintiff and                   **DEFENDANTS' OPPOSITION TO**
18              Counter-defendant,              **ASETEK'S *DAUBERT* MOTION TO**
                                                **EXCLUDE OPINIONS OF JOHN L.**
19       v.                                     **HANSEN CONCERNING COOLIT'S**
                                                **DAMAGES**
20  COOLIT SYSTEMS, INC.,
                                                DATE:        MAY 5, 2022
21              Defendant and                   TIME:        1:30 PM
                Counter-claimant,               LOCATION:    COURTROOM 5, 17TH FLOOR
22                                              JUDGE:       HON. EDWARD M. CHEN
    CORSAIR GAMING, INC. and CORSAIR
23  MEMORY, INC.,

24              Defendants.

25

26

27              REDACTED/PUBLIC VERSION OF DOCUMENT FILED UNDER SEAL

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................................. 1

II.   FACTUAL BACKGROUND ............................................................................................. 1

    A.    The CoolIT Patents are not limited to just a cold plate............................... 1

    B.    CoolIT and Asetek both make cooling devices. ......................................... 4

    C.    The Asetek-Corsair License on similar technology reflected the royalty Asetek agreed to accept. ........................................................................... 5

III.  LEGAL STANDARD ....................................................................................................... 5

IV.  ARGUMENT ................................................................................................................. 6

    A.    Mr. Hansen properly relied on the comparable Asetek-Corsair License. .................... 6

    B.    Mr. Hansen has demonstrated sufficient comparability. ............................. 8

    C.    Mr. Hansen properly apportioned damages. ............................................. 10

    D.    Asetek's proposed re-calculation of the royalty base is unnecessary and erroneous. ................................................................................................ 12

    E.    Overseas sales figure was based on reliable information. ......................... 14

    F.    Relation back doctrine applies to Asetek-USA damages. ......................... 16

V.   CONCLUSION............................................................................................................. 17

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

CASE NO. 3-19-CV-00410-EMC
DEFENDANTS' OPPOSITION TO HANSEN *DAUBERT*

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Comms., Inc.*,
694 F.3d 1312 (Fed. Cir. 2012)................................................................. 8, 10, 12

*Apple Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed. Cir. 2014).......................................................................... 6, 9

*Asetek Danmark A/S v. CMI USA Inc.*,
852 F.3d 1352 (Fed. Cir. 2017)............................................................................. 8

*Bayer v. Baxalta, Inc.*,
Case No. 16-cv-1122, 2019 WL 330149 (D. Del. Jan. 25, 2019)........................ 12

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*,
No. 15-cv-152-RGA, 2018 WL 4691047 (D. Del. Sept. 28, 2018).............. 7, 8, 9, 10

*Commonwealth Sci. & Indus. Research Org. v. Cisco Sys., Inc.*,
809 F.3d 1295 (Fed. Cir. 2015)..................................................................*passim*

*Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*,
927 F.3d 1292 (Fed. Cir. 2019)............................................................... 1, 8, 9, 10

*Ericsson, Inc. v. D-Link Sys., Inc.*,
773 F.3d 1201 (Fed. Cir. 2014)..................................................................*passim*

*Exmark Mfg. Co., Inc. v. Briggs & Stratton Power Prods. Grp., LLC*,
879 F.3d 1332 (Fed. Cir. 2018)........................................................................ 6, 7

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
879 F.3d 1299 (Fed. Cir. 2018)............................................................................. 5

*Finjan, Inc. v. Secure Computing Corp.*,
626 F.3d 1197 (Fed. Cir. 2010)........................................................................... 10

*Formax, Inc. v. Alkar-Rapidpak-MP Equip., Inc.*,
No. 11-c-298, 2014 WL 3057116 (E.D. Wis. Jul. 7, 2014)................................. 11

*i4i Ltd. Partnership v. Microsoft Corp.*,
598 F.3d 831 (Fed. Cir. 2010)....................................................................... 12, 15

*Krupski v. Costa Crociere S.p.A.*,
560 U.S. 538, 130 S.Ct. 2485, 177 L.Ed. 2d 48 (2010)...................................... 16

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009)..................................................................................... 9

*Micro Chem., Inc. v. Lextron, Inc.*,
    317 F.3d 1387 (Fed. Cir. 2003)................................................................................... 12

*Salazar v. HTC Corp.*,
    No. 2:16-CV-01096-JRG-RSP, 2018 WL 1783157 (E.D. Tex. Apr. 13, 2018)............ 9

*SMIC, Americas v. Innovative Foundry Techs. LLC*,
    473 F.Supp.3d 1021 (N.D. Cal. 2020) ....................................................................... 17

*Sprint Commc'ns Co. LP v. Charter Commc'ns, Inc.*,
    No. 17-1734, 2021 WL 979307 (D. Del. Mar. 16, 2021) .......................................... 11

*Summit 6, LLC v. Samsung Elecs. Co.*,
    802 F.3d 1283 (Fed. Cir. 2015)................................................................................... 6

*Vectura Ltd. v. Glaxosmithkline LLC*,
    981 F.3d 1030 (Fed. Cir. 2020)................................................................................... 7

*Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*,
    329 F Supp. 3d 1070 (N.D. Cal. 2018) ...................................................................... 6

*VirnetX Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014).......................................................................... 6, 7, 10

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015)................................................................................... 6

**Statutes**

35 U.S.C.
    § 284.......................................................................................................................... 5
    § 286.................................................................................................................... 16, 17

**Other Authorities**

Fed. R. Civ. P.
    4(m)........................................................................................................................... 16
    15(c).......................................................................................................................... 16
    15(c)(1)(C)(ii)............................................................................................................. 16

Fed. R. Evid. 703 ........................................................................................................... 9

