1  Robert F. McCauley (SBN 162056)
   robert.mccauley@finnegan.com
2  Arpita Bhattacharyya (SBN 316454)
   arpita.bhattacharyya@finnegan.com
3  Jeffrey D. Smyth (SBN 280665)
   jeffrey.smyth@finnegan.com
4  **FINNEGAN, HENDERSON, FARABOW,**
      **GARRETT & DUNNER, LLP**
5  3300 Hillview Avenue
   Palo Alto, California 94304
6  Telephone:    (650) 849-6600
   Facsimile:    (650) 849-6666
7
   Attorneys for Plaintiff and Counterdefendant
8  ASETEK DANMARK A/S and
   Counterdefendant ASETEK USA, INC.
9

10              **UNITED STATES DISTRICT COURT**
             **NORTHERN DISTRICT OF CALIFORNIA**
11               **SAN FRANCISCO DIVISION**

12

13  ASETEK DANMARK A/S,                          CASE NO. 3:19-cv-00410-EMC

14              Plaintiff and                    **ASETEK DANMARK A/S AND ASETEK**
                Counterdefendant,                **USA INC.'S OPPOSITION TO**
15                                               **DEFENDANTS' MOTION FOR SUMMARY**
    ASETEK USA, INC.,                            **JUDGMENT**
16
                Counterdefendant,
17                                               Date:        May 5, 2022
         v.                                      Time:        1:30 PM
18                                               Location:    Courtroom 5, 17th Floor
    COOLIT SYSTEMS, INC.,                        Judge:       Hon. Edward M. Chen
19
                Defendant and
20              Counterclaimant,
                                                       **REDACTED VERSION**
21  COOLIT SYSTEMS USA INC., COOLIT                    **FOR PUBLIC FILING**
    SYSTEMS ASIA PACIFIC LIMITED,
22  COOLIT SYSTEMS (SHENZHEN) CO.,
    LTD.,
23
                Defendants,
24
    CORSAIR GAMING, INC. and CORSAIR
25  MEMORY, INC.,

26              Defendants.

27

28

# **TABLE OF CONTENTS**

I.    INTRODUCTION ..................................................................................................1

II.   FACTUAL BACKGROUND................................................................................1

III.  ARGUMENT .......................................................................................................2

     A.    There are Disputed Issues of Material Fact as to Whether the CoolIT Products Accused of Infringement Have "Curved Blades" Under the Doctrine of Equivalents (DOE), and Therefore Summary Judgment Should Not be Granted................................................................................................................2

          1.    Asetek's DOE theory does not vitiate the "curved blades" limitation or violate the "all-elements" rule ...................................................................2

          2.    Asetek has provided substantial evidence from which a jury could reasonably find that CoolIT's impeller blades drive liquid in substantially the same way and produce substantially the same results ......7

          3.    Asetek has provided evidence based on which a reasonable jury could find that CoolIT's impeller blades are insubstantially different from curved blades ..........................................................................................12

          4.    Asetek does not violate the ensnarement doctrine.....................................12

     B.    Material Facts in Dispute Preclude a Finding of Summary Judgment on Whether CoolIT's New Tamriel Design Infringes Asetek's '362 Patent Claims..14

          1.    CoolIT's collateral and judicial estoppel arguments are meritless because there are genuine disputes of fact whether the alleged "reservoir" in Tamriel is a "single receptacle" (Asetek's position) or it has two receptacles (CoolIT's position) .....................................................14

          2.    Asetek's DOE theory for "reservoir" does not vitiate the "single receptacle" requirement, nor does it fail the function-way-result or insubstantial differences test ........................................................................19

     C.    There are Disputed Issues of Material Fact as to Whether the Antarctica Product on Sale Prior to CoolIT's Priority Date (August 9, 2007) Had "Microchannels," which Precludes a Finding of Summary Judgment .................21

          1.    Asetek's expert, Dr. Tuckerman, and an Asetek witness have testified that the Antarctica has "microchannels"..................................................21

          2.    The Antarctica physical sample is representative of the Antarctica product on sale before August 9, 2007 ......................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Lab'ys v. Dey, L.P.*,
  287 F.3d 1097 (Fed. Cir. 2002)..................................................................................12, 13

*Advanced Display Sys., Inc. v. Kent State Univ.*,
  212 F.3d 1272 (Fed. Cir. 2000)..........................................................................................12

*Aki v. Univ. of California Lawrence Berkeley Nat'l Lab'y*,
  74 F. Supp. 3d 1163 (N.D. Cal. 2014) ...............................................................................24

*Asetek v. CMI USA*,
  Case 4:13-cv-00456, Dkt. 426 ..................................................................................... *passim*

*Athletic Alts, Inc. v. Prince Mfg., Inc.*,
  73 F.3d 1573 (Fed. Cir. 1996)..............................................................................................4

*Deere & Co. v. Bush Hog, LLC*,
  703 F.3d 1349 (Fed. Cir. 2012)........................................................................................3, 4

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
  469 F.3d 1005 (Fed. Cir. 2006)..........................................................................4, 5, 6, 13

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
  535 U.S. 722 (2002).............................................................................................................6

*Graver Tank & Mfg. Co. v. Linde Air Prod. Co.*,
  339 U.S. 605 (1950).............................................................................................................5

*J & M Corp. v. Harley-Davidson, Inc.*,
  269 F.3d 1360 (Fed. Cir. 2001)..........................................................................................11

*Network Appliance, Inc. v. Bluearc Corp.*,
  No. C 03-5665 MHP, 2005 WL 1530222 (N. D. Cal. June 27, 2005) .............................4

*Novartis Corp. v. Ben Venue Laboratories, Inc.*,
  271 F.3d 1043 (Fed. Cir. 2001)..........................................................................................11

*Optical Disc Corp. v. Del Mar Avionics*,
  208 F.3d 1324 (Fed. Cir. 2000)............................................................................................6

*Sage Prod., Inc. v. Devon Indus., Inc.*,
  126 F.3d 1420 (Fed. Cir. 1997)............................................................................................4

*Tronzo v. Biomet, Inc.*,
  156 F.3d 1154 (Fed. Cir. 1998).....................................................................................4, 5, 6

*Voda v. Cordis Corp.*,
   536 F.3d 1311 (Fed. Cir. 2008)........................................................................................2, 3

*Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*,
   520 U.S. 17 (1997)..............................................................................................................4

*Wilson Sporting Goods Co. v. David Geoffrey & Assocs.*,
   904 F.2d 677 (Fed. Cir. 1990)........................................................................................6, 12

**Statutes**

35 U.S.C. §§ 102............................................................................................................................13

35 U.S.C. § 103(a) (1994).............................................................................................................13

## I.     INTRODUCTION

Defendants' motion is misguided on both the law and the facts. Defendants' arguments about the doctrine of equivalents, vitiation and ensnarement reveal their fundamental misunderstanding of the governing law. For example, Defendants' contend that DOE law and claim vitiation preclude allegedly straight blades from infringing a claim reciting curved blades, but this is contrary to Federal Circuit precedent. Defendants also erroneously and repeatedly insist that disputed issues of material fact are supposedly undisputed. For example, Defendants contend there is no evidence that CoolIT's blades have substantially the same function, way, and result as curved blades, but Asetek's Computational Fluid Dynamics analyses and expert opinions refute that allegation. Defendants' arguments also completely ignore disputed facts about the Antarctica and prior art sales of same in the U.S. Defendants have failed to meet any of their burdens under Rule 56 and their motion for summary judgment should be denied.

