Robert F. McCauley (SBN 162056)
robert.mccauley@finnegan.com
Arpita Bhattacharyya (SBN 316454)
arpita.bhattacharyya@finnegan.com
Jeffrey D. Smyth (SBN 280665)
jeffrey.smyth@finnegan.com
**FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP**
3300 Hillview Avenue
Palo Alto, California  94304
Telephone:    (650) 849-6600
Facsimile:    (650) 849-6666

Attorneys for Plaintiff and Counterdefendant
ASETEK DANMARK A/S and
Counterdefendant ASETEK USA, INC.

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| ASETEK DANMARK A/S, | CASE NO. 3:19-cv-00410-EMC |
| Plaintiff and Counterdefendant, | **ASETEK DANMARK A/S'S AND ASETEK USA, INC.'S REPLY IN SUPPORT OF THEIR MOTION TO EXCLUDE OPINIONS OF MR. JOHN L. HANSEN CONCERNING COOLIT'S DAMAGES** |
| ASETEK USA, INC., | |
| Counterdefendant, | |
| v. | Date:        May 5, 2022 |
| COOLIT SYSTEMS, INC., | Time:        1:30 PM |
| Defendant and Counterclaimant, | Location:    Courtroom 5, 17th Floor<br>Judge:       Hon. Edward M. Chen |
| COOLIT SYSTEMS USA INC., COOLIT SYSTEMS ASIA PACIFIC LIMITED, COOLIT SYSTEMS (SHENZHEN) CO., LTD., | |
| Defendants, | **REDACTED VERSION<br>FOR PUBLIC FILING** |
| CORSAIR GAMING, INC. and CORSAIR MEMORY, INC., | |
| Defendants. | |

## **TABLE OF CONTENTS**

I.     INTRODUCTION ...........................................................................................................1

II.    ARGUMENT .................................................................................................................2

     A.    Mr. Hansen's Damages Analysis Fails to Account for Apportionment and CoolIT Cannot Fix the Deficiencies in His Report Through Attorney Argument ...........................................................................................................2

          1.    Mr. Hansen's Report fails to provide any analysis of whether and to what extent the Asetek-Corsair license included any apportionment. .........2

          2.    Conclusory testimony on technical comparability cannot substitute for apportionment. ...........................................................................................4

          3.    CoolIT's description of the scope of the CoolIT and Asetek patents is misleading and irrelevant because CoolIT cannot dispute that Asetek's patents cover an entire liquid cooling system, and CoolIT's asserted claims cover only one component. ...................................................................7

          4.    The cases relied on by CoolIT for exceptions to the general principle against using the entire market value of the accused product are inapposite. ....................................................................................................10

          5.    CoolIT ignores the Federal Circuit's recognition that damages analyses based on the entire market value of an accused product can lead to improper damages awards by juries. ...........................................................12

     B.    Mr. Hansen's Royalty Base Improperly Includes a Portion of Overseas Sales to Corsair and He Did Not Ask Corsair for Data to Support His Analysis, Which Data Corsair Has .......................................................................................13

     C.    CoolIT Cannot Overcome the Statutory Limitation on Damages by Relying on the Relation Back Doctrine .......................................................................................14

III.    CONCLUSION.............................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Asetek Danmark A/S v. CMI USA, et al,*
    Case No. 3:13-cv-00457-JST, Dkt. 219 .................................................................10

*Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.,*
    967 F.3d 1353 (Fed. Cir. 2020) ....................................................................11, 12

*Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.,*
    Case No. CV 15-152-RGA, 2018 WL 4691047 (D. Del. Sept. 28, 2018) .......................11

*Commonwealth Scientific & Industrial Research Organisation v. Cisco Systems, Inc.,*
    809 F.3d 1295 (Fed. Cir. 2015) ....................................................................10, 11

*Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC,*
    927 F.3d 1292 (Fed. Cir. 2019) .............................................................................11

*Exmark Manufacturing Co. v. Briggs & Stratton Power Products Group, LLC,*
    879 F.3d 1332 (Fed. Cir. 2018) .............................................................................10

*GPNE Corp. v. Apple, Inc.,*
    Case No. 12-CV-02885-LHK, 2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) ...................6

*Krupski v. Costa Crociere S.p.A.,*
    560 U.S. 538 (2010) ...............................................................................14, 15

*LaserDynamics, Inc. v. Quanta Comput., Inc.,*
    694 F.3d 51 (Fed. Cir. 2012) ........................................................................ *passim*

*NetFuel, Inc. v. Cisco Sys. Inc.,*
    Case No. 18-CV-02352-EJD, 2020 WL 1274985 (N.D. Cal. Mar. 17, 2020) ....................6

*ResQNet.com, Inc. v. Lansa, Inc.,*
    594 F.3d 860 (Fed. Cir. 2010) ...............................................................................5

*SMIC, Americas v. Innovative Foundry Techs. LLC,*
    473 F. Supp. 3d 1021 (N.D. Cal. 2020) ..................................................................15

*Uniloc USA, Inc. v. Microsoft Corp.,*
    632 F.3d 1292 (Fed. Cir. 2011) .............................................................................12

*Vectura Ltd. v. Glaxosmithkline LLC,*
    981 F.3d 1030 (Fed. Cir. 2020) ....................................................................11, 12

*Virnetx, Inc. v. Cisco Sys., Inc.,*
    767 F.3d 1308 (Fed. Cir. 2014) ....................................................................12, 13

