**REDACTED VERSION**

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASETEK DANMARK A/S, | Case No. 19-cv-00410-EMC |
| Plaintiff, | **FILED UNDER SEAL** |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART PARTIES' MOTIONS IN LIMINE AND MOTIONS TO STRIKE** |
| COOLIT SYSTEMS INC, et al., | |
| Defendants. | Docket Nos. 389, 391, 393, 397, 399-402, 405 |

## I.     INTRODUCTION

Plaintiff Asetek Danmark AS ("Asetek") filed suit against CoolIT Systems, Inc. and its subsidiaries and Corsair Gaming, Inc. and its U.S. subsidiaries (collectively "CoolIT"), asserting that CoolIT infringed and continues to infringe five of its patents — *i.e.*, the '601, '196, '362, '354 and '355 patents (collectively "CoolIT Patents"). CoolIT counterclaimed, alleging that Asetek infringed four of CoolIT's patents — *i.e.*, the '330, '284, '266, and '567 patents. All of the allegedly infringed patents relate to liquid cooling systems and methods for cooling heat-generating electronic components. At issue are various motions to strike and motions in limine.

## II.     FACTUAL & PROCEDURAL BACKGROUND

On January 23, 2019, Asetek filed this lawsuit against CoolIT. *See* Docket No. 1. Asetek's patented combination of a pump, a dual-chambered reservoir, and a cold plate into a single pump unit allows improved efficiency and compactness that enables the pump unit to be installed directly on the CPU/GPU of a computer motherboard, graphics card, or a server, have decreased risk of coolant leakage, is easy to install and use, is simpler, and less costly. Docket No. 228 (SAC) at 4. CoolIT counterclaimed on April 11, 2019, alleging that Asetek's Gen 4, Gen 5,

1    Gen 6, and Gen 7 products infringe its own patents — *i.e.*, the '330, '284, '266, and '567

2    patents—which claim a fluid heat exchanger. *See* Docket No. 23; Docket No. 333 (Fourth

3    Amended Counterclaim) at 14.

4        On December 22, 2020, this Court issued a minute order consolidating this case with the

5    related case of *Asetek Danmark A/S v. Corsair Gaming, Inc. et al.*, Case No. 3:20-cv-06541-EMC,

6    which asserted many of the same patents as this case. *See* Docket No. 207 at 1. SAC at 2-4.

7    Therefore, the consolidated complaint ("SAC") alleges infringement against CoolIT and Corsair, a

8    provider of gaming and streaming products. *See* SAC.

9        The '354 and '355 patents were later found unpatentable by the Patent Trial and Appeal

10   Board ("PTAB"), and Asetek appealed to the Federal Circuit. *See* Docket No. 380 (Order to Stay)

11   at 3, n.2; Docket No. 465 (Joint Case Management Statement) at 5. There is a pending *inter*

12   *partes review* ("IPR") of the '601 and '196 patents. Joint Case Management Statement at 3. On

13   September 30, 2021 and October 12, 2021, the '567 patent and some claims of the '266 Patents

14   were found unpatentable by the PTAB and are subject to an appeal. *Id.* This Court granted a

15   partial stay of litigation on February 10, 2022 as to Asetek's '354, '355, '601, and '196 patents

16   and CoolIT's '567 patent, pending inter partes review of the '601 and '196 patents. *See* Order to

17   Stay at 1. The stay did not affect the litigation as to Asetek's '362 Patent and CoolIT's '330, '284,

18   and '266 Patents currently at issue as they are not presently subject to IPR. *See id.*

19   A.    The '362 Patent

20       The '362 Patent claims an invention over prior art liquid cooling systems that were often

21   bulky with many components, which increased the total installation time, size, and risk of leakage.

22   Docket No. 1-1 (the '362 Patent) at 1:41-49. Asetek overcame this problem with a small and

23   compact design that is more efficient, easy to use and implement, and requires a low level of

24   maintenance. *Id.* at 1:53-52.

25       Only claims 17 and 19 are at issue in this case:

26       17. A method of operating a liquid cooling system for an electronic
         component positioned on a motherboard of a computer system,
27       comprising:

28       separably thermally coupling a heat exchanging interface of a

United States District Court
Northern District of California

reservoir with the electronic component positioned at a first location on the motherboard, the **reservoir including an upper chamber and a lower chamber**, the upper chamber and the lower chamber being separate chambers that are vertically spaced apart and separated by at least a horizontal wall, the upper chamber and the lower chamber being fluidly coupled by one or more passageways, at least one of the one or more passageways being positioned on the horizontal wall, the heat exchanging interface being removably coupled to the reservoir such that an inside surface of the heat exchanging interface is exposed to the lower chamber of the reservoir;

positioning a heat radiator at a second location horizontally spaced apart from the first location, the heat radiator and the reservoir being fluidly coupled together by tubing that extends from the first location to the second location;

activating a pump to a circulate a cooling liquid through the reservoir and the heat radiator, the pump including a motor and **an impeller having curved blades**, the impeller being positioned in the reservoir; and

activating a fan to direct air through the heat radiator, the fan being operated by a motor separate from the motor of the pump.

18. The method of claim 17, wherein activating the pump includes circulating the cooling liquid between the upper and the lower chambers of the reservoir.

19. The method of claim 18, wherein circulating the cooling liquid between the upper and the lower chambers includes passing the cooling liquid from the upper chamber to the lower chamber through a single passageway of the one or more passageways.

'362 Patent, Claims 17-19.

Asetek's claimed invention has several notable features, including "an impeller having a plurality of curved blades" and a single-receptacle "reservoir including an upper and a lower chamber" contained within it which circulates cooling liquid to keep computer chips from overheating. *See id.* These limitations overcame prior art. Docket No. 387-3, Ex. 2 (U.S. Patent No. 7,971,632 file history) (adding "curved blades"); *see also Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352, 1357–58 (Fed. Cir. 2017) ("[T]he jury found that the claimed liquid-cooling systems differ from the prior art . . . because the 'reservoir' is a 'single receptacle that is divided into an upper chamber and a lower chamber.'"). The parties and this Court previously construed "chamber" as "compartment(s) within the reservoir" and "reservoir" as a "single receptacle defining a fluid flow path." Docket No. 67 (Joint Claim Construction Statement) at 2-3; Docket

No. 237 at 3, Docket No. 258 (Claim Construction Order) at 5.  Furthermore, the parties stipulated to the following:

> 1. The claimed "reservoir" in Asetek's invention is a single receptacle that is divided into an upper chamber and a lower chamber, with the upper chamber providing the pumping function and the lower chamber providing the thermal exchange function.
>
> 2. Prior art devices included a pump, a single-chamber reservoir (as that term was used in the prior art), and a cold plate as separate components that were connected using tubing or attached together with clips or screws or permanently coupled.
>
> 3. Asetek's patent claims are directed to a liquid cooling device comprising a dual chambered reservoir bounded by a heat-exchanging interface.

Docket No. 342 (Estoppel Joint Statement) at 2.

## B.  The CMI Case

Asetek previously asserted the '362 Patent (and related U.S. Patent No. 8,245,764) in an unrelated action against Cooler Master ("CMI").  *See Asetek Danmark A/S v. CMI USA, Inc.*, Case No. 4:13-cv-00457-JST (hereinafter the "CMI case").  Represented by the same counsel as in the current case, Asetek argued that the patents were not invalid over the prior art because the '362 Patent's "reservoir" limitation required a single receptacle while prior art Ryu disclosed two separate receptacles attached together.  *See CMI USA Inc.*, 852 F.3d at 1357–58.  The jury agreed with Asetek and found the '362 Patent valid over Ryu.  *Asetek Danmark A/S v. CMI USA, Inc.*, No. 13-CV-00457-JST, 2015 WL 5568360, at *2 (N.D. Cal. Sept. 22, 2015), *aff'd in part, remanded in part*, 842 F.3d 1350 (Fed. Cir. 2016), *opinion modified and superseded on reh'g*, 852 F.3d 1352 (Fed. Cir. 2017), *and aff'd in part, vacated in part*, 852 F.3d 1352 (Fed. Cir. 2017).  The jury found the following key differences between the '362 Patent and the prior art:

> Rather than connecting together multiple separate components (as in the prior art), Asetek's patented pump head design combines, into a single unit, a pump and the claimed "reservoir" that has, among other things, dual chambers and is bounded by a removable cold plate.  Also, the claimed "reservoir" in Asetek's invention is a single receptacle that is divided into an upper chamber and a lower chamber, with the upper chamber providing the pumping function and the lower chamber providing the thermal exchange function.

*Id.*  The Federal Circuit affirmed.  *See CMI USA Inc.*, 852 F.3d at 1357–58.

United States District Court
Northern District of California

4

Thereafter in a motion for contempt sanctions, Asetek argued that CMI's product with two separate and separable receptacles infringed the '362 Patent, claiming that the single receptacle reservoir argument was not the "crucial distinction" from the prior art. *See Asetek Danmark A/S v. CoolIT Sys. Inc.*, No. 19-CV-00410-EMC, 2022 WL 74160, at *4 (N.D. Cal. Jan. 7, 2022). Upon this attempt to argue that a device with multiple separable receptacles can satisfy the single receptacle reservoir limitation in the CMI case, CoolIT sought leave to amend answers to add collateral and judicial estoppel defenses in the current action. *Id.* This Court granted the amendment and noted that "should Asetek now argue in the instant case that a reservoir encompasses multiple receptacles like it did at the July 27, 2021 *CMI USA Inc.* hearing, this argument would appear to be inconsistent with its previous argument in *CMI USA Inc.* that a reservoir limitation requires a single receptacle." *Id.* at *9.

C.    The '266, '330, and '284 Patents

Eleven claims across the '330, '284, and '266 Patents remain, each reciting or depending on an independent claim that recites a "plate" and a "plurality of [fins/walls]" defining a "corresponding plurality of microchannels":

> 13. A fluid heat exchanger for cooling an electronic device, the heat exchanger comprising:
>
> a plurality of walls defining a corresponding plurality of **microchannels**, wherein each microchannel extends from a first end to a second end;
>
> **a plate** overlying the walls; and
>
> a seal, wherein the seal is a portion of the plate;
>
> a fluid inlet passage configured to deliver a heat-exchange fluid through one aperture in the plate to each microchannel at a position between the corresponding first end and the corresponding second end of the respective microchannel;
>
> a fluid outlet passage configured to receive the heat-exchange fluid from the first end and the second end of each microchannel, wherein the fluid outlet passage has a first outlet region positioned adjacent the microchannel first ends and a second outlet region positioned adjacent the microchannel second ends, wherein the seal separates the fluid inlet passage from the fluid outlet passage;
>
> > wherein a flow of the heat-exchange fluid through the one aperture in the plate bifurcates into two sub flows within

United States District Court
Northern District of California

each microchannel, wherein the first outlet region receives one of the two sub flows adjacent the microchannel first ends and the second outlet region receives the other of the two sub flows adjacent the microchannel second ends, wherein the two sub flows recombine in the outlet passage.

15. The fluid heat exchanger according to claim 12, wherein the plurality of microchannels comprises at least two opposed outer microchannels and a centrally located microchannel positioned between the opposed outer microchannels, wherein the first outlet region comprises an outlet opening from each microchannel, wherein the outlet opening from the centrally located microchannel is larger than the outlet opening from at least one of the outer microchannels.

*See, e.g.*, Docket No. 27-4 (the '266 Patent), claims 13, 15; Docket Nos. 27-1 (the '330 Patent);

27-2 (the '284 Patent).

On October 12, 2021, the PTAB issued a Final Written Decision ("FWD") finding some of

the asserted claims of CoolIT's '266 Patent unpatentable and some of the asserted claims

patentable. *See generally* Docket No. 394-5 ('266 FWD). This decision came more than a month

after close of fact discovery and after the parties exchanged initial expert reports on September 16,

2021. Representative claim 1, which was considered by the PTAB, read as follows:

1. A heat exchange system comprising:

a housing defining a recessed region and an outlet port fluidly coupled with the recessed region;

a heat sink having a plurality of juxtaposed fins defining a corresponding plurality of microchannels between adjacent fins;

a **manifold body** at least partially defining an opening overlying the microchannels,

wherein the **manifold body** defines a pair of compliant surfaces flanking the opening,

wherein the compliant surfaces urge against the fins, defining a flow boundary of the microchannels,

wherein the opening extends transversely relative to the fins and is configured to distribute a working fluid among the microchannels,

wherein the **manifold body** partially occupies the recessed region of the housing, leaving a pair of opposed portions of the recessed region unfilled, defining opposed exhaust manifold portions flanking the opening and being configured to receive the working fluid from the microchannels, and

United States District Court
Northern District of California

6

1  wherein the housing further defines an outlet plenum
   configured to receive the working fluid from the exhaust
2  manifold portions and to convey the working fluid to the
   outlet port.

3  '266 Patent, claim 1.  The PTAB found claims 1, 2, 4, 5, and 9 unpatentable and claims 13-15 not

4  unpatentable.  '266 FWD at 47.

5                    **III.    LEGAL STANDARD**

6  A.    Federal Rules of Civil Procedure 26 and 37

7         Pursuant to Federal Rules of Civil Procedure 26(a)(2), an expert report must contain: "a

8  complete statement of all opinions the witness will express and the basis and reasons for them"

9  and "the facts or data considered by the witness in forming them."  Fed. R. Civ. P. 26(a)(2).  Rule

10 26(e) imposes a duty to timely supplement disclosures made under Rule 26(a) that become

11 incomplete or incorrect.  *Sportspower Ltd. v. Crowntec Fitness Mfg. Ltd.*, No. 817-CV-02032-

12 JLSKES, 2020 WL 7347860, at *2 (C.D. Cal. Nov. 18, 2020); Fed. R. Civ. P. 26(e).  If a party

13 fails to provide information as required under Rule 26, the improperly withheld information is

14 excluded unless the failure was "substantially justified" or "harmless."  Fed. R. Civ. P. 37(c)(1);

15 *Ingenco Holdings, LLC v. Ace Am. Ins. Co.*, 921 F.3d 803, 821 (9th Cir. 2019).  A failure to

16 comply with Rule 26(a)(2) is considered to be harmless when the party entitled to the expert

17 disclosure has not been prejudiced.

18        Furthermore, Patent Local Rule 3 "requires patent disclosures early in a case and

19 streamlines discovery by replacing the series of interrogatories that parties would likely have

20 propounded without it."  *ASUS Computer Int'l v. Round Rock Rsch., LLC*, No. 12-CV-02099 JST

21 (NC), 2014 WL 1463609, at *1 (N.D. Cal. Apr. 11, 2014) (internal quotation marks and

22 modifications omitted).  "Given the purpose of the Patent Local Rules, a party may not use an

23 expert report to introduce new infringement theories, new infringing instrumentalities, new

24 invalidity theories, or new prior art references not disclosed in the parties' infringement

25 contentions or invalidity contentions."  *Illumina, Inc. v. BGI Genomics Co.*, 559 F. Supp. 3d 1072,

26 1078 (N.D. Cal. 2021) (citations omitted).  However, experts may discuss "the subject matter of

27 their initial reports" and "any critiques of their opinions presented in the rebuttal reports, although

28 they may not present new opinions, arguments, or evidence as *alternatives* to opinions, arguments,

United States District Court
Northern District of California

7

1  or evidence.  In other words, true rebuttal to criticism is permitted—facts and opinions that should

2  have been in the original reports are not." *Cave Consulting Grp., Inc. v. OptumInsight, Inc.*, No.

3  15-CV-03424-JCS, 2018 WL 1938555, at *4 (N.D. Cal. Apr. 25, 2018).

4  B.  *Daubert*

5       In assessing the admissibility of expert testimony under Federal Rule of Evidence 702,[1] a

6  court must perform "a preliminary assessment of whether the reasoning or methodology

7  underlying the testimony is scientifically valid and of whether that reasoning or methodology

8  properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579,

9  592–93 (1993); *see also Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137 (1999) (*Daubert*

10 standards apply to all expert testimony, not only scientific experts).  Courts consider factors such

11 as: whether the theory or technique can be or has been tested, whether the theory or technique has

12 been subjected to peer review and publication, the known or potential rate of error with a scientific

13 technique, and acceptance of the technique by a relevant scientific community.  *Id.* at 593–94; *see*

14 *also United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000).  None of these factors is

15 dispositive and, ultimately, "[t]he inquiry envisioned by Rule 702 is . . . a flexible one" which is

16 focused "solely on principles and methodology, not on the conclusions that they generate."

17 *Daubert*, 509 U.S. at 594–95.

18      Under Rule 702 and *Daubert*, "[t]he duty falls squarely upon the district court to act as a

19 gatekeeper to exclude junk science that does not meet Federal Rule of Evidence 702's reliability

20 standards." *Est. of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014), *overruled on*

21 *other grounds by United States v. Bacon*, 979 F.3d 766 (9th Cir. 2020) (quotation and citation

22 omitted).  Moreover, "[t]he trial judge also has broad latitude in determining the appropriate form

23 of the inquiry."  *Id.*  The purpose of the gatekeeping role is to ensure that expert testimony is

24 "properly grounded, well-reasoned and not speculative," but it is not meant to substitute for

United States District Court
Northern District of California

---

[1] A qualified expert may give opinion testimony if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.  Fed. R. Evid. 702.

"[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden and proof [which] are the traditional and appropriate means of attacking shaky but admissible evidence." Fed. R. Evid. 702, Adv. Comm. Notes (2000) (quotation omitted). Thus, "[a]fter an expert establishes admissibility to the judge's satisfaction, challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge." *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014). Because the Court acts as a gatekeeper and not a factfinder, an expert whose methodology is otherwise reliable should not be excluded simply because the facts upon which his or her opinions are predicated are in dispute unless those factual assumptions are "indisputably wrong." *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996); *see also* Fed. R. Evid. 702, Adv. Comm. Notes (2000) (explaining that "[w]hen facts are in dispute, experts sometimes reach different conclusions" and a trial court is not "authorize[d] ... to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other"). The advisory committee notes for Rule 703 clarify the three possible sources of facts or data upon which expert opinions may be based on:

> (1) "the firsthand observation of the witness with opinions based thereon traditionally allowed . . .
> (2) presentation at the trial [such as a] hypothetical question or having the expert attend the trial and hear the testimony establishing the facts and
> (3) presentation of data to the expert outside of court and other than by his own perception."

Fed. R. Evid. 703, Adv. Comm. Notes; Fed. R. Evid. 702, Adv. Comm. Notes (2000) (Rule 702 is "broad enough to allow an expert to rely on hypothetical facts that are supported by the evidence.").

"It traditionally falls upon cross-examination to negate the facts or factual assumptions underlying an expert's opinion." *In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 967 (N.D. Cal. 2018). Therefore, an expert opinion does not become fatally inadmissible just because the expert assumed a certain set of facts as long as other evidence presented in the trial will support the assumed fact. "Attention is directed to the validity of the techniques employed rather than to relatively fruitless inquiries whether hearsay is involved." *Id.* Such facts, data, or opinions presented to the expert out of court, including hearsay, need not be admissible in evidence in order

United States District Court
Northern District of California

9

1    for the opinion or inference to be admitted if it is of a type reasonably relied upon by experts in the

2    field. Fed. R. Evid. 703.

3                                        **IV.    DISCUSSION**

4    A.    Motion for Judicial Estoppel (Docket No. 402) and Motion in Limine to Exclude Abraham

5          Opinions (Docket No. 400)

6          Asetek's invention contains a "reservoir including an upper chamber and a lower

7    chamber." '362 Patent, claim 17. The parties and this Court previously construed "chamber" as

8    "compartment(s) *within* the reservoir" and "reservoir" as a "single receptacle defining a fluid flow

9    path." *See* Docket Nos. 67, 104, 237, 258. Parties dispute whether CoolIT's upper and lower

10   chambers in their accused products constitute two separable receptacles. If so, they do not

11   infringe the '362 patent, which requires a single receptacle. *See* Docket No. 420 at 1-3.