**TABLE OF AUTHORITIES**
**(continued)**

                                                                                            **Page(s)**

Kappos & Michel, *The Smallest Salable Patent-Practicing Unit: Observations on its Origins,*
    *Development, and Future*, 31 BERKLEY TECH. L. J. 1435 (2017)................................................ 14

U.S. Patent Nos.
    8,240,362.................................................................................................................................... 4, 5
    8,245,764....................................................................................................................................... 5
    8,746,330....................................................................................................................................... 2
    9,603,284....................................................................................................................................... 1
    10,274,266................................................................................................................................... 1, 2

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

1

## I.   INTRODUCTION

The law is clear that damages can be properly calculated using comparable licenses, as Mr. Hansen did here.   Apportionment of the royalty rate can be accomplished through the use of a comparable license because "the requisite apportionment is implicitly considered with the royalty rate" of a comparable prior license.   *Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*, 927 F.3d 1292, 1301 (Fed. Cir. 2019).   It is not the law, as Asetek suggests, that the only proper calculation must be done only using the smallest salable patent-practicing unit.   *See Commonwealth Sci. & Indus. Research Org. v.   Cisco Sys., Inc.*, 809 F.3d 1295, 1303 (Fed. Cir. 2015) (*CSRIO*) ("The rule [Defendant] advances—which would require all damages models to begin with the smallest salable patent-practicing unit—is untenable.").

Mr. Hansen appropriately accounted for the incremental value of CoolIT's technology through the royalty rate he applied.   To arrive at his opinion, Mr. Hansen used a comparable license approach coupled with a *Georgia-Pacific* analysis.   His report is firmly based on the record, uses well-recognized and commonly-used methodologies, and reliably applies the reasonable royalty framework to determine damages.   Although Asetek disputes the applicability of the license used by Mr. Hansen, such disputes go to weight, not admissibility.   Asetek's other challenges about what facts are most relevant or reliable to calculating a reasonable royalty are also more properly left to cross examination and the jury.

Accordingly, Asetek's motion should, respectfully, be denied in its entirety.

## II.   FACTUAL BACKGROUND

### A.   The CoolIT Patents are not limited to just a cold plate.

CoolIT has asserted U.S. Patent Nos. 8,746,330 (the '330 patent), 9,603,284 (the '284), and 10,274,266 (the '266 patent) (collectively, "the CoolIT Patents"), which are in the same patent family and generally relate to cooling of heat-generating devices and computer systems.   The invention includes a fluid heat exchanger that is designed to be placed on top of a heat-generating electronic component (e.g., a computer processor) and transfer heat from the electronic component to a liquid coolant flowing through a particular arrangement of microchannels provided in the heat exchanger. In a nutshell, the CoolIT Patents disclose a novel fluid heat exchanger that directs fluid to a heat-

generating component to remove the heat, which is then carried in the fluid and away from the heat-generating device.  (Declaration of Reuben H. Chen ("Chen Decl."), (Ex. 1, 11/3/2021 Abraham Invalidity Rpt. ¶¶ 734–43.)[1]

Despite Asetek's arguments to the contrary, the inventions of the CoolIT Patents are <u>not</u> limited to the cold plate piece of the larger inventive liquid cooling system.  For example, the '266 patent is titled "fluid heat exchange systems" and describes innovations that "pertain generally to fluid heat exchange systems" and "to approaches for integrating components in such systems."  ('266 Patent, 1:48–59.)  It also discloses "designs that deliver improved heat-transfer and/or pressure-loss performance."  (*Id.*)  Instead of focusing on merely the cold plate in isolation, Figures 2–4 and Figure 7 of the '266 Patent show embodiments that include numerous components that work with the cold plate in new ways that make the claimed inventions advantageous over prior art:



FIG. 2

FIG. 3

FIG. 4

---

[1] Unless otherwise noted, all references to "Ex." refer to exhibits to the Declaration of Reuben H. Chen, submitted herewith.



FIG. 7

The Court's construction of the "fluid heat exchanger" term is consistent with this understanding.  In the claim construction order, the Court observed that the pump is external to the fluid heat exchanger component, and did not otherwise limit the fluid heat exchanger component to a particular structure or equate it with a cold plate.  (ECF No. 149 at 19–25.)  Indeed, the benefits of the CoolIT invention are not merely confined to the cold plate, but extend to numerous other features of the fluid heat exchange system.  For example, as explained by CoolIT's technical expert, Dr. John Abraham, another advantage of the CoolIT inventions is the simultaneous use of microchannels and flow bifurcation in a way that both improves thermal performance but also *increases pumping performance*, resulting in a simplified, integrated design to cool a heat-generating component.  (Ex. 1, 11/3/2021 Abraham Invalidity Rpt. ¶¶ 746, 750–59.)  CoolIT's other technical expert, Dr. Himanshu Pokharna also made clear that the specification of CoolIT's patent (i.e., intrinsic evidence) does not limit "fluid heat exchanger" to only the cold plate."  (Ex. 3, 12/16/2019 Pokharna Depo. Tr. at 176:4–13 (noting that the specification teaches that "Fluid heat exchanger 100 further includes a fluid inlet passage 104, which in the illustrated embodiment includes a port 111 through the housing opening

1  into a header 112 and thereafter a fluid inlet opening 112 (sic) to the microporous channels 103").)

2  **B.  CoolIT and Asetek both make cooling devices.**

3  Like the CoolIT Patents, the Asetek Patents are also directed to cooling systems for electronic

4  systems that remove heat by using liquid coolants.  The scope of the patents in both parties' families

5  is closer than Asetek might argue.  Although Asetek wants to claim that they invented the "all-in-one"

6  system,[2] its own patents have been found to be much more narrowly drawn.  As the Court is aware,

7  there was prior litigation over the validity of Asetek's '362 patent, and the only difference that the jury

8  found to exist between the claimed invention and a prior art patent, Korean Utility Model No. 20-

9  0314041 (Ryu), was a limitation requiring the "reservoir" to be a single receptacle.  (*See* ECF No. 264

10  at 2–3; ECF No.  351 at 6–7.)  Others, like Ryu, had already invented liquid cooling systems where a

11  pump chamber and a thermal exchange chamber were screwed together and part of an integrated unit.