## II.     FACTUAL BACKGROUND

Claim 17 of the '362 patent recites that the impeller has "curved blades." Asetek's experts have argued that although the impeller blades in the accused CoolIT products are not literally curved, they are equivalent to an impeller with backward-curved blades. Dkt. 386-5, ¶290; Dkt. 387-19, ¶6. Asetek's expert, Dr. Carl-Fredrik Stein, has shown through CFD simulation that the CoolIT impeller behaves and performs like an impeller with backward-curved blades. Dkt. 387-19, ¶¶17-19. Asetek's other expert, Dr. David Tuckerman, has testified that the CoolIT impeller is equivalent to a backward-curved impeller because any differences between them are not substantial, and that the CoolIT impeller performs substantially the same function, in substantially the same way, and produces substantially the same result as a backward-curved impeller. Dkt. 386-5, ¶¶290-293, 321.

Asetek's expert, Dr. Tuckerman, has testified that the reservoir in CoolIT's Tamriel design has a single receptacle and literally meets the parties' stipulated construction of "reservoir." Dkt. 386-5, ¶¶145-151, 304. Additionally, Dr. Tuckerman has testified that the Tamriel meets the "reservoir" element under the doctrine of equivalents because the Tamriel reservoir is substantially the same as and interchangeable with a reservoir formed by a single component, and any differences between them are not substantial. *Id.* at ¶¶152-155. Dr. Tuckerman further testified that the Tamriel reservoir

performs substantially the same function, in substantially the same way, and produces substantially the same result as a reservoir formed by a single component. *Id.*

Asetek's expert, Dr. Tuckerman, has also testified that the Antarctica has microchannels. Dkt. 395-4, ¶¶32, 57. Asetek additionally presented evidence that that the Antarctica kits sold and offered for sale in the U.S. prior to CoolIT's asserted priority date has "microchannels." Ex. I.

## III.   ARGUMENT

### A.   There are Disputed Issues of Material Fact as to Whether the CoolIT Products Accused of Infringement Have "Curved Blades" Under the Doctrine of Equivalents (DOE), and Therefore Summary Judgment Should Not be Granted

Defendants' motion is premised on basic misunderstandings and/or mischaracterizations of the law on doctrine of equivalency, particularly vitiation and ensnarement. When Defendants' incorrect arguments of DOE law are corrected, there are clearly genuine disputes of fact whether CoolIT's impeller blades are "straight" or are equivalent to "curved" blades under the function-way-result and insubstantial differences tests, which precludes a finding of summary judgment

#### 1.   Asetek's DOE theory does not vitiate the "curved blades" limitation or violate the "all-elements" rule

CoolIT fundamentally misunderstands that its products with impeller blades that are not literally "curved" in shape may still infringe Asetek's patent claims under DOE if CoolIT's impeller is equivalent to Asetek's claimed "impeller having curved blades" under the function-way-result or the insubstantial differences tests prescribed by the Federal Circuit. CoolIT argues that its impeller blades are admittedly "non-curved," and accordingly it does not infringe Asetek's claims which require "curved blades." Dkt. 387 at 8-9. But that is beside the point; CoolIT's argument is an erroneous non-sequitur. Asetek is not asserting literal infringement, so even if CoolIT's blades are "non-curved," they may still be liable for infringement under DOE. *See Voda v. Cordis Corp.*, 536 F.3d 1311, 1326–27 (Fed. Cir. 2008) (finding that the "redesigned curved portion" in Cordis's XB catheters "infringe the straight and substantially straight claims of the [asserted] patents under the doctrine of equivalents.").

The *Voda* case is particularly instructive because it dispels CoolIT's incorrect and unsupported assertion that "curved" cannot be mapped to straight[1]/non-curved blades under DOE. In *Voda*, defendant Cordis argued that a curved portion of its XB catheter was not equivalent to the claimed straight portion in Voda's claims. *Id.* But the jury found otherwise, and the Federal Circuit affirmed the jury's finding because "Voda introduced substantial evidence establishing that the redesigned curve portion of [Cordis's] XB catheter meets the straight and substantially straight limitations under the doctrine of equivalents." *Id.* Specifically, the Federal Circuit concluded that there was substantial evidence in the form of "testimony that the redesigned curve portion performed the same function as a straight portion, in the same way, to achieve the same result." *Id.* Thus, *Voda* clearly shows that straight may be mapped to curved, and vice versa, under DOE. The *Voda* decision thus illustrates that CoolIT's assertion that "curved blades" cannot be mapped to straight/non-curved blades is meritless. In view of Asetek's expert' opinions that CoolIT's purportedly straight/non-curved blades are insubstantially different from the claimed "curved blades," and perform the same function as curved blades, in the same way, to achieve the same result, then CoolIT's accused products may still infringe Asetek's claims under DOE (*see id.*) and summary judgment should not be granted.

Next, CoolIT incorrectly argues that "curved blades" are a structural limitation and that "attempting to map 'curved blades' onto CoolIT's admittedly non-curved blades violates the all-limitation rule." Dkt. 387 at 9. CoolIT misapplies the vitiation/"all-elements" rule. CoolIT cannot foreclose DOE by merely alleging that its blades are "non-curved" and by arguing that equating its "non-curved" blades to "curved blade" would vitiate the "curved blades" limitation in Asetek's claims. *See id.* As the Federal Circuit has explained, "[c]ourts should be cautious not to shortcut [the vitiation] inquiry by identifying a 'binary' choice in which an element is either present or 'not present.'" *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1356-57 (Fed. Cir. 2012). That is, "the vitiation test cannot be satisfied by simply noting that an element is missing from the claimed structure or process because the doctrine of equivalents, by definition, recognizes that an element is missing that must be supplied by the equivalent substitute. If mere observation of a missing element could satisfy the vitiation

---

[1] As discussed below, Asetek does not agree that CoolIT's impeller blades are "straight" blades as commonly understood is pump technology.

requirement, this 'exception' would swallow the rule." *Id.* Rather, "in certain instances," the vitiation/"all-elements" rule forecloses resort to DOE if the equivalency theory reads a limitation "completely out of the claim—*i.e.,* the limitation would be effectively removed or 'vitiated.'" *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1017 (Fed. Cir. 2006). That is, ***for vitiation/"all-elements" rule to bar application of DOE, the equivalency theory must "effectively eliminate[] a limitation in its entirety***." *Id.* (emphasis added). That was the case under the facts in *Tronzo v. Biomet, Inc.*, 156 F.3d 1154 (Fed. Cir. 1998) cited by CoolIT,[2] but is not the case here.