**Other Authorities**

Fed. R. Civ. P 15(c)(1)(C)(ii)..................................................................................................14, 15

1

## I.      INTRODUCTION

2          The Court has an obligation to ensure that only reliable damages theories that meet the

3    Federal Circuit's settled principles of apportionment are allowed to reach the jury. CoolIT and Mr.

4    Hansen both acknowledge that CoolIT's damages analysis requires apportionment because the

5    asserted CoolIT patent claims cover just one component of a multicomponent device. It is

6    undisputed that Mr. Hansen did not apply apportionment in his selection of the royalty base. He

7    could have formed a royalty base using the smallest saleable patent practicing unit—as the Federal

8    Circuit has often recommended—but did not. Mr. Hansen did not apply a low royalty rate to offset

9    his use of the entire value of the accused products either. Mr. Hansen applied his maximum royalty

10   rate from the Asetek-Corsair license to the full amount of revenue received by Asetek for sales of the

11   accused liquid cooling products without ever addressing apportionment.

12          It its opposition, CoolIT attempts to justify Mr. Hansen's failure to apportion damages with

13   unsupported attorney argument that the apportionment job was already done for him by the Asetek-

14   Corsair license. But CoolIT's attorney argument cannot save Mr. Hansen's fundamentally flawed

15   analysis. Critically, Mr. Hansen did not discuss apportionment in the Asetek-Corsair license. He did

16   not discuss "built-in apportionment" in his report at all. CoolIT's technical expert did not weigh in

17   on apportionment in the Asetek-Corsair license either; he did not even review the license.

18          CoolIT's "built-in apportionment" attorney argument also depends on the Asetek-Corsair

19   license being technically comparable, which CoolIT's experts purport to address in only the most

20   conclusory and superficial fashion. Neither Mr. Hansen nor Dr. Abraham offered anything on

21   technical comparability other than that the Asetek Cooling Patents are supposedly "directed towards

22   solving similar problems for similar products as the CoolIT Patents-In-Suit." Nothing more.

23          CoolIT's opposition also seeks to mislead the Court about the scope of the remaining

24   asserted CoolIT patent claims. CoolIT argues that the CoolIT patents are not limited to the cold plate

25   (citing to the specification and figures of CoolIT's '266 patent), but none of the claims of the '266

26   patent reciting a "fluid heat exchange system" survived the PTAB. CoolIT's remaining asserted

27   claims recite only a "fluid heat exchanger." For this motion, what matters is that CoolIT's asserted

28   claims do not cover a complete cooling system, unlike the claims in Asetek's licensed patents.

While the Federal Circuit has allowed some flexibility in damages analyses, the Court should not allow CoolIT to circumvent the long-standing, well-established apportionment requirements through insufficient, conclusory expert testimony and pure attorney argument.

## II.   ARGUMENT

### A.   Mr. Hansen's Damages Analysis Fails to Account for Apportionment and CoolIT Cannot Fix the Deficiencies in His Report Through Attorney Argument

CoolIT's opposition reveals three key undisputed facts. One, CoolIT does not dispute that its expert was required to perform some form of apportionment in determining reasonable royalty damages. Two, CoolIT does not dispute that its expert failed to conduct *any* apportionment with respect to the royalty base. And three, CoolIT does not argue that Mr. Hansen himself performed *any* apportionment when determining a royalty rate. CoolIT argues instead that Mr. Hansen can simply rely on supposed "built-in apportionment" in a license to different patents having different claim scope. This argument, however, is an invention of CoolIT's attorneys, has no support in Mr. Hansen's report, it is contradicted by the actual scope of CoolIT's asserted patent claims, and is contrary to Federal Circuit precedent. Thus, it should be excluded.

### 1.   Mr. Hansen's Report fails to provide any analysis of whether and to what extent the Asetek-Corsair license included any apportionment.

As noted above, CoolIT's opposition argues that the Asetek-Corsair license included "built-in apportionment" and that Mr. Hansen relied on the supposed "built-in apportionment" to ensure his damages calculations were properly apportioned. But this is just attorney argument. It has no support in Mr. Hansen's report. In his report, Mr. Hansen never mentions the concept of "built-in apportionment" *at all*, let alone in the context of the Asetek-Corsair license. *See* Dkt. 404-5. He offers *no* analysis of any such apportionment. *Id.* In fact, the word "apportion" does not appear anywhere in Mr. Hansen's discussion of the Asetek-Corsair license. *See Id.* at ¶¶ 63-80. Mr. Hansen only discusses apportionment under his *Georgia-Pacific* factor 13, at the conclusion of which he found "████████████████████████████████████████████████████" *Id.*, ¶¶ 81-93. He then proceeds to overrule his own analysis in pursuit of a higher royalty for CoolIT.

1    Furthermore, Mr. Hansen never explains why any apportionment in the Asetek-Corsair

2  license for Asetek's patents would apply equally to CoolIT's patents. *See* Dkt. 404-5. Asetek's

3  patents claim an entire liquid cooling system; CoolIT's asserted patent claims cover only one

4  component of that system. *See* Section II.A.3, below. To the extent there was any "built-in

5  apportionment" in the Asetek-Corsair license, it was based on the value of the entire Asetek system.

6  Mr. Hansen's report contains no explanation or economic analysis regarding why apportionment for

7  a single component would be the same. *See* Dkt. 404-5.