12         According to Asetek, (1) the term "single receptacle" in the stipulated construction of

13   "reservoir" does not preclude the presence of other smaller receptacles within the larger receptacle

14   forming the claimed "reservoir" and (2) CoolIT's alleged second smaller receptacle within a larger

15   receptacle is not actually a receptacle but a subcomponent of the reservoir. Docket No. 444-3 at 2.

16   Therefore, Asetek contends that CoolIT's position that the accused products have two separable

17   receptacles instead of one adds the following limitations beyond the parties' stipulation:

18              (1) the "single receptacle" must contain the two chambers
                (2) the structure separating the two chambers is within the same
19              single receptacle
                (3) the two chambers do not have their own separate and separable
20              enclosures and depend on the single receptacle to enclose them (in
                contrast to prior art Ryu and CoolIT's new design, of which the
21              upper/pump chamber and the lower/thermal exchanger chamber
                have their own separate and separable boundary walls).
22

23   Docket No. 450 at 2-3 (citing Docket No. 400-5 ¶ 55).

24         The parties dispute whether CoolIT's and Dr. Abraham's arguments are (1) inconsistent

25   with the argument CoolIT proffered at IPR and, therefore, judicially estopped, (2) inconsistent and

26   narrower than the parties' stipulated claim construction, and (3) have an untenable result that

27   excludes the '362 patent's own preferred embodiments. *See* Docket No. 400; Docket No. 402;

28   Dockets No. 413, 420.

United States District Court
Northern District of California

1         1.    <u>Judicial Estoppel</u>

During the pendency of this action, the '354 and '355 patents were subject to IPR and were found unpatentable by the PTAB on August 19, 2021. Docket No. 380 at 3, n.2. In the IPR petitions, CoolIT argued that Asetek's patents were obvious because they relied on prior art references wherein the reservoir had multiple receptacles within the "single receptacle," defined by multiple components in the reservoir. Docket No. 400 at 12; Docket No. 450 at 11. According to Asetek, CoolIT had argued that multiple components could constitute a single receptacle and reservoir related to the Duan, Batchelder, and Shin prior art. Docket No. 400-6 (Ex. D, CoolIT IPR Petition) at 26 (arguing that prior art discloses an accommodation chamber, cap, and cooling plate that "together form[ed] the claimed reservoir" and a "single receptacle defining a fluid flow path"); *see also* Docket No. 402-10 at 12-14; Docket No. 444-3 at 12. These multiple components that likely can hold liquid (and thus is a receptacle under CoolIT's current interpretation) "serve as a single receptacle defining a fluid flow path." *See* Docket No. 400 at 12; Docket No. 444-3 at 11. As such, Asetek argues that judicial estoppel prohibits CoolIT and Dr. Abraham from taking the inconsistent position that multiple components or receptacles cannot be connected or integrated together with the claimed "reservoir." *See generally* Docket No. 400; *see also* Docket No. 450-5 (Abraham Infringement Rebuttal Report) at ¶¶ 85-87 (opining that the manifold groove in the copper cold plate in the lower chamber of the accused device is "capable of holding coolant" and thus constitutes a separate receptacle).

As discussed separately for the parties' motion for summary judgment, CoolIT's prior position at IPR is not inconsistent with its current position because the fact that multiple *components* can form the "reservoir" or a "single receptacle" is irrelevant to the question of whether multiple chambers can be considered each a separate *receptacle* within the reservoir. As such, the Court **DENIES** Asetek's judicial estoppel arguments for both motions.

         2.    <u>Claim Construction</u>

Dr. Abraham opines that the accused H100i product contains a collection manifold in the heat exchanging interface (i.e., the copper cold plate), which constitutes a separate receptacle

under the word's plain and ordinary meaning because it can receive and contain liquid.[2] Docket No. 420-4 at 49-54; Docket No. 400 at 6, 8. Asetek argues that CoolIT's logic that the accused products constitute two separable receptacles creates new limitations that cannot be added to the stipulated construction. Asetek also argues that Dr. Abraham essentially argues claim construction to the jury to explain "what 'a single receptacle that is divided into two chambers' actually means" using extrinsic attorney annotations that Dr. Abraham did not inspect or verify. Docket No. 400 at 6; Docket No. 450 at 2-3 (*Huawei Techs., Co, Ltd v. Samsung Elecs. Co, Ltd.*, 340 F. Supp. 3d 934, 967 (N.D. Cal. 2018) (citing *Apple, Inc. v. Samsung Elecs. Co.*, No. 12-CV-00630-LHK, 2014 WL 660857, at *6 (N.D. Cal. Feb. 20, 2014) ("Expert opinions should be excluded when they "exceed the bounds' of the plain and ordinary meaning of the claim terms" and "delv[e] too deeply into claim construction to be presented to the jury[.]")).

First, Dr. Abraham does not attempt to advance a claim construction argument by explaining to the jury "what 'a single receptacle that is divided into two chambers' actually means." Docket No. 400 at 7-8. In fact, "[t]he implications of the Court's constructions are matters on which the parties' experts may opine" and "evidence regarding the plain and ordinary meaning of claim terms is not necessarily inadmissible at trial." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 763 F. Supp. 2d 671, 695 (D. Del. 2010); *Fujifilm Corp. v. Motorola Mobility LLC*, No. 12-CV-03587-WHO, 2015 WL 1265009, at *5 (N.D. Cal. Mar. 19, 2015). Indeed, rather than proposing a new technical significance to "reservoir," Dr. Abraham attempts to apply the stipulated construction of "single receptacle" and the patent's requirement of a reservoir with two chambers through their plain meanings.

Asetek also argues that, by characterizing the collection manifold in the copper cold plate as a separate receptacle, Dr. Abraham's construction of "reservoir" is inconsistent and narrower than the bounds of this court's claim construction. Docket No. 400 at 4, 6-8 (quoting *EMC Corp. v. Pure Storage, Inc.*, 154 F. Supp. 3d 81, 109 (D. Del. 2016) (citations omitted) ("'As expert testimony inconsistent with the Court's claim construction is unreliable and unhelpful to the finder

---

[2] Dr. Abraham notes that receptacle means "one that receives and contains something" under the Merriam-Webster Dictionary. Docket No. 420 at 4.

United States District Court
Northern District of California

1    of fact,' it should be excluded under the *Daubert* standard."); *see also Exergen Corp. v. Wal-Mart*

2    *Stores, Inc.*, 575 F.3d 1312, 1321 (Fed. Cir. 2009) (reversing jury finding of infringement in part

3    based on a statement to jury inconsistent with claim construction and holding that "[n]o party may

4    contradict the court's construction to a jury")).  Furthermore, Asetek argues that Dr. Abraham

5    applies a narrow construction of the term "reservoir" based on annotated screenshots of a Seidon

6    120V product from a different Asetek trial that he did not prepare, verify, or physically inspect.

7    Docket No. 400 4-7 (citing Ex. C ¶¶ 53-55).  In doing so, he introduced limitations such that "the

8    structure separating the two chambers is within the same single receptacle and divides such single

9    receptacle from within and into the two chambers within it" and that the "two chambers do not

10   have their own separate and separable [sic] enclosures . . . they depend on the single receptacle to

11   enclose them." *Id.*

12       CoolIT responds that it has a consistent position (derived from the jury verdict in the CMI

13   case) that the reservoir claimed in Asetek's patent is a single receptacle that is divided into an

14   upper chamber and lower chamber and is not infringed because CoolIT's products have two

15   separable receptacles.  Docket No. 420 at 3.  CoolIT again argues that Dr. Abraham merely applies

16   the stipulated constructions to the stipulated facts.  *See* Docket No. 420 at 11.  Asetek's

17   infringement theory requires that the lower chamber provide the thermal exchange function under

18   the parties' stipulation, and liquid is required for the thermal exchange function.  Docket No. 342

19   at 2.  Therefore, CoolIT argues that Asetek's theory requires that the copper plate device contain

20   liquid to satisfy this function.  Docket No. 420 at 6-7; Docket No. 420-4 at 49-54.

21       Asetek disputes CoolIT's statement that "there is virtually no space within [the lower

22   chamber of the H100i] . . . to provide the required thermal exchange function" because the

23   H100i's lower chamber extends above the cold plate and includes the plastic cavity.  Docket No.

24   450 at 4.  According to Asetek, the cold plate in the accused H100i device is not the only portion

25   of the lower chamber that contains volume/fluid and contributes to the thermal exchange function

26   of the lower chamber.  *Id.* at 3.  Asetek argues that the volume in the lower chamber in the H100i

27   is not just volume in the copper cold plate, but also includes the volume in the plastic housing

28   structure above the cold plate.  *Id.* at 4, 6 (citing Docket No. 400-5 (Ex. C, Dr. Abraham Rebuttal

United States District Court
Northern District of California

1   Report) ¶ 92 (referring to the copper cold plate/"heat exchanging interface" as only "part of the

2   lower chamber"); Docket No. 386-5 (Ex. 7, Dr. Tuckerman Report) ¶ 58, ¶ 275, ¶ 282).  Asetek

3   also points out that Dr. Tuckerman testified that the "lower chamber" is not just the copper cold

4   plate but includes other components above it.  *Id.* at 7 (figure depicting multiple components of

5   the lower chamber, not just the heat exchanging interface).  Asetek also argues that CoolIT's use

6   of the word "virtually no volume" in the H100i lower chamber other than in copper cold plate is a

7   tacit admission that there is, in fact, additional volume.  *Id.* at 5.  Furthermore, Asetek points out

8   that CoolIT's photos show grooves and spaces in the plastic portion of the lower chamber that

9   lines up with the structure of the cold plate such that when the unit (the plastic portion and the cold

10  plate) are assembled together, they form the interior of the lower chamber.  *Id.*



19  *Id.* (black plastic housing portion and the copper plate).

20      Asetek is correct; Dr. Tuckerman never stated that the cold plate is the *only* portion of the

21  lower chamber that contains fluid.  *See* Docket No. 386-5 (Ex. 7, Dr. Tuckerman Report).

22  Likewise, although Dr. Abraham identified the copper component for the fluid flow function, he

23  did not identify it as the *only* portion with this function.  *See* Docket No. 400-5 (Ex. C, Dr.

24  Abraham Rebuttal Report).  Therefore, while Dr. Abraham and Dr. Tuckerman identified other

25  components in the lower chamber above the cold plate, they did not specify that these other

26  components could not contain liquid.

27      Nevertheless, CoolIT's argument is not inconsistent with the parties' and the Court's

28  construction of a "reservoir."  *See Tesco Corp. v. Weatherford Int'l Inc.*, 750 F. Supp. 2d 780, 796

United States District Court
Northern District of California

1   (S.D. Tex. 2010) (merely presenting one interpretation of how the construction applies to the

2   accused products is permissible); *Arctic Cat Inc. v. Bombardier Recreational Prod., Inc.*, No. 14-

3   CV-62369, 2016 WL 9402395, at *7 (S.D. Fla. May 3, 2016), *vacated in part on other grounds*,

4   876 F.3d 1350 (Fed. Cir. 2017) ("Although it is improper to ignore the Court's constructions or to

5   utilize inconsistent constructions, it is appropriate for an expert to apply the Court's constructions,

6   . . . A dispute about the proper *application* of the Court's constructions is not grounds to exclude

7   [the expert's] opinions."); *Personalized User Model, L.L.P. v. Google Inc.*, No. CV 09-525-LPS,

8   2014 WL 807736, at *1–2 (D. Del. Feb. 27, 2014) (contrasting testimony clearly contradicting an

9   aspect of the claim language that the court had explicitly ruled upon in claim construction with

10  testimony applying the court's construction to the accused products, which was a factual dispute).

11  It is the "single receptacle" in the '362 patent that must contain the two chambers, as a "reservoir"

12  is a "single receptacle" containing an upper and a lower chamber, and a chamber is required to be

13  within the reservoir. *See* Docket Nos. 67, 104, 237, 258. Nothing in CoolIT's theory contradicts

14  or narrows the requirement that the upper and lower chambers are both within the "single

15  receptacle" that is also the "reservoir." And Dr. Abraham's reference to the Seidon 120V is

16  merely used as an example to illustrate his theory rather than introduce new limitations. As such,

17  Asetek's argument fails.

18          3.      The Nesting Doll Analogy

19          Asetek also argues that Dr. Abraham's interpretation of the reservoir was rejected by Judge

20  Tigar in another case. Docket No. 400 at 9-10. In the CMI case, CMI argued that prior art Ryu

21  (containing two spatially separable receptacles joined together) rendered Asetek's claims obvious

22  and that the accused products' sub-chamber within the lower chamber was a receptacle.

23  Therefore, according to CMI, the '362 was invalid, and the accused product did not infringe

24  because there was more than one receptacle within the reservoir. The jury found for Asetek on the

25  invalidity issue, reasoning that the '362 patent "differ[ed] from the prior art because they

26  combine[d] a "pump" and a "reservoir" "into a single unit" and because the "reservoir" is a 'single

27  receptacle that is divided into an upper chamber and a lower chamber.'" *CMI USA Inc.*, 852 F.3d

28  at 1357–58. In a subsequent motion for sanctions, CMI sought to raise judicial estoppel; however,

United States District Court
Northern District of California

15

1    Judge Tigar found that Asetek did not take a "clearly inconsistent" position with any position it

2    took at trial.  CMI case, Docket No. 426 at 6.  In doing so, he made the following nesting doll

3    analogy:

4              "[I]t could be that even if the copper subchamber is a receptacle, that
               would not change the fact that the reservoir is a single receptacle
5              divided into an upper chamber and lower chamber – the lower
               chamber would merely include or consist entirely of a smaller
6              receptacle or sub-chamber.  For example, nesting dolls contain many
               receptacles.  But the smaller dolls – or receptacles – do not affect
7              whether the biggest doll is a 'single receptacle'."

8    CMI case, Docket No. 426 at 6.  Asetek uses this analogy to argue that the smaller receptacles do

9    not affect the overall single receptacle, and therefore, Dr. Abraham's interpretation that a "single

10   receptacle" must have only one receptacle within it fails.[3]  Docket No. 400 at 9-10.

11        Asetek's argument fails.  Judge Tigar merely found that Asetek's argument was not

12   "clearly inconsistent" and raised the nesting doll theory only as an example.  *See* CMI case,

13   Docket No. 426 at 6.  Furthermore, CoolIT's theory does not clearly map to Judge Tigar's nesting

14   doll analogy because it argues that the smaller receptacles are not completely contained within the

15   larger receptacle, unlike a nesting doll.  Docket No. 420 at 15-16.  Whether the nesting doll

16   analogy may apply and whether it is appropriate to the facts of this case is a question of fact,

17   which fails for reasons discussed separately.

18        For the foregoing reasons, CoolIT's argument is not contrary to or narrower than the

19   parties' stipulated claim construction.

20             4.    "Comprising" Language

21        Asetek also unconvincingly argues that CoolIT's and Dr. Abraham's opinion that the

22   Tamriel has two receptacles fails because the word "comprising" is open-ended and must allow for

23   additional, unrecited elements (including additional receptacles) within an infringing device.  *See*

24   Docket No. 400 at 9; Docket No. 444-3 at 7 (citing *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495,

25   _____

26   [3] Previously, CoolIT had asked this Court leave to assert the defenses of collateral and judicial
     estoppel after learning of Asetek's inconsistent positions made during a hearing on Asetek's
27   motion for contempt sanctions in CMI.  *Asetek Danmark A/S v. CoolIT Sys. Inc.*, No. 19-CV-
     00410-EMC, 2022 WL 74160, at *1-*2 (N.D. Cal. Jan. 7, 2022).  The Court granted CoolIT's
28   motion, and barred Asetek from arguing that a reservoir encompasses multiple receptacles.  *Id.*
     Now, Asetek disputes CoolIT's attempt to take an inconsistent position.

United States District Court
Northern District of California

501 (Fed. Cir. 1997); *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1371–73 (Fed. Cir. 2005)).  However, to read "single" as "one or more" in an open-ended "comprising" patent would render the claimed singularity of the receptacle meaningless.  The Federal Circuit has previously explained that:

> [A]n indefinite article 'a' or 'an' in patent parlance carries the meaning of "one or more" in open-ended claims containing the transitional phrase 'comprising' . . . [and] [u]nless the claim is specific as to the number of elements, the article "a" receives a singular interpretation only in rare circumstances when the patentee evinces a clear intent to so limit the article.

*KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000).  Here, Asetek's argument fails because the claim is specific as to the number of elements.  Therefore, the word "comprising" would not, by itself, allow additional receptacles.

### 5.    Preferred Embodiments

Lastly, Asetek argues that defining "reservoir" to preclude smaller receptacles within it would exclude an analogous preferred embodiment of the '196 patent with internal components (such as an impeller cover and heat-exchanging interface) that would constitute smaller receptacles under Dr. Abraham's analysis.  Docket No. 444-3 at 9-10; No. 400 at 11.  The relevant preferred embodiment describes that an impeller cover is separable from the reservoir housing, is capable of holding or accommodating coolant, and defines a pump chamber.  *Id.*  As such, the preferred embodiment cannot practice the claimed invention.  Docket No. 400 at 11 (citing *Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir. 2013) ("[A] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct."); *accord Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007).  Asetek argues that the stipulated construction of "reservoir" applies equally to the '362, '196, and '601 patents.  Docket No. 444-3 at 10.

Although Asetek cites cases that generally state that claim interpretation cannot exclude a preferred embodiment and argues that the stipulated construction of "reservoir" applies to both the '362 and '196 patents, it has not cited any authority that would allow the Court to consider the preferred embodiments in a different patent in determining the issues of the '362 patent.  Thus,

United States District Court
Northern District of California

17

1   this argument fails.

2       For the foregoing reasons, the Court **DENIES** Asetek's motion to exclude Dr. Abraham's

3   opinions.

4   B.      Motion to Exclude Dr. Stein's Report (Docker No. 399)

5       One of the issues in this action is whether CoolIT's products, which have straight blades,

6   infringe the '362 patent, which requires "curved blades." Asetek relies on Dr. Stein's simulation

7   results to support its DOE theory against CoolIT devices: that the impeller blades in the accused

8   CoolIT products are substantially equivalent to an impeller with curved blades. In simulating the

9   performance and behavior of CoolIT's blades compared to curved blades and straight blades, Dr.

10  Stein did not test the blades in CoolIT's system but in a "generic" pump "to make sure that [he]

11  can evaluate the differences and similarities between the different blades." Docket No. 425 at 7.

12  CoolIT asks the Court to exclude Dr. Stein's report as irrelevant and unreliable. Because the

13  Court does not reach the DOE issue, this motion is dismissed as **MOOT**.

14  C.      Motion to Exclude Tuckerman Opinions (Docket No. 397)

15      CoolIT seeks to exclude Dr. David B. Tuckerman's opinions for various reasons set forth

16  below.

17      1.      Whether Dr. Tuckerman Wrote His Report

18      Rule 26 requires that an expert report be prepared and signed by the witness. Fed. R. Civ.

19  P. 26. However, an attorney may assist the expert in drafting the report:

20          Rule 26(a)(2)(B) does not preclude counsel from providing
            assistance to experts in preparing the reports, and indeed, with
21          experts such as automobile mechanics, this assistance may be
            needed. Nevertheless, the report, which is intended to set forth the
22          substance of the direct examination, should be written in a manner
            that reflects the testimony to be given by the witness and it must be
23          signed by the witness.

24  Fed. R. Civ. P. 26 Adv. Comm. Note (1993); *see also NetFuel, Inc. v. Cisco Sys. Inc.*, No. 5:18-

25  CV-02352-EJD, 2020 WL 1274985, at *3 (N.D. Cal. Mar. 17, 2020). "'[C]ounsel's composing of

26  initial drafts of reports based upon communications with the expert and allowing the expert to

27  substantively revise the report to reflect the expert's opinions, or counsel's drafting of the report

28  with the expert's substantive assistance' are permissible and do not warrant striking of the report."

United States District Court
Northern District of California

1   *Accentra Inc. v. Staples, Inc.*, No. CV 07-5862 ABC (RZX), 2010 WL 11459205, at *4 (C.D. Cal.