(*See* Ryu, FIG. 2a, ECF No. 387-24 at 16.)[3]  Thus, it is impossible to reconcile Asetek's arguments

about the narrowness of CoolIT's patent claims while it urges a broader "all-in-one" scope with its

own claims, which have been found to be narrowly targeted.  Nevertheless, putting aside the value of

---

[2] Asetek's own expert, Dr. Tuckerman admitted that "all-in-one" is a "vague" term and "can mean anything you want it to mean almost." (Ex. 4, 11/20/2021 Tuckerman Depo. Tr. at 132:22-23.)

[3] Additionally, as CoolIT's successful IPRs have shown, others prior art references like Batchelder and Duan, had also already disclosed liquid cooling systems where a pump chamber and a thermal exchange chamber were within a single receptacle.

Asetek's invention and the difference in the technical approach, the Asetek Patents are indisputably directed to solving similar problems for similar products as the CoolIT Patents.

### C. The Asetek-Corsair License on similar technology reflected the royalty Asetek agreed to accept.

In August 2012, Asetek and Corsair entered into a License Agreement (the "Asetek-Corsair License"). (Ex. 2, 12/2/2021 Hansen Rpt. ¶ 63.) Under the terms of the agreement, Asetek granted Corsair a non-exclusive license to make, use, or sell licensed products under the Asetek Patents, which include U.S. Patent Nos. 8,245,764 and 8,240,362, and other related patents in the same family. (*Id.*) In exchange for the rights granted, Corsair agreed to pay royalties based on Corsair's annual order volumes of Asetek products. (*Id.* ¶ 64.) The royalty rate ███████████████████████████████ ██████████████████████. (*Id.* ¶¶ 64–66.) The agreement also specified that ██████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████ (*Id.* ¶ 68.) ████████ █████████████████████████████████████████████████████ (*Id.*)

For purposes of computing a reasonable royalty in this case, Mr. Hansen used June 2014 as the time the hypothetical negotiation would have taken place for all of the CoolIT patents. (*Id.* ¶¶ 23–24.) Mr. Hansen analyzed the Asetek-Corsair License for technical comparability (with input from Dr. Abraham) and economic comparability. (*Id.* ¶¶ 69–74.) He then considered the Asetek-Corsair License as part of his apportionment analysis. (*Id.* ¶ 80.) After consideration of the fifteen *Georgia-Pacific* factors, Mr. Hansen concluded that the parties to the hypothetical negotiation would conservatively agree to a royalty rate of ███████████ of the United States revenue from Asetek accused product sales. (*Id.* ¶¶ 95–104.)

## III. LEGAL STANDARD

The apportionment requirement derives from 35 U.S.C. § 284. "Under § 284, damages awarded for patent infringement 'must reflect the value attributable to the infringing features of the product, and no more.'" *CSRIO,* 809 F.3d at 1301. "When the accused technology does not make up the whole of the accused product, apportionment is required." *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1309 (Fed. Cir. 2018). A damages expert "could do this in various ways--by careful

selection of the royalty base to reflect the value added by the patented feature . . .; by adjustment of the royalty rate so as to discount the value of a product's non-patented features; or by a combination thereof." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).

Apportionment need not occur through a quantitative analysis, but can be carried out through an analysis of the qualitative Georgia-Pacific factors. *Exmark Mfg. Co., Inc. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1350 (Fed. Cir. 2018); *see also Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*, 329 F Supp. 3d 1070, 1102 (N.D. Cal. 2018).  As the Federal Circuit has stated, "[W]e are cognizant of the difficulty that patentees may face in assigning value to a feature that may not have ever been individually sold.  However, we note that we have never required absolute precision in this task; on the contrary, it is well-understood that this process may involve some degree of approximation and uncertainty." *VirnetX Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014). Thus, only an "approximate value of th[e] technological contribution" of the patents at issue must be provided. *Ericsson*, 773 F.3d at 1233. *See also Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015) ("[E]stimating a reasonable royalty is not an exact science. The record may support a range of reasonable royalties, rather than a single value. Likewise, there may be more than one reliable method for estimating a reasonable royalty.").  Importantly, "questions regarding which facts are most relevant or reliable to calculating a reasonable royalty are 'for the jury.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1315 (Fed. Cir. 2014) overruled on other grounds by *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015).

## IV.  ARGUMENT

### A.  Mr. Hansen properly relied on the comparable Asetek-Corsair License.

Asetek's principal argument is that the smallest salable patent-practicing unit must be used to apportion the royalty base when a patent covers only one component of a multi-component product. This is incorrect.  Instead, the Federal Circuit has instructed time and again that it may be proper to base a reasonable royalty analysis on the selling price of the overall accused product even if the patented feature is directed to a component.  *See, e.g., CSRIO*, 809 F.3d at 1300–301; *Exmark Mfg. Co., Inc. v. Briggs & Stratton Power Prods. Grp.*, LLC, 879 F.3d 1332, 1350 (Fed. Cir. 2018).

For example, in *Exmark*, the defendant appealed from the district court's denial of a new trial

on damages on the basis that the patentee improperly relied on the entire market value of the accused lawn mower for its royalty base where the asserted patent was directed to an improved flow control baffle of the lawn mower. *Exmark*, 879 F.3d at 1347–48. The Federal Circuit observed at the outset that the patentee was only entitled to "compensat[ion] for the patented improvement (i.e., the improved flow control baffle) rather than the entire [lawn] mower." *Id.* at 1348. However, the Court rejected the defendant's argument that it was improper for the patentee to use the entire lawn mower as the base because the Court determined that the patentee had appropriately apportioned the royalty base through the royalty rate. *Id.* ("So long as Exmark adequately and reliably apportions between the improved and conventional features of the accused mower, *using the accused mower as a royalty base and apportioning through the royalty rate is an acceptable methodology*.") (emphasis added).