In *Tronzo,* the claims at issue recited "a generally conical outer surface." *Id.* at 1160. The patentee argued that an accused product with a hemispherical outer surface met the "generally conical outer surface" limitation under DOE because, "[a]ccording to the expert testimony, *any* shape would be equivalent to the conical limitation." *Id.* (emphasis in original). That is, patentee's theory of equivalency did not identify a specific element of the accused product as an equivalent to the "generally conical outer surface" limitation; rather, the patentee simply argued that ***any*** shape would be equivalent to a conical shape. *See id.*; *see also DePuy Spine,* 469 F.3d at 1019 (distinguishing *Tronzo*). In view of the facts and expert opinion in *Tronzo*, the Federal Circuit concluded that the patentee's equivalency theory "would write the 'generally conical outer surface' limitation out of the claims." *Id.* (citing *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39 n.8 (1997)). But that is not the case here. Asetek is not asserting that ***any*** blade would be equivalent to a "curved blade." Rather, Asetek is asserting that the ***specific blades*** in the accused CoolIT devices are equivalent to curved blades under the function-way-result and insubstantial differences tests. *See* Dkt. 386-5,

---

[2] *Sage Prod., Inc. v. Devon Indus., Inc*., 126 F.3d 1420, 1425-26 (Fed. Cir. 1997) is also not applicable here because, in *Sage*, the application of the equivalency theory would have "effectively remove[d] [] a limitation" from the claim. Similarly, *Athletic Alts, Inc. v. Prince Mfg., Inc.,* 73 F.3d 1573, 1582-83 (Fed. Cir. 1996) cited by CoolIT is inapposite because the equivalency theory would have embraced a structure that was "specifically excluded from the scope of the claims." (citation omitted). And in *Network Appliance, Inc. v. Bluearc Corp.*, No. C 03-5665 MHP, 2005 WL 1530222, at *9 (N. D. Cal. June 27, 2005), the district court rejected "functional interchangeability" because the accused servers achieved results similar to the patented servers by using a "substantially different arrangement of elements" and it "would take considerable powers of imagination to identify any combination of hardware and software components in the accused devices that embodies these claim elements." The facts in this case are different and *Sage*, *Athletic Alternatives,* and *Network Appliance* are inapposite.

1   ¶¶290, 292, 293; *see DePuy Spine,* 469 F.3d at 1019. Thus, the "impeller having curved blades"

2   limitation is not read out of the claims, and accordingly vitiation/"all elements" rule does not bar

3   application of DOE in Asetek's case.

4          Indeed, Asetek's expert's equivalency opinion is analogous to that in *DePuy*, which

5   distinguished *Tronzo.* In *DePuy*, the district court misapplied "the 'all elements' rule and concluded

6   that . . . treating a conical shape as the equivalent of a spherical shape would vitiate the 'spherically-

7   shaped' limitation" in DePuy's claims. *DePuy Spine,* 469 F.3d at 1016. The Federal Circuit disagreed

8   that "applying the doctrine of equivalents would vitiate or read out the 'spherically-shaped' limitation"

9   because, unlike in *Tronzo*, "DePuy did not propose that any shape would meet the 'spherically-shaped'

10  limitation. Rather, DePuy's expert presented particularized declarations demonstrating its theory that

11  a specific element of the accused device—the hollow conically-shaped portion of the receiver

12  member—was insubstantially different from the corresponding 'spherically-shaped' limitation." *Id.* at

13  1019-20. Here, as in *DePuy*, Asetek's experts presented testimony that a specific element of the

14  accused devices—CoolIT's impeller blades—was insubstantially different from the corresponding

15  "curved blades" limitation, and performed the same function as a "curved blade," in the same way, to

16  achieve the same result. Dkt. 386-5, ¶¶290, 292, 293. In fact, Asetek's expert specifically noted that

17  straight/radial blades would not be equivalent to the claimed "curved blades"; only "non-radial blades

18  that perform like curved blades," such as CoolIT's blades, would be equivalent. *See id.* at ¶¶291, 292.

19  Accordingly, vitiation/"all elements" rule does not bar Asetek's DOE theory.

20         CoolIT continues to misapply DOE law by arguing that "curved" implies a shape of the blade,[3]

21  i.e., having a "curvature" or "arc," and that the "curved" shape cannot be met under DOE by a

22  differently shaped blade, i.e., straight/non-curved blade. Dkt. 387 at 10. CoolIT is incorrect because

23  difference in shape between the claim element and the equivalent element in the accused device is

24  immaterial to a DOE analysis. *Graver Tank & Mfg. Co. v. Linde Air Prod. Co.*, 339 U.S. 605, 608

25  (1950) ("The theory on which [the doctrine of equivalents] is founded is that if two devices do the

26  same work in substantially the same way, and accomplish substantially the same result, they are the

27

28  _____
[3] Asetek disagrees that "curved" describes the "shape of the blade." Dkt. 387 at 8. Asetek's expert testified that "we're not talking about shapes" in these claims; "the word 'shape'" does not appear in the claims. Ex. A [Dec 30 dep. tr.], 262:1-263:14.

1  same, *even though they differ in name, form or **shape**.*") (citation omitted; emphasis added); *DePuy*

2  *Spine*, 469 F.3d at 1016 (finding equivalency between a "spherically-shaped" limitation and a

3  "conically-shaped" portion of an accused device); *Optical Disc Corp. v. Del Mar Avionics*, 208 F.3d

4  1324, 1337 (Fed. Cir. 2000) (finding that equating "the double-step trailing edges" of the accused

5  device to the recited "ramped trailing edges" would not "write that limitation out of the claim," and

6  further explaining that "*Tronzo* does not stand for the proposition that a claim limitation describing a

7  specific shape of a claimed structure cannot be infringed under the doctrine of equivalents by a

8  differently shaped structure.").

9      Next, CoolIT argues that by asserting that a "curved blade" is equivalent to another "non-radial

10 blade" (such as CoolIT's), Asetek renders the "curved blade" element inconsequential because

11 "'curved blades' and 'non-radial blades' do not have the same scope." Dkt. 387 at 9-10. CoolIT again

12 fundamentally misunderstands DOE, because the whole point of the equivalency doctrine is to

13 "***expand[] the right to exclude*** to 'equivalents' of what is claimed." *Wilson Sporting Goods Co. v.*

14 *David Geoffrey & Assocs*., 904 F.2d 677, 684-85 (Fed. Cir. 1990) (emphasis in italics in original; bold

15 emphasis added); *see also id.* ("The doctrine of equivalents, by definition, involves going beyond any

16 permissible interpretation of the claim language; i.e., it involves determining whether the accused

17 product is 'equivalent' to what is described by the claim language."). CoolIT's additional criticism

18 that "[h]ad Asetek intended to cover all non-radial blades, it should have drafted its claims to recite

19 'non-radial blades' rather than 'curved blades'" (Dkt. 387 at 10) is also misplaced because Asetek is

20 not attempting to cover all non-radial blades, rather Asetek's DOE application only covers the specific

21 blades in the accused CoolIT devices that behave and perform like curved blades under the function-

22 way-result and insubstantial differences tests. *See* Dkt. 386-5, ¶¶290, 292, 293. Moreover, the doctrine

23 of equivalency allows the patentee "to claim those insubstantial alterations that were not captured in

24 drafting the original patent claim but which could be created through trivial changes," which is exactly

25 what Asetek's application of DOE does. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co*., 535

26 U.S. 722, 733 (2002).

27      In sum, Asetek's equivalency theory does not vitiate the "curved blades" limitation and

28 summary judgment should not be granted.

2. **Asetek has provided substantial evidence from which a jury could reasonably find that CoolIT's impeller blades drive liquid in substantially the same way and produce substantially the same results**

CoolIT's assertion that Asetek has provided "no evidence" that the CoolIT impeller blades perform in the same way as the claimed "curved blades" is premised on an incorrect theory that its blades are straight. Asetek's experts disagree that CoolIT's blades are straight. Rather, Asetek's experts have testified that CoolIT's blades are non-radial, which is understood in pump technology to be not straight blades:

> It is my understanding that CoolIT has attempted to characterize their pump impeller as a straight-blade impeller. I do not agree that the CoolIT impeller can be referred to as straight-blade impeller because generally radial impellers — where the fluid flow leaves the impeller in radial direction, perpendicular to the pump shaft — are known in the field of pump technology as straight-blade or straight-vane impellers. The CoolIT impeller is not a radial impeller and thus cannot be properly characterized as a straight-blade impeller or straight impeller.