8    Faced with this lack of analysis, CoolIT's attorneys attempt to fill in the gaps themselves.

9  But attorney argument cannot resuscitate a defective expert opinion. For example, CoolIT argues

10  that the Asetek-Corsair License must be apportioned because otherwise "the royalty rate would have

11  been closer to 100%." Dkt. 417-3 at 8. This is absurd on its face as licenses that satisfy the entire

12  market value rule exist without applying a 100% royalty. Importantly, this is not an opinion

13  expressed by CoolIT's experts, but attorney argument appearing only in CoolIT's opposition.

14    Similarly, CoolIT invents a supposed comparison made by Mr. Hansen of the technology in

15  Asetek's patents with that in CoolIT's patents by pointing to a section of his report that purportedly

16  included such comparison. Dkt. 417-3 at 10-11. But no such comparison exists. All but one of the

17  paragraphs cited make no mention of Asetek's patents. *See* Dkt. 404-5, ¶¶ 47-53, 70. Rather, the

18  paragraphs are a discussion of the supposed "benefits" of the CoolIT patents. *Id.* And the only

19  paragraph that does mention Asetek's patents states only that they "are directed towards solving

20  similar problems for similar products as the CoolIT Patents-In-Suit" without any further explanation.

21  *Id.*, ¶ 70. This statement is baseless, as explained below.

22    CoolIT implies that Mr. Hansen determined that the royalty in the Asetek-Corsair license

23  reflected the "incremental value" of Asetek's patents. Dkt. 417-3 at 10. Mr. Hansen did not offer any

24  such opinion and never mentions the "incremental value" of Asetek's patents in his report. *See*

25  Dkt. 404-5. Nor does he purport to have analyzed the Asetek's patents. *Id.* In his deposition, ███

26  ████████████████████████████████████████████████████████████

27  ████ Ex. A at 174:24-175:15 ██████████████████████████████████

28  ████████████████████████████████████████████████████████████

1 ████████████████████████████████████████████████████████████

2 ███████. This phantom "incremental value" is just more attorney argument.

3      **2.    Conclusory testimony on technical comparability cannot substitute for apportionment.**

4

5      Because Mr. Hansen performed no apportionment analysis, in its opposition, CoolIT argues

6 that the comparability of the Asetek-Corsair license to the hypothetical negotiation permits CoolIT

7 to simply adopt whatever apportionment was performed in that license. But again, Mr. Hansen's

8 report fails to support CoolIT's attorney's argument for multiple reasons.

9      First, Mr. Hansen's analysis of the technical comparability of the Asetek patents to the

10 CoolIT patents consists of a single paragraph in his report that relies entirely on an off-the-record

11 conversation with Dr. Abraham, CoolIT's other paid expert. Specifically, Mr. Hansen relies on Dr.

12 Abraham's alleged statement that "the Asetek Cooling Patents are directed towards solving similar

13 problems for similar products as the CoolIT Patents-In-Suit…." *Id.*, ¶ 70. And nothing else. That is

14 insufficient under Federal Circuit law, as discussed in more detail below. *LaserDynamics, Inc. v.*

15 *Quanta Comput., Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012) (noting "loose or vague comparability

16 between different technologies or licenses does not suffice."). Significantly, Dr. Abraham did not tell

17 Mr. Hansen that the Asetek-Corsair license was for technology comparable to that claimed in the

18 asserted claims of the CoolIT patents; Dr. Abraham admitted in deposition that he had never even

19 seen the Asetek-Corsair license, much less discuss the license with Mr. Hansen or opine on its scope.

20 Ex. B at 17:9-19:6 ("Q. Do you -- do you recall having any communication with Mr. Hansen

21 regarding license agreement? A. I don't specifically recall that conversation. Q. Have you ever seen

22 a license agreement between Asetek and Corsair? A. I do not recall seeing one.").

23      Second, the comparability statement on which Mr. Hansen relies is not expressed in Dr.

24 Abraham's lengthy report. *See* Dkt. 396. In fact, Dr. Abraham's expert report emphasizes the

25 *differences* between the Asetek and CoolIT patents. Dkt. 396, ¶¶ 744-749. Specifically, Dr. Abraham

26 opined that the Asetek patents "have fundamental differences" from the CoolIT patents (*Id.*, ¶ 745)

27 and that there are "clear differences" between them (*Id.*, ¶ 746). In his deposition, when describing

28 his conversation with Mr. Hansen, Dr. Abraham explained "I remember talking to Mr. Hansen about

1     how the devices worked, and ***in particular, the differences between the Asetek patents and the***

2     ***CoolIT patents***." Ex. C at 62:22-63:1 (emphasis added). The apparent opinion of Dr. Abraham that

3     the patents are technically comparable is not an opinion Dr. Abraham has offered to present at trial.

4     Rather, based on his report he instead will testify that there are "fundamental differences" between

5     the Asetek and CoolIT patents. Dkt. 396, ¶¶ 745-746.

6        Third, Dr. Abraham himself has no support for the comparability statement. Specifically,

7     when asked at his deposition about his conversation with Mr. Hansen concerning comparability, Dr.

8     Abraham could provide no information other than the exact words that appear in Hansen's report.

9     Ex. B at 134:14-18 ("Did you tell Mr. Hansen that the Asetek patents are technically comparable to

10     the CoolIT patents? A. What I told Mr. Hansen is captured by these two paragraphs that we have

11     been discussing."); *see also id*. at 130:24-138:3. Dr. Abraham repeatedly noted that he did not

12     provide a comparability opinion in his own reports. *Id.* at 134:5-7, 137:2-6, 137:20-138:3, 142:7-18.