2   Oct. 7, 2010); *see also Seitz v. Envirotech Sys. Worldwide Inc.*, No. CIV. A. H-02-4782, 2008 WL

3   656513, at *2–3 (S.D. Tex. Mar. 6, 2008).

4          CoolIT argues that Dr. Tuckerman's opinion should be stricken in its entirety because the

5   totality of the circumstances suggests that he may not have prepared his report as required by Rule

6   26.  CoolIT points to the following facts to support its argument: (1) the first draft of the report

7   was written by Asetek, (2) Dr. Tuckerman did not identify his own obviousness grounds, (3) Dr.

8   Tuckerman's lack of familiarity and confusion regarding his report, (4) long response times (five

9   to ten minutes) in answering simple questions and merely reading his report into the record in

10  response to questions, and (5) the fact that the claim chart attached to his report recycles annotated

11  pictures from the declaration of Asetek's former expert, Dr. Tilton, and (6) Dr. Tuckerman's lack

12  of awareness that paragraphs 48 and 50 of his report were virtually verbatim copies of Dr. Tilton's

13  declaration.[4]  Docket No. 397 at 14, n.11.  Therefore, CoolIT argues that the expert report must be

14  excluded under *Numantics* because it was not written by Dr. Tuckerman.  Docket No. 443 at 10;

15  Docket No. 397 at 15 (citing *Numatics, Inc. v. Balluff, Inc.*, 66 F. Supp. 3d 934, 943, 45 (E.D.

16  Mich. 2014) ("Where an expert merely offers his client's opinion as his own, that opinion may be

17  excluded."  "[The expert's] complete lack of knowledge about the factors relevant to assessing

18  obviousness undermines [CoolIT's] assertion that [the expert's] conclusions are his own.")).

19         However, *Numatics* is inapposite.  The expert in *Numatics* adopted in entirety a report that

20  was written by counsel and only made "fairly minor" changes to it, even acknowledging that

21  "[h]ad he drafted the report, . . . it would not have consumed sixty-five pages [but had] boiled [it]

22  down to five pages after removing the legalness out of it."  *Numatics*, 66 F. Supp. 3d at 944

23  (quotation marks omitted).  In contrast, Dr. Tuckerman states that he made "a lot of changes" to

24  his report.  The fact that Asetek wrote Dr. Tuckerman's report does not bar the expert report under

25  Rule 26 as long as there was substantial involvement by the expert.  The *Accentra* court explained:

26              Rule 26 . . . contemplates "**some attorney involvement** in the
                preparation of any expert report," but "the expert must also
27

28  ───────────────
    [4] Asetek fails to provide support for Dr. Tuckerman's lack of awareness.

United States District Court
Northern District of California

substantially participate in the preparation of his report." This involvement can include counsel's paraphrasing of the expert's qualifications, counsel's providing "teamwork," "collaboration," or editorial assistance on the report, **counsel's composing of initial drafts of reports based upon communications with the expert and allowing the expert to substantively revise the report to reflect the expert's opinions, or counsel's drafting of the report with the expert's substantive assistance**[.]

**In *Seitz*, for example, attorneys created the initial drafts of expert** reports based upon the expert's substantive opinions communicated to counsel and, **after the initial drafts were created by counsel, the expert revised them by adding, deleting, and modifying content**. Similarly, in *Crowley*, **an attorney prepared an expert report based upon "substantial input" from the expert based on meetings the attorney had with the expert, which was permitted because Rule 26 does not "require that the expert be the person who actually puts pen to paper (or fingers to keyboard)."'**

An attorney cannot, however, simply draft the report without prior substantive input from an expert and ask the expert to approve and sign the report because that "would read the word 'prepared' completely out of the rule." Thus, an expert cannot simply "perus[e] the work product" of someone else and sign the bottom of the report because doing so creates "very little, if any, evidentiary value" in the expert's testimony. In *Weitz*, the expert report was excluded because the expert's assistant conducted the underlying research and created the expert report, and only afterward did the expert sign the report without changing any part of the report. *Id.*

*Accentra*, 2010 WL 11459205, at *4 (citations omitted); *see also Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*, 87 F. Supp. 3d 928, 949–50 (N.D. Cal. 2015) (declining to strike expert report even though counsel typed the report because the expert testified that the information in the report came from him)).

Although CoolIT's counsel created the initial draft, Dr. Tuckerman was involved in the expert report both prior to the first draft and significantly afterward, as he testified that "there was back and forth before . . . the first draft and lots of back and forth after the first draft" and that Asetek "created the report under [his] guidance." Docket No. 397-4 (Ex. 3, 12/22/21 Tuckerman Depo.) at 15:16-21; Docket No. 397-3 (Ex. 2, 12/20/21 Tuckerman Depo.) 146:23-147:6. Dr. Tuckerman also provided the following testimony:

Q: You wrote it; right?

A: I did.

. . . .

20

> [Asetek] wrote the first draft and I reviewed it very carefully . . . [B]ecause some of this is . . . legalese in terms of how things are said, and there are certain organizational ways. So I'm not highly knowledgeable on how these reports are to be organized and what's the best way to display information.
>
> So [Asetek] wrote the draft, I read it very carefully. I had numerous teleconferences with [Asetek]. . . . I gave changes that I requested either for clarity or for - - certainly for technical accuracy. And [Asetek] would make those changes and . . . we'd go back and forth. And so over a period of a few months, the report came together[.] . . .
>
> I can't say that every single word was chosen by me, but I absolutely agreed with the final product, every word in the final product.

Docket No. 397-3 (Ex. 2, 12/20/21 Tuckerman Depo.) at 144:14-145:17; *see also* Docket No. 397-4 (Ex. 3, 12/22/21 Tuckerman Depo.) at 15:1-10).

To the point that Dr. Tuckerman did not identify his own obviousness grounds[5], CoolIT fails to cite any cases stating that an expert is required to select the prior art for his expert report. Dr. Tuckerman also testified that he agreed that they would be legitimate prior art. Docket No. 397-3 (Ex. 2, 12/20/21 Tuckerman Depo.) at 167:22-169:18.

CoolIT seems to put great weight on the fact that Dr. Tuckerman conflates an expert declaration with the PTAB's FWD decision. However, this issue seems to stem from Dr. Tuckerman's confusion regarding the legality and significance of the document. During his deposition, he had difficulty remembering all the contents of the materials and was confused about the significance of the counsel's question. Docket No. 397-3 (Ex. 2) at 20:15-21:18 ("I need a couple minutes to refresh my memory . . . I saw a great many documents since this case began . . . I think this is a - - perhaps a legal technicality question - - whether this exhibit was incorporated in the PTAB's final written decision. I don't know whether it would be considered as such or not.").

Finally, CoolIT points out that a chart attached to Dr. Tuckerman's report includes Dr. Tilton's annotated pictures (from the invalidity claim chart) only with different colors and wording and that two paragraphs were "virtually verbatim copies of Dr. Tilton's declaration." However, Dr. Tuckerman did not merely copy and paste the annotated pictures from the invalidity claim

---

[5] Dr. Tuckerman was not involved in selecting the initial list of prior art for the invalidity contentions because he replaced another expert in the case.

1    – he made changes to the annotations to clarify their meaning. For example, he renames "the

2    plate" to "flow distributor," clarifies that "walls" are "microfins," and combines different pictures

3    in different parts of his report. *Compare* Docket No. 397-15 (Ex. 14, Dr. Tuckerman's Expert

4    Report) Chart III, at 1, 2, 3, 6 *with* Docket No. 397-16 (Ex. 15 Dr. Tilton's Expert Declaration in

5    IPR2020-00825) at 103, 104, 105, 117.

6         As for the two paragraphs that were copies of Dr. Tilton's declaration, Dr. Tuckerman

7    testified:

8              A: . . . [W]hen something is true and correct and technically correct,
               you know, I don't feel the need to change around the words. You
9              know, if I was publishing a paper, you know, then issues of
               permission might be relevant. But when I'm just stating a truth --
10             and let me be very clear, I'm not relying on Dr. Tilton's opinions. I
               think Dr. Tilton is correct, but these are – these are exactly my own
11             opinion on the subject because they're manifestly and obviously true
               physical facts . . .
12

13   Ex. 3 at 29:7-31:17 (emphasis added; objections omitted).

14        CoolIT cites a case that excluded an expert witness's testimony because "undeniable

15   substantial similarities between [the expert's] report and the report of another expert prepared with

16   assistance from the same counsel in an unrelated case, demonstrate that counsel's participation so

17   exceeded the bounds of legitimate 'assistance' as to negate the possibility that [the expert] actually

18   prepared his own report[.]" *In re Jackson Nat. Life Ins. Co. Premium Litig.*, No. 96-MD-1122,

19   2000 WL 33654070, at *1 (W.D. Mich. Feb. 8, 2000); *Numatics*, 66 F. Supp. 3d at 943. However,

20   two paragraphs within two reports totaling 200 pages in length do not "demonstrate that counsel's

21   participation so exceeded the bounds of legitimate 'assistance' as to negate the possibility that [Dr.

22   Tuckerman] actually prepared his own report within the meaning of Rule 26(a)(2)." *Id.* Mere

23   failure to properly cite the source of the contents in these paragraphs does not suggest that his

24   expert report as a whole is not his own. As such, CoolIT's attempt to exclude Dr. Tuckerman's

25   opinion in its entirety is unconvincing.

26        2.    Dr. Tuckerman's Opinion on Non-Infringing Alternatives

27        Dr. Tuckerman opines that Asetek's Gen 3 and Cooler Master products are acceptable non-

28   infringing alternatives. According to CoolIT, this opinion fails because he admitted at deposition

United States District Court
Northern District of California

22

that he was "[n]ot at all" familiar with the Asetek Gen 3 product and that he never inspected or conducted performance testing on the Cooler Master product. Docket No. 397 at 16 (citing Docket No. 397-4 (Ex. 3 12/22/21 Tuckerman Depo.) at 79:22-80:6; Docket No. 397-6 (Ex. 5 3/18/22 Tuckerman Depo.) at 67:2-11). As such, Dr. Tuckerman has no independent basis for assessing whether the thermal performance of these products would be acceptable to Asetek customers, let alone that these products do not infringe the Asserted CoolIT Patents. *Id.* at 17 (citing *Acceleration Bay LLC v. Activision Blizzard Inc.*, No. 1:16-CV-00453-RGA, 2019 WL 4194060, at *8 (D. Del. Sept. 4, 2019) ("It is undisputed that none of its technical experts have opined that the earlier games are non-infringing. Thus, the only support for the conclusion that the earlier versions of the games are non-infringing alternative is [the expert's] assumption.")). Asetek responds that Dr. Tuckerman did not have to inspect these products to opine on them because he relied on Asetek's and CoolIT's documents and CoolIT's own expert opinions. Docket No. 422 at 17.

Regarding the acceptability of the Gen 3 product, Asetek's statement that it will "have the CEO of Asetek, Andre Eriksen, testify about [the acceptability of a non-split glow design similar to the Gen 3] (not Dr. Tuckerman)" is insufficient. Docket No. 422 at 18. Furthermore, Dr. Tuckerman's single source (Dr. Abraham's admission that the Asetek Gen 3 has non-split flow designs) is not disclosed in the "Materials Considered" list of Dr. Tuckerman's report. Docket No. 443 at 9. Asetek's attempt to push the acceptability issue to Mr. Eriksen and Dr. Abraham fails because he cannot simply delegate to another his opinion on whether the noninfringing alternative would be acceptable to the customers.

Regarding the acceptability of the Cooler Master product, Dr. Tuckerman relies on CoolIT's competitive analysis, which states that Cooler Master is a competitor to CoolIT and Asetek with superior performance to that of CoolIT's split flow design and acceptable to customers. Docket No. 422 at 19 ("[Cooler Master's] 'thermal resistance . . . is better than the comparable [CoolIT product] . . . [Cooler Master] is a meaningful competitor to Asetek and CoolIT/Corsair's desktop liquid cooling products.' It is, therefore, reasonable to infer that the thermal performance of the non-split flow Cooler Master product is acceptable to customers of

United States District Court
Northern District of California

1    desktop liquid cooling products." (citing Docket No. 395-6, ¶ 84)); *see also* Ex. C at 71:6-72:17

2    (CoolIT document stating that there "is a nonsplit-flow design that is performing comparable to

3    other split-flow designs, and given that, [] it would seem to be a perfectly acceptable option for

4    customers.")).  Dr. Tuckerman's reliance on CoolIT's and Asetek's documents and counsel for the

5    fact that the Cooler Master product does not have split flow designs is not improper, as experts

6    may rely on factual representations by the parties.[6]  However, although CoolIT's competitive

7    analysis identifies Cooler Master as a competitor with thermal performance superior to that of

8    CoolIT's split flow design, the mere fact that thermal performance is superior does not, by itself,

9    answer the question of acceptability to Asetek customers.[7]  *See* Docket No. 422; *Webasto Thermo*

10   *& Comfort N. Am., Inc. v. BesTop, Inc.*, No. 16-CV-13456, 2019 WL 3334563, at *6 (E.D. Mich.

11   July 25, 2019) ("any opinion that the proposed design would provide all the same benefits of the

12   [patent] and would be an acceptable alternative to consumers would involve explaining to a jury

13   what consumers valued in the [patent] and why and how the alleged proposed alternative design-

14   around satisfied those customer preferences and demands").  That the Cooler Master product is a

15   "meaningful competitor" merely because "they are going after the same market" also does not

16   answer the question of acceptability to Asetek customers.  Docket No. 422 at 19.  As such, Dr.

17   Tuckerman's opinion lacks a basis sufficient to satisfy *Daubert*.

18        For the foregoing reasons, the Court **GRANTS** CoolIT's motion to exclude Dr.

19   Tuckerman's opinions regarding noninfringing alternatives.

20        3.    Dr. Tuckerman's Opinions on Impeller Blades

21        The '362 patent claims an impeller having curved blades.  Docket No. 397 at 17.  CoolIT

22   ask the Court to exclude Dr. Tuckerman's opinions regarding the impeller blades because he (1)

23

24   _____

     [6] For the noninfringement issue, Asetek points out that a non-split flow design is undisputedly a
25   noninfringing design around, that CoolIT's own expert admitted that the Asetek Gen 3 has non-
     split flow designs, and that CoolIT's own analysis and witness states that the Cooler Master
26   product has non-split flow designs and therefore do not infringe.  Docket No. 422 at 18 (citing Ex.
     E, F, G).
27
     [7] CoolIT points out that the document Dr. Tuckerman relies on actually shows that the Cooler
28   Master product has worse performance than Asetek's Gen 7 product.  But this is not a question of
     admissibility.

                                          24

conflates "curved" blades with "non-radial" blades that include non-curved blades and (2) his

multiple definitions of "radial" blades are unreliable.  Because the Court does not reach the DOE

issue, this motion is dismissed as **MOOT**.

### 4.    Dr. Tuckerman's Opinions on Microchannels

Parties dispute the measured distance between the adjacent fins of the *Antarctica* prior art

to argue whether *Antarctica* has "microchannels" that are required to be less than 1mm.  Dr.

Pokharna's invalidity rebuttal report provides his methodology (*i.e.*, using electronic vernier

calipers) and data showing that the *Antarctica* sample's channel widths exceed 1.0mm.  Docket

No. 389-5 (Ex. 4, Pokharna Reb. Rep.)  ¶¶ 72-74.  On the other hand, Dr. Tuckerman argues that

the adjacent fins are spaced about 0.9–1.0mm apart but does not disclose his methodology in his

report.  Docket No. 397-2 (Ex. 1, Tuckerman Rep.) ¶ 57.  In the report, Dr. Tuckerman simply

states that he relied both on his personal measurements and the testimony of Mr. Eriksen.  *Id.*;

Docket No. 443 at 3.  It was later in his depositions on December 20, 2021 that Dr. Tuckerman

discussed his methodology, that the channel width was measured using calipers at the base of the

microchannels as follows:

> I used . . . calipers to measure the fins at the base which is where I
> felt the most relevant dimension was because the base of the fins is
> where the most heat transfer occurs.  As fins -- you go up in fin
> height, they become less effective.  And so to me, the base was the
> relevant dimension to measure it at.  And I got readings, . . . between
> [0.9] and 1.0[.]

Docket No. 422-3 (Ex. A, 12/20/21 Tuckerman Depo.) at 137:9-138:13.

Dr. Pokharna later emphasized the unreliability of such methods because "at the base it is

fraught with most errors and . . . inconsistencies" because "there is a possibility of making a

measurement that is smaller than the tool that was used to create that gap" that is "clearly

inconsistent and not really representative of the gap."  Docket No. 443-2 (Ex. 23 1/10/2022

Pokharna Dep.) at 118:13-122-21.  At the second supplemental deposition on March 18, 2022, Dr.

Tuckerman further testified that he "put calipers at the bottoms of the grooves, which is where

they would be narrowest -- that's the way the machining works -- and looked . . . to see if any

exceeded a millimeter, and they didn't."  Docket No. 422-4 (Ex. B, 3/10/22 Tuckerman Depo.) at

United States District Court
Northern District of California

8:23-9:12.

a.  Rule 26 and Scope of Dr. Tuckerman's Testimony

Rule 26 requires expert reports to be a "complete statement of all opinions the witness will express and the basis and reasons for them" inclusive of "the facts or data considered by the witness forming them[.]" Fed. R. Civ. Proc. 26(a)(2)(B). "[S]ubsequently-given deposition testimony is not a substitution for adequate disclosure in the expert's original report." *Asetek Danmark A/S v. CMI USA, Inc.*, No. 13-CV-00457-JST, 2014 WL 6997670, at *1 n.1 (N.D. Cal. Dec. 9, 2014); *accord Foshee v. Zuniga*, No. 20-CV-00132-VKD, 2021 WL 1947560, at *8 (N.D. Cal. May 14, 2021). Failure under Rule 26(a) may result in exclusion "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Asetek argues that the additional disclosure regarding his methodology at his deposition merely elaborates his report and that CoolIT has not shown any harm from the belated explanation of his methodology. Docket No. 422 at 5-6. CoolIT points out that a deficient expert report cannot be cured through subsequent depositions. Docket No. 443 at 6. CoolIT argues that Dr. Tuckerman's failure to provide his methodology resulted in its inability to independently test and opine on the reliability of Dr. Tuckerman's opinion and methodology. *Id.* at 7. CoolIT cites various cases in which expert opinions were excluded for violating Rule 26. Docket No. 443 at 5-6 (citing *Salgado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998) ("Expert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions."); *Alvarado v. FedEx Corp.*, No. C 03-2659 SI, 2006 WL 1761276, at *3–4 (N.D. Cal. June 27, 2006); *Atmel Corp. v. Info. Storage Devices, Inc.*, 189 F.R.D. 410, 411–12, 416 (N.D. Cal. 1999)).

CoolIT's cases are generally inapposite. Several of them were precluded because the late disclosure came on the eve of trial, was produced almost two years after the close of discovery or was solicited by counsel on redirect rather than as responses to questions by the opposing counsel. *CMI USA, Inc.*, 2014 WL 6997670, at *2; *Foshee*, 2021 WL 1947560, at *8; *Edwards Lifesciences Corp. v. Meril Life Scis. Pvt. Ltd.*, No. 19-CV-06593-HSG, 2022 WL 254348, at *7 (N.D. Cal. Jan. 27, 2022). *Atmel* is inapposite because the court declined to find the expert

report's inadequate methodology harmless because it "reflect[ed] deliberate litigation tactics, not an inadvertent oversight or an excusable lapse." *Atmel Corp.*, 189 F.R.D. at 410–12 ("Atmel's expert decided, at counsel's direction, to sit back and wait to see what the other side came up with and then rebut that limited universe."). In *Alvarado*, the plaintiff provided new opinions that were previously available in an affidavit after his deposition. *Alvarado*, 2006 WL 1761276, at *3–4 ("Throughout this litigation, plaintiffs' counsel have repeatedly displayed a flagrant disregard for the Federal Rules of Civil Procedure and the Local Rules of this Court. The Court will not permit such behavior[.]").