It is simply not true that there is only a single permitted methodology for apportionment. *CSIRO*, 809 F.3d at 1301–02 ("Our law also recognizes that, under this apportionment principle, there may be more than one reliable method for estimating a reasonable royalty . . . because different cases present different facts.") (internal quotation marks and citations omitted); *Virnetx, Inc.*, 767 F.3d at 1328 ("[W]e have never required absolute precision in [applying the principles of apportionment]; on the contrary, it is well-understood that this process may involve some degree of approximation and uncertainty").

Use of comparable licenses is particularly favored. Indeed, using "comparable licenses to establish a reasonable royalty rate, without performing a separate apportionment analysis, where there is a logical basis for doing so" is specifically permitted. *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, No. 15-cv-152-RGA, 2018 WL 4691047, at *7 (D. Del. Sept. 28, 2018) (internal citations omitted); *Vectura Ltd. v. Glaxosmithkline LLC*, 981 F.3d 1030, 1041 (Fed. Cir. 2020) ("[A] party relying on a sufficiently comparable license can adopt the comparable license's royalty rate and royalty base without further apportionment and without proving that the infringing feature was responsible for the entire market value of the accused product") (internal citations omitted). The Federal Circuit has further explained that "[l]ogically, an economist could [apportion] . . . by adjustment of the royalty rate so as to discount the value of a product's non-patented features." *Ericsson*, 773 F.3d at 1226. For example, the Federal Circuit has "accepted '*built in apportionment*' for a comparable license

1  agreement." *Bio-Rad Labs.*, 967 F.3d 1353, 1376 (Fed. Cir. 2020) (citing *Elbit Sys.*, 927 F.3d at 1301)

2  (emphasis added).

3      Mr. Hansen properly relied on the Asetek-Corsair License to derive a royalty rate that reflects

4  the incremental value that the CoolIT Patents add to the Asetek cooling system.  *Ericsson*, 773 F.3d

5  at 1226.  The Asetek-Corsair License is itself apportioned because Asetek did not invent the "all-in-

6  one" cooling system as it claims.  If it did, then the royalty rate would have been closer to 100% instead

7  of ███████.  Mr. Hansen's reliance on the Asetek-Corsair License comports with controlling Federal

8  Circuit law and he appropriately determined that the hypothetical negotiation would yield a similar

9  royalty rate that reflects the incremental value of cooling technology of the CoolIT patents-in-suit.

10     **B.    Mr. Hansen has demonstrated sufficient comparability.**

11      Asetek next argues that Mr. Hansen did not account for differences between this case and the

12  Asetek-Corsair License.  (Br. at 13.)  Asetek is wrong.  In his expert report, Mr. Hansen conducted a

13  thorough analysis of both the technical comparability and economic comparability between the

14  Asetek-Corsair License and the hypothetical license between CoolIT and Asetek for the CoolIT

15  Patents.  (Ex. 2, 12/2/2021 Hansen Rpt. ¶¶ 62–74, 80.)

16      When relying on a comparable license for a reasonable royalty analysis, all that is required is

17  a showing of "baseline comparability."  *Bio-Rad Labs,,* 967 F.3d at 1374.  In *Bio-Rad*, the Federal

18  Circuit emphasized that "the issue of comparability is often one of sufficiency of the evidence, not

19  admissibility."  *Id.* at 1373; *see also ActiveVideo Networks, Inc. v. Verizon Comms., Inc.*, 694 F.3d

20  1312, 1333 (Fed. Cir. 2012) (allowing an expert to rely on a license that did not cover the technologies

21  in the case, holding the "degree of comparability ... [a] factual issue[] best addressed by cross

22  examination and not by exclusion.").  The facts of *Bio-Rad* prove the point.  The court found the

23  district court did not err in allowing testimony where both the patents-in-suit and the patents licensed

24  in comparator agreements "related to microfluids" or related to products in the relevant market.  *Bio-

25  Rad Labs.*, 967 F. 3d at 1374.

26

────────────────

27  [4] Although CoolIT disagrees with Asetek's position that the Asetek-Corsair License reflects an
   effective royalty rate of 10-19%, ████████████████████████████████████████████████

28  ████████████████████████████████████████  *See Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d
   1352, 1363–64 (Fed. Cir. 2017).

1    Mr. Hansen has demonstrated even more than a "baseline comparability" by consulting with

2    Dr. Abraham to inform his understanding of the technology and providing a link between that

3    technology and the CoolIT patents.  By doing so, Mr. Hansen properly relied on the technical expertise

4    of Dr. Abraham that the Asetek Cooling Patents are directed toward solving similar problems for

5    similar products and are technically comparable.  (Ex. 2, 12/2/2021 Hansen Rpt. ¶¶ 69–70; *see also*

6    Ex. 1, 11/3/2021 Abraham Invalidity Rpt. ¶¶ 734–65.); *See Salazar v. HTC Corp.*, No. 2:16-CV-

7    01096-JRG-RSP, 2018 WL 1783157, at *3 (E.D. Tex. Apr. 13, 2018) ("Fed. R. Evid. 703 permits an

8    expert to rely on inadmissible facts or data to form an opinion if they are the kinds of facts or data on

9    which an expert in the field would reasonably rely.  No doubt damages experts calculating a reasonable

10   royalty rely on facts or data from a party's technical expert."); *see also Apple*, 757 F.3d at 1321.