Dkt. 387-19, ¶7; *see also* Dkt. 386-5, ¶291 ("[T]he CoolIT impeller is non-radial just like a backward-curved impeller (and unlike a radial (straight) blade impeller).").

At a minimum, whether CoolIT's blades are straight (i.e. radial) or non-radial is a disputed issue that means Defendants' motion should be denied. Accordingly, Defendants' argument comparing length of a curved blade to a hypothetical straight/radial blade (not its own blades which are non-radial), and their associated arguments about difference in clearance and the distance traveled by liquid if driven by straight vs. curved blades, are meaningless because whether CoolIT's blades are straight is a disputed issue.

And as far any differences in length between the simulated backward-curved blades and CoolIT's blades go, Dr. Stein testified that "there is nothing in our [simulation] that limited us to have blades of the same length. We are very happy to look at blades of slightly different lengths that perform similarly to the CoolIT blade," but regardless, both impeller blades "start at pretty much the same point" and "end at pretty much the same point" and any difference between their lengths is a "triviality" because what is most important is to have the "same clearance." Ex. B [Stein Dep. Tr.] at 109:10-110:9.

Moreover, Defendants have also provided no testing or simulation results showing that its impeller blades behave or perform like straight blades; it simply claims that CoolIT's blades are "straight" with no simulation or testing results to back up that unsupported claim. In contrast, Asetek's expert, Dr. Tuckerman, has provided detailed opinion testimony based on the simulation results of Asetek's other expert, Dr. Stein, that CoolIT's impeller does not behave like straight-blade impellers, rather it "behaves and performs in substantially the same manner as a backward-curved impeller":

> Specifically, I have reviewed the expert report of Dr. Carl-Fredrik Stein of FS Dynamics (hereinafter the "Stein Report") and agree with him that **the CoolIT impeller behaves and performs like an impeller with backward-curved blades**. As shown by the respective P-Q curves of the CoolIT impeller, a backward-curved impeller, and a straight impeller in the Stein Report, **the pressure head, power consumption, and hydraulic efficiency of the CoolIT impeller are substantially the same as those of a backward-curved impeller**. Any differences in the pressure vs. flow curves, the power consumption vs. flow curves, and the hydraulic efficiencies of the CoolIT impeller and a backward curved impeller are insignificant from a practical engineering perspective and comparable to the margin of error of such engineering simulations. In contrast, **the pressure vs. flow curves, the power consumption vs. flow curves, and hydraulic efficiencies of a straight impeller are significantly different (and manifestly inferior from an engineering perspective) from those of the CoolIT impeller and a backward curved impeller**. **The simulation results thus demonstrate that the CoolIT impeller is unlike a straight-blade impeller (in its commonly understood meaning); rather, it behaves and performs in substantially the same manner as a backward-curved impeller**. In other words, the CoolIT impeller is not substantially different from a backward-curved impeller, i.e., it is equivalent to a backward-curved impeller.

Dkt. 386-5, ¶290 (emphases added).

***Defendants have provided no countervailing testing or simulation results to support its assertion that its impeller blades do not behave and perform in substantially the same manner as the backward-curved impeller simulated by Asetek's expert.*** Bhattacharyya Decl., ¶11. Thus, the only credible evidence in the record is Asetek's, which shows that the CoolIT impeller is unlike a straight-blade impeller, rather it behaves and performs in substantially the same way and produces substantially the same results as a backward-curved impeller:

> The CoolIT impeller (which is a non-radial impeller) performs substantially the same function of driving cooling liquid through the cooling loop as an impeller having curved blades. As shown in the Stein Report, **the CoolIT impeller also operates in substantially the same way and generates substantially the same result as a backward-curved impeller**. *See* P-Q and efficiency curves in the Stein Report.

Indeed, there is no significant difference in function, operation, and performance/results between a backward-curved impeller and the CoolIT impeller. ***All that CoolIT has done is replace the backward-curved impeller in its prior liquid cooling products (which were accused on infringement by Asetek) with the current CoolIT impeller (which is non-radial). But a person skilled in the art would understand that a backward-curved impeller is interchangeable with the CoolIT impeller because any differences in the function, way of operation, or results between the two would be insubstantial.*** That is, the use of a backward-curved impeller or the CoolIT impeller in the pumps of the accused products is simply a matter to design choice as it relates to Asetek's claimed invention. In sum, the CoolIT impeller in the H100i Liquid Cooler (and other accused CoolIT/Corsair products) is equivalent to a backward-curved impeller because any differences between them are not substantial. Moreover, the CoolIT impeller performs substantially the same function, in substantially the same way, and produces substantially the same result as a backward-curved impeller, which was used in CoolIT's prior generation liquid cooling products.

Dkt. 386-5, ¶293 (emphases added).

CoolIT's complaints that Dr. Stein did not simulate the "CoolIT device" or CoolIT's impeller are also unavailing. Because the equivalency at issue is between CoolIT's impeller blades and a backward-curved impeller blades, Dr. Stein isolated the impeller blades at issue from the surrounding device structure to simulate the performance of CoolIT's impeller blades vis-à-vis backward curved impeller blades and a straight impeller blades. Ex. B [Stein Dep. Tr. Jan 11] at 96:16-19 ("***We simulated the blade***, the impeller blade, that is used -- that the CoolIT has to other blades. And we want to see if they behave the same in a generic similar looking pump."). That is, Dr. Stein simulated the performance and behavior of CoolIT's blades compared to a backward-curved blades and straight blades in a "generic" pump "to make sure that we can evaluate the differences and similarities between the different blades." Ex. B at 96:16-98:4. He explained that it was necessary to "simplify the pump to make sure that we don't have any funny effects around inlets and outlets like recirculation, which plagues simulations often if you don't have them," and that he tried to "capture the general characteristics of the pump with these three different impellers" to made sure the comparison of the blades are "a more fair comparison" without "influence" from the "disturbing external influences" that may skew the results. *See id.*; *see also id.* at 99:1-100:10 (testifying that he wanted to make a "clean pump comparison where we want to focus on the differences the various impellers have" and "we wanted as little influence as possible from exterior geometrical details that are very system-specific.").

Thus, CoolIT's argument that Dr. Stein did not recreate CoolIT's device or impeller identically is a non-issue because the appropriate comparison for the DOE analysis is between CoolIT's impeller blades and backward-curved blades (Dr. Stein included straight blades as well to show that the behavior of the CoolIT blades differs from that of straight blades). And as far as simulation of the CoolIT's blades are concerned, Dr. Stein testified that "[t]here are no material difference of any of the interiors or **of the shape of the blades** or anything like that**."** *Id.* at 115:2-15; *see also* below deposition testimony by Dr. Stein:

> We do not claim to simulate CoolIT's
> device. We claim to simulate a relevant pump **using**
> **CoolIT's blade.** The actual device does not have
> that inlet.
> But we chosen to make a pump that is
> similar to CoolIT's. They are not identical. With
> the -- but **the aim of seeing and investigating the**
> **behavior of the blade with as few disturbing factors**
> **as possible.**

*Id.* at 120:9-16.