13     Dr. Abraham said he is not offering an opinion on comparability. *Id.* at 141:3-8 ("THE WITNESS: I

14     am not--did--did I offer an opinion on technical comparability in my report? Q. No, you did not. A.

15     Okay. I'm not offering that opinion."). And Dr. Abraham ultimately admitted—after repeatedly

16     attempting to dodge the question for an hour—that the only basis for his opinion that the Asetek and

17     CoolIT patents are technically comparable is that they are directed to solving similar problems for

18     similar products. *Id.* at 163:2-164:11 ("I just want to compare the claims and ask -- and ask you,

19     aside from the fact that the Asetek Asserted claims and the CoolIT Asserted claims are directed

20     towards solving similar problems for similar products, do you have any other basis for your opinion

21     that the Asserted Asetek claims and the Asserted CoolIT claims are technically comparable? A.

22     Well, I mean that is my basis."); *see also id.* at 130:24-164:11.

23        Fourth, technical comparability requires something more than simply "solving similar

24     problems for similar products." Under that analysis a simple fan would be technically comparable to

25     the cooling systems at issue in this case. In fact, this type of minimal comparability analysis is

26     exactly what the Federal Circuit precluded in the two seminal decisions cited in Asetek's motion.

27     *LaserDynamics*, 694 F.3d at 79-80; *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869, 873 (Fed.

28     Cir. 2010) (vacating damages award and commenting that "district courts performing reasonable

royalty calculations [must] exercise vigilance when considering past licenses to technologies other than the patent in suit."). Notably, CoolIT does not mention or even attempt to distinguish *ResQNet* or *LaserDynamics* in its opposition.

Fifth, Dr. Abraham is not qualified to offer any economic opinions or comparison on the relative economic value of the Asetek and CoolIT patents, and no facts or data have been cited in support of the proposition that CoolIT's patents are supposedly "more valuable." *See.* Dkt. 404-3, Section II.D.2. As mentioned, Dr. Abraham never even saw the Asetek-Corsair license. Ex. B at 17:9-19:6 Moreover, Dr. Abraham based his valuation opinion only on his own "experience," and did not speak to any customers—including Corsair—concerning the relative value of the Asetek and CoolIT patents. Dkt. 405-9 at 113:4-22; Dkt. 405-10 at 176:16-178:7. This complete lack of support makes Mr. Hansen's alleged reliance on the Asetek-Corsair license to do his work for him unreliable. And as explained previously, there is no evidence that Mr. Hansen relied on any alleged "built-in" apportionment; that is unsupported attorney argument in CoolIT's opposition.

Finally, Mr. Hansen's failure to do any actual analysis of technical comparability cannot be solved through cross-examination as CoolIT argues. While some cases have found comparability can be addressed on cross examination, at a minimum, there must be sufficient explanation and analysis in the expert's report to understand the basis of the opinion. *See NetFuel, Inc. v. Cisco Sys. Inc.*, Case No. 18-CV-02352-EJD, 2020 WL 1274985, at *7 (N.D. Cal. Mar. 17, 2020) (striking damages opinion where technical expert provided no methodology on valuation); *see also GPNE Corp. v. Apple, Inc.*, Case No. 12-CV-02885-LHK, 2014 WL 1494247, at *6 (N.D. Cal. Apr. 16, 2014) ("Without a methodology . . . cross-examination is futile."). Otherwise, a damages expert could always avoid exclusion through a conclusory statement of comparability in his/her report. Here, ███ ████████████████████████████████████████████████████████████ █████████████████████████████████████████ Ex. A at 174:24-175:15. Dr. Abraham has not explained it either. While it may be permissible to allow the jury to decide the issue of comparability in some cases, here CoolIT and Mr. Hansen have provided no facts or data, just "loose or vague comparability" on which the jury cannot rely. *See LaserDynamics*, 694 F.3d at 79-80.

### 3. CoolIT's description of the scope of the CoolIT and Asetek patents is misleading and irrelevant because CoolIT cannot dispute that Asetek's patents cover an entire liquid cooling system, and CoolIT's asserted claims cover only one component.

Because Mr. Hansen failed to explain his understanding of the scope of the CoolIT and Asetek patents or how the relative scope of those patents justifies his failure to perform any apportionment, CoolIT attempts in its opposition to fill the gap with attorney argument concerning the scope of those patents. But the asserted patent claims are unambiguous. CoolIT's remaining asserted patent claims cover only a "fluid heat exchanger." The Asetek patent claims licensed in the Asetek-Corsair license cover a "liquid cooling system." Mr. Hansen did not discuss or account for these differences or explain how a royalty appropriate for a complete cooling system would include the same "built-in apportionment" as a royalty for a mere component of that same system.

#### a. CoolIT's asserted patent claims cover a "fluid heat exchanger."

In its opposition brief, CoolIT states that the "CoolIT Patents are <u>not</u> limited to the cold plate piece of the larger inventive liquid cooling system." Dkt. 417-3 at 2. CoolIT's description of its "patents" is misleading. Chiefly, CoolIT ignores that the scope of the invention is defined by the language of the claims, not the specification. As explained in Asetek's motion, at this juncture, all of CoolIT's remaining asserted claims are directed to a "fluid heat exchanger," not a liquid cooling system that includes a fluid heat exchanger. *See* Dkt. 405-2, ¶¶ 15-16.[1] The fluid heat exchanger is primarily comprised of the cold plate, and CoolIT's experts used the cold plate as the smallest saleable patent practicing unit. *See* Dkt. 404-5, ¶ 84.