Here, Dr. Tuckerman's initial failure explicitly to discuss his methodology does not appear to be such gamesmanship, and CoolIT does not claim that new depositions are warranted. Furthermore, Dr. Pokharna has already addressed the reliability of Dr. Tuckerman's methodology in his deposition. CoolIT had more than two months between the initial and supplemental depositions, and there is almost a year between the depositions and trial. In addition, CoolIT had the opportunity to provide competing expert opinions on the matter, as CoolIT served its own expert report providing competing measurements. Therefore, Dr. Tuckerman's failure to disclose his measuring method in his report seems to be an unintentional and harmless omission that has already been remedied. Because the omission was harmless, the exclusion of Dr. Tuckerman's opinion is not warranted under Rule 37(c)(1).

### b.    Reliability

As for CoolIT's challenge of Dr. Tuckerman's methodology as unreliable, Asetek points out that CoolIT's own expert used the same methodology – i.e., measuring the microchannels with calipers. Docket No. 422 at 4. The only difference is that Dr. Pokharna measured at the top of the channels, whereas Dr. Tuckerman measured at the base. CoolIT has not specifically identified why this location would constitute an issue of fundamental methodology rather than a mere difference in choice between the two experts. Furthermore, although Asetek argues that Dr. Tuckerman failed to record any of his measurements, this fact "go[es] to the weight and the credibility of his opinion, not its admissibility." *Godo Kaisha IP Bridge 1 v. Broadcom Ltd.*, No. 2:16-CV-134-JRG-RSP, 2017 WL 2839492, at *1–2 (E.D. Tex. Apr. 20, 2017) ("None of

United States District Court
Northern District of California

[CoolIT's] criticisms calls for the exclusion of [the expert's] opinion . . . [CoolIT] allege[s] that [the expert] does not show his work . . . [and] used . . . images[] that are not in his report.  Even if true, these criticisms either go to the weight and credibility of his opinion, not its admissibility.")).

For the foregoing reasons, the Court **DENIES** CoolIT's *Daubert* motion to exclude Dr. Tuckerman's opinion regarding the microchannels.

D.    Motion to Strike Exhibit 275 (Docket No. 389)

CoolIT also seeks to strike Exhibit 275, a picture of the machining document for the *Antarctica* device, used to corroborate Dr. Tuckerman's opinion that the adjacent fins measured less than 1.0mm.  Asetek produced Exhibit 275 for the first time during redirect at Dr. Tuckerman's deposition on December 21, 2021.  Docket No. 389 at 1.  CoolIT seeks to strike exhibit 275 and any opinions based thereon.  *Id.*

Dr. Tuckerman admitted in his deposition that Asetek's counsel provided him with Exhibit 275 and that it showed "blades that they say they used with calipers measuring that blade." 12/21/21 Tuckerman Dep. at 138:17-20, 139:15-18.  This image includes a photo of blades, a caliper measuring 0.93mm, and a piece of paper in Danish.  Docket No. 431-3 (Exhibit 275); Docket No. 389 at 2.  The image includes a string of numbers and letters that Asetek claims is a "legend" in English.  Exhibit 275; Docket No. 389 at 4.

Dr. Tuckerman did not personally review or inspect these blades, the measuring tool, or the document shown (Dr. Tuckerman does not know how to read Danish), nor ask anyone at Asetek what the materials depicted were.  *See* Docket No. 389-6 (Ex. 5, 12/22/21 Tuckerman Depo.) at 13:1-13; Docket No. 389-4 (Ex. 3, 3/10/22 Tuckerman Depo.) at 18:22-19:2, 22:4-16, 24:20-25. He did not independently measure the blade's thickness.  Docket No. 389-4 (Ex. 3, 3/10/22 Tuckerman Depo.) at 20:25-23:7.  Instead, he just received the *Antarctica* sample from counsel. *See* Docket No. 389-3 (Ex. 2, 12/20/21 Tuckerman Depo.) at 141:16-142:8, Docket No. 389-4 (Ex. 3, 3/10/22 Tuckerman Depo.) at 25:4-6.  CoolIT argues that Asetek was obligated to produce Exhibit 275 during fact discovery and that Exhibit 275 is hearsay.

1.    Rule 26

CoolIT argues that it had requested all documents concerning the alleged *Antarctica* prior

art product. Therefore, Asetek was obligated to produce Exhibit 275 during fact discovery at least by CoolIT's Requests for Production Nos. 99[8] and 102[9], and Asetek agreed to produce responsive documents. Docket No. 389 at 4, 6. CoolIT argues that such late disclosure four months after the close of fact discovery during a redirect examination resulted in prejudice. CoolIT points out that they had no opportunity to seek discovery related to Exhibit 275 or provide expert testimony related to the image. *Id.* According to CoolIT, Exhibit 275 is not simply an omitted piece of evidence to Dr. Tuckerman's Invalidity Report but a product of attorney argument. *Id.* at 5.

According to Asetek, they have fulfilled all their discovery obligations because CoolIT requested documents related to the *structure* of the *Antarctica* device, not documents related to the *tools* used to manufacture the product. Docket No. 414 at 1. Furthermore, Asetek argues that this delayed production was substantially justified and harmless. *Id.* at 1, 7; Fed. R. Civ. P. 37(c)(1) (information may be introduced if the parties' failure to disclose the required information is substantially justified or harmless).

Asetek argues that the delayed production of Exhibit 275 is substantially justified because it was a response to criticisms articulated for the first time in CoolIT's expert's rebuttal report. *See* Docket No. 414 at 1. CoolIT responds that Asetek may not introduce new opinions or evidence, regardless. Docket No. 432 at 5; *see Cave Consulting Grp., Inc. v. OptumInsight, Inc.*, No. 15-CV-03424-JCS, 2018 WL 1938555, at *4 (N.D. Cal. Apr. 25, 2018) (experts may not, when rebutting critiques of their opinions, "present new opinions, arguments, or evidence as

---

[8] Request for Production No. 99 recites "All Documents concerning the *Antarctica* 'Water Chill' Liquid Cooling Kit as it existed before August 9, 2007" and Request for Production No. 102 recites "All Documents concerning the design, structure, and operation of the *Antarctica* 'Water Chill' Liquid Cooling Kit as it existed before August 9, 2007, including but not limited to user manuals, installation manuals, technical manuals, specifications, engineering drawings, and other documentation." CoolIT's RFP No. 99 sought all documents concerning the *Antarctica* device as it existed before August 9, 2007. *See* Docket No. 389-7 (CoolIT's RFP) at 2. Asetek objected to this request for "all documents" as overbroad, unduly burdensome and vague, but agreed to produce specific categories of documents related to the device in response to other RFPs. Docket No. 389-8 (Asetek's objections and responses to CoolIT's RFP) at 3.

[9] CoolIT's RFP No. 102 similarly sought all documents concerning the design, structure, and operation of the *Antarctica* device as it existed before August 9, 2007. Docket No. 389-7 at 2. Asetek again objected to this request for "all documents" as overbroad, unduly burdensome, and vague, but agreed to conduct a reasonable search for documents sufficient to show the structure of the *Antarctica* device. Docket No. 389-8 at 5.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    alternatives to opinions, arguments, or evidence that [the rebuttal experts] criticized").  According

2    to CoolIT, the exhibit constitutes a new opinion because the experts opined on the actual channels

3    of the *Antarctica* sample rather than the machining tool.  Docket No. 432 at 5.  However, it is not;

4    Dr. Tuckerman's reliance on Exhibit 275 is just another method to corroborate his *initial* opinion

5    that the microchannel is spaced less than 1 mm apart.  As such, Dr. Tuckerman did not articulate

6    any new opinions or invalidity theories in connection with Exhibit 275.

7         Furthermore, Dr. Tuckerman could not have anticipated that his methodology would be

8    criticized.  *Cave Consulting*, 2018 WL 1938555, at *4 (""[E]xperts may . . . testify at their

9    depositions regarding not only the subject matter of their initial reports but also any critiques of

10   their opinions presented in the rebuttal reports . . . [T]rue rebuttal to criticism is permitted—facts

11   and opinions that should have been in the original reports are not.").  Dr. Pokharna's expert notes

12   that Dr. Tuckerman cites deposition testimony from Mr. Erikson, the inventor of the patents,

13   which states that the channel widths are between 06. to 0.8 mm, yet no evidence corroborated this

14   testimony.  Docket No. 389-5 (Dr. Pokharna Expert Report).  As a direct response to this criticism

15   that no corroborating evidence exists, Dr. Tuckerman sought evidence that could corroborate his

16   and Mr. Erikson's representation that the channel width is less than 1 mm.  *Id.*  As such, Exhibit

17   275 does not appear to be a new opinion but a permissible true rebuttal to criticism.

18        In addition, there was no meaningful harm to CoolIT.  CoolIT argues that they were

19   harmed because they were unable to seek fact discovery.  *See* Docket No. 431-2 at 9-10 (citing

20   *Balt. Baltimore Aircoil Co., Inc. v. SPX Cooling Techs. Inc.*, No. CV CCB-13-2053, 2016 WL

21   4426681, at *18–19 (D. Md. Aug. 22, 2016), *aff'd,* 721 F. App'x 983 (Fed. Cir. 2018).  CoolIT

22   argues that Asetek did not bother to provide CoolIT Exhibit 275 prior to Dr. Tuckerman's

23   deposition on December 21, 2021, and that they should have been afforded an English translation

24   of the document, an opportunity to seek discovery on the other documents in the binder and any

25   related documents,[10] the opportunity to inspect the machining tool, blades and the measuring tool,

26   and the opportunity to depose the Asetek employee who made the alleged measurement.  *See id.*

27

28   _____

[10] It is not clear from Exhibit 275 that there is a binder related to the document.

There is some prejudice because CoolIT did not have the chance for fact discovery regarding the untranslated document. *See* Docket No. 431-2 at 9. Nevertheless, CoolIT had months to consider Exhibit 275 and had multiple opportunities to address it. CoolIT's counsel initially did not follow up on Exhibit 275. Docket No. 414 at 5-6. Then two weeks later, in Dr. Pokharna's deposition, Dr. Pokharna offered his view that it was physically impossible to make something 0.9 mm wide using a 0.93 mm tool. *Id.* Judge Beeler granted CoolIT additional two hours of deposition time with Dr. Tuckerman, during which he defended his position that it was possible to get a narrower product using the tool. *Id.* Therefore, CoolIT questioned Dr. Tuckerman regarding this exhibit in his March deposition three months after the exhibit was produced, and CoolIT's expert also addressed the exhibit in his own deposition. *Id.* at 2. There are also still more than six months until the trial. As such, the delay is harmless, and Exhibit 275 need not be excluded under Fed. R. Civ. Proc. 26 and 37(c)(1). Nonetheless, Exhibit 275 is excluded on hearsay grounds.

        2.    <u>Hearsay</u>

According to CoolIT, Exhibit 275 must be excluded because it constitutes double hearsay and is not of a type reasonably relied upon by experts in the field as required by *Daubert* and Rule 703, especially when it was never translated, and the expert is unable to read the document. Docket No. 443 at 7-8 (citing *Tubular Rollers, LLC v. Maximus Oilfield Prod., LLC*, No. 4:19-CV-03113, 2021 WL 5991744, at *1–2 (S.D. Tex. Dec. 16, 2021) (excluding expert opinions grounded in double hearsay)); Docket No. 431-2 at 9.

Asetek argues that Dr. Tuckerman identified the English portions of the image as a "legend," but the word "legend" is not used by Dr. Tuckerman. Dr. Tuckerman merely used these numbers and letters and deduced their significance. *See* Docket No. 389-3 at 261:20-264:15. Furthermore, although Asetek contends that Dr. Tuckerman could read portions of the exhibit because the box labeling was in English, the relevant portion is a truncated string of numbers and letters that read: "317 KEYW . . . . 25 50X1x1 . . ." *See* Exhibit 275; Docket No. 414 at 12; Docket No. 414-4 (Ex. B, 3/18/22 Tuckerman Depo.) at 89:24-94:15. Dr. Tuckerman testified:

        A. **It's my understanding that [Exhibit 275] Asetek's assertion**

United States District Court
Northern District of California

1

> **that this is the blade that was used to cut the microchannels**, and
> it is evident from the picture that it had a [thickness] of 0.93
> millimeters, which . . . Asetek asserts that that box contains, I
> believe, the saw blades. And [from] the labeling on the box, I am a
> making an **inference from the 50-by-1-by-13**, that the 50 is
> **probably a blade diameter**, and the 1 refers to the thick -- the
> nominal thickness of the cut that it's supposed to make. In other
> words, you know, if you're trying to make a nominal 1-millimeter
> cut, you're going to use a blade that is thinner than that because
> there's what's called a kerf width that you always get when you cut.
> So it always -- you always end up with a groove that's a little larger
> than your blade. But that blade would be consistent with the kind of
> channels I saw on *Antarctica*.

2

3

4

5

6

7

8  Docket No. 389-3 at 261:20-264:15.

9          Asetek argues that a knowledgeable Asetek witness will establish the foundation and

10  admissibility of Exhibit 275 at trial and that Rule 703 allows experts to assume the truth of facts

11  and hypotheticals in their opinions. Docket No. 414 at 14; Docket No. 422 at 10. Asetek also

12  argues that because Dr. Tuckerman may base his expert opinions on hearsay if experts in the

13  particular field would reasonably rely on them in forming an opinion under Rule 703, he did not

14  have to personally inspect the blades and could assume that the blades in Exhibit 275 were used to

15  cut the channels of the *Antarctica* device. Docket No. 422 at 9. Finally, Asetek also argues that

16  any doubt on Exhibit 275's reliance goes to the weight of the evidence rather than admissibility.

17  *Id.* at 15.

18          "[D]ata relied on by the expert 'need not be admissible for the opinion to be admitted' if

19  experts in the field would reasonably rely on such data." *Power Integrations, Inc. v. Fairchild*

20  *Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1373 (Fed. Cir. 2013) (quoting Fed. R. Evid. 703).

21  However, this does not mean that an expert may base his opinions on any evidence, and "[t]he trial

22  judge must have considerable leeway in deciding how to determine whether the expert's testimony

23  is sufficiently reliable." *Id.* (quoting *Kumho Tire Co.*, 526 U.S. at 152). In addition, the Federal

24  Circuit noted that "Rule 703 does not make admissible otherwise inadmissible evidence":

25              [A]lthough Rule 703 "permit[ted] experts some leeway" in basing
               their opinions on inadmissible evidence, "a party cannot call an
26              expert simply as a conduit for introducing hearsay under the guise
               that the testifying expert used the hearsay as the basis of his
27              testimony." Rather, the court explained, "[t]he appropriate way to
               adduce factual details of specific past events is, where possible,
28              through persons who witnessed those events."

United States District Court
Northern District of California

> Rule 703 was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion.

*Wi-LAN Inc. v. Sharp Elecs. Corp.*, 992 F.3d 1366, 1375 (Fed. Cir. 2021) (quotation marks and citations omitted). In *Wi-LAN Inc.*, the Federal Circuit found that evidence "could not be admitted under Rule 703 because it was not authenticated and, as a result, [the plaintiff] was attempting to use Rule 703 as a "'backdoor' to allow the admission into evidence of otherwise inadmissible declarations and other materials simply because they might assist the jury's evaluation of an expert's opinions." *Id.* The Federal Circuit also held that the expert's testimony relying on the inadmissible evidence was also inadmissible because the plaintiff failed to establish that experts in the field "reasonably rely on" the unauthenticated source code. *Id.* at 1376 ("[I]t is the judge who makes the determination of reasonable reliance, and ... for the judge to make the factual determination under Rule 104(a) that an expert is basing his or her opinion on a type of data *reasonably* relied upon by experts, the judge must conduct an independent evaluation into reasonableness.").

In *Tubular Roller*, the defendant disputed an expert's reliance on information that was provided to him by a person who never saw the product but watched a video and later passed what he gleaned from the video to the expert. *Tubular Rollers, LLC v. Maximus Oilfield Prod., LLC*, No. 4:19-CV-03113, 2021 WL 5991744, at *1 (S.D. Tex. Dec. 16, 2021). The court explained:

> Rule 703 contemplates that an expert can rely on hearsay or other inadmissible facts or data. This Court has not found any authority— nor has it been cited to any authority—that an expert can reasonably rely on double hearsay relayed to him/her by an employee of a party with a vested interest in the outcome of the case.
> . . .
>
> Neither party has suggested that this kind of hearsay is the kind of information that engineers normally rely upon while performing their day jobs. The Court, therefore, excludes all evidence based solely upon Dr. Wooley's reliance on Henkes' viewing of a video purporting to be Maximus' product. It might be a different story if Dr. Wooley had actually taken the trouble to view the film himself but relying on a third person to watch the video and tell him what was in it goes way beyond the boundaries of Federal Rule of Evidence 703.

United States District Court
Northern District of California

*Id.* at *1-*2.

Likewise, Dr. Tuckerman's reliance on inadmissible double hearsay is, in this instance, improper. Asetek's vague representation that an Asetek witness will lay out the foundation and admissibility of Exhibit 275 at trial is insufficient. This is especially true when Dr. Tuckerman does not rely on Exhibit 275 for forming his own opinions but merely "corroborates" his own theory with an unidentified person's work without any analysis. Whether a specific device measured 0.93mm is not a fact that experts would reasonably rely on in the field. Furthermore, it is especially improper for Dr. Tuckerman to rely on another person's measurement when the expert opinion is the measurement itself rather than a fact he relies on. Therefore, Asetek's attempt to use the photo as corroborating evidence is an **attempt to adopt the hearsay document itself as expert opinion**. Although Dr. Tuckerman relies on Exhibit 275 in his testimony, he did not (and would not be able to) establish Exhibit 275 as a reliable authority because he was simply given the document by Asetek's counsel and does not know where the document came from and who took the photo.

Accordingly, the Court **GRANTS** CoolIT's motion to strike Exhibit 275.

E.    Motion to Strike Tuckerman Report (Docket No. 401)

Patent Local Rule 3–3(b) requires that the party opposing patent infringement and asserting invalidity identify "[w]hether each item of prior art anticipates each asserted claim or renders it obvious." Patent L.R. 3–3(b). Patent Local Rule 3–3(c) requires invalidity contentions to include "an identification of any combinations of prior art showing obviousness." The party must include "[a] chart identifying where specifically in each alleged item of prior art each element of each asserted claim is found[.]" Patent L.R. 3–3(c). CoolIT seeks to strike allegedly new invalidity theories in Dr. Tuckerman's Invalidity Report and assertion of a reference that is estopped. Docket No. 401 at 2.

1.    Belated Disclosure of a New Theory

According to CoolIT, Dr. Tuckerman's Invalidity Report now includes a new invalidity theory that a POSITA could have modified *Antarctica*'s heat spreader plate to form microchannels and separated the alleged "housing" and "plate" regions to insert a seal in between. *Id.*; Docket

34

No. 433 at 2. Defendants accuse Dr. Tuckerman of attempting to assert these new theories after realizing that *Antarctica*'s channel widths exceed 1 millimeter. Docket No. 433 at 4. The Court considers whether Dr. Tuckerman's opinion is an impermissible new obviousness theory or "permissible specifications of [a] previously disclosed theor[y.]" Docket No. 433 at 4-5 (quoting *Finjan, Inc. v. Sophos, Inc.*, No. 14-CV-01197-WHO, 2016 WL 2988834, at *13 (N.D. Cal. May 24, 2016)).

a.  Microchannel

Asetek argues that Dr. Tuckerman's Invalidity Report does not raise new invalidity theories because Asetek had already disclosed that *Antarctica* has microchannels in its obviousness claim charts, in line with Dr. Tuckerman's opinion that *Antarctica* has microchannels. *See, e.g.,* Docket No. 401-3 at 2; Docket No. 401-4 at 2; Docket No. 401-5 at 1; Docket No. 401-6 at 1.