11   Moreover, Mr. Hansen explained how the Asetek-Corsair License and the hypothetical license

12   are economically comparable, as: (1) the Asetek/Corsair License involves Corsair, a primary customer

13   of both Asetek and CoolIT, and a named defendant in this matter; (2) includes the same types of

14   covered products (*e.g.*, liquid cooling products); and (3) are directed to similar end users and

15   applications (*e.g.*, computer gaming enthusiasts, data centers).  (Ex. 2, 12/2/2021 Hansen Rpt. ¶ 71.)

16   Additionally, both the Asetek/Corsair License and the hypothetical license were non-exclusive, and

17   the Asetek/Corsair License was less than 2 years before the hypothetical license.  (Ex. 2, 12/2/2021

18   Hansen Rpt. ¶¶ 23, 63.)  As in *Bio-Rad*, this is enough to establish "baseline comparability."  *Bio-Rad*

19   *Labs.*, 967 F.3d at 1374.

20   The Federal Circuit has never required the technological features of the comparable license to

21   be strictly identical (or even substantially similar) to the features of the defendant accused of

22   infringement.  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009) is a prime example.

23   There, defendant Microsoft was accused of infringement through the calendar date-picker in Microsoft

24   Office, but was permitted to rely for comparability purposes on a $6.5 million lump sum license "for

25   a graphical user interface technology" in general.  *Id.* at 1331–32; *see also Elbit Sys.*, 927 F.3d at 1300

26   (prior settlement agreement to "one-way satellite communication" comparable to patent directed to

27   "two-way satellite communication").

28   To the extent Asetek's complaint concerns the degree of comparability, that is "a factual issue

1    best addressed through cross examination." *Bio-Rad Labs.*, 967 F.3d at 1374.  Even where there are

2    "several differences between the . . . license relied upon [by the defendant] and the hypothetical

3    negotiation," as long as the proffering experts' opinions "permitted the jury to properly" evaluate those

4    differences, then the "degree of comparability" is "a factual issue best addressed by cross examination

5    and not by exclusion."  *Virnetx*, 767 F.3d at 1331  (internal quotations and citation omitted); *see also*

6    *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) ("The

7    degree of comparability of the Gemstar and Grande license agreements as well as any failure on the

8    part of ActiveVideo's expert to control for certain variables are factual issues best addressed by cross

9    examination and not by exclusion.").  *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211–

10   12 (Fed. Cir. 2010) (same).

11          **C.      Mr. Hansen properly apportioned damages.**

12          Asetek further claims Mr. Hansen failed to apportion damages or tie his analysis to his

13   reasonable royalty.  But this criticism ignores Mr. Hansen's careful consideration of the Asetek-

14   Corsair License and application of the *Georgia-Pacific* factors.

15          The Federal Circuit has explicitly approved the methodology Mr. Hansen employs: using a

16   comparable license agreement to inform apportionment.  The economic terms of comparable licenses

17   may reflect the factors relevant to apportionment—such as the incremental contribution of an

18   invention or intellectual property held by the licensee—and thus may themselves apportion value. *See,*

19   *e.g., Elbit Sys.*, 927 F.3d at 1301.

20          That is what Mr. Hansen did.  By using the royalty rates from the Asetek-Corsair License, he

21   took apportionment into consideration because, like the accused products, the licensed products in the

22   Asetek-Corsair License contained features not covered by the patents licensed there.  As discussed

23   above, the only allegedly-novel aspect of Asetek's Patents was limited to the "single receptacle"

24   concept.  Thus, just because Asetek Patents have claims drafted to "cover" the entire cooling system

25   by listing various conventional components, that does not automatically make the entire cooling

26   system novel.  Rather, the ***incremental*** value of Asetek's invention was reflected in the ███ royalty

27   rate in the Asetek-Corsair License. (*See* Ex. 2, 12/2/2021 Hansen Rpt. ¶¶ 62–74.)

28          With input from Dr. Abraham, Mr. Hansen considered the technology claimed in the Asetek

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

10.

CASE NO. 3-19-CV-00410-EMC
DEFENDANTS' OPPOSITION TO HANSEN *DAUBERT*

1    Patents and compared it with the technology claimed in the CoolIT Patents. (*Id*. ¶¶ 47–53, 70.)  As

2    part of that comparison, he set forth various features of the CoolIT Patents and the kind of benefits

3    that are important to customers. (*Id*.)  He also considered Dr. Abraham's opinion that CoolIT's patents

4    are more valuable than Asetek's because they disclose the simultaneous use of microchannels and split

5    flow features that yield an optimal thermal and pressure design.  (*Id*.; Ex. 1, 11/3/2021 Abraham

6    Invalidity Rpt. ¶¶ 734–65.)  Further, based on discussions with Dr. Abraham and an analysis of

7    Asetek's own business decisions, Mr. Hansen noted that Asetek would not be able to offer a

8    commercially-acceptable desktop product █████████████████████████████████████████

9    for sale without utilizing the CoolIT Patents. (Ex. 2, 12/2/2021 Hansen Rpt. ¶¶ 56–57, 60, 100.)  To

10   the extent that Dr. Abraham's opinions are in question, Asetek can remedy this concern on cross-

11   examination.  *Formax, Inc. v. Alkar-Rapidpak-MP Equip., Inc.*, No. 11-c-298, 2014 WL 3057116, at

12   *1–2 (E.D. Wis. Jul. 7, 2014) ("Whether those conclusions are sound can be explored at trial through

13   cross-examination and other expert testimony."); *Sprint Commc'ns Co. LP v. Charter Commc'ns, Inc.*,

14   No. 17-1734, 2021 WL 979307, at *8 (D. Del. Mar. 16, 2021) (proper for damages expert to rely on

15   opinions from technical expert).  There is no basis on which to exclude Mr. Hansen's opinion on his

16   analysis of the Georgia-Pacific factors with reliance on technical matters from consulting with Dr.