Significantly, CoolIT's expert Dr. Abraham's simulation results are "remarkably similar" to Dr. Stein's results, which shows that modelling and simulations done by Dr. Stein were accurate and the results are reliable. *Id.* at 100:3-102:17.

CoolIT's argument that its actual comparison of its redesigned impeller blades to the curved blades in its prior generations is irrelevant. Asetek's patent claims do not claim the specific blade structure/configuration in CoolIT's prior generation of products; they generically recite curved blades, so the proper DOE analysis is whether the blades in CoolIT's accused current products have substantially the same function, way, and result as curved blades. And Dr. Stein's analysis shows they do. And even if the comparison between CoolIT's redesigned and prior blades had any relevance, CoolIT's statement that there were "pronounced differences in their 'results'" is incorrect, and the actual results do not support that exaggerated statement. Looking at the same results that CoolIT boasts as showing "pronounced difference," the inventor of the CoolIT patents (Mr. Geoffrey Lyon), ████

████████████████████████████████████████████████████████████████████████████████

1

2

3

4

5

6

7

8

9                    *See id.* And as the Stein Report shows, any such difference

10 in efficiency or power consumption between the CoolIT impeller and backward-curved impeller is

11 insignificant. Dkt. 386-5, ¶293.

12        Defendants' reliance on *Novartis* and *J & M Corp.* are unavailing. *Novartis Corp. v. Ben Venue*

13 *Laboratories, Inc.*, 271 F.3d 1043 (Fed. Cir. 2001) is not a DOE case. There, Novartis attempted to

14 show literal infringement based upon a computer model developed by its expert. *Id.* at 1049-50. But

15 the district court rejected the expert's conclusions based upon that model because Novartis had failed

16 to demonstrate that the computer model was representative of Ben Venue's process. *Id.* "Specifically,

17 the district court questioned the applicability of a forty-year old scholarly article [] upon which [the

18 expert's] model was allegedly based, and faulted [the expert] for failing to consider the particular

19 mixing equipment employed by Ben Venue." *Id.* Here, in contrast, CoolIT does not dispute that Dr.

20 Stein's model of CoolIT's impeller blades are deficient; they simply nitpicked about other irrelevant

21 aspects of the simulation. And in *J & M Corp. v. Harley-Davidson, Inc.*, 269 F.3d 1360, 1368 (Fed.

22 Cir. 2001), the equivalency under DOE was rejected because of prosecution history estoppel, which

23 is not applicable here.

24        Thus, Asetek's evidence that the CoolIT impeller performs substantially the same function, in

25 substantially the same way, and produces substantially the same result as a backward-curved impeller

26 precludes summary judgment.

27

28

### 3. Asetek has provided evidence based on which a reasonable jury could find that CoolIT's impeller blades are insubstantially different from curved blades

Contrary to Defendants' assertion, Asetek's expert Dr. Tuckerman has testified that CoolIT's impeller is "equivalent to a backward-curved impeller because any differences between them are not substantial." Dkt. 386-5, ¶293; *see also id.* at ¶290 ("The simulation results thus demonstrate that the CoolIT impeller is unlike a straight-blade impeller (in its commonly understood meaning); rather, it behaves and performs in substantially the same manner as a backward-curved impeller. In other words, the CoolIT impeller is not substantially different from a backward-curved impeller, i.e., it is equivalent to a backward-curved impeller."). Defendants' argument comparing curved blades to straight blades (even though it is disputed that CoolIT's blades are straight) is unavailable, and does not negate Asetek's expert's testimony that CoolIT's impeller blades are insubstantially different from curved blades. Therefore, summary judgment should not be granted.

### 4. Asetek does not violate the ensnarement doctrine

Defendants misapply the law of ensnarement as well. To determine the scope of the doctrine of equivalents in light of the prior art, a "hypothetical claim" that "literally recites the range of equivalents asserted to infringe" is presented and "[t]he pertinent question then becomes whether that hypothetical claim could have been allowed by the PTO over the prior art." *Abbott Lab'ys v. Dey, L.P.*, 287 F.3d 1097, 1105-06 (Fed. Cir. 2002) (citing *Wilson Sporting Goods,* 904 F.2d at 684). Here, the hypothetical claim is claim 17 of the '362 patent with the "impeller having curved blades" limitation changed to an "impeller having curved blades or other non-radial blades that perform like curved blades." Dkt. 386-5, ¶292. "In order for [Asetek's] hypothetical claim to be anticipated, 'a single, prior art document [must] describe *every element* of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." *Abbott Lab'ys.*, 287 F.3d at 1105-06 (citing *Advanced Display Sys., Inc. v. Kent State Univ.,* 212 F.3d 1272, 1282 (Fed. Cir. 2000)) (emphasis in original). "Likewise, to make the hypothetical claim obvious, the court must find that 'the differences between the subject matter sought to be patented [i.e., the hypothetical claim] and the prior art are such that *the subject matter as a whole* would have been obvious at the time the invention was made to a person having ordinary skill

1    in the art to which said subject matter pertains.'" *Id.* (citing 35 U.S.C. § 103(a) (1994)) (emphasis in

2    original)).

3         In *Abbot Lab'ys*, the Federal Circuit found that the district court erred by comparing only the

4    equivalent limitation to the prior art, "while ignoring other limitations of the [hypothetical] claim." *Id.*

5    The Federal Circuit explained that the asserted prior art "cannot anticipate [Abbot's] ***hypothetical***

6    ***claim*** . . . because the [asserted prior art] does not disclose each and every limitation of that

7    [hypothetical] claim," nor would the "***hypothetical claim*** [] be obvious over the" asserted prior art. *Id.*

8    (emphases added); *see also DePuy*, 567 F.3d at 1325 (explaining that "the district court must assess

9    the prior art introduced by the accused infringer and determine whether the patentee has carried its

10   burden of persuading the court that ***the hypothetical claim is patentable over the prior art***. Ultimately,

11   if such a claim would be unpatentable under 35 U.S.C. §§ 102 or 103, then the patentee has

12   overreached, and the accused device is noninfringing as a matter of law.") (internal citation and

13   quotation marks omitted; emphasis added).

14        Similarly here, CoolIT's ensnarement argument only compares the "an impeller having curved

15   blades or other non-radial blades that perform like curved blades" limitation—not the hypothetical

16   claims as a whole—to Ryu. Dkt. 387 at 15. CoolIT's ensnarement arguments fails as a result. *Abbott*

17   *Lab'ys.*, 287 F.3d at 1105-06. Even if CoolIT were to compare the hypothetical claim to Ryu, it would

18   still fail for two separate reasons. First, CoolIT admits that Ryu's blades are "straight." Dkt. 387 at 15.