Rather than focus on the asserted claims of its patents, CoolIT focuses instead on the title, figures, and specification of just one patent—the '266 patent—to describe CoolIT's patents collectively, but does not inform the Court that the '266 patent is a continuation-in-part that includes

---

[1] CoolIT previously asserted claims 1, 2, 4, 5, and 9 of the '266 patent, which recite "A heat exchange system," but each of those claims was determined to be unpatentable by the PTAB in IPR No. IPR2020-00825. Dkt. 405-2, ¶¶ 15-16. In addition, CoolIT previously asserted claims 1, 2, 3, 5, 7, 25, and 28 of CoolIT's U.S. Patent No. 9,057,567, each of which recite "A heat exchange system," but each of those claims was determined to be unpatentable in IPR No. IPR2020-00747. *Id.*

1   disclosures not in CoolIT's other asserted patents.[2] Specifically, CoolIT's other two patents (the '330

2   and '284 patents) claim priority only to a provisional application filed on August 9, 2007 ("the 2007

3   Provisional," Dkt. 394-6). The 2007 Provisional is titled "Fluid Heat Exchanger" and includes only

4   figures and descriptions of a fluid heat exchanger, not a heat exchange system. Dkt. 394-6. The term

5   "heat exchange system" does not appear anywhere in the '330 or '284 patents. *See* Dkts. 23-1, 23-2.

6   Four years later, CoolIT filed a different provisional application on July 27, 2011 ("the 2011

7   Provisional," Dkt. 394-7). Unlike the 2007 Provisional, the 2011 Provisional related to "Heat

8   Exchange Systems" more broadly. Dkt. 394-7. CoolIT's '266 patent claims priority to the 2011

9   Provisional, but as explained above, the only claims of the '266 that remain valid and asserted in this

10  case today are limited to the "fluid heat exchanger." CoolIT's technical expert applied the 2007

11  priority date for claims 13 and 15 of the '266 patent. Dkt. 394-3 at 52:15-53:5.[3] Thus, CoolIT's

12  reliance on the '266 patent/2011 Provisional to try to expand what its claims cover is wrong.

13  Moreover, during claim construction, the Court rejected CoolIT's argument that the "fluid

14  heat exchanger included a pump and covered a whole cooling system, and instead construed the term

15  "fluid heat exchanger" to mean "component that transfers heat from a heat source to a cooling liquid

16  circulated by a pump that is external to the component." Dkt. 149 at 21-25. That is all the asserted

17  claims cover.

18  While CoolIT's reliance on the '266 patent disclosure to describe all of its patents

19  collectively is incorrect, CoolIT appears to concede that none of the remaining asserted patent claims

20  cover a complete liquid cooling device, which is the relevant point for Asetek's motion.

21  **b.    Asetek's patents cover a "liquid cooling system."**

22  Unlike CoolIT's asserted patent claims, which cover only a fluid heat exchanger, Asetek's

23  patents and asserted claims cover a complete liquid cooling system. Asetek's heat exchanging

---

[2] CoolIT's expert Dr. Abraham also described in his expert report features of the CoolIT patents that allegedly would affect demand for the CoolIT patents, but his report cited to parts of the specification of CoolIT's now-invalidated '567 patent for support. *See, e.g*, Dkt. 418-2, ¶¶ 750-759.

[3] If CoolIT's expert had instead relied on the 2011 Provisional to expand the claim scope, the priority date would be in 2011 and claims 13 and 15 of the '266 patent would be invalid. *See* Dkt. 390-12, ¶ 69

interface is just one of many components recited. For example, Claim 17 of Asetek's '362 patent

recites the following:

> 17. A method of operating a liquid cooling system for an electronic component positioned on a motherboard of a computer system, comprising:
>
> separably thermally coupling **a heat exchanging interface** of a reservoir with the electronic component positioned at a first location on the motherboard, the reservoir including an upper chamber and a lower chamber, the upper chamber and the lower chamber being separate chambers that are vertically spaced apart and separated by at least a horizontal wall, the upper chamber and the lower chamber being fluidly coupled by one or more passageways, at least one of the one or more passageways being positioned on the horizontal wall, **the heat exchanging interface being removably coupled to the reservoir such that an inside surface of the heat exchanging interface is exposed to the lower chamber of the reservoir**;
>
> positioning a heat radiator at a second location horizontally spaced apart from the first location, the heat radiator and the reservoir being fluidly coupled together by tubing that extends from the first location to the second location;
>
> activating a pump to a circulate a cooling liquid through the reservoir and the heat radiator, the pump including a motor and an impeller having curved blades, the impeller being positioned in the reservoir; and
>
> activating a fan to direct air through the heat radiator, the fan being operated by a motor separate from the motor of the pump.

Dkt. 405-4 at claim 17. The portions in bold above are the heat exchanging interface elements that

somewhat correspond to the "fluid heat exchanger" of CoolIT's claims. The rest of the Asetek claim

elements relate to other things.