Asetek primarily relies on *Fujifilm Corp. v. Motorola Mobility LLC*, No. 12-CV-03587-WHO, 2015 WL 757575, at *31 (N.D. Cal. Feb. 20, 2015) to argue that the Patent Local Rules do not require an explanation of motivation. However, this case is inapposite. In *Fujifilm*, Motorola's expert reports included explanations of motivation to combine that were significantly different from those that were previously disclosed. *See id.* However, Motorola argued that "the Patent Local Rules do not require the disclosure of motivations to combine, so long as the accused infringer's invalidity contentions include otherwise adequate explanations of why the relevant prior art references render the asserted claims obvious." *Id.* The court noted that the prior local rule required the disclosure of the motivation to combine, but the then current rule does not have this requirement. *Id.* at *32. Therefore, Fujifilm failed to show that "the undisclosed motivations to combine it seeks to strike constitute new invalidity theories, as opposed to more specific articulations of previously disclosed ones." *Id.*

Unlike Motorola, Asetek did not identify the microchannels as an obviousness theory. Although the entire claim chart contains the heading: "Anticipated by *Antarctica* or obvious in view of *Antarctica*," there is no indication that microchannels will be considered under an obviousness theory. In contrast, other obviousness theories are clearly indicated. For example,

Asetek's obviousness theory that if the housing and the plate in *Antarctica* were "not connected, it also would have been obvious to provide a gasket [i.e., a seal] between the plate and the housing [of *Antarctica*] to seal the inlet and outlet openings and prevent short-circuiting of the fluid" is clearly stated in the invalidity contentions. Docket No. 401-3 at 5, 8-9, 11; Docket No. 401-4 at 9, 20, 29; Docket No. 401-5 at 2; Docket No. 401-6 at 14. Because Asetek had not disclosed this obviousness theory regarding the microchannel in its invalidity contentions, Dr. Tuckerman's obviousness theory that *Antarctica* could have been modified to form microchannels constitutes an impermissible new theory. *Illumina, Inc. v. BGI Genomics Co.*, 559 F. Supp. 3d 1072, 1078 (N.D. Cal. 2021) ("a party may not use an expert report to introduce new . . . new invalidity theories . . . not disclosed in the parties' infringement contentions or invalidity contentions.").

Accordingly, the Court **GRANTS** CoolIT's motion to strike regarding the obviousness theory regarding the microchannels.

b. <u>Separation of the Plate and Housing</u>

Asetek's invalidity contentions state the following:

> The housing and the plate in *Antarctica* are connected to create a seal therebetween. If they were not connected, it also would have been obvious to provide a gasket between the plate and the housing to seal the inlet and outlet openings and prevent short-circuiting of the fluid.

Docket No. 401-3 at 5, 8-9, 11; Docket No. 401-4 at 9, 20, 29; Docket No. 401-5 at 2; Docket No. 401-6 at 14.

According to CoolIT, Asetek's invalidity contention above is limited to a monolithic housing spaced apart from a plate. Docket No. 433 at 5. Therefore, CoolIT seeks to strike Asetek's new theory that it would have been obvious to deconstruct *Antarctica*'s plastic mold and separate the "plate" and "housing" such that using a gasket would have been obvious. *Id.* Specifically, CoolIT seeks to strike a prior art, Danger Den-RBX, brought up for the first time almost two years after Asetek's disclosure deadline, and despite the fact that the Court's limitation to six prior art references per patent. Docket No. 42; Docket No. 401 at 5.

Dr. Tuckerman distinguishes Danger Den-RBX from *Antarctica* as having "separate housing and plate that are mated together with a seal therebetween" which *Antarctica* lacks

because of the Court's "seal" construction.  *Id.*  CoolIT contends that Asetek attempts to use the Danger Den-RBX as prior art that supplies this missing limitation in *Antarctica*.  Docket No. 401 at 5, 11; Docket No. 433 at 6.  CoolIT argues that Dr. Tuckerman treats Danger-RBX as an analog to *Antarctica* by stating that if a POSITA could modify its minichannels to be microchannels,[11] it could satisfy the seal limitation unlike *Antarctica*, and render the '330 and '284 patents obvious. Docket No. 401 at 11.  According to CoolIT, Dr. Tuckerman attempts to improperly use Danger Den-RBX as invalidating prior art, because his report (1) recites a priority date for the device, (2) treats Danger Den-RBX to fill gaps between *Antarctica* and the claims, and (3) color-codes components to the patent claim limitations and points to the device as "an obvious design alternative or modification of the *Antarctica*."  Docket No. 401 at 11; Docket No. 433 at 6, n.6.

Asetek responds that Dr. Tuckerman did not use Danger-Den RBX as a reference to fill gaps in *Antarctica*, because he has not opined that *Antarctica* would have been modified in view of Danger-Den RBX nor that *Antarctica* would have been combined with it.  Docket No. 419 at 11-12; Docket No. 419-3 (Ex. A 12/20/21 Tuckerman Depo.) at 163:10-164:6 (Dr. Tuckerman testifying that he is not "combining" *Antarctica* and Danger-RBX, nor is he saying that "Danger Den could stand alone on its own and be an obviousness ground"),172:15-23.  Rather, it was used merely as a background reference to establish knowledge of a POSITA and the state of the art (that (1) using "split-flow to improve thermal efficiency" was well-known prior to CoolIT's alleged invention, and (2) fluid heat exchangers with separate "housing" and "plate" and a "seal" in between were known in the field of computer liquid cooling by August 2007— *i.e.,* the date of CoolIT's purported invention) as well as a motivation to modify *Antarctica*.  Docket No. 419 at 11.

According to Asetek, Dr. Tuckerman does not "rely" on Danger Den-RBX; instead, he

---

[11] Regarding this point, Asetek responds that the suggestion to replace the minichannels to microchannels is innocuous because, just below that statement, Dr. Tuckerman notes that the *Antarctica* already has microchannels.  Docket No. 401-8, ¶ 69 ("In fact, microchannels were used in highperformance heat sinks/fluid heat exchangers since the early 1980s.  *See, e.g.,* Tuckerman Ph.D. Thesis, Bonde, Kandlikar, Bhatti, *Antarctica*, Kang, Hamilton, Chang, etc.").  Therefore, Dr. Tuckerman is not relying on Danger-RBX to supply the allegedly missing "microchannels" limitation in *Antarctica*.  Docket No. 419 at 13.

1    merely discusses that "to have a separate seal versus a monolithic seal is . . . an obvious change"

2    and provides the Danger Den-RBX as "supplemental color" to his analysis. *Id.* at 12; Docket No.

3    419-3 (Ex. A 12/20/21 Tuckerman Depo.) at 165:25-166:24). Dr. Tuckerman testified to the

4    following regarding this matter:

5             A. Well, what I'm saying is the '330 patent is obvious in view of
                 *Antarctica*. . .. I show the housing and plate as being a monolithic
6                sealed assembly, but, you know, you could have separated them.
                 It's a design choice. Chang was cited as one example. Danger Den
7                was cited as another example

8             . . .

9             A. . . . . [W]hat I'm doing is using Danger Den as just additional
                 support for the idea that the housing and plate can be separate,
10               because they certainly did that. Similarly, using Chang as a support
                 for the obvious. It's not saying that I had to use it because it's
11               obvious -- it's obvious in its own right that you can separate the
                 monolithic things and put a seal between them, but really just
12               additional -- you know, for color on that point . . .

13   Docket No. 419-3 (Ex. A 12/20/21 Tuckerman Depo.) at 175:23-176:9, 176:13-177:11.

14           "Courts in this district have generally, though not uniformly, declined to strike previously

15   undisclosed references where they are being used only as 'background' material, and not as

16   anticipation or obviousness references." *Finjan, Inc.*, 2016 WL 2988834, at *11. In *Finjan*, the

17   patentee argued that the defendant's expert was "using [the challenged] information as a means of

18   bringing in previously undisclosed prior art references to support its obviousness theories" and

19   "that much of the information is organized in the form of limitation-by-limitation analyses." *Id.*

20   The defendant argued that the expert used the information merely 'to aid in his analysis' and for

21   'background and foundational purposes,' not as a means of introducing 'new obviousness

22   combinations.'" *Id.* The court granted the motion to strike "to the extent that the references are

23   being used as invalidating prior art references" but denied the motion "to the extent that the

24   references are being used merely as background material." *Id.* The court further clarified that the

25   defendant was prohibited "from using previously undisclosed references to show that the prior art

26   disclosed 'other . . . limitations not covered by [the] prior art references' disclosed in its invalidity

27   contentions and listed in its Final Election of Asserted Prior Art." *Id.* (citation omitted). In

28   another case, *Largan*, the court struck portions of an export report, noting:

                                                    38

> **[The expert] references** paragraph 105 of the Shinohara '829 reference **not in his background section, but as an example of a reference that teaches the benefits** of the selective aberration compensation provided by an inflection point **and that would motivate modifying the Kwon '111 reference** to include an inflection point on a surface of the third lens element. **That is not background; it is asserted prior art.**

*Largan Precision Co, Ltd. v. Genius Elec. Optical Co.*, No. 13-CV-02502-JD, 2014 WL 6882275, at *6 (N.D. Cal. Dec. 5, 2014).

Like *Largan*, the reference to Danger Den-RBX is not merely discussed in the background section. It is discussed as examples of prior art, with their components extensively discussed in color-coded comparison to the patent claim limitations. *See* Docket No. 401-8 (Tuckerman Invalidity Report) at 14, 27-29. Asetek claims that *Largen* runs afoul of Federal Circuit precedents that background references establishing state of the art and the knowledge and perspective of a POSITA are to be consulted in finding a motivation to combine or modify. However, these cases only suggest in a general manner that references used merely as background art should be considered by courts. *Genzyme* broadly states that "the Board may consider a prior art reference to show the state of the art at the time of the invention, regardless of whether that reference was cited in the Board's institution decision." *Genzyme Therapeutic Prod. Ltd. P'ship v. Biomarin Pharm. Inc.*, 825 F.3d 1360, 1369 (Fed. Cir. 2016) ("[S]uch references can legitimately serve to document the knowledge that skilled artisans would bring to bear in reading the prior art identified as producing obviousness." (quotation marks and citation omitted)). The *Ariosa* court found that an exhibit, which was used for the proposition that "[m]assively parallel sequencing methods were in routine use by 2008" "had to be considered by the Board even though it was not one of the three pieces of prior art presented as the basis for obviousness." *Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1365 (Fed. Cir. 2015) (finding that it would be erroneous to decline "to consider [the exhibit], even as evidence of the background understanding of skilled artisans . . . simply because the brochure had not been identified at the petition stage as one of the pieces of prior art defining a combination for obviousness"). In *Rea*, the Federal Circuit found that the PTAB failed to account for critical background information that could easily explain why an ordinarily skilled artisan would have been motivated to combine or modify the cited references

United States District Court
Northern District of California

to arrive at the claimed inventions.

> Randall relied on [prior art to show] a familiar, even favored, approach to bulkhead stowage. . . . The Board's failure to consider that evidence—its failure to consider the knowledge of one of skill in the art appropriately—was plainly prejudicial. Once it is established that a prevalent, perhaps even predominant, method of stowing a bulkhead panel was to raise it to the ceiling, it is hard to see why one of skill in the art would not have thought to modify Aquino to include this feature—doing so would allow the designer to achieve the other advantages of the Aquino assembly while using a stowage strategy that was very familiar in the industry.

*Rea*, 733 F.3d at 1362-63 (Fed. Cir. 2013). However, unlike *Rea* and *Ariosa*, Dr. Tuckerman does not merely discuss the Danger Den-RBX as a well-known or favored design at the time despite his and Asetek's representation. *See Pavo Sols. LLC, Kingston Tech. Co.*, No. 8:14-cv-01352-JLS-KES, 2019 WL 8138163 at *11 (C.D. Cal. Nov. 20, 2019) (noting that "the Court must look past [Defendant's] labeling and analyze whether that which [expert] terms 'background' is really being used as 'invalidating prior art,' " and finding an expert's opinions to be "attempt[s], through clever labeling, to end run the Patent Local Rules and their requirement that prior art be disclosed in the invalidity contentions."). Dr. Tuckerman first introduces Danger Den-RBX and *Antarctica* (asserted prior art) together "as examples of prior art devices that utilize split-flow to improve thermal efficiency." Docket No. 401-8 (Tuckerman Invalidity Report) at 14. Dr. Tuckerman then notes that "the Danger Den-RBX is very similar to *Antarctica* in structure, function, and operation, except that the Danger Den-RBX has separate housing and plate that are mated together with a seal therebetween, whereas *Antarctica* has a single-piece housing and plate." *Id.* at 27. He argues that the well-known features of the Danger Den-RBX could be used to improve *Antarctica*, such as a compliant seal that proves better contact and sealing between the plate and the heat spreader plate to force fluid to flow through the microchannel. *Id.* at 14, 29-30. He further argues that "Although the Danger Den-RBX does not include microchannels, it would have been obvious to replace the mini-channels . . . in the Danger Den-RBX with microchannels." *Id.* at 29. Such "repeated use of claim terms (i.e., [seal/seal extending between the housing and the plate]) and the Court's claim construction language in analyzing the [Danger Den-RBX] to demonstrate that [it] discloses the claim limitations. . . . goes beyond the use of the [Danger Den-RBX] as a mere

United States District Court
Northern District of California

background reference and crosses the line into prior art bearing on invalidity." *Pavo Sols. LLC v. Kingston Tech. Co., Inc.*, No. 814CV01352JLSKES, 2019 WL 8138163, at *11 (C.D. Cal. Nov. 20, 2019), *aff'd*, 35 F.4th 1367 (Fed. Cir. 2022); *see also Largan Precision*, 2014 WL 6882275, at *6 (distinguishing using a reference only as background material with using it "in support of a particular claim element being anticipated or obvious").

As such, the Court **GRANTS** the motion regarding the Danger Den-RBX.

### 2.  Prior Art Chang

Previously, CoolIT had asked this Court to strike Anderson, Chang, and Hamilton as "patents or printed publications that reasonably could have been raised during Asetek's previously filed inter partes review" under 35 U.S.C. § 315(e)(2). This Court granted CoolIT's motion to strike the invalidity contentions as follows:

> The issue at the heart of each party's motion to strike is whether the respective parties are estopped from raising certain prior art references as grounds for invalidity . . . CoolIT has provided sufficient evidence that a skilled searcher performing a diligent search would have found the disputed references, and thus the references reasonably could have been raised at the time Asetek petitioned for IPR. . . . Given that a skilled searcher performing a diligent search could have located Hamilton, Chang, and Anderson, . . .  the Court GRANTS CoolIT's Motion to Strike.

Docket No. 98 at 5, 13-14.

Statutory estoppel under 35 U.S.C. § 315(e)(2) states:

> The petitioner in an inter partes review of a claim in a patent under this chapter that results in a final written decision ... may not assert ... in a civil action arising in whole or in part under section 1338 of title 28 ... that the claim is invalid on any ground that the petitioner raised or reasonably could have raised during that inter partes review.

35 U.S.C. § 315(e)(2). IPR is limited to invalidity grounds "that could be raised under section 102 or 103 and only on the basis of prior art consisting of patents or printed publications." 35 U.S.C. § 311(b). Estoppel under § 315(e)(2) thus requires: (1) a final written decision; (2) that the challenged grounds fall under §§ 102 or 103; and (3) that the challenged grounds were raised or reasonably could have been raised during the IPR.

However, Courts have found IPR estoppel to not apply to prior art references when they

United States District Court
Northern District of California

1    could not have been raised in combination with another product at IPR.  *See Polaris Indus., Inc. v.*

2    *Arctic Cat Inc.*, No. CV 15-4475 (JRT/TNL), 2019 WL 3824255, at *2–*3 (D. Minn. Aug. 15,

3    2019) (rejecting IPR estoppel with respect to defendant's obviousness combinations because they

4    could not reasonably have raised the combinations during the IPR because § 315(e)(2) estoppel

5    does not apply to products); *Gen. Access Sols., Ltd. v. Sprint Spectrum LLC*, No. 2:20-CV-00007-

6    RWS, 2021 WL 5154085, at *4 (E.D. Tex. July 21, 2021) ("IPR estoppel does not apply here.

7    Systems art cannot be raised in IPR.  Thus, the Navini System—either alone or in combination

8    with Toshimitsu—was not raised and could not been raised as an invalidity 'ground' in

9    Sprint's IPR.").

10        Asetek disclosed its invalidity grounds that CoolIT's patent was "Obvious in View of

11   *Antarctica* and Rendered Obvious by *Antarctica* in View of Chang"—in its Invalidity

12   Contentions.  Docket No. 401-2 at 4.  Because the Court struck Asetek's original invalidity

13   contentions ground on the Chang reference against the '330 patent under IPR estoppel after Asetek

14   challenged and failed to invalidate the '330 claims, CoolIT argues that Dr. Tuckerman's reliance

15   on Chang contravenes IPR estoppel.  *See* Docket No. 98.  CoolIT points out that Dr. Tuckerman

16   asserts that "Chang discloses every limitation of the asserted claims, including a seal extending

17   between the housing and the plate" and that the claim chart includes Chang disclosures for all

18   limitations.[12]  Docket No. 401 at 7.  Therefore, CoolIT argues that Asetek merely uses *Antarctica*

19

20   _____

     [12] However, the full text clarifies:

21
22           Chang discloses every limitation of the asserted claims, including a
             seal extending between the housing and the plate. Specifically,
23           Chang discloses a fluid heat exchanger having a separate housing
             and plate (unlike the single-piece housing and plate of the
24           Antarctica). Chang further includes a seal extending between the
             housing and the plate, as shown below.
             . . .
25
             A person skilled in the art in August 2007 would have known been
26           motivated to modify Antarctica in view of Chang to have a separate
             housing and plate and a seal therebetween because of the
27           manufacturing advantages and cost-effectiveness of having separate
             housing and plate.
28
     Docket No. 401-8, ¶¶ 73, 74.

1    to skirt IPR estoppel under 35 U.S.C. § 315(e)(2) and the Court's Order striking its Chang-based

2    grounds without actually relying on it.

3            Asetek responds that Dr. Tuckerman's Invalidity Report does not advance an anticipation

4    position based on Chang. Docket No. 419. Rather, it raises an obviousness combination based on

5    *Antarctica in view of* Chang, which is not estopped. *Id.* Asetek assures that Dr. Tuckerman will

6    not argue at trial that Chang alone, without being combined with *Antarctica*, invalidates CoolIT's

7    '330 patent claims. *Id.* Furthermore, Asetek argues that there is no order from the Court striking

8    the Chang reference itself from Asetek's invalidity contentions. Rather, CoolIT only moved to

9    estop the prior art references as charted in the invalidity claim charts — i.e., invalidity grounds

10   based solely on the references, and not in combination with the *Antarctica* prior art system.

11   Docket No. 419 at 19. Asetek points out that the estoppel statute prohibits invalidity *grounds*

12   rather than specific prior art references. *Id.* (citing 35 U.S.C. § 315(e)(2) (precluding "any ground

13   that the petitioner raised or reasonably could have raised during [a prior IPR].")).

14           Here, the *Antarctica* device is not a patent or printed publication. Therefore, it is prior art

15   that could not have been raised at IPR under § 315(e)(2). It would not have been possible for the

16   Chang reference to have been considered in combination with the *Antarctica* patent at IPR. As

17   such, IPR estoppel does not apply. *See Arctic Cat Inc.*, 2019 WL 3824255, at *2–*3; *Sprint

18   Spectrum LLC*, 2021 WL 5154085, at *4. Furthermore, CoolIT's concern that Asetek will argue a

19   theory involving Chang by itself and not combined with *Antarctica* seems to be simply resolved

20   by Asetek's representation that Dr. Tuckerman will not argue at trial that Chang alone invalidates

21   the patent without being combined with *Antarctica*. Docket No. 419 at 18.

22           As such, IPR estoppel does apply, and the Court **DENIES** this motion as to the Chang

23   reference.

24   F.    Asetek's Late-Disclosed Noninfringing Design-Arounds

25           1.    Motion to Strike Late-Disclosed Alternatives (Docket No. 390)

26           CoolIT seeks to strike Asetek's expert opinions based on Asetek's alleged design-arounds

27   due to (1) late disclosure and (2) failure to meet the standard for reliability required by *Daubert*.