17   Abraham.  Again, all can be remedied through cross, not exclusion.

18           In addition to Dr. Abraham's input, Mr. Hansen also considered other facts and data that

19   support his opinions on the relative values of the Asetek and CoolIT patents.  For example, he cited

20   testimony from an Asetek witness ████████████████████████████████████████████

21   █████████████████████████████████████████████████████████████████████████████████

22   █████████████████████████. (Ex. 2, 12/2/2021 Hansen Rpt. ¶¶ 52, 56–57, 60, 100.)

23   The same witness also testified that Asetek ███████████████████████████████████████

24   █████████████████████████████████████████████████████████. (*Id*. ¶ 56.)

25   Further, Mr. Hansen cited Asetek's own press release touting the split-flow technology and how the

26   new Gen 4 cold plate has better efficiency than the previous Asetek Generation 3 products. (*Id*. ¶ 52.)

27           Further, Mr. Hansen evaluated how each *Georgia-Pacific* factor would directionally affect the

28   royalty, considered how the circumstances of the hypothetical negotiation differs from the facts

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

11.

CASE NO. 3-19-CV-00410-EMC
DEFENDANTS' OPPOSITION TO HANSEN *DAUBERT*

present when the Asetek-Corsair License was executed, and arrived at a royalty rate of 7% by tying the proposed royalty rate to the facts of the case. (*Id.* ¶¶ 95–104.) He accounted for economic differences, such as the fact that CoolIT and Asetek are primary direct competitors, and explained why that would place upward pressure on the royalty rate. (*Id.* ¶¶ 72–73.) He also recognized that while ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ █████████████████████████████████. (*Id.* ¶ 74.) Based on the higher value of the technology embodied in the CoolIT Patents, the assumption of validity and infringement, and the competitive relationship of the parties, among other factors, he concluded a royalty rate of ███████ ███ would be reasonable for a license to the CoolIT Patents. (*Id.* ¶¶ 95–104.)

Asetek's disagreement with how Mr. Hansen adjusts for the differences between the Asetek-Corsair License and the hypothetical negotiation are matters for cross-examination, not exclusion. *ActiveVideo Networks Inc.*, 694 F.3d at 1333 ("The degree of comparability of ... license agreements as well as any failure on the part of [an] expert to control for certain variables are factual issues best addressed by cross examination and not by exclusion."). As noted above, the degree to which the Asetek-Corsair License is comparable (and thus achieves this aim) is a question for the jury. *Bayer v. Baxalta, Inc.*, Case No. 16-cv-1122, 2019 WL 330149, at *3 (D. Del. Jan. 25, 2019) (criticisms that an apportionment analysis lacked "economic foundation" went to weight and credibility, and did not warrant exclusion). None of the case law Asetek cites suggests otherwise.

Likewise, "questions about what facts are most relevant or reliable to calculating a reasonable royalty are for the jury." *i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 855–56 (Fed. Cir. 2010). Asetek takes issue with Mr. Hansen's analysis of the facts and criticizes his report for ignoring certain facts (e.g., by not considering CoolIT's Domino ALC product). (Br. at 17.) But, when "the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony." *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003). Asetek should save its fact-based complaints for trial.

**D.     Asetek's proposed re-calculation of the royalty base is unnecessary and erroneous.**

The smallest salable patent-practicing unit (SSPPU) concept neither compels nor supports using the cost of a component as the royalty base. In *Ericsson*, the court held that licenses using a

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

12.

CASE NO. 3-19-CV-00410-EMC
DEFENDANTS' OPPOSITION TO HANSEN *DAUBERT*

1   royalty base greater than the SSPPU could be presented to the jury. *Ericsson*, 773 F.3d at 1225–29.

2   In *CSIRO*, the Federal Circuit held that courts need not apply SSPPU at all. *CSIRO*, 809 F.3d at 1303

3   (requiring "all damages models to begin with the smallest salable patent-practicing unit – is untenable"

4   and conflicts with the Court's "prior approvals of a methodology that values the asserted patents based

5   on comparable licenses."). Although it can be a useful guidepost, the SSPPU concept is not a rigid

6   rule prescribing how patent damages and royalties must be calculated in all contexts. *See id.* Again,

7   Asetek seems to be complaining about the result, not the methodology, which is left for cross, not

8   exclusion.

9           Contrary to Asetek's assertion, Mr. Hansen did not disregard his calculation of the SSPPU.

10  Instead, he used it as a guidepost to inform his royalty analysis and ultimately concluded that it

11  ***understated*** the value of the CoolIT Patents and their contribution to the Asetek Accused Products.

12  (Ex. 2, 12/2/2021 Hansen Rpt. ¶¶ 81–93.) As Mr. Hansen explained in his report, he understood from

13  Dr. Abraham that the cold plate is the primary component within the Asetek accused products that

14  provides the technology claimed in the CoolIT Patents and that it is one of five primary systems within

15  the Asetek accused products, contributing at least 20% of the value of the product.[5] (*Id.* ¶ 91.) He

16  also understood from Dr. Abraham that certain components, such as the fan, reflect off-the-shelf

17  components that do not provide unique advantages, and other components, such as packaging, provide

18  no functional benefits to the Asetek accused products. (*Id.*) Therefore, assigning profit to these

19  components on a pro rata basis would reduce the profits available to be attributed to components

20  providing functional benefits. (*Id.*) Putting this in terms of numbers, the gross profit of ███ per unit

21  earned by Asetek on the SSPPU represents approximately ███ of the average selling price of the

22

23  ─────────────────
    [5] As Mr. Hansen clarified in his deposition, his discussions with Dr. Abraham concerned the functional
    benefit of the cold plate component and the relative value of utilizing that component in Asetek's
24  product. (Ex. 5, 1/5/2021 Hansen Depo. Tr. at 203:13-205:8.) Mr. Hansen considered Dr. Abraham's
    input to inform his own opinion on the relative monetary value.
25  [6] The calculation of ███ is the profit on the cold plate as a percentage of the revenue per unit. In
    the numerator, the gross profit of the cold plate is calculated as ███ per unit. (Ex. 7, 11/3/21
26  Hansen Rpt., Attachment 8). In the denominator, the revenue per unit is calculated as ██████
    in revenue divided by ██████ units. (Ex. 8, 12/2/2021 Hansen Rpt., Attachment 5U.) The
27  resulting ███ figure represents a simple allocation of profit (available to pay a royalty) to the cold
    plate, and does not reflect the importance or contribution of the cold plate to the
28  performance/function/value of the product.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

13.