19   But Asetek's hypothetical claim requires "an impeller having curved blades or other non-radial blades

20   that perform like curved blades." CoolIT has not pointed to any evidence showing that Ryu's straight

21   blades meet the "impeller having curved blades or other non-radial blades that perform like curved

22   blades" limitation of Asetek's hypothetical claim. Second, as discussed in Asetek's summary

23   judgment motion, CoolIT's expert admits that Ryu does not disclose the "reservoir" limitation of claim

24   17, nor does CoolIT's expert explain *how* or *why* Ryu would have been combined with other prior art

25   references to arrive at the "reservoir" element of claim 17. Dkt. 394 at 23. Accordingly, Ryu cannot

26   anticipate or render obvious the hypothetical claim, which has the "reservoir" limitation. Thus,

27   Asetek's hypothetical claim does not ensnare Ryu.

28

**B.** **Material Facts in Dispute Preclude a Finding of Summary Judgment on Whether CoolIT's New Tamriel Design Infringes Asetek's '362 Patent Claims**

    **1.** **CoolIT's collateral and judicial estoppel arguments are meritless because there are genuine disputes of fact whether the alleged "reservoir" in Tamriel is a "single receptacle" (Asetek's position) or it has two receptacles (CoolIT's position)**

Defendants' motion blatantly misrepresents that "it is undisputed that Tamriel includes a second receptacle detachably connected to a first receptacle," (Dkt. 387 at 19) and then argues that Asetek is collaterally and judicially estopped from taking that position. But Asetek's expert disagrees that the Tamriel has two receptacles, and has instead testified that the Tamriel has a "single receptacle defining a fluid flow path," and accordingly the Tamriel has the claimed "reservoir". Dkt. 386-5, ¶¶145, 150, 304 (more on this below). Because there is a genuine dispute whether the Tamriel has two receptacles, or a "single receptacle," summary judgment is precluded.

More specifically, Defendants' argument that Tamriel has "a second receptacle detachably connected to a first receptacle" is belied by their own documents and the pictures of Tamriel. ███████ ████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ nowhere is it referred to as "receptacle." CoolIT's argument that the top chamber subcomponent is a "receptacle" is therefore nothing but a litigation-driven relabeling of the upper/pump chamber as a "receptacle."

The "reservoir" (i.e., single receptacle) of the Tamriel is shown below (*id.* at ¶¶145, 146):

As Asetek's expert Dr. Tuckerman has explained, the Tamriel "includes a single reservoir housing . . .  in which a subcomponent defining a pump volute is fitted in. The subcomponent that is nestled within the reservoir housing defines in part the upper/pump chamber of the claimed 'reservoir.'" *Id.* at ¶147. Although Defendants' motion is unclear, Asetek understands Defendants are asserting that the subcomponent defining the upper/pump chamber (referred to hereinafter as "top chamber subcomponent") is a second receptacle. But Asetek's expert disputes Defendants' position that the top chamber subcomponent is a "receptacle" such that the reservoir of the Tamriel includes two receptacles. *Id.* at ¶150. Specifically, Asetek's expert testified: ***"I disagree that the 'top chamber' subcomponent is a receptacle; rather it is a compartment within the reservoir housing***." *Id.* Accordingly, Defendants' assertion that it is undisputed that the Tamriel has two receptacles is manifestly incorrect. CoolIT's allegation that Asetek is defying a prior statement to the Court by "accusing the two receptacles screwed together in Tamriel" (Dkt. 387 at 20) is also incorrect for the same reason that Asetek's expert disagrees that the top chamber subcomponent is a "receptacle."

The following image from CoolIT's own documents show that the top chamber subcomponent is nestled into the reservoir housing, and that mating features on the top chamber (referred to in CoolIT's documents as "top chamber locating feature holes") are then interconnected with "lower

chamber guide bosses" on the reservoir housing to couple/mate the top chamber subcomponent with the reservoir housing. *Id.* at ¶¶148, 149.



CoolIT's arguments are hard to follow, but it seems to suggest that the upper and lower chambers of the Tamriel are "separable," and therefore those chambers do not form a "single receptacle." Dkt. 387 at 16. But Asetek's expert disagrees that the upper and lower chambers of the Tamriel are "separable" or that they are separate "receptacle," rather Asetek's expert has testified that the upper and lower chambers are "mated/interconnected" to form a "single receptacle":

> [S]ix screws are used to permanently fasten the "top chamber" to the reservoir housing, as shown above, such that the "top chamber" is ***not separable*** from the reservoir housing. In fact, a user who desired an operable product would not consider separating the "top chamber" subcomponent from the housing because the pump unit would be factory-sealed, and so decoupling of the subcomponent would cause the cooling liquid in the system to leak out and destroy the product. When the "top chamber" is mated/interconnected with the reservoir housing, they together form a single receptacle with a "top chamber" (the upper/pump chamber) and a "lower chamber" (the lower/thermal exchange chamber). *See* COOLIT0036075-76.

Dkt. 386-5, ¶149.

1   CoolIT's position the top chamber subcomponent is a "receptacle" is further belied by the fact

2   that the top chamber subcomponent fulfills the same function as the impeller cover 46A in Asetek's

3   preferred embodiment (shown in Figure 17 of the '196 patent (illustrated below)), which is fitted into

4   the reservoir housing 14 and defines pump chamber 46. Dkt. 386-5, ¶150. Nowhere does the '196

5   patent (or the '601 or '362 patents) describe subcomponents such as impeller cover 46A or

6   intermediate member 47 as "receptacles." *Id.*



FIG. 17

25   Even if the top chamber subcomponent is referred to as receptacle (it should not be), Tamriel

26   still includes the claimed "reservoir," i.e., a single receptacle. As Judge Tigar explained in the Cooler

27   Master case, "it could be that even if the copper sub-chamber is a receptacle, that would not change

28   the fact that the reservoir is a single receptacle divided into an upper chamber and lower chamber –

the lower chamber would merely include or consist entirely of a smaller receptacle or sub-chamber. For example, nesting dolls contain many receptacles. But the smaller dolls – or receptacles – do not affect whether the biggest doll is a 'single receptacle'." *Asetek v. CMI USA*, Case 4:13-cv-00456, Dkt. 426 at 6. There, Cooler Master/CMI argued that the presence of a copper sub-chamber, which they referred to as a "receptacle," within the reservoir housing meant the reservoir was not a single receptacle. Judge Tigar disagreed with that (noting that "nesting dolls contain many receptacles. But the smaller dolls – or receptacles – do not affect whether the biggest doll is a 'single receptacle'."). *See id*. Similarly, here, even if the top chamber subcomponent is called a receptacle as urged by Defendants, it is still only a smaller receptacle contained within the larger receptacle that forms the reservoir housing, just like "nesting dolls contain many receptacles." *See id.* Accordingly, CoolIT's argument that a "single receptacle" cannot have other receptacles within it is legally incorrect. Even if the top chamber subcomponent is referred to as a "receptacle" (a point that Asetek disputes), the Tamriel still has a "single receptacle," i.e., a "reservoir," as shown below.



Dkt. 386-5, ¶149.

1       At bottom, summary judgment is precluded because there is a genuine factual dispute about

2   whether the Tamriel has a "single receptacle" or two receptacles.

        **2.**    **Asetek's DOE theory for "reservoir" does not vitiate the "single**
3                  **receptacle" requirement, nor does it fail the function-way-result or**
4                  **insubstantial differences test**

5       CoolIT's vitiation argument fails for the same reason discussed above, i.e., Asetek's expert

6   disputes that the Tamriel has two receptacles. Instead, the "reservoir" of the Tamriel, which includes

7   one or more sub-components fitted and housed within the reservoir housing, is equivalent to a reservoir

8   formed by a single-component reservoir housing (as in CoolIT's prior design). Dkt. 386-5, ¶152. In

9   other words, the claimed "reservoir" covers or equates to "a reservoir formed by multiple

10  subcomponents." *Id.* Because Asetek is not taking a position that the claimed "reservoir" is formed by

11  two receptacle, the "single receptacle" requirement is not excluded or vitiated.[4]

12      CoolIT's comparison of the Tamriel to the prior art Ryu is unavailing. The Tamriel is distinctly

13  different from Ryu because in Ryu the pump device (pump driving unit 30) and the heat exchanging

14  device (water jacket 20) are separable and independent modules that are stacked on top of each other.