      CoolIT attempts to minimize the invention of the Asetek patents by mischaracterizing the

jury verdict in the previous litigation between Asetek and Cooler Master. CoolIT argues that "the

only difference that the jury found to exist . . . was the limitation of the reservoir to be a single

receptacle" (Dkt. 417-3 at 4), but that is not the case. The jury's complete finding was as follows:

> Asetek's patented invention is directed to a closed loop liquid cooling system in which cooling liquid is pumped continuously between a pump head and a heat radiator (positioned remote from the pump head). **Rather than connecting together multiple separate components (as in the prior art), Asetek's patented pump head design combines, into a single unit, a pump and the claimed "reservoir" that has, among other things, dual chambers and is bounded by a removable cold plate.** Also, the claimed "reservoir" in Asetek's invention is a single receptacle that is divided into an upper chamber and a lower chamber, with the upper chamber providing the pumping function and the lower chamber providing the thermal exchange function. In addition to providing efficient heat removal, Asetek's patented invention includes at least one of the

following benefits over each example of prior art: a compact (narrow) profile, cost-effective manufacturing, and reduced risk of fluid leakage.

*Asetek Danmark A/S v. CMI USA, et al*, Case No. 3:13-cv-00457-JST, Dkt. 219 at 3-4 (emphasis added). The jury also found evidence of commercial success due to the Asetek invention, long-felt need for the solution provided by Asetek's patents, unsuccessful attempts by others to find the Asetek solution, copying of the invention by others, unexpected and superior results from the invention, and praise from others in the field. *Id.* at 4. CoolIT's attempt to diminish the scope of the Asetek patents based on the previous jury verdict is incorrect.

### 4. The cases relied on by CoolIT for exceptions to the general principle against using the entire market value of the accused product are inapposite.

CoolIT's attempts to analogize this case to the few cases where the Federal Circuit has found exceptions to the general principle that the entire market value should not be used are unsuccessful. None of the cases cited by CoolIT permits or justifies Mr. Hansen's unreliable approach here.

For example, the principal case relied on by CoolIT is *Exmark Manufacturing Co. v. Briggs & Stratton Power Products Group, LLC*, 879 F.3d 1332 (Fed. Cir. 2018). But that case involved very different circumstances than the present case. In *Exmark*, the accused product was a lawnmower and the asserted patent claims covered an entire lawnmower. Indeed, this was an important factor in the Federal Circuit's analysis:

> Using the accused lawn mower sales as the royalty base is particularly appropriate in this case because the asserted claim is, in fact, directed to the lawn mower as a whole.. . . It is not the baffle that infringes the claim, but rather the entire accused mower. Thus, **claim 1 covers the infringing product as [a] whole, not a single component of a multi-component product**.

*Id.* at 1348 (emphasis added and internal citations omitted). This is the opposite of the situation here. CoolIT's asserted patent claims cover only one component, and *do not* cover the entire product.

Similarly, in *Commonwealth Scientific & Industrial Research Organisation v. Cisco Systems, Inc.*, 809 F.3d 1295 (Fed. Cir. 2015) ("*CSIRO*"), the Federal Circuit affirmed that "the smallest salable patent-practicing unit principle provides that, where a damages model apportions from a royalty base, the model should use the smallest salable patent-practicing unit as the base." *Id.* (citing *LaserDynamics*, 694 F.3d at 67). However, the Court found that that accepted principle did not apply in *CSIRO* because the damages were based on the parties' actual negotiations for a license to the

1    asserted patent. The accused infringer, Cisco, had informally proposed a royalty for the asserted

2    patent, and that amount was used as the lower bound for the reasonable royalty analysis. The Court

3    commented that "[b]ecause the parties' discussions centered on a license rate for the [same] patent,

4    this starting point for the district court's analysis already built in apportionment." *Id.* at 1303. (This

5    is the factual setup from which the "built-in apportionment" cases CoolIT relies on was derived.)

6    The facts that warranted deviation from the smallest saleable unit principle in *CSIRO* are not present

7    in this case. Asetek and CoolIT have never negotiated a license to the CoolIT patents. In fact, *no one*

8    has ever negotiated a license to the CoolIT patents. Dkt. 403-5 at 157:2-24. *CSIRO* is inapposite.

9         The other cases relied upon by CoolIT fare no better because in those cases the experts

10   performed the analysis that Mr. Hansen did not. For example, in *Elbit*, the expert explicitly testified

11   that apportionment "is essentially embedded in [the] comparable value" and also relied on testimony

12   from the accused infringers on the increased value of the new system over the old system. *Elbit Sys.*

13   *Land & C4I Ltd. v. Hughes Network Sys., LLC*, 927 F.3d 1292, 1301 (Fed. Cir. 2019). In *Bio-Rad*,

14   the expert had "claimed that his 15% royalty rate was already apportioned in the comparable

15   licenses, but failed to provide any numerical value to support his analysis." *Bio-Rad Lab'ys, Inc. v.*

16   *10X Genomics Inc.*, 967 F.3d 1353, 1376 (Fed. Cir. 2020). The Court commented that that case was

17   "not a case in which an unsupported conclusory opinion leaves the jury with nothing but

18   speculation." *Id.* at 1377. Unlike *Elbit* and *Bio-Rad*, Mr. Hansen did not discuss whether

19   apportionment has already been accounted for in the Asetek-Corsair license. And in *Vectura*, the

20   license relied on was a license between the same parties that the accused infringer's expert admitted

21   was "a very close comparable." *Vectura Ltd. v. Glaxosmithkline LLC*, 981 F.3d 1030, 1040 (Fed.

22   Cir. 2020). The Federal Circuit commented that the damages theories presented "a rather unusual

23   circumstance." *Id.* at 1040. The Court also referred to the comparability analysis—which Mr.