28   CoolIT argues that 3D CAD files regarding these design-arounds were provided in Asetek's

43

1  rebuttal expert reports more than three months after the close of fact discovery, and their samples

2  were produced over five months after the close of discovery. In the alternative, CoolIT requests

3  leave for further 30(b)(6) deposition testimony regarding these design-arounds and to serve reply

4  reports on infringement and damages. Docket No. 390 at 2.

5  　　On June 25, 2019 and November 5, 2020, CoolIT requested information on "any

6  anticipated or future changes" and explanations as to "each change that [Asetek] have made or

7  plan to make to the design, operation, and/or use of the ASETEK ACCUSED PRODUCTS as a

8  result of or in response to this LITIGATION and/or the COOLIT PATENTS-IN-SUIT" in its

9  interrogatories. Docket No. 390 at 3, 5; Docket Nos. 391, Ex. 2, 3, 18, 19. Asetek's response

10  identified a design around "side-to-side flow arrangements in the microchannel arrays, instead of

11  the center-to-side/split-flow arrangement." Docket No. 391 Ex. 4 (First Suppl. Resp. to Interrog.)

12  at 2. The redesign was specifically described as follows: "in the microchannel arrays on the heat

13  spreader plates/heat-exchanging interfaces, cooling liquid enters each microchannel and exists at

14  the opposite end of the microchannel. This contrasts with CoolIT's claimed inventions where

15  cooling liquid bifurcates into two sub-flows within each microchannel and proceeds outwardly

16  toward the end of the microchannel." *Id.* Asetek also provided unlabeled computer-generated

17  images.



Top view of Asetek's proposed redesign          Kandlikar Fig. 7(b) (Prior Art) (Ex. A)
ASE-CLT00054035 (Dkt. 390-7)

24  *Id.*; Docket No. 391 Ex. 6; Docket No. 390 at 6.

25  　　According to Asetek, its disclosure of the redesigns was timely because these two-

26  dimensional (2D) CAD drawings were provided, and these 2D CAD drawings were marked and

27  discussed during the deposition of Asetek's 30(b)(6) witness on non-infringing alternatives, Mr.

28  Eriksen, on August 24-25. Docket No. 424 at 3-4. CoolIT did not indicate that they did not

United States District Court
Northern District of California

1    understand the 2D drawings nor requested 3D CADs at that time.  *Id.*

2          Mr. Eriksen testified that these designs were "Plan B" alternative designs "that is non split-

3    flow" in case they lost the case, that it a "work in progress" that achieves the same performance

4    levels as the Asetek Gen 4, 5, 6, and 7 products accused of infringement in this action.  Docket

5    No. 390-4 at 194:14-25, 200:5-8.  Although he was aware that the documents were created by

6    someone in Asetek's thermal department, he did not know the author of those documents nor

7    when they were created.  *Id.* at 189:10-14, 196:21-24.

8          Asetek argues that although Mr. Eriksen was unable to answer exactly by who and when

9    the design was created, they were not specific Rule 30(b)(6) deposition topics.  *Id.* at 4-5.  Even

10   so, Asetek provided this information in less than one week, on August 31 (the last day of fact

11   discovery) in its fourth supplemental response.  *Id.*; *See* Docket No. 390 Ex. 10 (Fourth Supp.

12   Resp. Interrogatories) at 14.

13         The interrogatory responses also included an alleged simulation result of the supposed

14   design-around, without information about how or based on what the result was produced, other

15   than the name of the person who performed the simulation and that it took approximately 20-30

16   hours.  *See* Docket No. 390 Ex. 9 (Third Supp. Resp. Interrogatories), Ex. 10 (Fourth Supp. Resp.

17   Interrogatories) at 14-15.  CoolIT notes that its drawings had no labels but specified that the side-

18   to-side design was created in the second quarter of 2021 and that they were readily available in

19   2019 and before.  *Id.*

20         Asetek also identified for the first time a new modification of the gasket that sits atop and

21   seals the microchannels, explaining that Asetek could "square off the angled portion of the gasket"

22   and "move the outlet ports of the outlet headers . . . from near the outermost fins to a central

23   location of the outlet headers" as circled below.  Docket No. 390-9 (Ex. 10, Fourth Supp. Resp.

24   Interrogatories) at 15.  However, Asetek did not provide any drawing of this alleged design and

25   provided only pictures of an existing gasket and generic descriptions of modifications that could

26   be made to it:

27   ///

28   ///

United States District Court
Northern District of California

 

 

Docket No. 391 Ex. 10 (Fourth Supp. Resp. Interrogatories) at 15. Asetek responds that these modifications to the gasket were only conceptual at the time, and no design drawings or CADs had existed at that point. Fourth Supp. Resp. Interrogatories at 15.

CoolIT's opening report on September 16, 2021, and supplemental infringement report on November 3, 2021 acknowledged Asetek's redesigns but did not address them. *Id.* at 8; *see* Docket No. 325. On December 8, 2021, Asetek produced, for the first time, 3D CAD files regarding these design-arounds in Dr. Stein's rebuttal expert report and sent them to CoolIT's counsel. [13] *See* Docket No. 390 at 7; Docket No. 391 Ex. 12 (Stein Report) ¶¶ 4, 11. The 3D CADs first became available on November 19, 2021. Docket No. 424 at 7. Expert depositions were taken one month later. At Dr. Pokharna's deposition on January 6 and 10, 2022, Dr. Pokharna refused to answer questions about the redesigns, claiming that he needed proof that the redesign was manufacturable to opine on whether the alternative design infringed CoolIT's patents. *Id.* at 9; Docket No. 438-2 at 10. Dr. Abraham, CoolIT's expert on Asetek's patents, also did not opine on Asetek's redesign. Docket No. 242 at 10.

Samples for the redesigns were made and available starting January 26, 2022. Docket No. 242 at 10. Asetek's counsel offered to deliver them to CoolIT's counsel on February 15, 2022 and

---

[13] Asetek had provided Dr. Stein with CAD files that were preprocessed for CFD analysis using Ansys SpaceClaim and, the Ansys SpaceClaim files were created by Dr. Stein as part of his expert analysis after the close of fact discovery, not by Asetek. *Id.* As such, these files were unavailable for Asetek to produce during fact discovery. *Id.*

delivered the physical samples on February 22, 2022.  Docket No. 390 at 9; Docket No. 242 at 10.

Asetek argues that the samples and files were delivered as they first became available and that the redesign was made available to CoolIT by 2D images during fact discovery, and that CoolIT never requested any 3D CADs for months.  *Id.* at 12-13.  Asetek emphasizes that CoolIT should have sought clarification earlier if the 2D CADs were insufficient, as the parties had active communications and were accommodating during discovery.  Docket No. 424 at 14; *Illumina, Inc.*, 559 F. Supp. 3d 1072 (denying motion to strike a theory that was new and filed after the close of fact and expert discovery as untimely); *accord Finjan, Inc. v. Blue Coat Sys., Inc.*, No. 13-CV-03999-BLF, 2015 WL 3640694, at *5 (N.D. Cal. June 11, 2015) (refusing to strike deficient infringement theories when the defendant did not timely move to strike and never provided notice of the deficiencies).

According to CoolIT, the 2D CADs are irrelevant because Dr. Stein's report relies exclusively on the belated 3D files.  Docket No. 438-2 at 1.  CoolIT points out that the 2D and 3D CAD files depict different designs because (1) the 2D and 3D CAD images do not resemble each other, and (2) the 2D design was described as a redesign of only the cold plate while the 3D CAD files described in Dr. Stein's report discuss changes to both the cold plate and the gasket.  CoolIT argues that Asetek impermissibly introduces a new theory based on new evidence by embodying a design-around incorporating changes to both the cold plate and the gasket.  Docket No. 438-2 at 8.  According to CoolIT, the two were distinct alternatives, and a redesign combining the two is a new theory that CoolIT first became aware of with Asetek's rebuttal expert reports on December 8, 2021, which Asetek had no chance to address.  Docket No. 438-2 at 6-7.

CoolIT contends that Asetek's late introduction of a new design around constitutes a new theory, and Asetek is obligated to timely disclose its theories and evidence during fact discovery.  Docket No. 390-2 at 12-13.  The rebuttal expert reports do not rely on a new theory.  In the Fourth supplemental response dated August 31, 2021, Asetek first discussed the alternative design describing the plate and the alternative design modifying the gasket.  *See* Fourth Supp. Resp. Interrogatories at 14-15.  Asetek identified these two different potential areas of redesign without any indications that they would be implemented together or only separately, and CoolIT does not

47

cite a case wherein a combination of possible redesigns constituted a new theory.

Furthermore, Asetek's delayed production of the 3D CAD files is substantially justified and harmless under Fed. R. Civ. Proc. 37(c)(1). Asetek's lack of production of the 3D CAD files until November 19, 2021 is justified because they became available on November 19, 2021, and harmless because neither party could rely on these files until that point. *See Airborne Athletics, Inc. v. Shoot-A-Way, Inc.*, No. CIV. 10-3785 SRN/JJK, 2012 WL 3612035, at *6 (D. Minn. Aug. 21, 2012) ("Under Fed.R.Civ.P. 37(c), the failure to disclose the redesign[] . . . was substantially justified, particularly as [it] did not exist during the discovery period."). The delay between November 19 and the date the expert reports were due on December 8, 2021, such that only Asetek's experts could rely on them for the rebuttal reports, was not substantially justified. However, this delay was harmless because Dr. Pokharna refused to consider any CAD files in his report. Dr. Pokharna did not opine on the redesigns using the 2D CADs. Even after reading Asetek's rebuttal report discussing the 3D CADs, Dr. Pokharna refused to even open the 3D CADs before his deposition held a month later, claiming that it would not have been prudent for him to provide an opinion on Asetek's redesigns just based on a set of CADs. Docket No. 424 at 19; Docket No. 424, Ex. F (Dr. Pokharna Dep.) at 94:2-9, 94:23-95:4. Dr. Pokharna testified in his deposition:

> "I -- I believe it's not really prudent if we just looking at some set of CAD only in the absence of knowing if this has ever been made or if it is manufacturable to spend a lot of time on that to, you know, create an informed opinion about a design.
>
> If it were manufacturable, if you will -- if it were made, if it were introduced in a market, then I could look at the CAD and say, "Okay. I mean, this CAD is to present their -- what they are proposing." Right now it's just Asetek's imagination maybe."

Docket No. 424, Ex. F (Dr. Pokharna Dep.) at 94:2-20.[14] Therefore, although CoolIT had a month to address the new CADs, its expert chose not to do so. Dr. Pokharna's refusal to consider the CADs because they are "just Asetek's imagination" rather than a manufacturable or manufactured product suggests that earlier production of the CADs or an additional period of time to address

---

[14] The parties also argue whether Dr. Pokharna said that he needed a "manufactured product." But his testimony states that "if it were manufacturable" then he could provide an opinion. *Id.*

United States District Court
Northern District of California

1    them would not have made a difference. Therefore, the late disclosure of the 3D CAD files was

2    harmless.

3           Accordingly, the Court **DENIES** CoolIT's motion to strike.

4           2.    <u>Motion to Exclude Portions of Dr. Mody's Expert Report (Docket No. 392)</u>

5           CoolIT requests the Court to exclude portions of the rebuttal damages report by Asetek's

6    damages expert, Dr. Nisha Mody. Docket No. 392 at 2. The rebuttal report identifies two

7    redesigns of Asetek products discussed above, and the parties argue whether the alleged

8    alternatives were available and acceptable.

9           The Patent Act provides: "the court shall award [the patent owner] damages adequate to

10    compensate for the infringement but in no event less than a reasonable royalty for the use made of

11    the invention by the infringer." 35 U.S.C. § 284. The burden of proving damages falls on the

12    patentee. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). Two

13    alternative categories of infringement compensation are the patentee's lost profits and the

14    reasonable royalty he would have received through arms-length bargaining. *Id.*

15           The reasonable royalty compensates the patent owner for the claimed invention's

16    incremental improvement over the prior art or the next best commercially acceptable

17    noninfringing alternatives if any such alternatives are shown to be available during the period of

18    infringement. *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831 (Fed. Cir. 2010) (affirming

19    admissibility of expert's reliance on Georgia-Pacific factors in his reasonable royalty

20    determination, including the lack of "acceptable non-infringing alternatives . . . at the time of the

21    hypothetical negotiation"); *Illumina Inc. v. BGI Genomics Co.*, No. 20CV01465WHOTSH, 2020

22    WL 7047708, at *2 (N.D. Cal. Dec. 1, 2020) (citation omitted). "To prove the absence of

23    acceptable, non-infringing alternatives, the patentee may prove either that the potential alternative

24    was not acceptable to potential customers or was not available at the time." *Presidio Components,*

25    *Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1380 (Fed. Cir. 2017).

26

27

28

> When an alleged alternative is not on the market during the
> accounting period, a trial court may reasonably infer that it was not
> available as a noninfringing substitute at that time. The accused
> infringer then has the burden to overcome this inference by showing
> that the substitute was available during the accounting period.

> Mere speculation or conclusory assertions will not suffice to overcome the inference. After all, the infringer chose to produce the infringing, rather than noninfringing, product. Thus, the trial court must proceed with caution in assessing proof of the availability of substitutes not actually sold during the period of infringement.

*Grain Processing Corp. v. Am. Maize-Prod. Co.*, 185 F.3d 1341, 1353 (Fed. Cir. 1999) (citations omitted).

Here, there is a reasonable inference that the alleged alternative was not available as a noninfringing substitute because it was not on the market during the accounting period. *See id.* As such, the accused infringer—Asetek—has the burden to overcome this inference by showing that the substitute was available. *See id.* Whether a purported noninfringing alternative was "available" requires an assessment of whether Asetek had the "necessary materials, equipment, know-how, and experience to make an alternative product during the relevant time frame." *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1013 (N.D. Cal. 2013) (citations omitted); *Grain Processing*, 185 F.3d at 1353.

CoolIT points out that the product designs were never implemented and that there is no evidence to show the availability of its redesigns beyond mere speculation because Dr. Mody's opinion is not supported by any independent evidence or analysis. Docket No. 436-3 at 1-2. She relies solely on undocumented conversations she had with Andre Eriksen and testimony by Dr. Tuckerman and Dr. Stein. Docket No. 392. Therefore, Asetek has not met the burden of proving the availability and acceptability of non-infringing alternatives. *See* Docket No. 436-3 at 1 (citing *CBOE v. ISE*, No. 07 C 623, 2013 WL 12323444, at *2 (N.D. Ill. Mar. 7, 2013) (excluding expert testimony on non-infringing alternatives that fails to cite evidence that the accused infringer contemplated the non-infringing substitute during the period of infringement)).

Asetek responds that Dr. Mody does not purport to opine on the availability or acceptability of the alternatives. Rather, she assumed that they were for the purpose of her analysis, which is permissible under Rule 703, which allows experts to assume the truth of facts and hypotheticals. Docket No. 415-3 at 5. Asetek points out that Dr. Mody relied on (1) Asetek's interrogatory responses that stated that the design was available in 2019 and before, (2) testimony from Andre Eriksen, and (3) the opinions of technical experts Dr. Tuckerman and Dr. Stein. *Id.*

1    (citing Docket No. 392-3 ¶¶ 39–40 (Dr. Tuckerman's opinion that the redesign would avoid

2    infringement and have comparable or materially better performance); Docket No. 390-12 ¶¶ 76-81

3    (Dr. Stein performing computer simulations of the redesign and showing that they were

4    comparable or improved in performance and thus be an acceptable substitute); Docket No. 392-4

5    (Eriksen providing estimated costs and the timeline for implementing the redesign and stating that

6    he considered the redesigns to be acceptable "with hundred percent certainty").  These arguments

7    fail for the reasons discussed below.

8         First, Dr. Mody's reliance on Asetek's interrogatory responses stating that the design was

9    available in 2019 is insufficient.  Dr. Mody merely copied and pasted the relevant interrogatory

10   responses, stating that Asetek "explained" that it "could readily and easily switch to an alternative

11   design."[15]  Such "100% . . . regurgitation of what he was told" is insufficient as an expert opinion

12   regarding a non-infringing design-around.  *See Webasto Thermo & Comfort N. Am., Inc. v.*

13   *BesTop, Inc.*, No. 16-CV-13456, 2019 WL 3334563, at *5 (E.D. Mich. July 25, 2019); Docket No.

14   392-3 ¶ 39.

15        Second, Asetek's reliance on Dr. Stein and Dr. Tuckerman's testimony is also insufficient.

16   Here, the issue is not that Mr. Mody may not rely on other experts' testimony and opinions.

17   However, Dr. Mody's opinion rises and falls with Dr. Stein's and Dr. Tuckerman's opinions on

18   availability and acceptability.  *See* Docket No. 436-4; Docket No. 392-3 at 19 ("I understand that

19   Dr. . . .  Tuckerman and Dr. . . . Stein have also expressed opinions concerning the availability and

20   acceptability of non-infringing designs which I have considered.  I also understand, . . . that . . . if

21   [its Gen 5, 6, and 7 products do not infringe], Asetek's Gen 5, 6, and 7 products would be non-

22   infringing alternatives.").  Yet, Dr. Tuckerman's opinion and Dr. Stein's opinion that the redesign

23   would be comparable and acceptable as a substitute only show the acceptability of the technology

24   (thermal performance results) and do not discuss the acceptability of the technology to Asetek's

25

26   ---

27   [15] The interrogatory response merely states: "Asetek could readily and easily switch to an
     alternative design" which "was created by Anders H. Saksager . . . in approximately the second
     quarter of 2021[] but the design was readily available in 2019 and before, and there is no
28   technological or other reason that Asetek could not have implemented them in 2019 or before."
     Docket No. 392-3 ¶ 39.

United States District Court
Northern District of California

1    customers or their availability without any discussions of Asetek's equipment, know-how, and

2    experience to implement the alternative. Therefore, Dr. Tuckerman only addressed whether the

3    redesigns would provide comparable performance. Docket No. 436-3 at 2. In fact, Dr.

4    Tuckerman did not opine on Asetek's Gen 1 and Gen 2 products at all and admitted that he was

5    not familiar with the Asetek Gen 3 device and that he never inspected the Cooler Master product.

6    Docket No. 436-4 at 6-7; *see* Docket No. 390-12 (Ex. 13, 12/8/21 Tuckerman Report). Similarly,

7    Dr. Stein was merely asked to simulate the redesigns. Neither opined on Asetek's ability to

8    implement these redesigns in 2014. Docket No. 436-3 at 2; Docket No. 390-12.

9         The last remaining basis for Dr. Mody's opinion is Mr. Eriksen's representation that the

10   redesigns would be acceptable to Asetek's customers. Dr. Mody relies on an undocumented

11   conversation with Mr. Eriksen for the following information: Asetek has salaried employees who

12   could modify the designs of Asetek's products. Docket No. 392-3 at 19. Asetek estimates that it

13   would take approximately $250,000 to redesign and the retooling costs estimated for modifying

14   each generation. *Id.* In total, Asetek estimates implementing a redesign for all four products

15   would cost approximately $367,500 and could be implemented in a matter of months, and would

16   not require any customer review, as the change would not be considered material. *Id.*

17        Although an expert is permitted to rely on foundational factual testimony from witnesses

18   who will be available to testify at trial to their personal knowledge of them, *Oracle Am., Inc. v.*

19   *Google Inc.*, No. C 10-03561 WHA, 2011 WL 5914033, at *1 (N.D. Cal. Nov. 28, 2011), Dr.