CASE NO. 3-19-CV-00410-EMC
DEFENDANTS' OPPOSITION TO HANSEN *DAUBERT*

1  Asetek accused products, but that only reflects the profit on the cold plate unit itself[7] and doesn't

2  account for the value that the component actually contributes to the cooling function of the system.

3  (*Id.* ¶ 91.)  In comparison, assuming 20% of the profit for the Asetek accused products is attributable

4  to CoolIT Patents, then the royalty rate would be approximately ████████████████████

5  ████████████████████████████  (*Id.* ¶ 91, n. 156.)

6        This is consistent with observations by courts and commentators that the true value of the

7  invention lies in the functionality it enables, not in a disembodied component that might serve as a

8  part of the invention's implementation. *See* Kappos & Michel, *The Smallest Salable Patent-Practicing*

9  *Unit: Observations on its Origins, Development, and Future*, 31 BERKLEY TECH. L. J. 1435 (2017).

10  Similarly, the district court in *CSIRO* aptly remarked that the value of a book is not measured by the

11  cost of the ink, paper, and binding used to make it. *CSIRO*, 809 F.3d at 1300.  No reason supports the

12  conclusion that the value of a technology enabling a product to function must necessarily be limited

13  to the cost of the product's constituent parts rather than the value of the whole.

14        Asetek's proposed recalculation of the royal base is not only unnecessary but also incorrect.

15  According to Asetek, Mr. Hansen should have multiplied Asetek's ████████  in revenues from

16  sales of accused products by ████  to reach a new royalty *base*.  But this is non-sensical because the

17  ████  already represents the profit as a percentage of revenue and is the indicated royalty *rate*.  The

18  revenue cannot be multiplied by a ████  royalty rate to yield a new revenue royalty base.  Asetek offers

19  no legal authority to support this circular approach.

20       **E.**    **Overseas sales figure was based on reliable information.**

21        It is undisputed that Asetek sells a substantial amount of accused products to its customers

22  outside of the United States, but a percentage of those products are subsequently shipped to the United

23  States.  Asetek did not provide the ultimate shipping destination for many of its sales transactions in

24  its produced data.  (Ex. 2, 12/2/2021 Hansen Rpt. ¶ 44, n. 57.)  Because direct data for these

25  downstream sales was not available to Mr. Hansen, he used other evidence to calculate this number.

26

---

[7] As addressed above and noted by Mr. Hansen, the inventions of the CoolIT Patents are not limited
27  to the cold plate component of a liquid cooling system.  Certain additional subcomponents or
subassemblies are necessary to practice the claims of the CoolIT Patents. (Ex. 2, 12/2/2021 Hansen
28  Rpt. ¶¶ 85-86.)

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

14.

CASE NO. 3-19-CV-00410-EMC
DEFENDANTS' OPPOSITION TO HANSEN *DAUBERT*

1   For Corsair, one of Asetek's primary customers, he was able to use additional information to account

2   for the downstream products that are ultimately shipped to the United States and calculated those

3   downstream sales to be ██████.[8] Asetek offers no alternative way[9] to perform that calculation

4   but now seeks to strike the entire amount.

5     Asetek's criticisms of Mr. Hansen's methodology are unfounded.  Mr. Hansen properly used

6   reliable information from public SEC filings, which stated that 35%–38% of Corsair's products had

7   been sold in the U.S. by Corsair. (Ex. 6, 11/3/21 Hansen Rpt., Attachment 5.D.5.)  Although the sales

8   percentages from the public filings did not break out the numbers by Corsair's two product segments

9   (Gamer and Creator Peripherals and Gaming Components and Systems), Corsair's entire business is

10  focused on "high-performance gear for gamers and content creators" (Ex. 9, Corsair Gaming, Inc.

11  Form 10-K for the fiscal year ending December 31, 2020, p. 5), and there is no reason to believe that

12  the geographic breakdown for liquid cooling systems would be any different than the overall product

13  mix.  Mr. Hansen started with an estimate of Asetek's sales to Corsair that are shipped into the U.S.

14  From this figure, Mr. Hansen deducted unit sales for which there was direct evidence that the units

15  were shipped into the U.S., leaving the balance of sales for which direct evidence was not available,

16  but that Corsair's public disclosures indicate were shipped into the U.S.  (ECF No. 405-13, Ex. 11,

17  Attachment 5.D.)  Asetek disparages Mr. Hansen's calculations as "specious" and describes his steps

18  as "magically" transforming one figure to another.  (Br. at 18–19.)  But what Asetek dismisses as feats

19  of "magic" were actually Mr. Hansen's efforts to reconcile the U.S. sales with the percentages

20  provided in the public SEC filings and to make sure that the U.S. revenues are not double counted in

21  his analysis.  (ECF No. 405-3, Chen Decl. Ex. 1 at 161:23–162:4) (describing category 4 as the

22  increment used to arrive at the 35% factor).  Regardless of Asetek's mischaracterizations, these types

23  of "questions about what facts are most relevant or reliable to calculating a reasonable royalty are for

24  the jury." *i4i Ltd.*, 598 F.3d at 855–56.