15  *See* Dkt 387 at 17 (showing Ryu). In contrast, in the Tamriel, the subcomponent forming the

16  upper/pump chamber is nestled within a single reservoir housing that includes the lower/thermal

17  exchange chamber, as shown below. Dkt. 386-5, ¶152. Moreover, unlike in Ryu, the top chamber

18  subcomponent is permanently affixed to the reservoir housing and is not separable without significant

19  fluid loss. *Id.* In other words, the top chamber subcomponent of the Tamriel is not a functionally

20  independent device like pump driving unit 30 of Ryu. *Id.* In Ryu, the pump driving unit 30 and water

21  jacket 20 are stand-alone modules and each module is a Field Replaceable Unit (FRU) that can be

22  replaced by a user, whereas the subcomponents in the Tamriel are not FRUs and are not intended to

23  be replaced by a user. *Id.*

24      Significantly, there are disputed issues of fact whether the Tamriel reservoir (formed by

25  multiple subcomponents) is insubstantially different from a reservoir formed by a single component,

26

27  _____

28  [4] CoolIT's arguments about "housing" is misleading because Asetek is not taking those positions
with respect to the Tamriel that CoolIT is supposed to be launching as a commercial product, and the
Tamriel actually discussed in CoolIT's brief. Dkt. 387 at 21.

and whether the Tamriel reservoir (formed by multiple subcomponents) meets the function-way-result test compared to a reservoir formed by a single component.

Specifically, Asetek's expert has testified that the Tamriel reservoir performs substantially the same function of defining dual chambers (an upper/pump chamber and a lower/thermal exchange chamber) and a fluid flow path therethrough as that of a reservoir formed by a single component (as in the CoolIT's prior design). *Id.* at ¶154. The reservoir of the Tamriel, which includes one or more sub-components fitted and housed within the reservoir housing, also operates in substantially the same way and generates substantially the same result as a reservoir formed by a single component. *Id.* For example, the fitting of the top chamber subcomponent (that defines in part the upper chamber) within a reservoir housing prevents leakage and provides a compact (low profile) design that is substantially the same as a reservoir formed by a single component. *Id.* Moreover, the Tamriel reservoir, much like a single component reservoir, provides independent optimization of the pumping function in the upper/pump chamber and thermal exchange function in the lower/thermal exchange chamber. *Id.* The flow path through the Tamriel reservoir is also substantially the same as the flow path through a reservoir formed by a single component. *Id.*

Indeed, there is no significant difference in function, operation, and performance/results between a reservoir formed by a single component housing (as in CoolIT's prior design) and a reservoir formed by integrating two or more subcomponents (as in Tamriel). *Id.* In fact, a reservoir formed by a single component is interchangeable with a reservoir formed by integrating two or more subcomponents because any differences in the function, way of operation, or results between the two would be insubstantial. *Id.* That is, a reservoir formed by a single component versus a reservoir formed by integrating two or more subcomponents is simply a matter of design choice as it relates to Asetek's claimed invention. *Id.*

In sum, the reservoir in CoolIT's Tamriel design meets the parties' stipulated construction of "reservoir" — "single receptacle defining a fluid flow path" — under the doctrine of equivalents because the reservoir of the Tamriel is substantially the same as and interchangeable with a reservoir formed by a single component, and any differences between them are not substantial. *Id.* at ¶¶154, 155. Moreover, the Tamriel reservoir performs substantially the same function, in substantially the

1  same way, and produces substantially the same result as a reservoir formed by a single component. *Id.*

2  At a minimum, there are disputed issues of material fact whether the Tamriel's reservoir meets the

3  insubstantial differences or function-way-results test, which bar a finding of summary judgment.

**C.** **There are Disputed Issues of Material Fact as to Whether the Antarctica**
4      **Product on Sale Prior to CoolIT's Priority Date (August 9, 2007) Had**
5      **"Microchannels," which Precludes a Finding of Summary Judgment**

6        CoolIT again mischaracterizes the record by stating that Asetek presents "no evidence" that 1)

7  the Antarctica sample that the parties' experts have inspected and relied has "microchannels," or 2)

8  the Antarctica was on-sale before the August 9, 2007 priority date of the CoolIT patents. Dkt. 387 at

9  23. CoolIT further mischaracterizes its own counter evidence as "uncontested." *Id.* Neither of these

10  arguments withstands scrutiny because, as discussed below, Asetek presented sufficient evidence from

11  which a reasonable jury could find that the Antarctica has "microchannels" and that the Antarctica

12  was on sale before in the U.S. before the August 9, 2007 priority date of the CoolIT patents.

**1.** **Asetek's expert, Dr. Tuckerman, and an Asetek witness have**
13          **testified that the Antarctica has "microchannels"**

14

15        Under the parties' stipulation in this case, "microchannels" means "channels with widths up to 1

16  millimeter." Dkt. 395-4, ¶¶32, 57. Asetek has presented sufficient evidence for a reasonable jury to

17  conclude that the Antarctica has channels with widths up to 1 mm, and thus those channels are

18  "microchannels." For example, Asetek's expert Dr. Tuckerman's Invalidity Report states that "[t]he

19  space between adjacent fins [in the Antarctica] is about 0.9 - 1.0 mm" and accordingly, "the channels

20  formed between adjacent fins" is "microchannels." *Id.* at ¶57. Dr. Tuckerman further opined that a person

21  skilled in the art would have readily formed "microchannels" (in place of macro- or mini-channels) in the

22  Antarctica because the benefits of microchannels were well known by August 2007. *See id.* Because Dr.

23  Tuckerman signed his Report under penalty of perjury, it constitutes evidence showing the Antarctica has

24  "microchannels."

25        Moreover, Asetek's expert further testified during his deposition on December 20, 2021 that he

26  personally measured the channel widths in Antarctica and the measurements showed that the channels

27  were about 0.9-1.0 mm:

28        Q. Okay. And in preparing your expert report,
              did you review the Antarctica device?

A. I did.

**Q. Did you physically review the Antarctica**
**device in preparing your report?**
**A. I did.**

Ex. F [Dec 20 Dep. Tr.] at 122:20-123:11 (emphases added).

Q. Okay. And you state in paragraph 57 that
the space between adjacent fins is about 0.9 to 1
millimeter; correct?
A. Yes.
Q. What evidence do you point to in your report
for this opinion?
A. Well, okay. So first there is Eriksen's
deposition; however, I didn't think that was
sufficient to be something I was going to swear to,
so I wanted to inspect the device personally. And I
used like -- **I used calipers to measure the fins at**
**the base which is where I felt the most relevant**
**dimension was because the base of the fins is where**
**the most heat transfer occurs**.
As fins -- you go up in fin height, they
become less effective. And so to me, **the base was**
**the relevant dimension to measure it at. And I got**
**readings, you know, between [0.9] and 1.0, so I was**
**okay with that.**
Q. Did you make those measurements prior to
submitting your report or after you submitted your
report?
A. I made them prior.

*Id.* at 137:9-138:13 (emphasis added).