24   Hansen did not do—as "critical to any built-in apportionment theory." *Id.* at 1044. The analysis in

25   Mr. Hansen's report does not fit into these cases.

26        Finally, CoolIT also relies on a District of Delaware decision in *Bio-Rad Laboratories, Inc. v.*

27   *10X Genomics, Inc.*, for the proposition that "using 'comparable licenses to establish a reasonable

28   royalty rate, without performing a separate apportionment analysis, where there is a logical basis for

1  doing so' is specifically permitted." Dkt. 417-3 at 1 (quoting *Bio-Rad Lab'ys, Inc. v. 10X Genomics,*

2  *Inc.*, Case No. CV 15-152-RGA, 2018 WL 4691047, at *7 (D. Del. Sept. 28, 2018)). Rather than

3  support CoolIT, this case shows why Mr. Hansen's analysis should be excluded. The judge in *Bio-*

4  *Rad* excluded the expert for failing to account for apportionment. *Id.* at *8. The judge was "dubious"

5  of the expert's analysis because it had simply stated that apportionment would have been considered

6  by the parties to the agreement and had largely already been taken into consideration. *Id.* The judge

7  concluded that allowing the expert's "cursory analysis to circumvent the apportionment requirement

8  would effectively gut the doctrine." *Id.* (noting "[t]he Federal Circuit has repeatedly emphasized the

9  importance of apportionment as part of a district court's gatekeeping function.") At least the expert in

10  *Bio-Rad* had a cursory statement suggesting that apportionment was accounted for in the license he

11  relied on. Mr. Hansen has not even done that.

12                  **5.**     **CoolIT ignores the Federal Circuit's recognition that damages**

13                            **analyses based on the entire market value of an accused product**
                          **can lead to improper damages awards by juries.**

14         Ultimately, Mr. Hansen's failure to apportion and his use of the entire market value of the

15  accused Asetek products raises the very real risk of an improper damages award from the jury, as

16  repeatedly recognized by the Federal Circuit. The Federal Circuit has warned that "calculating

17  reasonable royalty damages by using the revenue of the entire product as a royalty base 'carries a

18  considerable risk that the patentee will be improperly compensated for non-infringing components of

19  that product.'" *LaserDynamics*, 694 F.3d at 67 (vacating a damages verdict because the expert

20  improperly used the entire market value for a royalty base in calculating damages). The Federal

21  Circuit has also noted that the improper use of the entire market value skews the damages horizon

22  for the jury. *See LaserDynamics*, 694 F.3d at 67-68; *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d

23  1292, 1320 (Fed. Cir. 2011). Nowhere in its opposition does CoolIT even attempt to address these

24  concerns.[4]

25

26        [4]In its motion, Asetek suggested the Court could correct Mr. Hansen's analysis by using Mr.

27  Hansen's own opinion that ███████████████████████████████████████ *Id.*, ¶

28  93. There is nothing erroneous with this suggestion. Clearly, this approach is supported by the
principle of limiting the royalty base to the SSPPU described in *Virnetx* and *LaserDynamics*.

At bottom, Mr. Hansen's analysis is unreliable. He did not apportion the royalty base. He did not apportion the royalty rate (and instead applied the same rate from the Asetek-Corsair license). CoolIT's attorneys argue his analysis was acceptable because of "built-in apportionment" and use of a "base line comparable" license, but those arguments are both incorrect and not supported by Mr. Hansen's report. The Court should exercise its gatekeeping authority to "ensure that only theories comporting with settled principles of apportionment [are] allowed to reach the jury." *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014). Mr. Hansen's opinions should be excluded.

## B.   Mr. Hansen's Royalty Base Improperly Includes a Portion of Overseas Sales to Corsair and He Did Not Ask Corsair for Data to Support His Analysis, Which Data Corsair Has

In its motion, Asetek argued that the Court should not allow Mr. Hansen to present speculation and guesswork to the jury about alleged additional sales when Mr. Hansen and CoolIT failed to obtain actual data from Corsair that exists. Asetek explained that the Federal Circuit rejects damages awards that are based on speculation and guesswork and CoolIT does not disagree. Asetek provided examples of district court decisions limiting damages analysis where the patentee did not obtain information the necessary information in discovery. CoolIT did not respond to those cases. The Court should exclude Mr. Hansen's opinions speculating as to alleged "additional sales" for all of the reasons explained in Asetek's motion. *See* Dkt. 404-3, Section III.E.

CoolIT attempts to excuse the clear shortcomings of Mr. Hansen's analysis by arguing that "direct data of these downstream sales was not available to Mr. Hansen," (Dkt. 417-3 at 14), but that is factually incorrect. To determine how many Asetek products Corsair sold in the United States, Mr. Hansen simply had to ask Corsair, a party on whose behalf he is testifying. Corsair's sales data provides the U.S. shipping locations for its products. Smyth Decl., ¶ 5. And Mr. Hansen knows this because he considered Corsair's U.S. sales of the accused CoolIT products. Smyth Decl., ¶ 6. His rebuttal report included over 2,000 pages of exhibits in which he filtered the Corsair U.S. sales data in various ways. *Id.* Mr. Hansen was able to consider this data in his rebuttal report because Asetek requested it in discovery. Smyth Decl., ¶ 5. CoolIT and Mr. Hansen failed to request or obtain equivalent data for the accused Asetek products.