20   Mody again does not provide any analysis into the acceptability of the redesign beyond relaying

21   Mr. Eriksen's opinion that the redesigns would be acceptable and "would not require any customer

22   review, as the change would not be considered material." Docket No. 392-3 at 19; *Webasto*

23   *Thermo & Comfort N. Am., Inc. v. BesTop, Inc.*, No. 16-CV-13456, 2019 WL 3334563, at *6

24   (E.D. Mich. July 25, 2019) (striking accused infringer's damages expert's testimony supported

25   only by a conversation he had with the accused infringer's director of engineering, a lay witness);

26   *Conceptus, Inc. v. Hologic, Inc.*, 771 F. Supp. 2d 1164, 1179 (N.D. Cal. 2010) (finding that an

27   expert testimony that alternatives were available based on an unsworn report of its own expert that

28   relied exclusively on private conversations with [the defendant's] personnel was double hearsay

1    and insufficient); *BesTop, Inc.*, 2019 WL 3334563, at \*6 ("[A]ny opinion that the proposed design

2    would . . . be an acceptable alternative to consumers would involve explaining to a jury what

3    consumers valued in the [patent] and why and how the alleged proposed alternative design-around

4    satisfied those customer preferences and demands.").[16]

5         Asetek also argues that Dr. Mody only rebutted the opinions of CoolIT's damages expert,

6    Mr. Hansen, and did not opine on the availability and acceptability of Asetek's redesign options.

7    *See* Docket No. 392-3. Mr. Hansen had criticized that Asetek had not provided any "evidence that

8    it would be able to offer a commercially acceptable desktop product for sale without utilizing the

9    CoolIT Patents-in-Suit." *Id.* ¶ 35. However, while it is permissible for an expert to rebut the

10   criticisms of another expert, expert opinions must still be reliable. Dr. Mody's response is, at best,

11   a "regurgitation of what he was told" by Asetek without his own input. *Webasto Thermo &*

12   *Comfort N. Am., Inc. v. BesTop, Inc.*, No. 16-CV-13456, 2019 WL 3334563, at \*5 (E.D. Mich.

13   July 25, 2019) ("Mr. Robinson's Report and his testimony . . . demonstrate . . . that his entire

14   opinion on the alleged non-infringing design around is 100% a regurgitation of what he was told

15   in conversation . . .").

16        Furthermore, Dr. Mody concedes that she never performed an analysis regarding whether

17   Asetek's 2012 Gen 1, 2, 3, and the Cooler Master Liquid 240R products would still be

18   commercially acceptable years later. Docket No. 392 at 7 (Ex. 1 (citing 12/8/2021 Mody Reb.

19   Rpt.) ¶ 37; Ex. 3 (1/4/2022 Mody Depo. Tr.) at 148:16-23. Dr. Mody merely points to Asetek's

20   responses to interrogatories. 1/4/2022 Mody Depo. Tr. at 148:16-23 (Q: How did you determine

21   that the products Asetek sold through 2012 would be acceptable to customers in 2018, 2019 and

22   2020? . . . A: So I've not done that specific analysis that you talk of . . . But . . . I explain there are

23   responses to interrogatories regarding what would be modified[.]")). The sole reference to the

24   Cooler Master product was also a direct copy of Asetek's interrogatory that "Asetek could also

25

26   _____

27   [16] Although Asetek argues that *Volterra Semiconductor Corp. v. Primarion, Inc.*, 796 F. Supp. 2d 1025, 1040 (N.D. Cal. 2011) is analogous, this case is inapposite because it did not discuss non-infringing alternatives and found that a declaration by an expert could be attached despite lacking supporting documents because the expert had extensive personal knowledge and personally reviewed the technical documents, unlike the current case.

28

United States District Court
Northern District of California

1    easily implement an alternative design with a side-to-side flow arrangement in the microchannel

2    arrays like that in the Cooler Master MasterLiquid 240R[.]"  Docket No. 392-3 at 7, n.45.  Again,

3    Dr. Mody's reliance on interrogatories is insufficient.  *See Acceleration Bay LLC v. Activision*

4    *Blizzard Inc.*, No. 1:16-CV-00453-RGA, 2019 WL 4194060, at *8 (D. Del. Sept. 4, 2019)

5    (excluding a damages expert's assumption that earlier versions of a product are non-infringing

6    alternatives and any damages conclusions stemming from that assumption because "none of its

7    technical experts have opined that the earlier games are non-infringing" and "[a] damages' expert's

8    assumption is not sufficient to support a damages opinion based on a particular non-infringing

9    alternative").

10        For the foregoing reasons, the Court **GRANTS** CoolIT's motion regarding the availability

11    and acceptability of Asetek's noninfringing alternatives.

12    G.    Motion in Limine to Exclude Hansen Opinions (Docket No. 405)

13        "Reasonable royalty damages are deemed the minimum amount of infringement damages

14    'adequate to compensate for the infringement'. . . Such damages must be awarded 'for the use

15    made of the invention by the infringer.'"  *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d

16    51, 66–67 (Fed. Cir. 2012) (citing 35 U.S.C. § 284).  Analysis of reasonable royalty can look to

17    comparable license agreements, which in turn consider whether the licenses are technologically

18    and economically comparable and whether they arise under comparable circumstances.  *See, e.g.,*

19    *id.*; *Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1372–73 (Fed. Cir. 2020).

20    "[A]llegedly comparable licenses may cover more patents than are at issue in the action, include

21    cross-licensing terms, cover foreign intellectual property rights, or, . . . be calculated as some

22    percentage of the value of a multi-component product."  *Ericsson, Inc. v. D-Link Sys., Inc.*, 773

23    F.3d 1201, 1227 (Fed. Cir. 2014).  "Testimony relying on licenses must account for such

24    distinguishing facts when invoking them to value the patented invention."  *Id.*  "[T]he fact that a

25    license is not perfectly analogous generally goes to the weight of the evidence, not its

26    admissibility."  *Id.*  However, "alleging a loose or vague comparability between different

27    technologies or licenses does not suffice."  *LaserDynamics, Inc.*, 694 F.3d at 79; *see also Finjan,*

28    *Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1312 (Fed. Cir. 2018) (a "surface similarity" supported

United States District Court
Northern District of California

by "conclusory statements" is insufficient).  A district court may not rely on licenses without even a "discernible link to the claimed technology."  *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 870 (Fed. Cir. 2010) ("the fact that the infringing products in [the prior license] were also in the computer security field and that [the infringer involved in the prior license] was a competitor" is insufficient).

CoolIT retained Mr. Hansen as a damages expert.  In his report, Mr. Hansen calculated, through a hypothetical license negotiation between CoolIT and Asetek under the multi-factor *Georgia-Pacific* framework, a reasonable royalty for CoolIT's patents-in-suit equal to 7% of U.S. sales of Asetek's accused products.  *See* Docket No. 404-5 (Ex. 4 (Hansen Rpt.).  Asetek disputes (1) the "non-apportioned" royalty rate of 7% and (2) the "non-apportioned" royalty base totaling approximately ███████  Specifically, Asetek argues that the 7% royalty rate is unreliable because Mr. Hansen erroneously considered a previous license agreement between Asetek and Corsair (the "Asetek-Corsair license") as a comparable license and relied on technical expert Dr. Abraham's unreliable opinions.  Regarding the royalty base, Asetek argues that Mr. Hansen failed to apportion the royalty base based on the incremental value of CoolIT's patents-in-suit to the accused product and improperly added an additional ███████ that allegedly represents Asetek's sales of infringing products to Corsair that were subsequently resold in the U.S.

1.  Comparability of the Asetek-Corsair License and Mr. Hansen's Reliance on Dr. Abraham's Technical Expert Opinion

Asetek argues that Mr. Hansen arrived at a 7% royalty rate by using the Asetek-Corsair license as a reference point without sufficiently establishing its comparability.  *See* Docket No. 404-3 at 13-14 (citing *LaserDynamics, Inc.*, 694 F.3d at 67–70 ("[w]hen relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice."); *ResQNet.com, Inc.*, 594 F.3d at 896, 871–72 ("This court has long required district courts performing reasonable royalty calculations to exercise vigilance when considering past licenses to technologies other than the patent in suit.")).  Asetek Specifically contends that Mr. Hansen failed to consider "the differences between (1) the licensed Asetek patents (which cover full liquid cooling product systems) and corresponding royalty base in the

1    Asetek-Corsair license as compared to (2) the CoolIT patents (which cover only the cold plate)

2    and the corresponding smaller royalty base in the hypothetical negotiation." *See* Docket No. 404-

3    3 at 13.

4         In response, CoolIT argues that the Asetek-Corsair license is a comparable license and that

5    it is appropriate to use comparable licenses to establish a reasonable royalty rate without

6    performing apportionment. *See* Docket No. 418 at 6-10; Docket No. 417-3 (citing *Vectura Ltd. v.*

7    *Glaxosmithkline LLC*, 981 F.3d 1030, 1041 (Fed. Cir. 2020) ("[A] party relying on a sufficiently

8    comparable license can adopt the comparable license's royalty rate and royalty base without

9    further apportionment and without proving that the infringing feature was responsible for the

10    entire market value of the accused product.") (citation and quotation omitted)).  Specifically,

11    CoolIT argues that the "Asetek-Corsair license is itself apportioned because Asetek did not invent

12    the 'all-in-one' cooling system as it claims" because "[i]f it did, then the royalty rate would have

13    been closer to 100% instead of 1%–7%." Docket No. 418 At 8.  Therefore, the 7% Mr. Hansen

14    derived from the Asetek-Corsair license already "reflects the incremental value that the CoolIT

15    patents add to the Asetek cooling system."  Docket No. 418 at 8.

16         A reasonable royalty analysis based on comparable licenses requires only a showing of

17    "baseline comparability" and "the issue of comparability is often one of sufficiency of the

18    evidence, not admissibility." *Bio-Rad Laboratories, Inc.*, 967 F.3d at 1373–74.  As such, CoolIT

19    argues that as long as Mr. Hansen's opinions permit the jury to properly evaluate the differences

20    between the previous and the hypothetical licenses, the degree of comparability is "a factual issue

21    best addressed through cross examination" rather than exclusion.  Docket No. 418 at 9-10 (citing

22    *Bio-Rad Laboratories, Inc.*, 967 F.3d at 1374; *ActiveVideo Networks, Inc. v. Verizon Commc'ns,*

23    *Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) ("The degree of comparability of the [two] license

24    agreements as well as any failure on the part of ActiveVideo's expert to control for certain

25    variables are factual issues best addressed by cross examination and not by exclusion.")).

26         Here, Mr. Hansen has sufficiently shown "baseline comparability" by relying on Dr.

27    Abraham's opinion that the Asetek cooling patents are directed toward solving similar problems

28    for similar products and are technically comparable:

United States District Court
Northern District of California

"*Technical Comparability:*

. . .

Based on input from Dr. Abraham that the Asetek Cooling Patents are directed towards solving similar problems for similar products as the CoolIT Patents-In-Suit, I understand that they are technically comparable. However, I understand that it is Dr. Abraham's opinion that the technology claimed in each of the CoolIT Patents-In-Suit is more valuable than the technology claimed in the Asetek Cooling Patents because, as stated above, the CoolIT Patents-In-Suit disclose the simultaneous use of microchannels and split flow features that yield an optimal thermal and pressure design."

Hansen Rpt. ¶¶ 69-70.

Mr. Hansen also finds economic comparability based on the facts that "(1) the Asetek/Corsair license involves Corsair, a primary customer of both Asetek and CoolIT, and a named defendant in this matter of both Asetek and CoolIT; (2) includes the same types of covered products (e.g., liquid cooling products); and (3) are directed to similar end users and applications (e.g., computer gaming enthusiasts, data centers)." *See* Hansen Rpt. ¶ 71.

Asetek suggests that Mr. Hansen's finding of comparability is ungrounded because he erroneously considered Dr. Abraham's unreliable and overly conclusory opinions. *See* Docket No. 404-3 at 14. In addition to technical comparability, Dr. Abraham also opined that CoolIT's patents are "more valuable" than Asetek's and that "the cold plate (CoolIT's patents-in-suit) is at least as important as the other systems (five primary systems in Asetek's accused cooling devices), contributing at least 20% of the value of the product." Hansen Rpt. ¶¶ 91, 96. Asetek disputes the reliability of Dr. Abraham's input, arguing that they did not draw upon customers' evaluations but merely Dr. Abraham's "experience," which cannot substitute quantitative or scientific analysis as a reliable basis for expert opinions. *See* Docket No. 404-3 at 7-8 (citing *GPNE Corp. v. Apple, Inc.*, No. 12-CV-02885-LHK, 2014 WL 1494247, at *6 (N.D. Cal. Apr. 16, 2014) (noting that "30 years of experience does not constitute sufficient facts or data, or reliable principles and methods") (citation and quotation omitted); *Open Text S.A. v. Box, Inc.*, No. 13-CV-04910-JD, 2015 WL 349197, at *6 (N.D. Cal. Jan. 23, 2015) (excluding a damages expert's opinions because "[r]ather than spelling out the steps she took to go from the data to the royalty rate opinion, [the expert] cites her 'experience'—an abstraction not visible to the eyes of the Court, the jury, and opposing counsel, or testable in the crucible of cross-examination.")). Asetek further points out that Dr.

57

1  Abraham considers the 20% he provides as a "performance value" rather than a monetary

2  valuation, he has never seen the Asetek-Corsair license, and his expert report emphasizes the

3  *differences* between the Asetek and CoolIT patents rather than provides a comparability opinion.

4  *See* Docket No. 448-3 at 4-6; Docket No. 448-3; Abraham Jan. 5 Depo. at 107:9-109:3, 147:19-

5  148:6; Docket No. 405-9; Hansen Depo. at 204:4-205:8; Docket No. 404-4.  Asetek thus argues

6  that it is unknown how Dr. Abraham's input played into Mr. Hansen's economic analysis.  Docket

7  No. 404-3 at 17.

8        With respect to CoolIT's argument that any potential issue with Mr. Hansen's reliance on

9  Dr. Abraham's input can be remedied through cross-examination, Asetek notes that expert

10  opinions must have sufficient explanation and analysis rather than just conclusive statements to be

11  effectively cross-examined, and "Mr. Hansen have provided no facts or data" for his comparability

12  analysis on which a jury can rely on.  Docket No. 448-3 at 6 (citing *GPNE Corp.*, 2014 WL

13  1494247, at *6 ("Without a methodology . . . cross-examination is futile.").

14        Here, Mr. Hansen's opinions are not merely conclusory.  Dr. Abraham's input is

15  permissible because "it is routine and proper for a damages expert in a technical patent case to rely

16  on a technical expert for background" because "[a]n expert cannot be an expert in all fields, and it

17  is reasonable to expect that experts will rely on the opinion of experts in other fields as

18  background material for arriving at an opinion."  *DataQuill Ltd. v. High Tech Computer Corp.*,

19  887 F. Supp. 2d 999, 1026 (S.D. Cal. 2011) (citation omitted).  Mr. Hansen also opines that

20  Corsair is a primary customer of both Asetek and CoolIT, the licenses include the same types of

21  covered products (e.g., liquid cooling products), and the products are directed to similar end users

22  and applications (e.g., computer gaming enthusiasts, data centers).  Hansen Rpt. ¶¶ 69-71.  What

23  Mr. Hansen provides amounts to more than a "discernable link" or a "surface similarity" between

24  the patents.  Rather than simply stating that "both patents cover [similar] technology," Mr. Hansen

25  does explain the "functionality enabled by the patent-in-suit as well as the functionality

26  purportedly covered by the licensed patent and compare their economic importance."

27  *LaserDynamics, Inc. v. Quanta Computer, Inc.*, No. 2:06-CV-348-TJW-CE, 2011 WL 7563818, at

28  *3 (E.D. Tex. Jan. 7, 2011).  As such, Mr. Hansen establishes more than baseline comparability in

United States District Court

Northern District of California

1   light of the cases where the Federal Circuit found sufficient basis for comparability.  *See Bio-Rad*

2   *Laboratories, Inc.*, 967 F.3d at 1374 (finding baseline comparability because both the patents-in-

3   suit and the patents in prior licenses "related to microfluids").

4          The fact that Dr. Abraham also provides an opinion on the differences between Asetek's

5   and CoolIT's patents does not invalidate his opinion regarding their technical and functional

6   similarities.  *See ActiveVideo Networks, Inc.*, 694 F.3d at 1333; *Virnetx, Inc. v. Cisco Sys., Inc.*,

7   767 F.3d 1308, 1331 (Fed. Cir. 2014) (noting "differences between the licenses at issue and the

8   circumstances of the hypothetical negotiation," but concluding that "[t]he jury was entitled to hear

9   the expert testimony and decide for itself what to accept or reject") (citation and quotation

10  omitted).

11         In sum, Mr. Hansen provides enough factual basis for comparability that allows the royalty

12  rate from the Asetek-Corsair license to serve as a reference point for his reasonable royalty

13  analysis.

14         2.      The 7% Royalty Rate

15         The Court considers whether Mr. Hansen erred in applying the maximum 7% rate under

16  the Asetek-Corsair license without taking into account that the Asetek-Corsair license covers a full

17  liquid cooling system while the CoolIT patents cover only the cold plate.  CoolIT contends that the

18  1–7% royalty rate in the Asetek-Corsair license "is itself apportioned because Asetek did not

19  invent the 'all-in-one' cooling system."  Docket No. 418 at 8.  CoolIT emphasizes that "the only

20  allegedly novel aspect of Asetek's Patents was limited to the 'single receptacle' concept" and

21  having claims "drafted to cover the entire cooling system by listing various conventional

22  components . . . does not automatically make the entire cooling system novel."  *Id.* at 11.

23  Therefore, the 1–7% rate in the Asetek-Corsair license correctly reflects the *incremental value* of

24  Asetek's invention.  *Id.*  Asetek responds that Asetek's invention cannot be limited to, as CoolIT

25  claims, the "single receptacle" concept but covers many elements in an entire cooling system.  *See*

26  Docket No. 448-3 at 8-9 (citing *Asetek Danmark A/S v. CMI USA, et al.*, Case No. 3:13-cv-00457-

27

28

United States District Court
Northern District of California

JST, Docket No. 219 at 3-4).[17]

Mr. Hansen's focus on the incremental value of Asetek's invention in relying on the 1–7% rate in the Asetek-Corsair license was not erroneous. *See Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*, 927 F.3d 1292, 1301 (Fed. Cir. 2019) ("When the accused technology does not make up the whole of the accused product, apportionment is required."). "[T]here is no blanket rule of quantitative apportionment in every comparable license case" and courts accept "'built in apportionment' for a comparable license agreement." *Bio-Rad Laboratories, Inc.*, 967 F.3d at 1376–77. This idea of "built-in" apportionment is supported by Mr. Hansen's testimony. In response to questions regarding whether he used apportionment to account for the different scopes of the Asetek and CoolIT patents, Mr. Hansen explained that apportionment was already reflected in the analysis of the relative value of the patents. *See* Hansen Depo. at 188:11–190:15. As for the argument that the prior license relied on is not comparable or the most comparable one, the jury is free to hear evidence that the license is not comparable. *See Rad Laboratories, Inc.*, 967 F.3d at 1376–77.

"Built-in apportionment effectively assumes that the negotiators of a comparable license settled on a royalty rate and royalty base combination embodying the value of the asserted patent." *Vectura Limited*, 981 F.3d at 1041. "*[A] party relying on a sufficiently comparable license* can adopt the comparable license's royalty rate and royalty base without further apportionment and without proving that the infringing feature was responsible for the entire market value of the accused product." *Id.* (citation and quotation omitted) (emphasis added). As such, the question is whether CoolIT meets its burden to prove that the license is not just comparable but "'sufficiently comparable' in that 'principles of apportionment were effectively baked into' the purportedly comparable license" without further apportionment. *Omega Pats., LLC v. CalAmp Corp.*, 13 F.4th 1361, 1377 (Fed. Cir. 2021) (citing *Vectura Limited*, 981 F.3d at 1041).