25

---

26  [8] Mr. Hansen did not include customers other than Corsair in this analysis, so his calculation is
    conservatively confined to Corsair only.  (Ex. 2, 12/2/2021 Hansen Rpt. ¶ 44, n. 57.)

27  [9] Asetek faults CoolIT for not getting information directly from Corsair, but as Mr. Hansen testified,
    his recollection was that Corsair did not have complete information about where its customers

28  ultimately sell and use all of their products.  (Ex. 5, 1/5/2022 Hansen Depo. Tr. at 166:7-167:2.)

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

15.

CASE NO. 3-19-CV-00410-EMC
DEFENDANTS' OPPOSITION TO HANSEN *DAUBERT*

**F.     Relation back doctrine applies to Asetek-USA damages.**

Asetek seeks to avoid more than a year's worth of damages from Asetek USA by complaining that Asetek USA was added too late as a party and that the 6-year-limit rule under 35 U.S.C. § 286 bars recovery for infringement between June 10, 2014 and October 21, 2015.  Because the relation back doctrine applies, the Court should reject this request.

Rule 15(c) governs when an amended pleading relates back to the original filing date of the complaint.  The relevant section is 15(c)(2)(C)(ii), which provides when "the amendment changes the party or the naming of the party against whom a claim is asserted" the amended pleading relates back only if "the party to be brought in by amendment knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity."  Fed. R. Civ. P. 15(c)(1)(C)(ii).  "Rule 15(c)(1)(C)(ii) asks what the prospective defendant knew or should have known during the Rule 4(m) period, not what the plaintiff knew or should have known at the time of filing [the] original complaint."  *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 548, 130 S.Ct. 2485, 177 L.Ed. 2d 48 (2010).

The record shows that Asetek USA knew or at least should have known at the time of the original complaint that the action would have been brought against it but for a misunderstanding on CoolIT's part about which Asetek entity had responsibility for the claims at issue.  As the Court recognized in its order granting in part CoolIT's motion for leave to amend counterclaims, "CoolIT was not [previously] aware that [Asetek Danmark's related entities] made U.S. sales of the products accused in this litigation."  ECF No. 332.  Yet, Asetek USA either knew or should have known the action would have been brought against it because Asetek treats its various entities as one.  For example, Asetek's counsel admitted that "the decision makers at Asetek are all of the same people. It's not a worldwide conglomerate, the way it may sound."  ECF No. 319 at 5–6.  Asetek's annual reports confirm that all the officers of the various Asetek entities are the same.  *Id.* at 6.  And Asetek's controller, David Pangburn, testified that although he is officially employed by Asetek USA, he provided services to all of the related Asetek entities, such as external reporting, annual report preparation, quarterly report preparation, technical, accounting advice, oversight of the financial consolidation process, and oversight of the U.S. federal tax return for the various Asetek entities.  *Id.*

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

CASE NO. 3-19-CV-00410-EMC
DEFENDANTS' OPPOSITION TO HANSEN *DAUBERT*

1   Given that Asetek USA was involved in selling the same accused products at issue and knew or should

2   have known it had a substantial role in the infringement, application of the relation back doctrine is

3   warranted here.  *See SMIC, Americas v. Innovative Foundry Techs. LLC*, 473 F.Supp.3d 1021, 1025–

4   1026 (N.D. Cal. 2020) (concluding that the subsidiaries should have known that they were not named

5   as defendants because of plaintiff's misunderstanding and that the mistake did not foreclose a finding

6   of relation back).  And because the amended pleading relates back to the original filing of CoolIT's

7   counterclaims in April 2019, recovery for damages between June 10, 2014 and October 21, 2015 is

8   not barred under the six-year limitation of 35 U.S.C. § 286.

9   **V.   CONCLUSION**

10          For the foregoing reasons, CoolIT respectfully requests that the Court deny Asetek's motion.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

17.

CASE NO. 3-19-CV-00410-EMC
DEFENDANTS' OPPOSITION TO HANSEN *DAUBERT*

1  Dated:      April 14, 2022

2                                                   /s/  Reuben H. Chen

3                                                   COOLEY LLP
                                                    HEIDI L. KEEFE (178960)
4                                                   (hkeefe@cooley.com)
                                                    REUBEN H. CHEN (228725)
5                                                   (rchen@cooley.com)
                                                    DANIEL J. KNAUSS (267414)
6                                                   (dknauss@cooley.com)
                                                    ALEXANDRA LEEPER (307310)
7                                                   (aleeper@cooley.com)
                                                    DEEPA KANNAPPAN (313573)
8                                                   (dkannappan@cooley.com)
                                                    3175 Hanover Street
9                                                   Palo Alto, CA  94304-1130
                                                    Telephone:    (650) 843-5000
10                                                  Facsimile:     (650) 849-7400

11                                                  DUSTIN M. KNIGHT (*pro hac vice*)
                                                    (dknight@cooley.com)
12                                                  11951 Freedom Drive, 16th Floor
                                                    Reston, VA 20190
13                                                  Telephone: (703) 456-8000
                                                    Facsimile: (703) 456-8100

14                                                  *Attorneys for Defendant and Counter-claimant*
                                                    *COOLIT SYSTEMS, INC. and Defendants*
15                                                  *CORSAIR GAMING, INC. and CORSAIR*
                                                    *MEMORY, INC.*

16
                                                    GREENBERG TRAURIG, LLP
17                                                  KYLE D. CHEN (SBN 239501)
                                                    (kchen@gtlaw.com)
18                                                  1900 University Avenue
                                                    East Palo Alto, CA 94303
19                                                  Telephone: (650) 289-7887
                                                    Facsimile: (650) 328-8508

20
                                                    *Attorneys for Defendant CoolIT Systems, Inc.*
21

22

23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

18.

CASE NO. 3-19-CV-00410-EMC
DEFENDANTS' OPPOSITION TO HANSEN *DAUBERT*