During Dr. Tuckerman's supplemental deposition on March 18, 2022, he testified again that
channel widths in the Antarctica per his measurements were between of 0.9-1.0 mm:

So I believe I indicated that
they were -- what I did was, as you'll recall, **back in**
**July I put calipers at the bottoms of the grooves,**
**which is where they would be narrowest -- that's the**

> *way the machining works -- and looked for -- to see if*
> *any exceeded a millimeter, and they didn't*. And
> that -- that's all I did on it. I didn't think it was
> necessary to do more.

Ex. G [March 18 Dep. Tr.] at 8:23-9:12 (emphasis added).

> So I... Okay. So I'm saying space between
> adjacent fins is about 0.9 to 1.0 millimeters. And,
> while I don't specify that here, I deposed -- I was
> deposed previously on this, and indicated that *I took*
> *measurements with calipers at the bottoms of the*
> *microchannels on July 5th* -- I think it was -- and
> got -- ***didn't get any measurements above 1.0. And they***
> ***were all .9-something***. But that -- that's about all.

*Id.* at 14:3-10 (emphasis added); *see also id.* at 15:1-3 ("I took some measurements. And I reported that they were between .9 and 1.0."). Dr. Tuckerman also testified during his December 20, 2021 deposition that he consulted Exhibit 275 (which shows the blades used for cutting channels in the Antarctica per Asetek's representation) to corroborate his measurements of the Antarctica channels. Ex. F at 138:10-140:23, 261:20-264:15. He testified that he was able to confirm based on a legend below the picture of the blades in Exhibit 275 that the blades were indeed "intended to give [] a nominal 1-millimeter" cut. *Id.* Accordingly, Exhibit 275 and Dr. Tuckerman's related testimony further confirm that the Antarctica has channels up to 1 mm in width, i.e., "microchannels."

In addition to the testimony of Dr. Tuckerman, Asetek's 30(b)(6) witness, who designed and developed the Antarctica waterblock, also testified that he recalls the channels in the Antarctica as "between 0.6 and 0.8 millimeters" as far as he recalls. Ex. H at 117:17-25; *see also* Dkt. 395-4, ¶57.

CoolIT turns a blind eye toward all the above testimony—which is all admissible evidence—to erroneously argue that Asetek presented "no evidence" that the Antarctica has "microchannels." In separate motions (Dkts. 389 and 397), CoolIT asserts that Dr. Tuckerman's opinion of "microchannels" and Exhibit 275 should be excluded or stricken, and CoolIT repeats some of those same arguments in its summary judgment motion. Dkt. 387 at 23-24. Asetek does not agree that its expert's opinion or testimony, or any other evidence, should be stricken/excluded, and has addressed

the propriety and merits of CoolIT's arguments in its oppositions to CoolIT's motions in Dkts. 389 and 397. Asetek will not repeat the same arguments here for sake of brevity. Suffice it to say that Defendants' motions to strike/exclude should be denied and CoolIT's arguments that Asetek has "no evidence" are incorrect. Moreover, just because CoolIT's expert reported different measurements of channel widths does not mean that CoolIT's expert's "measurements are not subject to reasonable dispute." Dkt. 387 at 6. Yes, they are, as explained above. Nor does the experts' differing measurements mean that Asetek's witness and expert testimony can be disregarded. Instead, it means is that there is a genuine dispute of material fact whether the Antarctica has "microchannels." Accordingly, summary judgment should not be granted.

### 2.   The Antarctica physical sample is representative of the Antarctica product on sale before August 9, 2007

Asetek presented evidence showing that Asetek was selling the Antarctica in the U.S. in 2004-2006, and thus Antarctica is prior art to CoolIT's patents, which have a priority date of August 9, 2007. *See* Dkt. 386-6; Ex. H, 115:12-116:22 (Asetek's CEO and Founder, Mr. André Eriksen) testifying that the Antarctica is prior art to the CoolIT's patents). CoolIT nevertheless argues that there may have been multiple versions of the Antarctica and there is no evidence demonstrating that the Antarctica sample that the parties' experts inspected and testified about is representative of the Antarctica that was sold in the U.S. prior to August 2007. Dkt. 387 at 24-25. Not surprisingly, CoolIT's counsel did not ask Mr. Eriksen during his deposition whether there is more than one version of the Antarctica cold plate, even though they questioned him on other aspects of the Antarctica. Bhattacharyya Decl., ¶12. If asked, Mr. Eriksen would have testified, as he has done in his Declaration (Exhibit I) submitted herewith,[5] that the Antarctica had only one version/generation of the cold plate, and that the cold plate in the Antarctica waterblock sample he gave to counsel (which the parties' experts inspected and is

---

[5] A nonmoving party is allowed to submit an affidavit/declaration in opposition to summary judgment motion to show a genuine issue of fact, and such affidavit/declaration should not be stricken under the "sham affidavit rule" unless any inconsistency "between a party's deposition testimony and subsequent affidavit" is "clear and unambiguous." *Aki v. Univ. of California Lawrence Berkeley Nat'l Lab'y*, 74 F. Supp. 3d 1163, 1173 (N.D. Cal. 2014) (citing 9th Circuit cases). Here, there is no inconsistency between Mr. Eriksen's deposition testimony and his declaration because he was never questioned about the versions/generations of the Antarctica cold plate during his deposition.

1   the prior art sample in this case) is representative of the cold plates in the Antarctica kits sold in the

2   U.S. in the 2004-2006 time frame. Ex. I, ¶¶4, 5; Bhattacharyya Decl., ¶12 (the parties' experts

3   inspected the Antarctica sample received from Mr. Eriksen). Accordingly, there is evidence that the

4   physical sample of Antarctica inspected by the parties, which has "microchannels" per Asetek, is

5   representative of the cold plates in the Antarctica kits sold in the U.S. before CoolIT's priority date.

6   Ex. I, ¶¶2, 4, 5.

7       CoolIT's reliance on Dr. Tuckerman's testimony to cast doubt on the prior art status of the

8   Antarctica is misdirected. Dkt. 387 at 25. Asetek is not relying on Dr. Tuckerman to establish that the

9   Antarctica is prior art to CoolIT's patents. As Dr. Tuckerman testified, he has "no way of knowing"

10  whether there are multiple versions of Antarctica, or whether the sample that he inspected is

11  representative or not; he properly assume it is under Rule 703, "measured" the sample he was given,

12  and opined based on his measurements of that sample. Ex. F at 128:6-129:22, 141:23-142:8. Mr.

13  Eriksen's declaration, however, links the Antarctica physical sample to a version of the Antarctica

14  sold in the U.S. prior to August 9, 2007, and Mr. Eriksen will lay the foundation for the Antarctica

15  sample at trial. Ex. I, ¶5.

16      Therefore, contrary to CoolIT's assertion, Asetek has presented evidence that the Antarctica

17  kits sold and offered for sale in the U.S. prior to CoolIT's asserted priority date has "microchannels."

18  Accordingly, summary judgment should not be granted.

19

20  Dated: April 14, 2022                     FINNEGAN, HENDERSON, FARABOW,
                                                 GARRETT & DUNNER, LLP
21

22                                           By:    /s/ Arpita Bhattacharyya
                                                 Arpita Bhattacharyya
23                                               Attorneys for Plaintiff and Counterdefendant
                                                 ASETEK DANMARK A/S and
24                                               Counterdefendant ASETEK USA, INC.

25

26

27

28