1    Further, in its opposition, CoolIT misleadingly cites to Mr. Hansen's testimony that "his

2    recollection was that Corsair did not have complete information where its customers ultimately sell

3    and use all of their products." Dkt. 417-3 at 15, n.9. The relevant question, of course, is not what

4    Corsair's *customers* do with the products once purchased. The relevant question is where *Corsair*

5    *itself* has sold and shipped the products purchased from Asetek and/or what percentage of Asetek

6    products bought by Corsair outside the U.S, and then Corsair has resold in the U.S. ██████

7    ████████████████████████████████████████████████

8    CoolIT argues that Mr. Hansen's reliance on the SEC filings was proper and that "there is no

9    reason to believe that the geographic breakdown for liquid cooling systems would be any different

10   than the overall product mix." Dkt. 417-3 at 15. The issue is that there is no reason to believe the

11   geographic breakdown for liquid cooling products is *the same* as the overall product mix. And that is

12   because ██████████████████████████████████████████████

13   ████████ Asetek produced data showing a substantial number of sales to Corsair that are

14   shipped directly to the United States.[5] Mr. Hansen's assumption that this data is incomplete and/or

15   that Corsair ships additional accused liquid cooling products into the United States has no basis and

16   should be excluded as unreliable.

17   C.   **CoolIT Cannot Overcome the Statutory Limitation on Damages by**
          **Relying on the Relation Back Doctrine**

18

19   CoolIT seeks to rely on the "relation back" doctrine to extend its damages recoverable

20   against Asetek USA beyond the six-year limitation, but the relation back doctrine should not apply

21   here. Asetek USA did not know "the action would have been brought against it, but for a mistake

22   *concerning the proper party's identity*." Fed. R. Civ. P 15(c)(1)(C)(ii) (emphasis added). This is an

23   express requirement of Rule 15 that CoolIT fails to establish.

24   CoolIT's argument to the contrary focuses on what *CoolIT* allegedly knew when it filed its

25   Complaint. But CoolIT itself admits that "Rule 15(c)(1)(C)(ii) asks what the prospective defendant

26   ───────────────

27   [5] CoolIT attempts to paint Mr. Hansen's mathematical gymnastics as an attempt by Mr.
     Hansen to act "conservatively" and ensure that the U.S. revenues are not double counted. Dkt. 417-3
     at 15. The problem with Mr. Hansen's method is not that he is removing the confirmed U.S. sales to
     avoid double counting; the problem is with his unsupported assumption that 35% of Asetek's
28   products sold to Corsair land in the United States.

1  knew or should have known during the Rule 4(m) period, ***not what the plaintiff knew or should***

2  ***have known*** at the time of filing [the] original complaint." (Dkt. 417-3 at 16 (quoting *Krupski v.*

3  *Costa Crociere S.p.A.*, 560 U.S. 538, 548 (2010) (emphasis added)). The Court's previous finding

4  regarding what *CoolIT* was aware of is immaterial.[6]

5        Moreover, as explained in Asetek USA's opposition to CoolIT's motion to amend, CoolIT in

6  fact knew of Asetek USA's involvement in sales in September 2014. At the pretrial conference in

7  the previous litigation, Asetek's and CoolIT's counsel discussed that Asetek Danmark A/S and

8  Asetek USA Inc. are separate entities that both sell liquid cooling products. Dkt. 316-2, ¶ 8. At

9  CoolIT's counsel's request, trial was delayed and Asetek provided discovery on the sales made by

10  Asetek USA. Dkt. 316-3 at 14:3-24; Dkt. 316-2, ¶ 8; Dkts. 316-4, 316-5, 316-6. So, when CoolIT

11  sued Asetek A/S in this case, Asetek USA had no reason to think CoolIT and its counsel had

12  forgotten about these significant events and/or was mistaken about the identity of the proper parties.

13        CoolIT relies on *SMIC*, but that case is easily distinguished because the court found "the

14  relation back inquiry unnecessary." *SMIC, Americas v. Innovative Foundry Techs. LLC*, 473 F.

15  Supp. 3d 1021, 1025 (N.D. Cal. 2020). The Rule 15 commentary in that case was not only *dicta*, but

16  also distinguishable from the present case because the original complaint in *SMIC* expressly alleged

17  infringement "through the activities of [the] subsidiaries" (*Id.*), whereas CoolIT's counterclaims in

18  this case did not (Dkt. 23). Instead, when viewed from Asetek USA's perspective, CoolIT's failure

19  to name Asetek USA "was the result of a fully informed decision as opposed to a mistake

20  concerning the proper defendant's identity." *See Krupski*, 560 U.S. at 552. Thus, the requirements of

21  Rule 15(c)(1)(C)(ii) are not met.

22  **III.   CONCLUSION**

23        For the reasons outlined above, the Court should exclude Mr. Hansen's unreliable opinions

24  regarding CoolIT's damages. Asetek respectfully requests that its motion be granted.

25

26

---

27      [6] CoolIT crops the Court's finding to omit the fact that the CoolIT was aware of the existence of Asetek USA. Dkt. 417-3 at16. The Court's complete finding stated as follows: Although ***CoolIT***

28  ***was aware of the existence of the Asetek Danmark's related entities***, CoolIT was not aware that such entities made U.S. sales of the products accused in this litigation." Dkt. 322 (emphasis added).

Dated: April 21, 2022

FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP

By:  /s/ Jeffrey D. Smyth
Jeffrey D. Smyth
Attorneys for Plaintiff and Counterdefendant
ASETEK DANMARK A/S and
Counterdefendant ASETEK USA, INC.