---

[17] The jury found that: "Asetek's patented invention is directed to a closed loop liquid cooling system in which cooling liquid is pumped continuously between a pump head and a heat radiator (positioned remote from the pump head). *Id.* Rather than connecting together multiple separate components (as in the prior art), Asetek's patented pump head design combines, into a single unit, a pump and the claimed "reservoir" that has, among other things, dual chambers and is bounded by a removable cold plate." *Id.*

United States District Court
Northern District of California

Here, Mr. Hansen relied on a technical expert to conclude that Asetek's patents are "directed towards solving similar problems for similar products" as CoolIT's patents.  Hansen Rpt. ¶ 70.  He also opined that the real and hypothetical licenses involve the same primary customer, both include liquid cooling products, and are both directed to similar end users and applications. As such, there is sufficient comparability.  *See Vectura Limited*, 981 F.3d at 1040 (finding that although the comparable license encompassed rights to more than 400 patents, the key component of the license covered "roughly very similar technologies").

Even if the Court finds built-in apportionment, Mr. Hansen is still required to explain why he adopted the maximum 7% figure from the Asetek-Corsair license.  *See ResQNet.com, Inc.*, 594 F.3d at 873 (district court erred by considering certain licenses and adjusting "upward" the reasonable royalty rate "without any factual findings that accounted for the technological and economic differences between those licenses").  Here, Mr. Hansen relied on Dr. Abraham's opinion that CoolIT's patents are more valuable because they "disclose the simultaneous use of microchannels and split flow features that yield an optimal thermal and pressure design."  Hansen Rpt. ¶ 70.  Asetek argues that Dr. Abraham based his opinion on his "experience," which does not constitute a reliable methodology.  Docket No. 404-3 at 15-16.  However, Dr. Abraham elaborates that he has designed and helped install the technology and worked with people who use the devices in opining that "cold plate is at least as important as the other system and contributes 20 percent of the value of the product."  *See* Abraham Jan. 7 Depo. at 176:17-178:7; Docket No. 405-10.[18]  Dr. Abraham repeatedly explained that the 20% figure is not a precise value he assigned to the cold plate but simply means that he identified five systems in Asetek's methodology described products, and the cold plate is no less important than any other component.  Abraham Jan. 5 Depo. at 111:24-113:3.  He also explained that he did not need to talk to customers "about what features

---

[18] "Because I — I have — I have designed, I have helped — I have students ask me how to install these things and ask me how to reduce noise, how to reduce — how to improve heat transfer. Look, I have worked in this field for over two decades; so I know what customers want.  Here's what customers want.  They want their chips to be cool; they want the system to work, and they want low noise.  And the CoolIT patent does all three of those things exemplary.  And so I did not talk to any CoolIT's customers in the context of this litigation.  But I have decades of experience working with people who use these devices.  So I know what they want."

United States District Court
Northern District of California

1    provide value to the Asetek products" because he "design[s] these things" and he states in his

2    report the features that are "valuable to customers who are trying to cool electronics." Abraham

3    Jan. 5 Depo. at 113:4-114:2. It is unclear, and Asetek has not explained why Dr. Abraham's

4    failure to consult customers in the context of this lawsuit is fatal to the reliability of his opinion

5    regarding what functions of a cooling system for electronics are important.

6         In *NetFuel, Inc. v. Cisco Systems Inc.*, a technical expert found that "security, reliability,

7    and availability" represent at least 33% of the accused product without explaining the features that

8    comprise the 67% of remaining value or providing some economic or factual basis other than his

9    own "experience," "knowledge," and "understanding" of the product. *See* 2020 WL 1274985, at

10   *7 (N.D. Cal. Mar. 17, 2020). A damages expert relied on the number and arrived at a 33%

11   apportionment rate. *See id.* at *6. The court excluded the damages expert's opinion as an

12   impermissible "black box" without "sound economic and factual predicates." *See id.* at *7. Here,

13   the 20% figure represents Dr. Abraham's evaluation of the relative value of different components

14   rather than his precise assignment of value, and Asetek also understands that "Dr. Abraham's

15   'analysis' related to a *relative 'performance value'* and is not an indication that CoolIT's patents

16   contribute 20% of the revenue or profit." Docket No. 404-3 at 17. Moreover, Mr. Hansen did not

17   take Dr. Abraham's 20% figure as it is but appears to have considered it in conjunction with other

18   factors in arriving at his final 7% royalty rate. For example, the fact that "Asetek agreed to accept

19   a lower royalty rate from Corsair for increased annual purchase volumes by Corsair from Asetek

20   [but] no such royalty discounts in exchange for increased purchases would exist in the

21   hypothetical license" puts upward pressure on the royalty rate. Hansen Rpt. ¶ 73. "The patents in

22   the hypothetical negotiation are also assumed to be valid and infringed, which places upward

23   pressure on the royalty rate relative to agreements that do not assume validity and infringement of

24   the licensed patents." Hansen Rpt. ¶ 80. It thus does not follow that Mr. Hansen erroneously

25   relied on Dr. Abraham's technical input based on unreliable "black box." In sum, Mr. Hansen

26   appears to have adequately based his proposed 7% royalty rate on a comparable prior license and

27   provided explanations for adjustments based on the differences between the patents. *See*

28   *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 31 (Fed. Cir. 2012) ("[W]hile

United States District Court
Northern District of California

62

1    mathematical precision is not required, some explanation of both why and generally to what extent

2    the particular factor impacts the royalty calculation is needed.").  The factual basis and

3    methodologies for his opinions are clear enough to be challenged through cross-examination.

4           3.    Use of Asetek's Full Sales Revenue of ███████ as the Royalty Base

5           Asetek complains that Mr. Hansen has neither shown that the ███████ royalty base is

6    limited to revenue specifically attributed to CoolIT's asserted patents nor opined that CoolIT's

7    asserted patents drove Asetek's products' demand.  *See id.* at 10.  Asetek notes that because Mr.

8    Hansen calculated the profit attributed to CoolIT's cold plate to be 2.9% of the revenue from

9    Asetek's accused products, the proper royalty base should be no more than ███████—2.9%

10   of the ███████ revenue.  *See id.* at 12.

11          CoolIT contends that the 2.9% figure—profit from Asetek's accused products attributable

12   to the SSPPU (smallest salable patent-practicing unit)—is only a guidepost for Mr. Hansen's

13   analysis.  Docket No. 418 at 13.  Mr. Hansen properly considered Dr. Abraham's technical input

14   that CoolIT's cold plate (the SSPPU) contributed 20% of the *functional* or *performance* value of

15   Asetek's accused products, which informed Mr. Hansen's own opinion on the relative *monetary*

16   value.[19]  *See id.* at 13-14.  As such, because the value of a technology enabling a product to

17   function is not necessarily limited to the cost of the specific parts, and the 2.9% already *indicates*

18   *royalty rate*, the ███████ royalty base cannot be apportioned by multiplying it by 2.9%.  *See*

19   *id.* at 14; Hansen Rpt. ¶ 93 ("[2.9%] understates the value of the CoolIT Patents-In-Suit and their

20   contribution to the Asetek Accused Products.  Accounting for the importance and contribution of

21   the CoolIT Patents-In-Suit, the analysis of the profits attributable to the SSPPU supports a

22   reasonable royalty of 7%[.]"

23          Apportionment between the patented features and the non-patented features is generally

24   required when asserting damages unless it can be shown that the patented features of an accused

25   product drive the demand for the entire multi-component product.  *LaserDynamics, Inc.*, 694 F.3d

26

27   ───────────────

     [19] "Dr. Abraham informed me that the cold plate is one of five primary systems within the Asetek
28   Accused Products, and that the cold plate is at least as important as the other systems, contributing
     at least 20% of the value of the product."  Hansen Rpt. ¶ 98.

United States District Court
Northern District of California

at 67). This is because "calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product" and "care must be taken to avoid misleading the jury by placing undue emphasis on the value of the entire product." *Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1302 (Fed. Cir. 2015) ("*CSIRO*") (citation and quotation omitted).

Nevertheless, CoolIT is correct in pointing out that SSPPU does not dictate the calculation of a royalty rate. A rule that requires "all damages models to begin with the smallest salable patent-practicing unit . . . is untenable. It conflicts with our prior approvals of a methodology that values the asserted patent based on comparable licenses." *Id.* at 1303 (emphasis added). "[S]ophisticated parties routinely enter into license agreements that base the value of the patented inventions as a percentage of the commercial products' sales price," and thus "[t]here is nothing inherently wrong with using the market value of the entire product, especially when there is no established market value for the infringing component or feature, so long as the multiplier accounts for the proportion of the base represented by the infringing component or feature." *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*, 879 F.3d 1332, 1349 (Fed. Cir. 2018) (citing *Lucent Technologies, Inc.*, 580 F.3d at 1339).

Moreover, a claim does not have to cover the infringing product as a whole in order for a damages expert to use the end product's entire market value as the royalty base. In *Cisco*, the court found the "[SSPPU] principle is inapplicable [because] the district court did not apportion from a royalty base at all [but] began with the parties' negotiations." *Cisco*, 809 F.3d at 1302. The court concluded that it was proper to use a $0.9 per unit royalty rate previously proposed by the accused infringer Cisco as the lower bound for the reasonable royalty analysis, noting that "this starting point for the district court's analysis already built in apportionment." *Id.* at 1303. Similarly, in *Elbit*, the court found the damages expert's testimony "allowed the jury to find that the components at issue, for purposes of apportionment to the value of a larger product or service, were comparable to the components at issue in a [prior agreement], and [the defendant] introduced no evidence that precluded such a finding." 927 F.3d at 1301. "As a result, when [the damages expert] used the [prior agreement] as his starting point, his analysis could reasonably be found to

64

incorporate the required apportionment." *Id.*

The issue here is thus not whether Mr. Hansen can choose a different starting point than SSPPU for his reasonable royalty analysis but related to the previous inquiry of whether he has presented a sufficiently comparable license that allows for built-in apportionment. *See Cisco*, 809 F.3d at 1303 ("Where the licenses employed are sufficiently comparable, this method is typically reliable because the parties are constrained by the market's actual valuation of the patent."); *Vectura Limited*, 981 F.3d at 1041 ("[A] party relying on a sufficiently comparable license can adopt the comparable license's royalty rate and royalty base without further apportionment and without proving that the infringing feature was responsible for the entire market value of the accused product."). Because the Asetek-Corsair license is sufficiently comparable, Mr. Hansen can adopt both the royalty rate and the base from the Asetek-Corsair license as his starting point and then make adjustments. *Cisco,* 809 F.3d at 1303.

4.    Addition of Corsair's Estimated Resales in the U.S. to the Royalty Base

Asetek contends that Mr. Hansen improperly added ████████████the downstream sales of Asetek's products that were ultimately shipped back to the US—to the royalty base because the figure is unreliable and largely based on speculation. *See* Docket No. 404-3 at 18-19. Mr. Hansen used Corsair's SEC filings to find that 35%–38% of Corsair's products had been sold in the U.S. Docket No. 418 at 15. While Asetek contends that the percentages are not specific to liquid cooling products but include a variety of Corsair's products, CoolIT argues that Corsair's entire business is focused on "high-performance gear for gamers and content creators" and "there is no reason to believe that the geographic breakdown for liquid cooling systems would be any different than the overall product mix." Docket No. 404-3 at 18, n.7; Docket No. 418 at 15. Mr. Hansen multiplied Asetek's worldwide sales to Corsair ███████████by the percentages, arriving at the figures that represent Asetek's U.S. revenue from sales to Corsair ██████████. Docket No. 404-3 at 19. Mr. Hansen then treats any difference between this figure and Asetek's documented U.S. sales to Corsair as "additional U.S. revenue."[20] *Id.* at 19.

---

[20] This calculation effectively means CoolIT gets damages on 35% of Asetek's worldwide sales to Corsair, regardless of what Asetek's U.S. sales to Corsair is on record. *See* Docket No. 404-3 19;

United States District Court
Northern District of California

Asetek's challenge to Mr. Hansen's reliance on the SEC filing is unpersuasive.  Mr. Hansen has met his burden to provide some reliable factual basis for his position that the proportion of Corsair's liquid cooling systems resold to the U.S. is the same for its overall product mix.  While Asetek suggests that "CoolIT and Mr. Hansen could have, and should have, obtained actual, reliable data from Corsair," the Court is not required to exclude an expert opinion simply because of what is not included in the analysis.  *See Raul Siqueiros, et al. v. General Motors LLC,* 2022 WL 74182, at *6 (N.D. Cal. Jan. 7, 2022) ("While [the defendant] observations about what was not included in [the expert's] analysis is accurate, it does not necessarily follow that the facts and methodology on which [the expert] did rely are insufficient and unreliable.").  As such, the Court does not find the additional revenue he computed to be speculative.  Asetek is free to cross-examine him and present contrary figures to the jury.

5.  Inclusion of Revenue for Asetek USA between June 10, 2014, and October 21, 2015

CoolIT argues that recovery for damages incurred between June 10, 2014, and October 21, 2015 should not be barred by the six-year limitation of 35 U.S.C. § 286 because the amended counterclaims adding Asetek USA as a defendant filed on October 22, 2021 relate back to the original filing of CoolIT's counterclaims in April 2019 under the relation back doctrine.  *See* Docket No. 404-3 at 20.  The rule provides that the amended pleading relates back only if "the party to be brought in by amendment knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity."  Fed. R. Civ. P. 15(c)(1)(C)(ii).  "Relation back under Rule 15(c)(1)(C) depends on what the party to be added knew or should have known, not on the amending party's knowledge or timeliness in seeking to amend the pleading."  *Krupski v. Costa Crociere S. p. A.,* 560 U.S. 538 (2010).  "[A] plaintiff may

---

Hansen Depo. at 161:5–14:

> Q. And it doesn't matter what Categories 1 through 3 are in actuality, when you add your category 4 to it, they will always sum to 35 percent of Asetek's sales to Corsair outside the U.S. because of the way you set up your math, right?
> THE WITNESS: I believe that's mathematically correct, but I would want to relook at that.

United States District Court
Northern District of California

1    know generally what party A does while misunderstanding the roles that party A and party B

2    played in the 'conduct, transaction, or occurrence' giving rise to her claim.  If the plaintiff sues

3    party B instead of party A under these circumstances, she has made a 'mistake concerning the

4    proper party's identity' *notwithstanding her knowledge of the existence of both parties.*"  *Id.* at 549

5    (emphasis added).

6         CoolIT argues that Asetek USA knew or should have known that CoolIT's counterclaims

7    would have been brought against it at the time CoolIT filed the original counterclaims, but for

8    CoolIT's mistake of naming the wrong Asetek entity as the defendant.  *See* Docket No. 418 at 16-

9    17.  Both Asetek's counsel and annual reports confirm that the officers of both Asetek entities,

10   including the controller, were the same.  *See id.*  Therefore, CoolIT contends that Asetek should

11   have known that it was involved in the infringement at issue here.  *See id.*  CoolIT also argues that

12   this Court previously recognized that "CoolIT was not aware that entities other than Asetek

13   Danmark made U.S. sales of the accused products."  *See* Docket No. 332; Docket No. 418 at 16.

14   In response, Asetek argues that it did not know or had reason to know that the counterclaims

15   would have been brought against it because it believed that CoolIT had made an informed decision

16   not to name Asetek USA as a defendant.  *See* Docket No. 448-3 at 15.  Asetek argues that CoolIT

17   made the informed decision because CoolIT knew Asetek USA's involvement in the sales at issue

18   5 years before CoolIT filed the original counterclaims and because CoolIT knew Asetek USA and

19   Asetek A/S were separate entities in a previous litigation and discussed the two as separate entities

20   at the pretrial conference.  *See id.*

21        This Court's previous finding that CoolIT did not know that Asetek USA had made U.S.

22   sales of the accused products is irrelevant because the question is whether Asetek, not CoolIT,

23   knew or should have known that it would have been named as a defendant but for an error in

24   identity.  *Krupski*, 560 U.S. at 548-49 ("Information in the plaintiff's possession is relevant only if

25   it bears on the defendant's understanding of whether the plaintiff made a mistake regarding the

26   proper party's identity."); *SMIC, Americas v. Innovative Foundry Techs. LLC*, 473 F. Supp. 3d

27   1021, 1025 (N.D. Cal. 2020).

28        Asetek is correct in noting that "[w]hen the original complaint and the plaintiff's conduct

1  compel the conclusion that the failure to name the prospective defendant in the original complaint

2  was the result of a fully informed decision as opposed to a mistake concerning the proper

3  defendant's identity, the requirements of Rule 15(c)(1)(C)(ii) are not met." *Krupski*, 560 U.S. at

4  552. However, the alleged "knowledge" that CoolIT was aware that Asetek USA was a separate

5  entity is exactly what the Supreme Court found insufficient to "foreclose a finding that Rule

6  15(c)(1)(C)(ii) has been satisfied." *Id.* at 549 ("We disagree, however, with respondent's position

7  that any time a plaintiff is aware of the existence of two parties and chooses to sue the wrong one,

8  the proper defendant could reasonably believe that the plaintiff made no mistake."). Nothing on

9  the record "compels the conclusion" that CoolIT made a fully informed decision not to name

10  Asetek USA when CoolIT brought its original counterclaims.

11     Asetek fails to dispute CoolIT's argument that "Asetek USA either knew or should have

12  known the action would have been brought against it because Asetek treats its various entities as

13  one, as Asetek's counsel admitted that the decision makers and officers at Asetek are "all of the

14  same people." Docket No. 418 at 16-17; Docket No. 316-3 at 15:15-17. As subsidiaries sharing

15  the same name, officers, and counsel in this action, Asetek USA received sufficient notice of the

16  action and knew or should have known that the action would have been brought against it, but for

17  CoolIT's mistake. *See VMG Salsoul, LLC v. Ciccone*, No. CV1205967BROCWX, 2013 WL

18  12129402, at *8 (C.D. Cal. July 11, 2013) (finding that affiliated companies sharing a common

19  address and counsel shared a "community of interest," and therefore, knew or should have known

20  about the litigation); *Englebrick v. Worthington Indus., Inc.*, No. SACV0801296CJCMLGX, 2011

21  WL 13131125, at *3 (C.D. Cal. Sept. 15, 2011) ("[A]s a matter of law, notice may be properly

22  imputed to WCW because it is the subsidiary of WII[,]" share the same attorney, and "are related

23  corporate entities with very similar names[.]"). Thus, Rule 15(c)(1)(C) is satisfied.

24     Because Mr. Hansen bases his reasonable royalty analysis on a comparable license and

25  other reliable facts, opinions, and methodologies, the Court **DENIES** the motion to exclude his

26  opinions on CoolIT's damages under Rule 702 and *Daubert*.

27  ///

28  ///

# V. **CONCLUSION**

For the foregoing reasons, the Court:

- **GRANTS** CoolIT's Motion to Strike Exhibit 275 (Docket No. 389);

- **DENIES** CoolIT's Motion to Strike Last Disclosed Alleged Design Arounds (Docket No. 391);

- **GRANTS** CoolIT's Motion in Limine to Exclude Dr. Mody's Report (Docket No. 393);

- **GRANTS IN PART** CoolIT's Motion in Limine to Exclude Tuckerman Opinions (Docket No. 397) regarding the non-infringing alternatives, **DENIES IN PART** the motion regarding the microchannels, and dismiss the motion regarding the impeller blades opinion as **MOOT**.

- Dismisses CoolIT's Motion in Limine to Exclude Stein Report (Docker No. 399) as **MOOT**;

- **DENIES** Asetek's Motion in Limine to Exclude Abraham Opinions (Docket No. 400);

- **GRANTS IN PART** CoolIT's Motion to Strike Tuckerman Report (Docket No. 401) regarding the microchannels and the Danger Den-X prior art and **DENIES-IN-PART** the motion regarding the Chang prior art;

- **DENIES** Asetek's Motion for Judicial Estoppel (Docket No. 402); and

- **DENIES** Asetek's Motion in Limine to Exclude Hansen Opinions (Docket No. 405).

///
///
///
///
///
///
///

United States District Court
Northern District of California

Out of an abundance of caution, the Court provisionally files the entirety of this order under seal. The Court orders the parties to meet and confer to determine which parts of this order should be filed under seal. The parties shall file their joint sealing request with respect to this order within one week.

This order disposes of Docket Nos. 389, 391, 393, 397, 399, 400, 401, 402 and 405.

**IT IS SO ORDERED**.

Dated: September 11, 2022

EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California